*COLORADO SEX OFFENDER MANAGEMENT BOARD*

# STANDARDS AND GUIDELINES FOR THE ASSESSMENT, EVALUATION, TREATMENT AND BEHAVIORAL MONITORING OF ADULT SEX OFFENDERS



Colorado Department of Public Safety
Division of Criminal Justice
Office of Domestic Violence &
Sex Offender Management

700 Kipling Street, Suite 3000
Denver, CO 80215
(303) 239-4442 or (800) 201-1325 (in Colorado)
website: https://www.colorado.gov/dcj

*Revised January 2025*



CDOC/Nelson_00136

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Table of Contents

.......................................................................................................................

## Table of Contents

Introduction .................................................................................. 3

Guiding Principles .......................................................................... 8

Definitions .................................................................................. 12

1.000 Guidelines for Pre-Sentence Investigations ............................... 25

2.000 Standards for Sex Offense-Specific Evaluations .......................... 28

3.000 Standards of Practice for Treatment Providers .......................... 45

4.000 Qualifications of Treatment Providers, Evaluators, and Polygraph Examiners Working with Sex Offenders ........................................... 76

5.000 Standards and Guidelines for Community Supervision Teams Working with Adult Sex Offenders ............................................................ 117

5.700 Contact with Victims, Children and Vulnerable Adult Populations ............. 139

6.000 Standards of Practice for Post-Conviction Polygraph Testing (PCSOT) .......... 174

7.000 Continuity of Care and Information Sharing .............................. 195

8.000 Victim Impact and a Victim Centered Approach ......................... 202

9.000 Standards for Plethysmography ........................................... 208

Appendix A: Sex Offender Management Board Administrative Policies ............ 210

Appendix B: Guidance Regarding Victim/Family Member Readiness for Contact, Clarification, or Reunification ....................................................... 222

Appendix C: Young Adult Modification Protocol ................................. 225

Appendix D: Guidelines for the Use of Sexually Stimulating Materials ........... 230

Appendix E: Sexual Offense History Decision Aid ............................... 237

Appendix F: Sex Offense-Specific Intake Review for Clients Who Have Been in Prior Treatment ................................................................... 261

Appendix G: Disaster Emergency Management Safety Plan ...................... 265

Appendix H: Guidance to SOMB Listed Providers on the Use of Medical Marijuana, Prescription Medications and Over the Counter Medications by Sexual Offenders ... 267

Appendix I: Notice of Discharge Status Form ................................... 269



CDOC/Nelson_00137

Appendix J: Interim General Movement Safety Plan ........................................ 272

Appendix K-1: The Use of Phallometry, Viewing Time, and Polygraphy to Support Information-Gathering for Assessments....................................................... 274

Appendix K-2: APA Model Policy for the Evaluation of Examinee Suitability for Polygraph Testing .................................................................................. 279

Appendix K-3: Plethysmograph Examination and Viewing Time ......................... 284

Appendix L: Female Sex Offender Risk Assessment....................................... 288

Appendix M: Computer Use Agreement for Sex Offenders .............................. 292

Appendix N: Digital Technology  Use Factors............................................... 294

Appendix O: Background Investigations for Approved Supervisors ..................... 304

Appendix P: Approved 2023 Sexual Behavior History Packet............................ 305

Appendix Q: Parole Guidelines for Discretionary Release on Determinate-Sentenced Sex Offenders ...................................................................................... 353

Appendix R: Sexual Offenses Identified in Colorado Revised Statute.................. 354

Appendix S: Use Immunity ...................................................................... 357

Appendix T: Statutory Purview of the Standards and Guidelines for the Assessment, Treatment and Behavioral Monitoring of Adult Sex Offenders.......................... 359

Appendix U: Use of Tele-Therapy with Adult Sex Offenders ............................ 360

Appendix V: Resource List for Evaluators: Tools and Instruments for Sex Offense-Specific Evaluations.............................................................................. 363

Appendix W: Lifetime Supervision Criteria.................................................. 370

**Accessibility:** CDPS is committed to the full inclusion of all individuals. As part of this commitment, CDPS will ensure reasonable accommodations are provided to enable all people to engage fully in our trainings, meetings and events. To request accommodations, please contact Jill Trowbridge at 303-239-4526 or complete this accessibility form. Please make sure to also let us know if you need any of the materials in an alternative format.



CDOC/Nelson_00138

# Introduction

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In 2011 the legislature declared that "to protect the public and to work toward the elimination of sexual offenses, it is necessary to comprehensively evaluate, identify, treat, manage, and monitor adult sex offenders who are subject to the supervision of the criminal justice system and juveniles who have committed sexual offenses who are subject to the supervision of the juvenile justice system. Therefore, the general assembly declares that it is necessary to create a program that establishes evidence-based standards for the evaluation, identification, treatment, management, and monitoring of adult sex offenders and juveniles who have committed sexual offenses at each stage of the criminal or juvenile justice system to prevent offenders from reoffending and enhance the protection of victims and potential victims. The general assembly does not intend to imply that all offenders can or will positively respond to treatment (§16-11.7-101)." In 1992, the Colorado General Assembly passed legislation[1] that created a Sex Offender Treatment Board to develop standards and guidelines for the assessment, evaluation, treatment, and behavioral monitoring of sex offenders. The General Assembly changed the name to the Sex Offender Management Board (SOMB) in 1998 to more accurately reflect the duties assigned to the SOMB. The *Standards and Guidelines for the Assessment, Evaluation, Treatment, and Behavioral Monitoring of Adult Sex Offenders (*hereafter *Standards and Guidelines)* were originally drafted by the SOMB over a period of two years and were first published in January 1996. The *Standards and Guidelines* were revised in 1998, 1999, 2004, 20,08, and 2011 for two reasons: To address omissions in the original *Standards and Guidelines* that were identified during implementation and to keep the *Standards and Guidelines* current with the developing literature in the field of sex offender management.[2] The *Standards and Guidelines* apply to adult sexual offenders[3] under the jurisdiction of the criminal justice system. Pursuant to statutory purview (§16-11.7-102), a guilty plea, *nolo contendere*, conviction by trial, deferred sentences, and stipulation/finding of sexual factual basis fall under this statute. There may be others in need of evaluation, treatment, and supervision who do not meet the definition of a sex offender or are not under the jurisdiction of the Colorado criminal justice system. The SOMB recognizes that the *Standards and Guidelines* can be utilized as guidance in these instances. For more information, please see Appendix T.

According to the statute, treatment is defined as "therapy, monitoring, and supervision of any sex offender which conforms to the standards created by the board" (§ 16-11.7-102(4)). These Standards govern the practice of treatment providers, evaluators, and polygraph examiners approved by the SOMB and are required. Adherence to the Standards by approved providers is monitored through the

---

[1] Section §16-11.7-101 through Section §16-11.7-107, C. R. S.

[2] Center for Sex Offender Management. (2008). The Comprehensive Approach to Sex Offender Management. Washington, DC: U.S. Department of Justice, Office of Justice Programs; Yates, P. (2013). Treatment of Sexual Offenders: Research, Best Practices, and Emerging Models. *International Journal of Behavioral Consultation and Therapy*, 8(3-4): 89-94.

[3] Pursuant to Colorado Revised Statutes§16-11.7-102



CDOC/Nelson_00139

application, complaint, and standards compliance review processes.[4] Standards are mandatory and designated by "shall", while guidelines are distinguished by the use of the term "should." Although the SOMB does not have purview over other entities involved in the supervision of defendants convicted of a sexual offense (for example, probation, parole, and the judiciary), it offers these guidelines as a tool to assist in the management of offenders and to enhance collaboration[5] among stakeholders and to provide guidance on best practices.

The SOMB is required to maintain the *Standards and Guidelines* for the evaluation and treatment of criminal defendants with a current or past sex offense conviction.[6] The evaluation shall make recommendations for the management, monitoring, and treatment of the defendant based on his or her individual risk factors. Recommended interventions shall prioritize the physical and psychological safety of victims and potential victims, and meet the assessed needs of the particular defendant.[7] The *Standards and Guidelines* apply to treatment provided both in the community and during imprisonment.[8] Treatment providers shall be as flexible as possible and shall include a continuum of options that may include, but are not limited to, group counseling. To the extent possible, programs shall be accessible to all defendants, including those with mental illness and co-occurring disorders. The SOMB is required to revise the *Standards and Guidelines* based on comprehensive research and analysis of evidence-based practices and the effectiveness of its policies and procedures.[9] It is not the intention of the legislation, or the SOMB, that these standards and guidelines be applied to the treatment of juveniles who have sexually offended. Despite many similarities in the behavior and treatment of juveniles and adults, important differences exist in their developmental stages,[10] the process of their offending behaviors,[11] and the context for juveniles who must be addressed differently in their diagnosis and treatment. Please see the current publication of the *Standards and Guidelines for the Evaluation, Assessment, Treatment, and Supervision of Juveniles Who Have Committed Sexual Offenses*.

In 1998, the Colorado General Assembly passed legislation directing the SOMB, in collaboration with the Department of Corrections, the Judicial Branch, and the Parole Board, to also develop standards

---

[4] Appendix A of the SOMB Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

[5] McGrath, R.J., Cumming, G.F., Burchard, B.L., Zeoli, S., & Ellerby, L. (2010). Current Practices and Emerging Trends in Sexual Abuser

Management: The Safer Society 2009 North American Survey. Brandon, VT: Safer Society Press; Shingler, J. & Mann, R. E. (2006). Collaboration in clinical work with sexual offenders: Treatment and risk assessment. In W. L. Marshall, Y. M. Fernandez, L. E. Marshall, & G. A. Serran (Eds.), Sexual Offender Treatment: Controversial Issues (pp. 173-185). Hoboken, NJ: Wiley.

[6] §16-11.7-103(4) (a, b); *see also* §§16-11.7-102, – 104, C.R.S.

[7] §16-11.7-103(4)(a), C.R.S

[8] §16-11.7-103(4)(b), - 105, C.R.S

[9] §16-11.7-103(4)(e), C.R.S

[10] Center for Sex Offender Management. (2013). Transition-Aged Individuals Have Committed Sex Offenses: Considerations for the Emerging Adult Population. Silver Spring, MD: Author; Riser, D., Pegram, S., & Farley, J. (2013). Adolescent and Young Adult Male Sex Offenders: Understanding the Role of Recidivism. *Journal of Child Sexual Abuse*, 22(1): 9-31.

[11] Huang, D., Murphy, D., & Hser, Y. (2012). Developmental Trajectory of Sexual Risk Behaviors From Adolescence to Young Adulthood. *Youth & Society, 44*(4) 479-499; Keelan, C., & Fremouw, W. (2013). Child versus peer-adult offenders: A critical review of the juvenile sex offender literature. *Aggression and Violent Behavior, 18*(6):732-744; Piquero, A., Farrington, D., Jennings, W., Diamond, B. & Craig, J. (2012). Sex Offenders and Sex Offending in the Cambridge Study in Delinquent Development - Prevalence, Frequency, Specialization, Recidivism, and (Dis)Continuity Over the Life-Course. *Journal of Crime and Justice, 35*(3):412-426; Pullman, L., Lerouxb, E., Motayne, G., & Seto, M. (2014). Examining the developmental trajectories of adolescent sexual offenders. *Child Abuse & Neglect 38*(7):1249-1258; Seto, M., & Lalumie`re, M. (2010). What Is So Special About Male Adolescent Sexual Offending? A Review and Test of Explanations Using Meta-Analysis. *Psychological Bulletin. 136*(4), 526-575.



4

CDOC/Nelson_00140

for community entities that provide supervision and treatment specifically designed for sex offenders who have developmental or intellectual disabilities.[12] At a minimum, the Legislature mandates that these standards shall determine whether an entity would provide adequate support and supervision to minimize any threat that the sex offender may pose to the community.[13] The treatment and management of sex offenders with developmental or intellectual disabilities (DD/ID) is a highly specialized field.[14] The intent of the DD/ID *Standards and Guidelines* is to better address the specific needs presented by sex offenders with developmental or intellectual disabilities. They are based on best practices known today for managing and treating sex offenders with developmental or intellectual disabilities. To the extent possible, the SOMB has based these Standards on current research in the field. Materials from knowledgeable professional organizations have also been used to direct the *Standards and Guidelines*. The *Standards and Guidelines* that are designated with the letters "DD/ID" after the Standard number are not intended to stand alone, but must be used in conjunction with the other *Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*.

Sex offender treatment and management is a developing specialized field.[15] The Colorado Legislature has directed, in the SOMB's enabling statute, that: "The board shall revise the guidelines and standards for evaluation, identification, and treatment, as appropriate, based upon the results of the board's research and analysis." The SOMB is committed to remaining current on the emerging literature and research and periodically modifying the *Standards and Guidelines* based on new findings. The previous revisions to the *Standards and Guidelines* were undertaken with that goal in mind. The current revisions of the *Standards and Guidelines* are continuing evidence of this commitment. In 2013 the Colorado Legislature additionally appropriated funding for an independent external evaluation of the *Standards and Guidelines*. The results of this evaluation were published in January 2014.[16] The current revision of the *Standards and Guidelines* has been partially based in response to the external evaluation and, in addition, on research and analysis conducted by the SOMB independent of the external evaluation. In addition, the SOMB has also been subject to Sunset Reviews by the Department of Regulatory Agencies in 2011, 2016, and 2020, and has modified the *Standards and Guidelines* accordingly. Further, the SOMB received the results of a legislative audit from the Office of the State Auditor in 2020, and initiated a standards revision process based on these recommendations as well. It is the commitment of the SOMB to incorporate best practices and evidence-based practices for sex offender management in Colorado.

[12] Lindsay, W., Hastings, R., Griffiths, D., & Hayes, S. (2007). Trends and challenges in forensic research on offenders with intellectual disability. *Journal of Intellectual & Developmental Disability*, *32*(2): 55-61; Lindsay, W., & Michie, A. (2013). Individuals With Developmental Delay and Problematic Sexual Behaviors. *Current Psychiatry Reports*, *15*(4):1-6.

[13] Section §18-1.3-1009 (1)(c), C.R.S.

[14] Heaton, K., & Murphy, G. (2013). Men with Intellectual Disabilities who have Attended Sex Offender Treatment Groups: A Follow-Up. *Journal of Applied Research in Intellectual Disabilities, 26*(5): 489-500.

[15] Gallo, A., Belanger, M., Abracen, J., Looman, J., Picheca, J., & Stirpe, T. (2014). Treatment of High-Risk High-Need Sexual Offenders - The Integrated Risk Need Responsivity Model (RNR-I). *Annals of Psychiatry and Mental Health 3*(1): 1018.

[16] D'Orazio, D., Thornton, D, & Beech, A. (2014). An External Evaluation of Colorado Sex Offender Management Board Standards and Guidelines. *Central Coast Clinical & Forensic Psychology Services, Inc.*

[17] See Colorado Revised Statutes§16-11.7-102.

[18] Denver, M., Pickett, J. T., & Bushway, S. D. (2017). The Language Of Stigmatization And The Mark Of Violence: Experimental Evidence On The Social Construction And Use Of Criminal Record Stigma. Criminology, 55(3), 664-690. doi: 10.1111/1745-9125.12145; Willis, G. M., & Letourneau, E. J. (2018). Promoting Accurate and Respectful Language to Describe Individuals and Groups. Sexual Abuse, 30(5), 480-483. doi: 10.1177/1079063218783799.



CDOC/Nelson_00141

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

A. These Standards and Guidelines use a variety of terms referencing persons convicted as adults of a sexual offense. [17] The terms that are frequently used in the Standards and Guidelines include sex offender, offender, and client. Based on the guidance of the SOMB, the terms of reference utilized in different sections are determined by the SOMB committee convened to revise a particular section of these Standards and Guidelines. The SOMB committee decisions related to the terms of reference were influenced by the intervention focus of a given section (e.g., treatment, supervision, etc.), as well as the professional stakeholders providing the intervention. The SOMB notes that the use of the term 'sex offender' is consistent with the statutory definition identifying a person convicted of a sexual offense. However, the SOMB wishes to convey that the use of the term is in no way intended to label individuals by their behavior, or suggest that an adult convicted of a sex offense who is participating in and benefiting from sex offense-specific treatment cannot live a sex offense free life-style. [18]



CDOC/Nelson_00142

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Top of the Document



CDOC/Nelson_00143

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Guiding Principles

Purpose of the Guiding Principles is to establish the core foundation principles from which the *Standards and Guidelines* are created and to provide guidance in the absence of a specific standard or guideline.

1. The highest priority of these Standards and Guidelines is to maximize community safety[19] through the effective delivery of quality evaluation, treatment and management of sex offenders.[20]

2. Sexual offenses are traumatic and can have a devastating impact on the victim and victim's family.

   Sexual offenses violate victims and can lead to common and serious consequences across all areas of victims' lives, including chronic and severe mental and physical health symptoms,[21] as well as social, family, economic, and spiritual harm.[22] Research and clinical experience indicate that victims of sexual abuse often face long-term impact and continue to struggle for recovery over the course of their lifetime.[23] The impact of sexual offenses on victims varies based on numerous factors. By defining the offending behavior and holding offenders accountable, victims may potentially experience protection, support and recovery.[24] Professionals working with sexual offenders should be alert to how offenders' behaviors may inflict further harm on persons they have previously victimized.[25]

---

[19] Center for Sex Offender Management (2007). Enhancing the Management of Adult and Juvenile Sex Offenders: A Handbook for Policymakers and Practitioners. Center for Effective Public Policy, U.S. Department of Justice, Office of Justice Programs, 2005- WP-BX-K179 and 2006-WP-BX-K004; Colorado Revised Statutes16.11.7-101, "To protect the public and to work toward the elimination of sexual offenses, it is necessary to comprehensively evaluate, identify, treat, manage and monitor convicted adult sex offenders who are subject to the criminal justice system…"

[20] Mann, R. (2009). Sex offender treatment: The case for manualization. *Journal of Sexual Aggression, 15*(2): 121-131; Schmucker, M. & Losel, F. (2015). The effects of sexual offender treatment on recidivism: an international meta-analysis of sound quality evaluations. *Journal of Experimental Criminology, 11*(4):597-630.

[21] Chen et al. (2010). Sexual abuse and lifetime diagnosis of psychiatric disorders: Systematic review and meta-analysis. *Mayo Clinic Proceedings, 85*, 618-629; Dworking, E. R., Menon, S. V., Bystrynski, J., & Allen, N. E. (2017). Sexual assault victimization and psychopathology: A review and meta-analysis. *Clinical Psychology Review, 56*, 65-81; Mason, F. & Lodrick, Z. (2013). Psychological consequences of sexual assault. *Best Practice & Research Clinical Obstetrics and Gynaecology, 27*, 27-37; O'Leary, P., Easton, S. D., & Gould, N. (2017). The effect of child sexual abuse on men: Toward a male sensitive measure. *Journal of Interpersonal Violence, 32(2)*, 423-445; Pérez-Fuentes, G., Olfson, M., Villegas, L., Morcillo, C., Wang, S., & Blanco, C. (2013). Prevalence and correlates of child sexual abuse: A national study. *Comprehensive Psychiatry, 54*, 16-17; Walsh et al. (2012). National prevalence of posttraumatic stress disorder among sexually re-victimized adolescent, college, and adult household-residing women. *Archives of General Psychiatry, 69(9)*, 935-942; Wilson, D. (2010). Health Consequences of Childhood Sexual Abuse. *Perspectives in Psychiatric Care. 46(1)*, 56-64.

[22] Dworking et al (2017); Mason et al (2017); O'Leary et al (2017); Pérez-Fuentes et al (2013).

[23] Campbell, R., Dworkin, E., & Cabral, G. (2009). An ecological model of the impact of sexual assault on women's mental health. *Trauma, Violence, & Abuse, 10*, 225-246; Cuevas, C. A., Finkelhor, D., Clifford, C., & Ormrod, R. K. (2010). Psychological distress as a risk factor for re-victimization in children. *Child Abuse & Neglect, 34*, 235-243; Dworking et al (2017); Finkelhor, D. (2009). The Prevention of Childhood Sexual Abuse. *Future of Children, 19(2)*, 169-194; Mason et al (2017); O'Leary et al (2017); Pérez-Fuentes et al (2013).

[24] Whittle et al. (2015). A Comparison of Victim and Offender Perspectives of Grooming and Sexual Abuse. *Deviant Behavior, 36(7)*, 539-564.

[25] Hanson, R. K. & Yates, P. M. (2013). Psychological treatment of sex offenders. *Current Psychiatry Reports, 15(3)*, 1-8; Littleton, H. (2010). The impact of social support and negative disclosure reactions on sexual assault victims: A cross-sectional and longitudinal investigation. *Journal of Trauma & Dissociation, 11*, 210-227; Patterson, D. (2011). The linkage between secondary victimization by law enforcement and



CDOC/Nelson_00144

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

3. Community safety and the rights and interests of victims and their families, as well as potential victims, require paramount attention when developing and implementing assessment, treatment and management of sex offenders. [26]

4. Offenders are capable of change.

   Responsibility for change ultimately rests with the offender. Individuals are responsible for their attitudes and behaviors and are capable of eliminating abusive behavior through personal ownership of a change process. While responsibility for change is the offender's, the therapeutic alliance between the offender and the therapist is a predictive and important facet of responsivity leading to behavioral change. [27] A warm, direct, and empathic therapeutic approach contributes to an offender's motivation to change, as does the supervising officer's positive working alliance with the offender. [28]

   The treatment and management of sex offenders requires a coordinated response by the Community Supervision Team (CST) and will be most effective if SOMB providers and the entirety of the criminal justice and social services systems apply the same principles and work together. [29]

   Community safety is enhanced when treatment providers and community supervision professionals' practice in their area of specialization and work together. This collaboration should include frequent and substantive communication about information that will assist in reducing an offender's risk to the community. When the CST members respect the individual roles and mutually agree upon their goals, the offender can be treated and managed more effectively. [30]

5. Community supervision is an opportunity, the success of which is dependent upon a sexual offender's willingness and ability to cooperate with treatment and supervision, and be

---

rape case outcomes. *Journal of Interpersonal Violence, 26(2),* 328– 347; Watson, R., Daffern, M., & Thomas, S. (2017). The impact of interpersonal style and interpersonal complementarity on the therapeutic alliance between therapists and offenders in sex offender treatment. *Sexual Abuse: A Journal of Research and Treatment, 29(2),* 107-127; Watson, R., Thomas, S., & Daffern, M. (2015). The impact of interpersonal style on ruptures and repairs in the therapeutic alliance between offenders and therapists in sex offender treatment. *Sexual Abuse: A Journal of Research and Treatment,* 1-20.

[26] Campbell et al (2009); Cuevas et al (2010); Dworking et al (2017)

[27] Blasko, B., & Jeglic, E. (2014). Sexual offenders' perceptions of the client-therapist relationship: The role of risk. *Sexual Abuse: A Journal of Research and Treatment, 28(4):*1-20; Kozar, C. J. & Day, A. (2012). The therapeutic alliance in offending behavior programs: A necessary and sufficient condition for change? *Aggression and Violent Behavior, 17,* 482-487; Watson et al. (2017); Watson et al. (2015).

[28] Kozar et al (2012); Labrecque, R. M., Schweitzer, M., & Smith, P. (2014). Exploring the perceptions of the offender-officer relationship in a community supervision setting. *Journal of International Criminal Justice Research, 1,* 31-46; Watson et al. (2017); Watson et al. (2015).

[29] Alexander, R. (2010). Collaborative supervision strategies for sex offender community management. *Federal Probation, 74(2),* 16-19; Palmiotto, M. & MacNichol, S. (2010). Supervision of sex offenders: A multi-faceted and collaborative approach. *Federal Probation, 74(2),* 27-30.

[30] Alexander (2010); Palmiotto & MacNichol (2010).



CDOC/Nelson_00145

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

accountable for their behaviors. [31] Accordingly, members of the Community Supervision Team should employ practices designed to maximize offender participation and accountability. [32]

6. Treatment and supervision are most effective when they are individualized, and incorporate evidence-based and research informed practices. [33]

7. Risk for future sexual offending varies and may increase or decrease. The intensity and duration of treatment and supervision should respond to these variations in risk. [34]

   Individual assessment and evaluation of risk should be an ongoing practice. Treatment approaches and supervision plans should be modified accordingly. Effective management of risk balances the use of external controls with the development of individual protective factors and self-regulation in order to reduce risk, enhancing the offender's ability to live safely in the community.

8. Victims have the right to safety, to be informed and to provide input to the Community Supervision Team (CST).

   Physical and psychological safety is a necessary condition for victims to begin recovery related to sexual abuse. Victims experience additional trauma when they are blamed or not believed, which may be more damaging than the abuse itself. [35] Victim impact is substantially reduced when victims are believed, protected and adequately supported.

---

[31] Hönig, M., Vogelvang, B., & Bogaerts, S. (2017). "I am a different man now" – Circles of Support and Accountability: A prospective study. *International Journal of Offender Therapy and Comparative Criminology, 61(7),* 751-772.

[32] D'Orazio et al (2014); Woldgabreal, Y., Day, A., & Ward, T. (2016). Linking positive psychology to offender supervision outcomes: The mediating role of psychological flexibility, general self-efficacy, optimism, and hope. *Criminal Justice and Behavior, 43(6),* 697-721.

[33] Gallo et al. (2014); Hanson, R. K., Bourgon, G., & Hodgson, S. (2009). The principles of effective correctional treatment also apply to sexual offenders. *Criminal Justice and Behavior, 36(9),* 865-891; Levenson, J. (2014). Incorporating trauma-informed care into evidence-based sex offender treatment. *Journal of Sexual Aggression, 20(1),* 9-22; Seewald, K., Rossegger, A., Gerth, J., Urbaniok, F., Phillips, G. & Endrass, J. (2017). Effectiveness of a risk-need-responsivity-based treatment program for violent and sexual offenders: Results of a retrospective, quasi-experimental study. *Legal and Criminological Psychology, 23,* 85-99; Ward, T. & Gannon, T. (2014). Where has all the Psychology Gone: A Critical Review of Evidence-Based in Correctional Settings. *Aggression and Violent Behavior, 19*(4):435-446; Ward, T., Gannon, T., & Yates, P. (2008). The treatment of offenders: Current practice and new developments with an emphasis on sex offenders. *International Review of Victimology. 15(2),* 183-208.

[34] Bonta, J., & Wormith, J. S. (2013). Applying the risk-need-responsivity principles to offender assessment. In L.A. Craig, L. Gannon, L., & T. A. Dixon (Eds.), *What works in offender rehabilitation: An evidence-based approach to assessment and treatment* (pp. 71-93). Hoboken, NJ: Wiley-Blackwell; Gallo et al. (2014); Hanson et al. (2009); Parent, G., Guay, J., & Knight, R. (2011). An assessment of long-term risk of recidivism by adult sex offenders: One size doesn't fit all. *Criminal Justice and Behavior, 38(2),* 188-209; Seewald et al. (2017); van den Berg, J. W., Smid, W., Schepers, K., Wever, E., van Beek, D., Janssen, E., & Gijs, L. (2017). The predictive properties of dynamic sex offender risk assessment instruments: A meta-analysis. *Psychological Assessment,* 1-13.

[35] Beaver, W. R. (2017). Campus sexual assaults: What we know and what we don't. *The Independent Review, 22(2),* 257-268; Hayes, R. M., Abbott, R. L., & Cook, S. (2016). It's her fault: Student acceptance of rape myths on two college campuses. *Violence Against Women, 22(13),* 1540-1555; Littleton, H. (2010). The impact of social support and negative disclosure reactions on sexual assault victims: A cross-sectional and longitudinal investigation. *Journal of Trauma & Dissociation, 11(2),* 210-227; Najdowski, C., & Ullman, S. E. (2011). The effects of re-victimization on coping in women sexual assault victims. *Journal of Traumatic Stress, 24(2),* 218-221; Paige, J. & Thornton, J. (2015). Healing from intrafamilial child sexual abuse: The role of relational processes between survivor and offender. *Children Australia, 40(3),* 242-259; Patterson, D. (2011). The linkage between secondary victimization by law enforcement and rape case outcomes. *Journal of Interpersonal Violence, 26(2),* 328-347; Rennison, C. M. & Addington, L. A. (2014). Violence against college women: A review to identify limitations in defining the problem and inform future research. *Trauma, Violence, and Abuse, 15(3),* 159-169; Ullman & Peter-Hagene (2016). Longitudinal relationships of social reactions, PTSD, and re-victimization in sexual assault survivors. *Journal of Interpersonal Violence, 316),* 1074-1094; Yung, C. R. (2015). Concealing campus sexual assault: An empirical examination. *Psychology, Public Policy, and Law, 21(1),* 1-9.



CDOC/Nelson_00146

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The CST can assist the victim in this by providing information and affording the victim representation in the supervision and management of the offender. Victim input and knowledge of the offender are valuable information for the supervision team. [36] Victims are empowered to determine their level of participation.

9.  When a child is sexually abused within the family, the child's individual need for safety, protection, developmental growth and psychological well-being outweighs any conflicting parental or family interests.

10. The SOMB Standards and Guidelines are based on current and emerging research and best practices. [37]

    Treatment, management, and supervision decisions should be guided by empirical findings when research is available. Since there is limited and emerging empirical data specific to sexual offending, decisions should be made cautiously to minimize unintended consequences.

11. A continuum of treatment and management options for sex offenders should be available in each community in the state. Additionally, efforts should be made to maximize continuity of care whenever a transition from one treatment setting to another to maximize positive treatment progress. [38]

    It is in the best Interest of public safety for each community to have a continuum of management and treatment options so that treatment is appropriately matched to the client.

12. Successful treatment and management of sex offenders is enhanced when the Community Supervision Team (CST) models and encourages family, friends, employers and other members of the community in pro-social support of the offender. [39]

    Families, friends, employers and members of the community who have influence in the lives of offenders can meaningfully contribute to their successful functioning in society. Family and friends should be included in the supportive network in a manner that is sensitive to the possible negative impact of the offense on them. [40]

13. Information sharing among CST members is vital to public safety and offender success.

---

[36] Center for Sex Offender Management (2007). The Role of the Victim and Victim Advocate in Managing Sex Offenders (training curriculum). Silver Spring, MD.

[37] Colorado Revised Statutes16-11.7-103(e)(l), "The board shall research, either through direct evaluation or through a review of relevant research articles and sex offender treatment empirical data, and analyze, through a comprehensive review of evidenced-based practices, the effectiveness of the evaluation, identification, and treatment policies and procedures for adult sex offenders developed pursuant to this article."

[38] Boer, D. (2013). Some essential environmental ingredients for sex offender reintegration. *International Journal of Behavioral Consultation and Therapy, 8(3-4), 8*-11; Scoones, C., Willis, G., & Randolph, G. (2012). Beyond static and dynamic risk factors: The incremental validity of release planning for predicting sex offender recidivism. *Journal of Interpersonal Violence, 27(2),* 222-238.

[39] Miller (2015). Protective strengths, risk, and recidivism in a sample of known sexual offenders. *Sexual Abuse: A Journal of Research and Treatment, 27(1),* 34-50; de Vries Robbé, M., Mann, R. E., Maruna, S., & Thornton, D. (2015). An exploration of protective factors supporting desistance from sexual offending. *Sexual Abuse: A Journal of Research and Treatment, 27(1),* 16-33; Tharp, A. T., DeGue, S., Valle, L. A., Brookmeyer, K. A., Massetti, G. M., & Matjasko, J. L. (2013). A systematic qualitative review of risk and protective factors for sexual violence perpetration. *Trauma, Violence & Abuse, 14(2),* 133-67.

[40] Wilson, R., & McWhinnie, A. (2013). Putting the 'Community' back in community risk management of persons who have sexually abused. *International Journal of Behavioral Consultation and Therapy, 83-4), 72*-79.



CDOC/Nelson_00147

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Sexual offense-specific treatment is not conducted with the same degree of confidentiality as non-mandated treatment. [41] Sex offenders waive confidentiality with regard to therapeutic and/or public safety goals. When sensitive and private information is shared, the dignity and humanity of all involved must be respected.

14. Sex offense-specific assessment, evaluation, treatment, behavioral monitoring and supervision should be humane, non-discriminatory and bound by the rules of ethics and law. [42]

15. The individualization of evaluations, assessment, treatment and supervision requires particular attention to social and cultural factors.  Recognition of these factors are essential when interacting with clients from different social, cultural, and religious backgrounds.  A basic premise is to recognize the client's culture, your own culture, and how both affect the client-provider relationship.

This premise extends to all professional members of the CST and positive support persons and is essential in creating an equitable and inclusive environment regardless of differences in culture or lifestyle. [43]

**Top of the Document**

---

[41] Levinson J. & Prescott, D. (2010), Sex offender treatment is not punishment. *Journal of Sexual Aggression, 16(3); 275-285*; McGrath et al. (2010). *Current Practices and Emerging Trends in Sexual Abuser Management: The Safer Society 2009 North American Survey*. Brandon, VT: Safer Society Press; Sawyer, S. & Prescott, D. (2011). Boundaries and dual relationships. *Sexual Abuse: A Journal of Research and Treatment, 23(3)*, 365-380.

[42] Birgden, A. & Cucolo, H. (2011). The treatment of sex offenders: Evidence, ethics, and human rights. *Sexual Abuse: A Journal of Research and Treatment, 23(3)*, 295-313; Harrison, K. & Rainey, B. (2013). Legal and ethical aspects of sex offender treatment and management, Chichester, K, John Wiley & Sons, Ltd.

[43] Ratified by the SOMB 05/21/2021



CDOC/Nelson_00148

# Definitions

**Accountability:** Quality of being responsible for one's conduct: being responsible for causes, motives, actions and outcomes.

**Adjudication:** The determination by the court that it has been proven beyond a reasonable doubt that the juvenile has committed a delinquent act or that a juvenile has pled guilty to committing a delinquent act.

**Adjunct Treatment:** An additional and often separately provided mental health or medical intervention distinct from sex offense-specific treatment which is designed to enhance the client's overall wellness and functioning and thus the effectiveness of other required interventions. Examples include, but are not limited to, substance abuse treatment, care for depression or other mental illness, family therapy, and specialized trauma therapies.

**Approved Provider List:** The list, published by the SOMB, identifies the treatment providers, evaluators, and polygraph examiners who meet the criteria set forth in these Standards. The determination that the providers meet the criteria is made by the SOMB based on an application submitted by the provider, outlining their experience, training and credentials, a criminal history check and background investigation, written references and reference checks and a review of relevant program materials and products. Placement on the list must be renewed every three years.

**Approved Supervisor:** Approved Supervisors (AS) are adults who have been approved by the CST to supervise contact between a client and a specified minor, victim or vulnerable person. This person is an individual who has met the criteria described in 5.780 through 5.786 and has been approved by the CST.

**Approved Community Support Person:** Approved Community Support Person (ACSP) is a person who may support the offender in approved activities that do not involve contact for the purpose of interacting with a specific minor child(ren). This person is an individual who has met the criteria described in 5.790 through 5.793 and has been approved by the CST.

**Assessment:** An on-going process of evaluation which might include the use of standardized measurement instruments intended for treatment planning and review purposes.

**Authorized Representative:** A legal term describing a specific role with respect to a person receiving services as a result of an intellectual or developmental disability. An



CDOC/Nelson_00149

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

"authorized representative" is a person designated by the person receiving services, or by the parent or guardian of the person receiving services, if appropriate, to assist the person receiving services in acquiring or utilizing services or supports. The extent of the authorized representative's involvement shall be determined upon designation. [44]

**Behavioral Monitoring:** The Teams Model promotes engagement of offenders by the CST in the treatment and supervision process to enhance protective factors, decrease risk and increase the offender's motivation for positive behavioral change. Each member of the CST has a role to play in this process through closely working together, assessing risk and identifying target behaviors that are directly related to specific criminogenic needs areas. As they do so they are monitoring the offender's progress and compliance with treatment and supervision and implementing appropriate incentives and sanctions when required. (See Section 5.050 Promoting and Monitoring Behavioral Change.)

**Case Management:** Coordination and implementation of supervising, treating and managing the behavior of individual sex offenders.

**Child Contact Screen:** The Child Contact Screen is a process conducted by an SOMB Approved Evaluator to assess the appropriateness of an offender's contact with their own minor non-victim child(ren). (See Section 5.730).

**Client:** A person who is in sex offense-specific treatment and is convicted or adjudicated of a sexual offense.

**Clinical Experience:** Those activities directly related to providing evaluation and/or treatment to individual sex offenders, e.g. face-to-face therapy, report writing, administration, scoring and interpretation of tests; participation on community supervision teams of the type described in these *Standards and Guidelines*; and clinical supervision of therapists treating clients convicted of a sexual offense.

**Clinical Indicators:** Clinical indicators can be anything that provides information about a client's overall clinical presentation, which may include but is not limited to interviews, quality of treatment participation, polygraph examination results and disclosures, scores on dynamic risk assessments, psychological evaluation, behavioral observations, and collateral reports.

**Cognitive Distortions:** Learned assumptions, sets of beliefs, and self-statements which serve to deny, justify, minimize, and rationalize behavior. [45]

**Colorado Sex Offender**

---

[44] *See* Colorado Revised Statutes§ 25.5-10-202(1.3).

[45] Nunes, K. L., Hermann, C. A., White, K., Pettersen, C., & Bumby, K. (2018). Attitude may be everything, but is everything an   attitude? Cognitive distortions may not be evaluations of rape. *Sexual Abuse*, *30*(1), 43-62.



CDOC/Nelson_00150

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Management Board:**   The Colorado Sex Offender Management Board is a type II Board established in 1992 by the Colorado General Assembly. For additional information see the Introduction Section.

**Community Centered Board (CCB):**   A state-designated entity[46] providing designated services to individuals with intellectual or developmental disabilities.

**Community Supervision Team (CST):**   A team of professionals including a minimum of the supervising officer, the treatment provider, the evaluator, victim representative and polygraph examiner who collaborate to make decisions about the offender. The Community Supervision Team may also include pro-social support persons such as family members, spiritual leaders and employers. (See Section 5.000 for additional information).

**Competency:**   The constitutional and statutory requirement that, through completion of a criminal sentence, a defendant not have a mental disability or developmental disability that prevents the defendant from having sufficient present ability to consult with the defendant's lawyer with a reasonable degree of rational understanding in order to assist in the defense or prevents the defendant from having a rational and factual understanding of the criminal proceedings, including any sentencing obligations. [47]

**Conviction:**   A determination by the court that it has been proven beyond a reasonable doubt that the offender has committed a criminal act or that the offender has plead guilty to committing a criminal act.

**Custodial Parent:**   For the purposes of these *Standards and Guidelines*, primary residential custodian is the parent with whom the child resides with and who is exercising daily parenting responsibility for the child.

**Defense Mechanisms:**   Normal adaptive self-protective functions which keeps human beings from feeling overwhelmed and/or becoming psychotic, but which may become dysfunctional when overused or over-generalized.

**Denial:**   Denial is a psychological defense mechanism used to protect the ego from anxiety producing information. In addition to being a psychological defense mechanism, denial may also be a normal,[48]conscious action to avoid internal or external consequences associated with the offense behavior. For the purpose of this section, denial is defined as the failure

---

[46] *See* Colorado Revised Statutes § 25.5-10-209.

[47] *See generally* Colorado Revised Statutes § 16-8.5-101, *et seq.*

[48] Mann, R. E., Hanson, R. K, & Thornton, D. (2010). Assessing risk for sexual recidivism: Some proposals on the nature of psychologically meaningful risk factors. *Sexual Abuse: A Journal of Research and Treatment, 22(2),* 191-217.; Yates, P. M. (2009). Is sexual offender denial related to sex offense risk and recidivism? A review and treatment implications. *Psychology, Crime, and Law, 15(2-3),* 183-199.



CDOC/Nelson_00151

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

of a client to accept responsibility for the offense[49] on a continuum from low to moderate to high. There is conflicting research regarding denial as a risk factor for sexual re-offense.[50]

**Denier Intervention:** This intervention occurs separately from sex offense-specific treatment and is designed primarily for those in Level 3 (High) denial. It occurs separately from regular group therapy that is provided for offenders who have, at a minimum, admitted the crime of conviction. Denier Intervention may include a variety of modalities specifically designed to reduce denial, minimization and resistance to treatment and supervision. (See Standards 3.560-through 5.780 for additional information.)

**Department:** The Colorado Department of Public Safety.

**Developmental/Intellectual Disability:** An intellectual or developmental disability that manifests before the person reaches age 22, that constitutes a substantial disability to the affected person, and that is attributable to an intellectual and developmental disability or related conditions, including Prader-Willi syndrome, cerebral palsy, epilepsy, autism, or other neurological conditions when the condition or conditions result in impairment of general intellectual functioning or adaptive behavior similar to that of a person with an intellectual and developmental disability. The federal definition of "developmental disability" found in 42 U.S.C. sec. 15001 et seq., does not apply.[51]

*Impairment of general intellectual functioning* means that the person has been determined to have an intellectual quotient equivalent which is two or more standard deviations below the mean (70 or less assuming a scale with a mean of 100 and a standard deviation of 15) as measured by an instrument which is standardized, appropriate to the nature of the person's disability, and administered by a qualified professional.

**AND/OR**

---

[49] Association for the Treatment of Sexual Abusers Practice Standards and Guidelines, 2001 (p. 63)

[50] Harkins, L., Beech, A. R., & Goodwill, A. M. (2010). Examining the Influence of denial, motivation, and risk on sexual recidivism. *Sexual Abuse: A Journal of Research and Treatment, 22(1),*79-94.; Langton, C. M., Barbaree, H. E., Harkins, L., Arenovich, T., McNamee, J., Peacock, E. J, … Marcon, H. (2008). Denial and minimization among sexual offenders: Post treatment presentation and association with sexual recidivism. *Criminal Justice and Behavior, 35(1),* 69-98.; Mann, R. E., Hanson, R., K., & Thornton, D. (2010). Assessing risk for sexual recidivism: some proposals on the nature of psychologically meaningful risk factors. *Sexual Abuse: A Journal of Research and Treatment, 22(2),* 191-217.; Nunes, K., Hanson, K., Firestone, P., Moulden, H., Greenberg, D. & Bradford, J. (2007). Denial predicts recidivism for some sexual offenders. *Sex Abuse,* 91-105.

[51] § 25.5-10-202(26), C.R.S.



CDOC/Nelson_00152

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Adaptive behavior* means that the person has overall adaptive behavior which is significantly limited in two or more skill areas (communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work), as measured by an instrument which is standardized, appropriate to the person's living environment and administered and clinically determined by a qualified professional.

*"Similar to that of a person with intellectual disability"* means that a person's adaptive behavior limitations are a direct result of or are significantly influenced by impairment of the person's general intellectual functioning and may not be attributable to only a physical impairment or mental illness.

*Discussion: Some clients have intellectual and/or functional deficits that indicate a need for revised assessment, evaluation, treatment or behavioral monitoring even though they do not meet the definition for intellectual or developmental disability. Evaluators, treatment providers, polygraph examiners, and supervising officers shall provide services appropriate to each client's developmental level.*

**Direct Clinical Contact:** Includes intake, face-to-face psychotherapy, case/treatment staffing, treatment plan review, and crisis management with adult sex offenders.

**Dynamic Risk Factors:** Dynamic risk factors are defined as characteristics that are capable of change, and changes in these factors are associated with increased or decreased recidivism risk.[52] Dynamic factors are further described as either stable or acute. Stable dynamic risk factors are those with a tendency to be persistent characteristics (i.e. stable over time) that change over an extended period (e.g. cognitive distortions, deviant sexual arousal, intimacy deficits, social influences). Acute dynamic risk factors, conversely, are more fluctuating or rapidly changing, perhaps daily or hourly (e.g. sexual preoccupations, victim access, hostility, emotional collapse, substance abuse).

**Empathy:** Empathy is the capacity to understand or feel what another person is experiencing within their frame of reference.

**Evaluator:** An individual listed as an approved evaluator with the SOMB who conducts sex offense-specific evaluations of adults who are convicted of a sexual offense pursuant to professional standards and these *Standards and Guidelines.*

---

[52] Bonta,J. and Andrews, D.A. (2016). The psychology of criminal conduct (6th ed.). New York, NY: Routledge.



CDOC/Nelson_00153

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Evidence-Based Practices:**   The integration of the best available research with clinical expertise in the context of client characteristics, culture and preferences. [53]

**Exclusionary Criteria:**   Criteria established by the Colorado Sex Offender Management Board that precludes a client from having contact with a minor child. (See section 5.725.)

**Grooming:**   A process in which a client gradually attempts to gain a person or persons' trust with the intent to perpetrate abuse.

**Guardian:**   An individual at least 21 years of age who has qualified as a guardian of a minor or incapacitated person pursuant to appointment by a parent or by the court. The term includes a limited, emergency, and temporary substitute guardian but not a guardian ad litem. [54]

**Guideline:**   For the purposes of this document, guidelines are established by the SOMB are mandatory and designated by "should" and serve to provide guidance on best practice.

**Incapacitated Person:**   A person who lacks the ability to manage property and business affairs effectively by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, disappearance, minority, or other disabling cause (refer to Section 15-1.5-102 (5), C.R.S.).

**Incidental Contact:**   Incidental Contact with minor children involves contact with children as a result of regular or routine CST approved community access (e.g. - grocery store, bank, movies, sporting events, etc.). In such circumstances, the offender is not initiating contact with children or developing relationships with children. The offender does write and obtain approved safety plans for how to minimize and avoid interactions with children. Incidental contact can become unapproved purposeful contact if the offender does not take steps to avoid any additional interaction with children in these circumstances.

**Incompetent to Proceed (ITP):**   As a result of a mental disability or developmental disability, a defendant who does not have sufficient present ability to consult with the defendant's lawyer with a reasonable degree of rational understanding in order to assist in the defense, or a defendant who does not have a rational

---

[53] American Psychological Association (n.d.). Evidence Based Practice in Psychology.

Retrieved from https://www.apa.org/practice/guidelines/evidence-based-statement.

[54] § 15-14-102(4), C.R.S.



CDOC/Nelson_00154

|  | and factual understanding of the criminal proceedings at any time prior to completion of the sentence. [55] |
|---|---|
| **Informed Assent:** [56] | Assent is a declaration of willingness to do something in compliance with a request; acquiescence; agreement. The use of the term "assent" rather than "consent" in this document recognizes that clients are court ordered to participate in treatment and that their choices are therefore more limited. |
|  | Informed means that a person's assent is based on a full disclosure of the facts needed to make the decision intelligently, e.g. knowledge of risks involved, alternatives. |
| **Informed Consent:** | Consent is a voluntary agreement, or approval to do something in compliance with a request. |
|  | Informed means that a person's consent is based on a full disclosure of the facts needed to make the decision intelligently, e.g. knowledge of risks involved, alternatives. |
| **Minor Child/Children:** | A person under the age of 18 years. |
| **Own Minor Child:** | An Own Minor Child is a person under the age of 18 with whom the offender has a parental role. |
| **Parental Role:** | Parental Role is an established and on-going position of authority with routine primary caretaking responsibilities for a child(ren) not limited by legal, biological or marital status. |
| **Penile Plethysmography (PPG):** | An assessment tool that employs the use of an electronic device for determining and registering variations in penile tumescence associated with sexual arousal. Plethysmography includes the interpretation of the data collected in this manner. |
| **Polygraph Examination:** | The use of an instrument that is capable of recording, but not limited to recording, indicators of a person's respiratory pattern and changes therein, galvanic skin response and cardio-vascular pattern and changes therein. The recording of such instruments must be recorded visually, permanently and simultaneously. Polygraph examination includes the interpretation of the data collected in this manner, for the purpose of measuring physiological changes associated with deception. |

---

[55] § 16-8.5-101(11), C.R.S.; *Jones v. District Court*, 617 P.2d 803, 807 (Colo. 1980).

[56] The purpose of defining "informed assent" and "informed consent" in this section is primarily to highlight the degree of voluntariness in the decisions which will be made by a sex offender. No attempt has been made to include full legal definitions of these terms.



CDOC/Nelson_00155

**Positive Support Person***:* A positive support person is a person who provides positive support for behavior change, who has verified disclosure and been approved by the CST. This can be a peer who has successfully progressed within sex offense-specific treatment and supervision. (See Section 5.500 Role of Family Members and Natural Supports within the Team).

*Potential Victim:* A person or persons who are at risk for abuse or manipulation by the sex offender, including vulnerable populations. This may include but is not limited to a person or persons who are similar to those whom the offender has a history of targeting. This may also include persons about whom the offender objectifies, fantasizes, or makes plans to harm. Animals may be considered potential victims.

**Pre-Sentence Investigation Report (PSIR):** A written report prepared by the probation department to provide the court with information to consider at sentencing. (See section 1.000 for additional information).

**Pro-Social Living Plan:** A Pro-Social Living Plan is a comprehensive strategy to solidifying client strengths, and mitigating risk with protective factors so that the client can successfully establish a pro-social lifestyle that is incompatible with offending behavior.

**Purposeful Contact:** Purposeful Contact refers to any form of interaction with a victim, child or vulnerable person when the offender initiates the interaction and fails to minimize or avoid the incidental contact. This contact includes, but is not limited to, the following:

1. Having physical contact, face to face, or any verbal or non-verbal contact;

2. Being in a residence;

3. Being in a vehicle;

4. Participating in visitation of any kind;

5. Initiating correspondence through a third party including, but not limited to: written, electronic, telephone contact, voice messages, text messaging, e-mail, computer communication, correspondence through any social networking sites (including, by way of example, but not limited to Twitter, Facebook, Snapchat, and Instagram), or gifts;

6. This standard does not preclude conversations with a person about a child as long as that communication does not attempt to communicate with the child through that person.



CDOC/Nelson_00156

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

7.   Going to or loitering near places used primarily by minor children as defined by the CST; or

8.   Entering the premises, traveling past or loitering near any of the victims' residences, schools, day cares, places of worship or places of employment.

In extremely rare circumstances, an offender may have purposeful contact with a minor child or vulnerable person (without prior approval) based on an eminent danger to the child or vulnerable person. The CST should consider the context for this unapproved purposeful contact in the decision making related to addressing the violation of the contact prohibition.

**Risk Related Sexual Interest and Behavior Patterns:**

Any sexual interest or behavior that is empirically linked to risk factors for sexual offending and abusive behavior as well as sexual interest(s) or behavior that impairs the individual's ability to function as a healthy, pro-social member of the community. Such factors include cognitive, emotional, or behavioral sexual patterns determined to be sexually abusive or sexually problematic.  This may involve a disregard for negative consequences, the unmanaged need for instant gratification, a lack of impulse control, and/or results in disruption to other aspects of the client's life.

Risk Related sexual interest patterns may include, but are not limited to, the following:
   o Sexual interest in prepubescent and pubescent children
   o Sexualized violence
   o A presentation of multiple/specific paraphilia's

Risk Related sexual behavior patterns may include, but are not limited to, the following:
   o Disregard for the negative consequences caused by sexual behaviors and interest
   o Sexual preoccupation
   o Hypersexuality
   o Sexual compulsivity
   o Sexual coping

**Risk-Need-Responsivity Principle:**

The Risk Need Responsivity (RNR) model indicates that the comprehensiveness, intensity and duration of treatment provided to individual clients should be proportionate to the degree of risk that they present (the Risk principle), that treatment should be appropriately targeted at participant characteristics which contribute to their risk (the Need principle), and that treatment should delivered in a way that



20

CDOC/Nelson_00157

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

|  |  |
|---|---|
|  | facilitates meaningful participation and learning (the Responsivity Principle). [57] |
| **Safety Plan:** | A client generated plan for activities with the goal of preparing clients to address potentially risky situations and develop adaptive coping responses to situations. Safety plans should address potentially risky situations while taking into account client needs and victim and community safety. Safety plans will be submitted to the Community Supervision Team (CST) for review. |
| **Secondary Victim:** | Secondary victims can include non-victim children, non-offending parents, family members of the offender, and other individuals who are impacted by the offender's sexually offending behavior. [58] |
| **Sex Offender:** | The following definition is based on Section 16-11.7-102, C.R.S. For purposes of this document a sex offender is: |

1. Any (adult) person convicted of a sex offense (defined below) in Colorado on or after January 1, 1994, or;

2. Any person convicted in Colorado on or after July 1, 2000, of any criminal offense with the underlying factual basis being a sex offense, or;

3. Any person who is adjudicated as a juvenile or who receives a deferred adjudication on or after July1, 2002, for an offense that would constitute a sex offense if committed by an adult or for any offense, the underlying factual basis of which involves a sex offense, or;

4. Any person who receives a deferred judgment or deferred sentence for the offenses specified in below is deemed convicted, or;

5. Any (adult) person convicted of any criminal offense in Colorado on or after January 1, 1994, and;

---

[57] D'Orazio, D., Thornton, D., and Beech, A. (2013). A program evaluation of in-prison components: The Colorado department of corrections sex offender treatment and monitoring program. Report of the Central Coastal Clinical and Forensic Psychology Services, Inc.

[58] Bailey, D. J. S. (2017). A life of grief: An exploration of disenfranchised grief in sex offender significant others. American Journal of Criminal Justice, 43(3), 641-667; Baker, N. J., Tanis, H. J., & Rice, J. B. (2002). Including siblings in the treatment of child sexual abuse. Journal of Child Sexual Abuse, 10(3), 1-16; Cyr, M. Frappier, J., Hébert, M., Tourrigny, M., McDuff, P., & Turcotte, M. (2016). Psychological and physical health of non-offending parents after disclosure of sexual abuse of their child. Journal of Child Sexual Abuse, 25(7), 757-776; Cyr, M. Frappier, J., Hébert, M., Tourrigny, M., McDuff, P., & Turcotte, M. (2018). Impact of child sexual abuse disclosure on the health of non-offending parents: A longitudinal perspective. Journal of Child Custody, 15(2), 147-167; Dyb, G., Holen, A., Steinberg, A. M., Rodriguez, N., & Pynoos, R. S. (2003). Alleged sexual abuse at a day care center: Impact on parents. Child Abuse & Neglect, 27, 939-950; Grosz, C. A., Kempe, R. S., & Kelly, M. (2000). Extrafamilial sexual abuse: Treatment for child victims and their families. Child Abuse & Neglect, 24(1), 9-23; Levenson, J. & Tewksbury, R. (2009). Collateral damage: Family members of registered sex offenders. American Journal of Criminal Justice, 34, 54-68; Schreier, A., Pogue, J. K., & Hansen. D. J. (2017). Impact of child sexual abuse on non-abused siblings: A review with implications for research and practice. Aggression and Violent Behavior, 34, 254- 262; Tewksbury, R. & Levenson, J. (2009). Stress experiences of family members of registered sex offenders. Behavioral Sciences and the Law, 27, 611-626.



CDOC/Nelson_00158

    a. who has previously been convicted of a sex offense in Colorado, or;

    b. who has previously been convicted in any other jurisdiction of any offense which would constitute a sex offense in Colorado, or;

    c. who has a history of any sex offenses as defined in the *Sex Offense* definition below.

The determination of the legal status of a sex offender as either an adult or a juvenile is defined by statute.

A sex offender is also referred to as an "offender" in the body of this document; a sex offender is also referred to as a "client" and an "examinee" in sections relating to treatment and polygraph examinations respectively.

**Sex Offense:**  For the purposes of this document, sexual offenses are identified in §16-11.7-102. For the list of specific crimes, refer to Appendix T.

**Sex Offense-Specific Evaluation (SOSE):**  The purpose of an SOSE is to assess a client's need for treatment, determine what type of treatment is needed, and identify the risk level and any additional needs the client may have.[59] (See Section 2.000 for additional information.)

**Sex Offense-Specific Treatment:[60]**  Sex offense-specific treatment uses evidence-based modalities to prevent reoccurring sexually abusive/aggressive behavior by helping clients at risk of sexually re-offending to: (a) effectively manage the individual factors that contribute to sexually abusive behaviors, (b) develop strengths and competencies to address criminogenic needs, (c) identify and change thoughts, feelings and actions that may contribute to sexual offending, and (d) establish and maintain stable, meaningful and pro-social lives. Objectives include enhancing client success and contributing to safer communities.

The purpose of treatment is to facilitate positive change in clients by replacing sexually abusive or sexually problematic behaviors with behaviors that support healthy, consensual relationships. (See Section 3.000 for additional information.)

---

[59] McGrath, R.J. (2016). Clinical strategies for evaluating sexual offenders. In Phenix, A., Hoberman, H.M. *Sexual Offending* (pp. 265-278). New York: Springer.

[60] According to Section 16-11.7-102(4), Colorado Revised Statutes treatment means therapy, monitoring and supervision of any sex offender which conforms to the *Standards and Guidelines* created by the SOMB (see also Sex offense-specific treatment).



CDOC/Nelson_00159

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Sexual Contact:**   Rubbing or touching another person's sexual organs (i.e., breasts/chest area, buttocks, vagina, penis) either bare (under clothing) or over clothing if done for the purpose of evoking sexual arousal or sexual gratification of oneself or the other person or for the purpose of sexual abuse of the other person. Sexual contact may also include causing or allowing another person to touch one's own sexual organs either over or under the clothing, if done for the purpose of sexual arousal, gratification, or abuse. The term physical sexual contact is used interchangeably and may be used to improve some individuals' abilities to provide clear and unequivocal answers to polygraph questions. For the legal definition established by the Colorado General Assembly see §18-3-401(4).

**Sex Offender Treatment And Monitoring Program (SOTMP):**   This is the sex offense-specific treatment program administered in select Colorado Department of Corrections facilities.

**Standard:**   For the purposes of this document, standards are established by the SOMB are mandatory and designated by "shall" and serve to provide guidance on best practice.

**Static Risk Factors:**   For the purposes of these Standards, static risk factors refer to those characteristics that are set, are unchangeable by the client and may be environmental, or based upon other observable or diagnosable factors.

**Supervising Officer:**   A professional in the employ of the probation or parole departments or of a private/county community corrections facility who is primarily responsible for the supervision of the offender. Supervision includes behavioral monitoring and enforcement of compliance with supervision conditions as well as imposing, or recommending the imposition of, sanctions for non-compliant behavior.

**TEAMS Model:**   This model guides CST members to work collaboratively while practicing in their area of specialization. The goal of the CST's collaborative efforts is to engage offenders in treatment and supervision in order to decrease risk, enhance protective factors, and increase their intrinsic motivation for positive behavioral change.

**Treatment:**   According to Section 16-11.7-102(4), C.R.S. treatment means therapy, monitoring and supervision of any sex offender which conforms to the *Standards and Guidelines* created by the SOMB (see also Sex offense-specific treatment).

**Treatment Provider:**   A person who provides sex offense-specific treatment to sex offenders according to the *Standards and Guidelines* contained in this document.



23

CDOC/Nelson_00160

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

| | |
|---|---|
| **Victim:** | Any person against whom sexually abusive behavior has been perpetrated or attempted. |
| **Victim-Centered Approach:** | A victim centered approach means that the needs and interests of victims require paramount attention by professionals working with sexual offenders. Individuals and programs working with sexual offenders should always have the victim and potential victims in mind. This means a commitment to protecting victims, not re-victimizing, being sensitive to victim issues and responsive to victim needs. A victim centered approach requires an avenue to receive victim input and provide information to victims. |
| **Vulnerable Adult Populations:** | Individuals who are less able to protect themselves because of diminished capacity due to age or cognitive capacity or are subject to someone in a position of trust. |
| **Young Adults:** | When young adults are age 18 to age 25, the CST may exempt them from specific standards via the application of the Young Adult Modification Protocol. (See Appendix C for additional information regarding Young Adult Modification Protocol.) |

**Common Acronyms**

DD/ID:    Developmental Delay/Intellectual Disability
C.R.S.:   Colorado Revised Statute
CST:      Community Supervision Team
DOC:      Colorado Department of Corrections
PPG:      Penile Plethysmography
PSIR:     Pre-Sentence Investigation Report
RNR:      Risk-Need-Responsivity principle
SOMB:     Colorado Sex Offender Management Board
SOSE:     Sex Offense-Specific Evaluation
SOTMP:    Sex Offender Treatment and Monitoring Program

Top of the Document



24

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 1.000 Guidelines for Pre-Sentence Investigations

**1.100** Per C.R.S. 16-11-102, each sex offender shall be the subject of a presentence investigation (PSI) which shall include a sex offense-specific evaluation. This report should be prepared in all cases where it has been ordered by the court. [61]

*Discussion:  The purpose of the PSI is to provide the court with relevant information upon which to base sentencing decisions. The sex offense-specific evaluation establishes a baseline of information about the offender's risk and protective factors, treatment needs and amenability to treatment. The PSI may include recommendations about an offender's suitability for community supervision.*

*The PSI report, including the sex offense-specific evaluation, should be provided by the Probation Department to the Department of Corrections when applicable and should follow the sex offender in placements within the criminal justice system (see Section 7.000 – Continuity of Care and Information Sharing).*

**1.200** The PSI report should be completed by a pre-sentence investigator specially trained in sex offender management (See 5.175). [62]

**1.300** A PSI report shall address all the criteria pursuant to C.R.S.16-11-102. [63]

**1.400** When referring an offender for the sex offense-specific evaluation, the referral packet may include but is not limited to the following:

**A.** Police reports

**B.** Victim impact statements

**C.** Child protection reports

---

[61] Colorado Revised Statutes (2021). 16-11.7-104 – Sex offenders – evaluation and identification required - **(1)** On and after January 1, 1994, each convicted adult sex offender and juvenile who has committed a sexual offense who is to be considered for probation shall be required, as a part of the presentence or probation investigation required pursuant to section 16-11-102, to submit to an evaluation for treatment, an evaluation for risk, procedures required for monitoring of behavior to protect victims and potential victims, and an identification developed pursuant to section 16-11.7-103 (4).

[62] Center for Sex Offender Management (2008). *The Comprehensive Approach to Sex Offender Management*. Retrieved from: https://cepp.com/wp-content/uploads/2015/12/the-comprehensice-approach-to-sex-offender-management.pdf

[63] Colorado Revised Statutes (2021). 16-11.7-102 – Definitions - **(4)** "Treatment" means therapy, monitoring, and supervision of any sex offender which conforms to the standards created by the board pursuant to section 16-11.7-103.



CDOC/Nelson_00162

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    **D.** A criminal history

    **E.** Summary of available risk assessment information

    **F.** Prior evaluations and treatment reports

    **G.** Prior supervision records

    **H.** Release of Information

    **I.** Any other information requested by the evaluator

**1.500** Sex offense-specific evaluations received by the pre-sentence investigation writer that have been performed prior to an admission of guilt by the sex offender (pre-plea) may not meet the requirements of these Standards.

If the PSI writer receives a pre-plea evaluation and finds that the evaluation does not contain the information required under these Standards (see Section 2.000), the PSI writer may inform the court and provide recommendations upon request from the court. The PSI writer may seek supplemental information from the evaluator to collaboratively resolve any outstanding issues. [64]

---

[64] Colorado Revised Statutes 16-11-102 (1)(b)(I) (2021). Presentence or probation investigation. **(b)** (I) Each presentence report prepared regarding a sex offender, as defined in section 16-11.7-102 (2), with respect to any offense committed on or after January 1, 1996, shall contain the results of an evaluation and identification conducted pursuant to article 11.7 of this title.



CDOC/Nelson_00163

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Research Citations

The following Adult Standards and Guidelines in Section 1.000 have research or statutory support (the Standards are either footnoted or are supported by a review of the literature and the statute): 1.100, 1.200, 1.300, and 1.500. All footnotes and research references in these Standards were evaluated by the staff and presented to the SOMB in support of the Standards and Guidelines. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed.

The following Adult Standards and Guidelines in Section 1.000 but do not have research or statutory support, and are primarily procedural in nature: 1.400. The SOMB staff did a search for research and statutes applicable to the Standards noted above. Research and literature was not found applicable to these Standards, so in absence of research the Standards are based on best practices procedures, professional association guidelines, and the professional expertise of the members of the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00164

# 2.000 Standards for Sex Offense-Specific Evaluations

**2.000** The purpose of a sex offense-specific evaluation (hereafter evaluation) is to assess a client's need for treatment, determine what type of treatment is needed, and identify the risk level and any additional needs the client may have.[65] The evaluation shall describe and conceptualize the development, nature, and extent of a client's sexually abusive behavior; determine the criminogenic and other needs that should be addressed by offense-specific treatment and additional interventions; accurately assess risk factors associated with the short and long-term risk for sexual recidivism; identify specific responsivity factors and strengths that are likely to influence treatment amenability and outcomes; identify protective factors and how they influence risk; and obtain baseline assessment information to allow progress and changes to be monitored over time.[66] The evaluation should address risk factors associated with non-sexual recidivism and any potential connection with sexual behavior, where applicable.[67] When the referral is for a client whose index offense is a non-sexual crime but has a prior conviction for a sex offense, the evaluation should follow the guidelines provided in *Appendix E: Sexual Offense History Decision Aid*.

Treatment planning and progress monitoring, sentencing, release decision-making, transition and reentry planning, supervision, and other case management planning are all considerations that the evaluation should inform.[68] As the evaluation provides valuable information and recommendations, it should be viewed as time and context-bound, and there should be ongoing

---

[65] McGrath, R.J. (2016). Clinical strategies for evaluating sexual offenders. In A. Phenix & H. M. Hoberman (Eds.), *Sexual Offending: Predisposing antecedents, assessments and management* (pp. 265-278). Springer; Wormith, J. S. & Zidenberg A. M. (2018). The historical roots, current status, and future applications of the Risk-Need-Responsivity Model (RNR). In E. L. Jeglic & C. Calkins (Eds.), *New frontiers in offender treatment: The translation of evidence-based practices to correctional settings* (pp. 11-41). Springer.

[66] Olver, M. E. (2017). The risk-need-responsivity model: Applications to sex offender treatment. In D. P. Boer, A. R. Beech, T. Ward, L. A. Craig, M. Rettenberger, L. E. Marshall, & W. L. Marshall (Eds.), *The Wiley handbook on the theories, assessment, and treatment of sexual offending* (pp. 1313-1329). Wiley Blackwell; Olver, M. & Wong, S. (2016). Assessing treatment change in sexual offenders. In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 787-810). Wiley-Blackwell; Thaker, J. (2016). Case formulation. In In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 737-751). Wiley-Blackwell; Ware, J. & Matsuo, D. (2016). Risk assessment and treatment planning. In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 717-736). Wiley-Blackwell; Van den Berg et al. (2018). The predictive properties of dynamic sex offender risk assessment instruments: A meta-analysis. *Psychological Assessment, 30*(2), 179-191; Wilson R. J., Sandler J. C., McCartan K. (2020). Community dynamic risk management of persons who have sexually offended. In Proulx J., Cortoni F., Craig L. A., Letourneau E. J. (Eds.), *The Wiley handbook of what works with sexual offenders: Contemporary perspectives in theory, assessment, treatment, and prevention* (pp. 247-263). John Wiley & Sons.

[67] In D. P. Boer, A. R. Beech, T. Ward, L. A. Craig, M. Rettenberger, L. E. Marshall, & W. L. Marshall (Eds.), *The Wiley handbook on the theories, assessment, and treatment of sexual offending* (pp. 1313-1329). Olver, M. E. (2017). The risk-need-responsivity model: Applications to sex offender treatment. Wiley Blackwell; de Roos, M. S., Lloyd, C. D., & Serin, R. C. (2022). General criminal dynamic risk and strength factors predict short-term general recidivism outcomes among people convicted of sexual crime during community supervision. *Sexual Abuse, 0(0)*.

[68] McGrath, R.J. (2016). Clinical strategies for evaluating sexual offenders. In A. Phenix & H. M. Hoberman (Eds.), Sexual Offending: Predisposing antecedents, assessments and management (pp. 265-278). Springer; Ware, J. & Matsuo, D. (2016). Risk assessment and treatment planning. In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 717-736). Wiley-Blackwell.



CDOC/Nelson_00165

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

and/or updated assessment and evaluation at appropriate intervals. [69] The frequency and nature of updates should be individualized to the client and responsive to changes in risk and progress. As new information emerges, or overall risk and/or individual risk factors change, a client's treatment should be tailored to address those changes. [70]

Due to the importance of the initial assessment information to subsequent sentencing, supervision, treatment, and behavioral monitoring, each client shall receive a comprehensive assessment and evaluation. The evaluation should use evidence-based assessment methods, where possible, and align with best practice approaches. The evaluation should assess and summarize the interactions between the client's age, culture, psychosocial and emotional development and functioning, level of adaptive functioning, neuropsychological, cognitive, and learning impairments, language or communication barriers, acute psychiatric symptoms, denial, and level of motivation. [71] Sex offense-specific evaluations are not intended to replace more comprehensive psychological or neuropsychological evaluations. Evaluators are ethically responsible for conducting evaluations comprehensively and factually, regardless of the client's status within the criminal justice system.

Evaluations recommending sex offense-specific treatment should suggest the use of research-informed treatment, management, and monitoring interventions appropriate for each client's risk level, needs, and responsivity and minimize that client's likelihood to re-offend sexually. [72] Consequently, evaluators will prioritize the physical and psychological safety of victims and potential victims in making appropriate recommendations to each client's assessed risk and needs. Evaluators should not assume that report readers and recipients possess clinical training or expertise in offense-specific mental health evaluation or treatment. Consequently, evaluators should communicate the evaluation in a clear, understandable, fair, and respectful manner. Care should be taken to minimize overemphasis on a single test or aspect of the assessment.

Approved Evaluators who provide evaluations to clients with developmental disabilities shall be SOMB approved with the qualifications required by the Standards and Guidelines, Section 4.400 (G), 4.510 (I) and 4.600 (K).

---

[69] Babchishin K. M., Hanson R. K. (2020). Monitoring changes in risk of reoffending: A prospective study of 632 men on community supervision. *Journal of Consulting and Clinical Psychology, 88*(10), 886‑898; Hanson, K. R., Harris, A. J. R., Letourneau, E., Helmus, L. M., & Thornton, D. (2018). Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy, & Law, 24*(1), 48‑63; Hanson R. K., Newstrom N., Brouillette-Alarie S., Thornton D., Robinson B. E., Miner M. H. (2021). Does reassessment improve prediction? A prospective study of the sexual offender treatment intervention and progress scale (SOTIPS). *International Journal of Offender Therapy and Comparative Criminology, 65*(16), 1775‑1803.

[70] Heilbrun, K., Yasuhara, K., Shah, S, & Locklair, B. (2021). Approaches to violence risk assessment: Overview, critical analysis, and future directions. In K. S. Douglas & R. K. Otto (eds.), *Handbook of violence risk assessment* (pp. 1-26). Routledge; Olver, M. & Wong, S. (2016). Assessing treatment change in sexual offenders. In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 787-810). Wiley-Blackwell.

[71] Thaker, J. (2016). Case formulation. In In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 737-751). Wiley-Blackwell.

[72] McGrath, R.J. (2016). Clinical strategies for evaluating sexual offenders. In A. Phenix & H. M. Hoberman (Eds.), *Sexual Offending: Predisposing antecedents, assessments and management* (pp. 265-278); Thaker, J. (2016). Case formulation. In In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 737-751). Wiley-Blackwell; Ware, J. & Matsuo, D. (2016). Risk assessment and treatment planning. In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 717-736). Wiley-Blackwell.



CDOC/Nelson_00166

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**2.100** In accordance with Section 16-11-102(1) (b) C.R.S., each "sex offender" shall receive a sex offense-specific evaluation before or at the time of the pre-sentence investigation.[73]

**2.110** Recommendations from the evaluation should be the starting point of developing the treatment plan. Assessment is an ongoing process and should continue through each transition of supervision and treatment. Re-evaluation by Community Supervision Team (CST) members should occur as needed to ensure recognition of changing levels of risk.[74]

**2.115 Timeframes for Evaluations**

Evaluations should be completed within 90 days of acceptance of the referral to ensure the timeliness of recommendations. In the event that circumstances prevent the evaluation from being completed within 90 days, the evaluator shall notify the referral source and the client (or their representative) of the delay and the barriers preventing the completion. The evaluator shall update the referral source and client every 30 days until the evaluation is completed and shall document the barriers that prevented timely completion and the attempted solutions within the evaluation.

*Discussion Point: Upon acceptance of a referral, evaluators should make every effort to complete their work in a timely manner. Dates determined by the Court most often drive timeframes. Barriers may arise during evaluations that require additional time by the evaluator such as; the time needed to get collateral information, review extensive documentation, and availability of the client. In rural areas of the state, the availability of the evaluator may also be a factor. It is the responsibility of the evaluator to provide updates to all parties involved and document any barriers and reasons for any delays in the completion of the evaluation.*

If the evaluation will not be able to be started at the time of acceptance of the referral, such as in the case of evaluator wait lists, the evaluator shall notify the referral source to determine if an alternate referral will be made. When a referral source has agreed to have a client on the evaluator's waitlist, notification to the client every 30 days is not required until the evaluation has started and has exceeded 90 days.

---

[73] Colorado Revised Statutes 16-11.7-105 (1) (1) Each adult sex offender and juvenile who has committed a sexual offense sentenced by the court for an offense committed on or after January 1, 1994, shall be required, as a part of any sentence to probation, commitment to the department of human services, sentence to community corrections, incarceration with the department of corrections, placement on parole, or out-of-home placement to undergo treatment to the extent appropriate to such offender based upon the recommendations of the evaluation and identification made pursuant to section 16-11.7-104 or based upon any subsequent recommendations by the department of corrections, the judicial department, the department of human services, or the division of criminal justice in the department of public safety, whichever is appropriate. The treatment and monitoring shall be provided by an approved provider pursuant to section 16-11.7-106, and the offender shall pay for the treatment to the extent the offender is financially able to do so.

[74] McGrath, R.J. (2016). Clinical strategies for evaluating sexual offenders. In A. Phenix & H. M. Hoberman (Eds.), Sexual Offending: Predisposing antecedents, assessments and management (pp. 265-278). Springer; Ware, J. & Matsuo, D. (2016). Risk assessment and treatment planning. In D. P. Boer (Ed.), *The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3* (pp. 717-736). Wiley-Blackwell.



CDOC/Nelson_00167

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**2.120**  Evaluators are expected to stay current with special considerations available in the SOMB Standards and Guidelines for the clients they are evaluating. Evaluators should use appropriate tools, including but not limited to those contained in the SOMB appendices. Applicable appendices include the following:

1. Appendix C: Young Adult Modification Protocol
2. Appendix E: Sexual Offense History Decision Aid
3. Appendix F: Sex Offense-Specific Intake Review for Clients who have been in Prior Treatment
4. Appendix L: Female Offender Risk Assessment[75]

**2.130**  Evaluators shall be attentive to potential concerns about a client's competency/capacity to provide informed consent or assent, sign any legal releases, cooperate in the evaluation process, or understand, participate in, and benefit from any recommended treatment. The status of competency/capacity can change over time, regardless of prior findings. Competency/capacity is always evaluated based on the *present* condition of the client[76] and remains a potential issue throughout treatment and any subsequent evaluations.

**2.140**  An evaluator who suspects a client may not have a reasonable degree of rational or factual understanding[77] of the releases, evaluation process, legal proceedings, or potential sentences should notify the referral source, who may then alert the criminal court[78].

**2.150**  The evaluator shall obtain the informed assent of the client for the evaluation, by advising the client of the assessment and evaluation methods to be used, the purpose of the evaluation, and to whom the information will be provided. The evaluator's role shall be explained to the client. Results of the evaluation should be shared with the client, if appropriate, and the evaluator shall address any questions. The evaluation shall explain the limits of confidentiality and the obligations regarding mandatory reporting of child abuse and elder abuse.[79,80]

---

[75]

[76]  Colorado Revised Statutes 16-8.5-104 (1) (1) When a defendant raises the issue of competency to proceed, or when the court determines that the defendant is incompetent to proceed and orders that the defendant undergo restoration treatment, any claim by the defendant to confidentiality or privilege is deemed waived, and the district attorney, the defense attorney, and the court are granted access, without written consent of the defendant or further order of the court, to: (a) Reports of competency evaluations, including second evaluations; (b) Information and documents relating to the competency evaluation that are created by, obtained by, reviewed by, or relied on by an evaluator performing a court-ordered evaluation; and (c) The evaluator, for the purpose of discussing the competency evaluation.

[77]  Godinez v. Moran, 509 U.S. 389, 396 (1993); Dusky v. United States, 362 U.S. 402 (1960); C.R.S § 16-8.5-101(11). The due process clause of the United States Constitution requires that a defendant be competent during the pendency of his/her criminal case. Dusky, supra.

[78]  The criminal judge will determine whether the identified concerns warrant a forensic competency examination or the initiation of other proceedings as provided in C.R.S § 16-8.5-101 et. seq.

[79]  Colorado Revised Statutes19-3-304. Persons required to report child abuse or neglect. (1) (a) Except as otherwise provided by section 193-307, section 25-1-122 (4) (d), C.R.S., and paragraph (b) of this subsection (1), any person specified in subsection (2) of this section who has reasonable cause to know or suspect that a child has been subjected to abuse or neglect or who has observed the child being subjected to circumstances or conditions that would reasonably result in abuse or neglect shall immediately upon receiving such information report or cause a report to be made of such fact to the county department, the local law enforcement agency, or through the child abuse reporting hotline system as set forth in section 26-5-111, Colorado Revised Statutes.

[80]  Colorado Revised Statutes12-245-216 (1). Mandatory disclosure of information to clients. (1) Except as otherwise provided in subsection (4) of this section, every licensee, registrant, or certificate holder shall provide the following information in writing to each client during the initial client contact: (a) The name, business address, and business phone number of the licensee, registrant, or certificate holder; (b) (I) An explanation of the levels of regulation applicable to mental health professionals under this article 245 and the differences between



CDOC/Nelson_00168

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## 2.150 DD/ID

A. The information shall be provided in a manner that is easily understood, verbally and in writing, or through other modes of communication that may be necessary to enhance understanding.

   *Discussion: When the evaluator is working with a client with developmental disabilities, and determines that informed assent could not be acquired at the time of the evaluation, the evaluator shall obtain assistance from a third party who is not a practitioner from within the same agency. A third party may be an individual or group of individuals who understands the definition of informed assent and who has/had significant knowledge of the person's unique characteristics.*

B. The evaluator shall obtain the assent of the legal guardian, if applicable, and the informed assent of the client with developmental disabilities for the evaluation and assessments. The legal guardian will be informed of the evaluation methods, how the information may be used and to whom it will be released. The evaluator shall also inform the client with developmental disabilities and the legal guardian about the nature of the evaluator's relationship with the client and with the court. The evaluator shall respect the client's right to be fully informed about the evaluation procedures. Results of the evaluation may be reviewed with the client and the legal guardian upon request.

   If informed assent cannot be obtained after consulting with the third party, then the evaluator shall refer the case back to the community supervision team or the court. [81]

---

licensure, registration, and certification, including the educational, experience, and training requirements applicable to the particular level of regulation; and (II) A listing of any degrees, credentials, certifications, registrations, and licenses held or completed by the licensee, registrant, or certificate holder, including the education, experience, and training the licensee, registrant, or certificate holder was required to satisfy in order to complete the degree, credential, certification, registration, or license; (c) A statement indicating that the practice of licensed or registered persons in the field of psychotherapy is regulated by the division, and an address and telephone number for the board that regulates the licensee, registrant, or certificate holder; (d) A statement indicating that: (I) A client is entitled to receive information about the methods of therapy, the techniques used, the duration of therapy, if known, and the fee structure;

[81] PART 2 INTELLECTUAL AND DEVELOPMENTAL DISABILITIES 25.5-10-201. [Formerly 27-10.5-101.] Legislative declaration. (1) In recognition of the varied, extensive, and substantial needs of persons with INTELLECTUAL AND developmental disabilities, including the urgent need to enhance the development of children with INTELLECTUAL AND developmental disabilities, the general assembly, subject to available appropriations and subject to the existence of appropriate services and supports with available resources, hereby declares that the purposes of this article are: (a) To provide appropriate services and supports to persons with INTELLECTUAL AND developmental disabilities throughout their lifetimes regardless of their age or degree of disability; (b) To prohibit deprivation of liberty of persons with INTELLECTUAL AND developmental disabilities, except when such deprivation is for the purpose of providing services and supports which constitute the least restrictive available alternative adequate to meet the person's needs, and to ensure that these services and supports afford due process protections; (c) To ensure the fullest measure of privacy, dignity, rights, and privileges to persons with INTELLECTUAL AND developmental disabilities; (d) To ensure the provision of services and supports to all persons with INTELLECTUAL AND developmental disabilities on a statewide basis; (e) To enable persons with INTELLECTUAL AND developmental disabilities to remain with their families and in their home communities THE COMMUNITY OF THEIR CHOICE, to minimize the likelihood of out-of-home placement, and to enhance the capacity of families to meet the needs of children with INTELLECTUAL AND developmental disabilities; (f) To provide community services and supports for persons with INTELLECTUAL AND developmental disabilities which reflect typical patterns of everyday living; (g) To encourage state and local agencies to provide a wide array of innovative and cost-effective services and supports for persons with INTELLECTUAL AND developmental disabilities; (h) To ensure that persons with INTELLECTUAL AND developmental disabilities receive services and supports which encourage and build on existing social networks and natural sources of support, and result in increased interdependence, contribution to, and inclusion in community life; and ch. 323 health care policy and financing 1745 (i) to recognize the efficacy of early intervention services and supports in minimizing developmental delays and reducing the future education costs to our society. 25.5-10-202. [similar to former 27-10.5-102.] Definitions. As used in this article, unless the context otherwise requires: (1) "authorized representative" means a person designated by the person receiving services, or by the parent or guardian of the person receiving services, if appropriate, to assist the person receiving services in acquiring or utilizing services or supports pursuant to this article. The extent of the authorized representative's involvement shall be determined upon designation... (6) "consent" means an informed assent that is expressed in writing and freely given.



CDOC/Nelson_00169

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**2.160  Language, Culture, and Ethnic Considerations:**

A. The evaluator shall be sensitive to any cultural, ethnic, developmental, sexual orientation, gender, medical, and/or educational issues, or disabilities that are known or become known during the evaluation.
*Discussion Point: When questions or concerns arise for evaluators regarding if they have the necessary qualifications or experience to complete an evaluation, they should refer back to the established code of ethics and professional standards. The Mental Health Practice Act directs Licensed, Certified or registered Mental Health Professionals that no licensee, registrant, or certificate holder should "practice outside of or beyond the person's area of training, experience, or competence".*

B. Evaluators shall provide services that are culturally informed, inclusive and responsive to an individual client's needs.  It is recommended that background information regarding ethnic or cultural characteristics that may influence the evaluation process is obtained and reviewed in advance. Conducting an evaluation in a client's preferred language is recommended as best practice.  Whenever possible, the referral source should consider a referral to an evaluator who speaks the same preferred language as the client, considering all identified needs of the client.[82]

*Discussion Point: Evaluators should work with the client and referral source to determine a client's preferred and most proficient language, and to inform how best to proceed with the evaluation.  Information should be considered from collateral sources, the client's level of understanding, previous languages used with the client, and any other information that could inform what language the evaluation should be conducted in.*

**2.165  Use of Interpreters:**

Evaluators shall assess the need for language translation, including both foreign languages and sign language, at the time of the referral and before conducting the evaluation.  An evaluator who suspects a client may have a language barrier that would impact the outcome of the evaluation, shall inform the client and notify the referral source before the completion of the evaluation.  The evaluator shall be sensitive to ethnic or cultural characteristics and differences which shall be discussed with the selected interpreter.[83]

Clients and evaluators may request an interpreter at any point before or during an evaluation if there are indications one is needed.  If a request is made by the client for an interpreter, the

---

Consent shall always be preceded by the following: (a) a fair explanation of the procedures to be followed, including an identification of procedures that are experimental; (b) a description of the attendant discomforts and risks; 1746 health care policy and financing ch. 323 (c) a description of the expected benefits; (d) a disclosure of appropriate alternative procedures together with an explanation of the respective benefits, discomforts, and risks; (e) an offer to answer any inquiries concerning procedures; (f) an instruction that the person giving consent is free to withdraw consent and to discontinue participation in the project or activity at any time; and (g) a statement that withholding or withdrawal of consent shall not prejudice future provision of appropriate services and supports to persons.

82 Azama, C. & Alexander, A. (2020). Ethical use of interpreters for non-English speaking clients in forensic contexts. Psychotherapy bulletin, 55(1), 30-33.

83 Barber-Rioja, V., & Rosenfeld, b. (2018). Addressing linguistic and cultural differences in the forensic interview. international journal of forensic mental health, 17(4), 377-386.



CDOC/Nelson_00170

evaluator shall coordinate with the referral source and allow for one to be present. The evaluator shall utilize an approved court or certified interpreter, whenever possible. A client's relatives or friends shall not serve as interpreters for evaluations. [84, 85]

A. Evaluators shall inform the interpreter in advance about the evaluation process, which shall include but not be limited to the following information: [86, 87]

1. The evaluator shall inform the interpreter about the content and context of the evaluation. Specifically, the client will be asked about details of the sex offense, sexual behaviors, sexual interests, or other content which may be explicit or sensitive in nature.

2. An explanation of common terms and topics covered in the evaluation and an opportunity for the interpreter to ask questions before meeting with the client.

3. The importance of translations that accurately convey the content and essence [BMF3] of questions and answers. The interpreter should be informed of the impacts of paraphrasing and summarizing.

4. Discussion of interpretation of written assessments, testing, or additional information needed from the client.

5. The process for Visual Time (VT) or sexual interest testing, includes discussing cultural differences in topics and the potential for some items to be perceived differently through different cultural lenses.

6. Arranging time after the evaluation to ensure the accuracy of the translated information, resolution of any discrepancies, and questions or concerns from the interpreter.

7. When using an interpreter, evaluators shall inform the client and interpreter that the information discussed is confidential and remind the client of the limits of confidentiality.

B. The evaluator shall document the following regarding the use of interpreters:

1. Any request or recommendation for a language interpreter, by the client, referral source, Court, or evaluator;

---

84 Azama, C. & Alexander, A. (2020). Ethical use of interpreters for non-English speaking clients in forensic contexts. Psychotherapy Bulletin, 55(1), 30-33.

85 Barber-Rioja, V., & Rosenfeld, B. (2018). Addressing linguistic and cultural differences in the forensic interview. International Journal of Forensic Mental Health, 17(4), 377-386;

86 Barber-Rioja, V., & Rosenfeld, B. (2018). Addressing linguistic and cultural differences in the forensic interview. International Journal of Forensic Mental Health, 17(4), 377-386;

87 Weiss, R. A., & Rosenthal, B. (2012). Navigating cross-cultural issues in forensic assessment: Recommendations for practice. Professional Psychology: Research & Practice, 43(3), 234-240.



CDOC/Nelson_00171

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

2. If the client accepts or rejects interpreter services

3. Any barriers, limitations, issues, or potential impacts which may arise from the use, absence, or presence of a language interpreter.

4. Any other impacts on the evaluation process such as the inability to complete certain assessments, due to the use of a language interpreter

*Discussion Point: The use of an interpreter may bring some inherent difficulties including delays in conversations, difficulty translating specific words or concepts between languages, and dynamics that may emerge between the client and the interpreter. The introduction of a third party into the evaluation process may impact the client's overall comfort level, including discussion of personal or sensitive information. It is important for the evaluator to be mindful of these potential challenges and provide information about how this may have impacted the overall evaluation process.* [88, 89, 90]

**2.170** To ensure the most accurate prediction of risk for clients, the following evaluation modalities are all required in performing a sex offense-specific evaluation: [91]

**A.** Use of instruments that have specific relevance to evaluating clients

**B.** Use of instruments with demonstrated reliability and validity

**C.** Examination and integration of criminal justice data and other collateral information including:

1. The details of the current offense

2. Documents that describe victim trauma, when available

3. Scope of client's sexual behavior other than the current offense that may be of concern

**D.** Structured clinical and sexual history interview

**E.** Psychological testing and offense-specific standardized assessments/instruments

**F.** Testing of risk-related sexual interest (i.e., Viewing Time [VT] instruments) _**or**_

---

88 Barber-Rioja, V., & Rosenfeld, B. (2018). Addressing linguistic and cultural differences in the forensic interview. International Journal of Forensic Mental Health, 17(4), 377-386.

89 Wagoner, R. C. (2017). The use of an interpreter during a forensic interview: Challenges and considerations. Psychiatric Services, 68, 507-511.

90 Weiss, R. A., & Rosenthal, B. (2012). Navigating cross-cultural issues in forensic assessment: Recommendations for practice. Professional Psychology: Research & Practice, 43

91 McGrath, R.J. (2016). Clinical strategies for evaluating sexual offenders. In Phenix, A. Hoberman, H.M. Sexual Offending (pp. 265-278). New York: Springer.



CDOC/Nelson_00172

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Testing of deviant sexual arousal (i.e., Plethysmograph).

### 2.170 DD/ID

**A.** Due to the complex issues of evaluating clients with developmental disabilities, methodologies shall be applied individually, and their administration shall be guided by the following:

1. When possible, instruments should be used that have relevance and demonstrated reliability and validity, which are supported by research.

2. If a required procedure is not appropriate for a specific client, the evaluator shall document in the evaluation why the required procedure was not done.

**B.** Evaluators shall carefully consider the appropriateness and utility of using a plethysmograph assessment or viewing time assessment with clients who have developmental disabilities. For these assessments to be effective with this population, evaluators shall assess whether the client has a sufficient level of cognitive functioning to be able to adequately discriminate between stimulus cues. In addition, consideration shall be given to use of specialized assessment tools that have been developed for clients who have developmental disabilities.

### 2.200  Sex Offense-Specific Evaluation

A. Provided below is an outline for recommended areas of an offense-specific evaluation. Assessment tools shall be utilized in the evaluation as appropriate to the specific client population being evaluated (e.g., female, developmentally disabled, or juvenile offense being evaluated for adult non-sex offense). For a list of suggested assessment tools and instruments, see Appendix V.
B.   Mental Status
   1.   Review of Documents
   2.   Client Report of Offense
   3.   Risk and Treatment Need Domains (See Chart 1)
      a.   General and offense-related criminogenic needs
         i.   Sexual Interest and Behavior Patterns Domain
        ii.   Attitudes Domain
       iii.   Relational Style Domain
       iv.   Self-Management/Regulation Domain
   4.   Identified Risk and Protective Factors
      a.   Static actuarials
         i.   Assess Victim-related variables (e.g., stranger, non-related, male)
      b.   Dynamic actuarials
         i.   Combined risk
      c.   Protective Factors (see Chart 2)
      d.   Responsivity Factors (See Chart 3)
   5.   Psychological Testing Results
      a.   Sexual interest and/or arousal testing
      b.   Personality assessment



CDOC/Nelson_00173

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

      c. Assessment of psychopathy
         i. Other testing as indicated
6. Diagnostic Impressions
7. Overall risk determination/Summary
    a. Overall determination of risk based on identified risk factors, actuarial risk, protective factors, and responsivity factors
    b. Potential risk management strategies that may be important for other stakeholders to consider (e.g., potential targets for community supervision, restrictions on contact with the client's own minor children, access to sexually explicit materials, etc.);
    c. Impact on Victim
8. Recommendations
    a. Appropriate placement options (e.g., community-based or residential-based)
    b. Recommended interventions that support the application of risk, need, and responsivity (RNR) principles
    c. Recommendations that consider victim/community safety

Part of the outline above contains references to risk factors which are organized into four broad categories called *domains*. These domains include *Sexual Interest and Behaviors, Attitudes, Interpersonal, and Self-management.* Research indicates when risk factors are categorized into domains, providers are better able to understand and conceptualize the connections between an individual's risk factors, treatment needs, and other stability or protective factors which impact the risk of re-offense.

Evaluators shall administer assessment tools (e.g., mental health, substance abuse, etc.) in accordance with the tool's user's manual. When using an assessment tool with any evaluation client, where the tool has not been specifically validated on the client's unique characteristics (for example, gender, race, ethnicity, culture, etc.), the rationale for using the tool shall be included in the evaluation. The evaluator shall specifically note the strengths and limitations of the tools used and any impact this has on the overall evaluation results, based on the unique characteristics of the client being evaluated.

*Discussion: The assessment tools identified in Appendix V do not represent an exhaustive list of the available psychometric and behavioral measures. Some of these assessment tools have been validated, and as such should be applied following one's professional ethics and scope of practice based on the population for which it was intended and an individual client's treatment needs. The identified assessment tools are frequently used by evaluators while conducting sex offense-specific evaluations. Evaluators should follow updates related to improvements made to these tools, as they are periodically modified and improved upon. In addition, new tools may become available and may be utilized, as well. It is recognized that some methods of assessment may not be an option or the information to be reviewed may not be available.*

*Evaluation instruments and processes will be subject to change as more is learned in this area. For some populations, there may not be a validated assessment available, and therefore assessment should be based on clinical judgment and other relevant factors.*



CDOC/Nelson_00174

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*When in doubt, the evaluator should draw conclusions and make recommendations based on balance of evidence-based and best practices, victim and community safety, and the principles of Risk, Need, Responsivity.*



38

CDOC/Nelson_00175

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Chart 1: Risk and Treatment Needs

| Domain One: Sexual Interests and Behavior Patterns [92] | Domain Two: Attitudes [93] | Domain Three: Interpersonal [94] | Domain Four: Self-Management [95] |
|---|---|---|---|
| ● Risk-related sexual interests<br>　○ Sexual interest in prepubescent and pubescent children<br>　○ Interest in sexualized violence<br>　○ Multiple paraphilias<br>● Sexual preoccupation - intrusive, distracting, or frequent sexual thoughts<br>● Hypersexuality - frequent sexual - activity, extensive/indiscriminate sexual behavior<br>● Sexual compulsivity - strong sexual urges that are difficult to control or manage<br>● Sexual coping - using sexual activity to manage negative internal states | ● Victim schema<br>　○ Pro-child molestation or rape attitudes<br>● Rights schema<br>　○ Excessive sense of entitlement<br>● Means schema<br>　○ Antisocial/criminal attitudes and values<br>● Identity schema<br>　○ Sexual contact connected to self-esteem or social image<br>● Callousness/hostility toward women<br>● Negative emotionality/grievance thinking<br>● High externalization of blame | ● Dysfunctional relational style<br>　○ Inadequate/avoidant<br>　　▪ Poor social skills<br>　　▪ Fear of rejection<br>　　▪ Difficulty forming and maintaining healthy adult relationships<br>　○ Aggressive/narcissistic<br>　　▪ Utilitarian relationships<br>　　▪ Indifferent to the rights and wellbeing of others<br>　　▪ Manipulating or taking advantage of others<br>● Partner relationship history<br>　○ Lack of emotionally intimate partner relationships<br>　○ Difficulty sustaining marriage-type relationship<br>　○ Violence/infidelity in relationships<br>● Developmental history<br>　○ Insecure attachment style, family dynamics, exposure to violence, and maltreatment<br>● Emotional congruence with children<br>● Nature and quality of past and current relationships<br>　○ Negative social influences<br>　　▪ Antisocial associates<br>● Associates that support risk-related attitudes and beliefs | ● Antisocial lifestyle<br>　○ Early onset and pervasive resistance to rules and supervision<br>　○ Criminal and rule breaking behavior<br>● Lifestyle instability<br>　○ Impulsivity<br>　○ Poor delay of gratification<br>　○ Substance abuse<br>　○ Employment/financial instability<br>● Dysfunctional strategies<br>　○ Poor problem-solving/decision making skills<br>　○ Emotional dysregulation<br>　○ Ineffective coping skills<br>　○ Problems controlling anger/hostility<br>● Social activities<br>　○ Lack of prosocial structured group activities<br>　○ Antisocial and/or risk-activating social activities<br>● Access to victims |

[92] Nunes, K. & Pedneault, C. I. (2020). Indirect and physiological approaches to assessing deviant sexual interests. In J Proux, F. Cortoni, L. A. Craig, & E. J. Letourneau (Eds.), *The Wiley handbook of what works with sexual offenders: Contemporary perspectives in theory, assessment, treatment, and prevention* (pp. 123-138). Wiley-Blackwell; Seto, M.C. (2018) Pedophilia and Sexual Offending Against Children: Theory, Assessment, and Intervention. American Psychological Association; Wakeling. H. (2020). The psychometric assessment of sexual aggressors. In J Proux, F. Cortoni, L. A. Craig, & E. J. Letourneau (Eds.), *The Wiley handbook of what works with sexual offenders: Contemporary perspectives in theory, assessment, treatment, and prevention* (pp. 103-122). Wiley-Blackwell.

[93] Beech, A. R., Bartels, R. M., & Dixon, L. (2013). Assessment and treatment of distorted schemas in sexual offenders. *Trauma, Violence, & Abuse, 14*(1), 54-66; Ciadha, C. O. (2017). Cognitive explanations of sexual offending. In T. A. Gannon & T. Ward (Eds.), *Sexual offending: Cognition, emotion, and motivation* (pp. 35-52). John Wiley & Sons; Helmus, L., Hanson, R. K., Babchishin, K. M., & Mann, R. E. (2013). *Attitudes supportive of sexual offending predict recidivism: a meta-analysis. Trauma, Violence & Abuse, 14*(1), 34-53; Szumski, F., Bartels, R. M. Beech, A. R., & Fisher, D. (2018). Distorted cognition related to male sexual offending: The multi-mechanism theory of cognitive distortions (MMT-CD). *Aggression & violent Behavior, 39*, 139-151.

[94] McPhail, I. V., Hermann, C. A., & Nunes, K. L. (2013). Emotional congruence with children and sexual offending against children: A meta-analytic review. *Journal of Consulting & Clinical Psychology, 81*(4), 737-749. Thornton, D., (2013). Implications of our Developing Understanding of Risk and Protective Factors in the Treatment and Adult Male Sexual Offenders. *International Journal of Behavioral Consultation and Therapy, 8*(3-4), 62-65; Ware, J. & Matsuo, D. (2016). Risk assessment and treatment planning. In D. P. Boer (Ed.), The Wiley handbook on the theories, assessment and treatment of sexual offending, Vols 1-3 (pp. 717-736). Wiley-Blackwell.

[95] Olver, M. E., Drew, A., & Sowden, J. N. (2021). An examination of latent constructs of dynamic sexual violence risk and need as a function of indigenous and non-indigenous ancestry. Psychological Services, 18(4), 484-496. Thornton, D., (2013). Implications of our Developing Understanding of Risk and Protective Factors in the Treatment and Adult Male Sexual Offenders. International Journal of Behavioral Consultation and Therapy, 8(3-4), 62-65.



CDOC/Nelson_00176

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*The chart above is focused on information validated and focused on adult males. For more information on the best practices for the evaluation of females, please refer to Appendix L.

C. The following charts contain a list of Protective and Responsivity factors. In addition to the consideration of risk domains, evaluators shall consider relevant factors which are important in the overall determination of an individual's risk.

*Chart 2: Protective Factors*

| Category | Factors |
|---|---|
| Internal Factors | • Empathy skills<br>• Effective coping skills<br>• Effective behavioral management/self-control skills<br>• Hopeful and persistent attitude toward change<br>• Resiliency skills<br>• Effective socialization skills<br>• Strengths/assets<br>• Insight, understanding, and management of risk factors |
| Motivational Factors | • Employment, financial, and residential stability<br>• Prosocial involvement in group/leisure activities<br>• The presence of medium and long-term healthy life goals<br>• Sufficient problem-solving skills to overcome common life difficulties<br>• A positive attitude toward change and maintaining a healthy lifestyle<br>• Motivated for treatment<br>• Views self as personally responsible for making the needed changes<br>• Views self as capable of making the needed changes<br>• Has an open and collaborative attitude toward authority<br>• Identified goals and interests |
| External Factors | • Prosocial network of friends/influences<br>• Healthy, age-appropriate long-term partnered relationship<br>• Has a person who is an emotionally intimate confidant<br>• Works effectively with professional support<br>• Has professional support members who understand his/her needs and how to work with him/her<br>• Living circumstances coincide with level of treatment needs<br>• Structure and support that promote maintaining success (e.g., limited access to potential victims) |



CDOC/Nelson_00177

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Chart 3: Responsivity Factors*

| Category | Factors |
|---|---|
| Internal Factors | <ul><li>Cognitive ability level/learning impairments</li><li>Physical Disability/level of adaptive functioning</li><li>Motivation/Stage of change</li><li>Treatment readiness/amenability<ul><li>Self-efficacy regarding ability to engage in treatment</li><li>Positive vs. Negative impression of self</li><li>Subjective distress (guilt/shame about offending vs. Absence of remorse)</li><li>Emotion regulation capacity to manage stress from treatment and to engage in treatment</li></ul></li><li>Level of denial</li><li>Trauma history</li><li>Mental illness/ Co-existing conditions</li><li>Personality Disorder<ul><li>Psychopathy/ antisocial personality</li><li>Borderline</li></ul></li><li>Negative emotionality/grievance attitude</li><li>Dysfunctional interpersonal style/insecure attachment</li><li>Medical/pharmacological needs</li></ul>Gender |
| External Factors | <ul><li>Ethnic/Cultural background</li><li>Family/Support system dynamics</li><li>Faith/Religious resources</li><li>Current stressors</li><li>Language or communication barriers<ul><li>Low literacy</li></ul></li></ul> |

*The charts above do not contain an exhaustive list of protective and responsivity factors.*



CDOC/Nelson_00178

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### 2.210 Formulations and Recommendations

The recommendations shall be based on supporting evidence documented in the body of the report. Each recommendation shall include a clear and concise supporting explanation within the evaluation based on the above outline and domains with 2.200.

The evaluator shall make recommendations or findings regarding:[96]

A. Overall recidivism risk determination

    a. Sexual (static, dynamic, combined)

    b. Non-sexual, if applicable

B. General and offense-related criminogenic needs/risk factors (see chart)

C. Sexual interest and/or arousal testing

D. Diagnostic impressions

E. Protective factors (see chart);

F. Responsivity factors (see chart);

G. Appropriate placement options (e.g., community-based or residential-based);

H. Potential risk management strategies that may be important for other stakeholders to consider (e.g., potential targets for community supervision, restrictions on contact with the client's own minor children, access to sexually explicit materials/establishments, use of the internet, etc.);

*Discussion: This information should be clearly identified in the evaluation, with the purpose of providing information to assist the judge in decision formulation regarding contact with a client's own minor children, access to sexually explicit materials/establishments, and use of the internet. Please note, that evaluators are not required to make a recommendation either for or against such conditions, although an evaluator may choose to include such a recommendation.*

I. Recommended interventions that support the application of risk, need, and responsivity (RNR) principles for the client and that sufficiently address victim and community safety.

*Discussion: This information should be clearly identified in the evaluation, with the purpose of providing information to assist a judge in decision formulation. Please note,* evaluators are not required to make a recommendation either for or against such contact, although an evaluator may choose to include such a recommendation.

---

[96] Association for the Prevention and Treatment of Sexual Abuse. (2014). *Practice Guidelines for the Assessment, Treatment, and Management of Male Adult Sexual s*. Retrieved from: https://www.atsa.com/.



CDOC/Nelson_00179

**2.220** Any required evaluation areas that have not been addressed, or any required evaluation procedures that have not been performed, shall be specifically noted. In addition, the evaluator must state the limitations of the absence of any required evaluation areas or procedures on the evaluation results, conclusions or recommendations. When there is insufficient information to evaluate one of the required areas, then no conclusions shall be drawn nor recommendations made concerning that required area.

**2.230** The polygraph examination may be used as an adjunct tool in the evaluation process. The polygraph should not be used to determine guilt or innocence or as the primary finder of facts for legal purposes (see Section 6.000 for Standards on the use of the polygraph).

**2.240** Evaluators have an ethical responsibility to conduct evaluation procedures in a manner that ensures the integrity of testing data, the humane and ethical treatment of the client, and compliance with the mental health statutes. Evaluators should use testing instruments in accordance with their qualifications and experience.[97]

**2.250** Evaluators shall not represent or imply that an evaluation meets the criteria for a sex offense-specific evaluation if it does not comply with the SOMB *Standards and Guidelines*. Evaluators shall include a statement in each completed evaluation as to whether the evaluation is fully compliant with the SOMB *Standards and Guidelines* or not.

---

97 Colorado Revised Statutes12-245-203. Practice outside of or beyond professional training, experience, or competence - general scope of practice for licensure, registration, or certification. (1) Notwithstanding any other provision of this article 245, no licensee, registrant, or certificate holder is authorized to practice outside of or beyond the person's area of training, experience, or competence.



CDOC/Nelson_00180

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Research Citations

The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

**https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender**

The following Adult Standards and Guidelines in Section 2.000 were revised but do not have research support given their procedural nature: 2.220, 2.230, and 2.250. The SOMB staff did a search for research applicable to the Standards in this Section. Research was not found applicable to these Standards, so in absence of research, the Standards are based on best practices procedures, professional association guidelines, and the professional expertise of the members of the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00181

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 3.000 Standards of Practice for Treatment Providers

........................................................................................................................................................................

**3.000** Sex offense-specific treatment uses evidenced-based modalities to prevent reoccurring sexually abusive/aggressive behavior by helping clients at risk of sexually offending to: (a) effectively manage the individual factors that contribute to sexually abusive behaviors, (b) develop strengths and competencies to address criminogenic needs, (c) identify and change thoughts, feelings and actions that may contribute to sexual offending, and (d) establish and maintain stable, meaningful and pro-social lives. Objectives include enhancing client success and contributing to safer communities.

The following standards for the practice of treatment providers are designed to include current evidence-based principles and best practices for therapeutic interventions in the promotion of client progression and community safety. The purpose of treatment is to facilitate positive change in clients by replacing sexually abusive or sexually problematic behaviors with behaviors that support healthy, consensual relationships. Meaningful change is possible and essential for clients who have been found guilty of a sexual offense. Such practice promotes safer communities by working to prevent re-offense.

Treatment needs are determined through evidence-based risk assessment. Not all clients are at high risk for a sexual re-offense. Research advises that clients who present with a higher risk for recidivism require more intense treatment than clients who present with a lower risk for recidivism.[98] As clients present with varying factors associated with risk, therapy is individualized to address the treatment needs of each client. Therapeutic interventions are adjusted as a client's treatment needs change.

Favorable treatment outcomes are enhanced by a positive therapeutic alliance characterized as supportive and encouraging.[99] Treatment plans are designed to include specific, attainable, and measurable goals that target individual treatment needs and that support the client's change process. Because of the potential for clients to engage in harmful behaviors, treatment plans include goals that promote community safety. Treatment providers affirm the potential

---

[98] Lovins, B., Lowenkamp, C. T., & Latessa, E. (2009). Applying the risk principle to sex offenders: Can treatment make some sex offenders worse? *The Prison Journal, 89(3),* 344-357.; Smid, W. J., Kamphuis, J. H., Wever, E. C., & Verbruggen, M. C. F. M. (2015). Risk levels, treatment duration, and drop out in a clinically composed outpatient sex offender treatment group. *Journal of Interpersonal Violence, 30(5),* 727-743.; Wakeling, H. C., Mann, R. E., & Carter, A. J. (2012). Do low-risk sexual offenders need treatment? *The Howard Journal of Criminal Justice, 51(3),* 286-299.

[99] Blasko, B. L. & Jeglic, E. L. (2016). Sexual offenders' perceptions of the client-therapist relationship: The role of risk. *Sexual Abuse: A Journal of Research and Treatment, 28(4),* 271-290.; Watson, R., Daffern, M., & Thomas, S. (2017). The impact of interpersonal style and interpersonal complementarity on the therapeutic alliance between therapist and offenders in sex offender treatment. *Sexual Abuse: A Journal of Research and Treatment, 29(2),* 107-127.; Watson, R., Thomas, S., & Daffern, M. (2015). The impact of interpersonal style on ruptures and repairs in the therapeutic alliance between offenders and therapists in sex offender treatment. *Sexual Abuse: A Journal of Research and Treatment,* 1-20.



CDOC/Nelson_00182

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

change in clients, do not compromise victim or community safety, and encourage hope for all those impacted by sexual offense.

**3.100** Sex offense-specific treatment for clients convicted of a sexual offense shall be provided by persons (hereafter referred to as providers or listed providers) meeting qualifications described in Section 4.000 of these Standards and Guidelines.[100]

*Discussion: A provider who chooses to begin treating an alleged client during the pre-conviction stage should provide treatment in compliance with these Standards and Guidelines.*

*DD/ID Discussion: When providing treatment to individuals with developmental disabilities who may exhibit sexually inappropriate behaviors but who have not been convicted of a sex offense, it is recommended that the Standards be used as guidelines. The treatment of non-convicted individuals does not fall under the purview of the Sex Offender Management Board (SOMB).*

**3.120** A provider who treats convicted sex offenders under the jurisdiction of the criminal justice system must use sex offense-specific treatment (see Definition Section). This does not preclude participation in adjunctive treatment as clinically indicated based on the risk level and needs of the client. Providers shall use their clinical judgment to prioritize treatment needs and develop a treatment plan that responds to any additional treatment needs. The provider of the adjunct services shall be knowledgeable of sex offense related issues and must be approved by the Community Supervision Team. Upon initiating services, the adjunct therapist should be considered part of the Community Supervision Team (CST).

*Discussion: There may be periods of time when offense-specific treatment is suspended or supplemented in order to respond to other acute needs of the client. Supplemental treatment that is necessary for the client to benefit from offense-specific treatment should be incorporated into the client's treatment plan.*

**3.130** Treatment providers shall utilize strength-based interventions with the goal of aiding the client in desisting from sexually abusive behavior. Such interventions will include approach-oriented goals that will enhance inherent and/or developed pro-social strengths.

*Discussion: Clients who have committed sexual offenses approach therapy with different levels of ambivalence regarding engagement in treatment. Research has shown that therapists who demonstrated an empathic, warm, rewarding, and directive approach resulted in the greatest positive changes in clients who have sexually offended.[101] Research has shown that a*

---

100 Colorado Revised Statutes (2020) 16-11.7-105 Each adult sex offender or juvenile who has committed a sexual offense sentenced by the court for an offense committed on or after January 1, 1994, shall be required, as a part of the any sentence to probation, commitment to the department of human services, sentence to community corrections, incarceration with the department of corrections, placement on parole, or out-of-home placement to undergo treatment to the extent appropriate to such offender based upon the recommendations of the evaluation and identification made pursuant to section 16-11.7-104 or based upon any subsequent recommendations by the department of corrections, the judicial department, the department of human services, or the division of criminal justice in the department of public safety, whichever is appropriate. The treatment and monitoring shall be provided by an approved provider pursuant to section 1611.7-106, and the offender shall pay for the treatment to the extent the offender is financially able do so.

101 Glaser, B. (2009). Treaters or punishers? The ethical role of mental health clinicians in sex offender programs. Aggression and Violent Behavior, 14, 248-255.; Marshall, W. L. (2005). Therapist style in sexual offender treatment: Influence on indices of change. Sexual Abuse: A Journal of Research and Treatment, 17(2), 109-116.; Marshall, W. L., Serran, G. A., Moulden, H. Mulloy. R., Fernandez. Y.M., Mann, R.E.,



CDOC/Nelson_00183

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*challenging and supportive approach, rather than a harsh confrontational style, produced increased treatment benefits.* [102]

### 3.160 Sex Offense-Specific Treatment

Treatment Providers shall use the following primary interventions:

A. Assign a risk level for each client.

1. Preliminary assignment of risk shall be conducted by the provider within the first 30 days of treatment.

2. Assignment of risk shall be based upon the information available to the provider. This includes but is not limited to: the pre-sentence evaluation, the pre-sentence investigation, police reports, clinical interview, observations, psychological test results, the intake, and possible updated risk assessments and psychological results.

3. **Treatment providers shall tailor a client's treatment dosage and intensity to match the assessed risk of the client.** Treatment dosage congruent with the client's risk and need increases the likelihood of a positive treatment outcome. [103] Responsivity factors (such as learning style, level of functioning, developmental maturity and language skills) shall be identified and incorporated when determining the course of treatment. As a client's risk or needs change, the provider shall modify treatment dosage accordingly. The provider shall consult with the CST regarding the need for referral to a program of different intensity if not offered in his/her program.

4. Risk assessment is an ongoing process throughout the client's treatment (see Section 2.000 for a list of risk assessment tools.)

B. Core Treatment Concepts

1. Risk factors identified for treatment intervention shall be supported by evidenced-based research.

   *Discussion: The provider should select at least one dynamic risk assessment instrument(s) to identify specific risk factors to target. (See Section 2.200 for recommended instruments.) Other risk factors may be identified, provided the risk factors are supported in sex-offense peer-reviewed literature.*

---

& Thornton, D. (2002). Therapist features in sexual offender treatment: Their reliable identification and influence on behaviour change. *Clinical Psychological and Psychotherapy, 9*, 395-405.

[102] Glaser, B. (2009). Treaters or punishers? The ethical role of mental health clinicians in sex offender programs. *Aggression and Violent Behavior, 14*, 248-255.; Marshall, W. L. (2005). Therapist style in sexual offender treatment: Influence on indices of change. *Sexual Abuse: A Journal of Research and Treatment, 17(2)*, 109-116.; Marshall, W. L., Serran, G. A., Fernandez, Y.M., Mulloy, R., Mann, R. E., & Thornton, D. (2003). Therapist characteristics in the treatment of sexual offenders: Tentative data on their relationship with indices of behaviour change. *Journal of Sexual Aggression, 9*, 25-30.

[103] Smid, W. J., Kamphuis, J. H., Wever, E. C., & Verbruggen, M. C. F. M. (2015). Risk levels, treatment duration, and drop out in a clinically composed outpatient sex offender treatment group. *Journal of Interpersonal Violence, 30(5)*, 727-743.; Wakeling, H. C., Mann, R. E., & Carter, A. J. (2012). Do low-risk sexual offenders need treatment? *The Howard Journal of Criminal Justice, 51(3)*, 286-299.



CDOC/Nelson_00184

2. Providers shall address the client's individualized risk factors as priority treatment targets in addition to other clinical needs and concerns.

3. The following treatment concepts shall include but not be limited each client's sex offense-specific treatment:

   a. Acceptance of responsibility for offending and abusive behavior;

      i. A sexual history, including sexual offense history, disclosure process shall be a required component of treatment for the purpose of identifying the risk and treatment needs of the client. The client shall complete a sexual behavior disclosure packet (see Appendix P), and upon completion of the disclosure process, shall be referred for a sexual history polygraph (see Section 6.012).[104]

      If the client refuses to answer incriminating sexual offense history questions, including sexual offense history polygraph questions, then the provider shall meet with the supervising officer and polygraph examiner to identify and implement alternative methods of assessing and managing risk and needs. The provider shall not unsuccessfully discharge an offender from treatment for solely refusing to answer incriminating sexual offense history questions, including sexual offense history polygraph questions.

      *Discussion: This provision has been included in the Standards and Guidelines to ensure compliance with an offender's privilege against self-incrimination and relevant case law.*

      *In sex offender treatment and supervision, disclosure and accountability are encouraged. Disclosure of past sexual offending behaviors is considered important to understand the offender's index offense and offense patterns, to facilitate behavioral change and can be very beneficial to offenders in relieving guilt and shame regarding past offenses.*

      *While treatment providers shall not unsuccessfully discharge an offender from treatment solely for refusing to answer incriminating questions, a treatment provider may opt to discharge a client from treatment or not accept a client into treatment if the provider determines a factor(s) exists that compromises the therapeutic process.*

   b. Identify thoughts, feelings, and behaviors that lead up to the offending behavior;

   c. Restructure cognitive distortions;

   d. Establish adaptive pro-social functioning;

---

[104] *United States v. Von Behren*, 822 F.3d 1139 (10th Cir. 2016).



CDOC/Nelson_00185

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    e.  Promote healthy sexuality and relationship skills;

    f.  Gain knowledge of victim impact and empathy.[105]

        i.  Offense specific treatment shall incorporate a victim centered approach. This means a commitment to protecting victims, being sensitive to victim issues and responsive to victims' needs (see Section 8.000).

        *Discussion: Community safety and the rights and interests of victims and their families are important considerations when developing and implementing assessment, treatment and other strategies to reduce the risk posed by sexual abusers.[106]*

        *Discussion: Therapists have an ethical obligation to the client. This focus includes a balanced response to the assessed needs of the client, the protection of identified victims and the prevention of further victimization. The needs of the client and victim exist on a continuum.*

       ii.  Clarification work shall be a required component of treatment.

        *Discussion: Please refer to Section 5.745 regarding the victim clarification processes. Clarification is designed to primarily benefit the victim. A victim may or may not choose to participate in the clarification process, and the CST should also make a determination that clarification is in the victim's best interests. The clarification process may also be conducted for secondary victims.*

        *Clarification work by the offender shall occur regardless of whether the victim participates, and may include written letters, practice sessions with the provider, group work, and victim panels. In addition, verbal or face-to-face sessions with the victim may occur if the victim chooses to participate in clarification.*

    g.  Develop Pro-Social Living Plan.

        i.  The provider shall require clients to complete a Pro-Social Living Plan prior to completion of treatment.[107]

       ii.  The Pro-Social Living Plan should aid the client in creating a life that is incompatible with offending behavior.

---

[105] The SOMB recognizes empathy is not an evidenced-based risk factor. However, empathy is a necessary component for healthy social connections and an important skill in developing pro-social support systems.

[106] Dritt, J. L. (2011). *It's a big tent: Victim advocates and sex offender management professionals working together* [PowerPoint slides]. 30th Annual Association for the Treatment of Sexual Abusers Research and Treatment Conference.

[107] A Pro-Social Living Plan is a comprehensive strategy to prevent relapse by solidifying client strengths, and mitigating risk with protective factors so that the client can successfully establish a pro-social lifestyle that is incompatible with re-offense.



CDOC/Nelson_00186

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

      iii.   This plan shall be completed in collaboration with the client and incorporate individualized strategies.

4. Providers may expand interventions to additional treatment topics as necessary based on the client's risk and need, and community safety.

5. Group therapy is the preferred modality in which sex offense-specific treatment should occur. Other treatment modalities such as individual, family, psycho-educational, and other adjunct options may be appropriate for goal-oriented purposes. The specific client needs and purpose of an alternative modality shall be determined by the therapist. Changes in modality shall be documented in the client's treatment plan and reviewed pursuant to Standard 3.160(B)(6).

6. In-person therapy is the preferred and expected modality in which sex offense specific treatment should occur. In some cases, teletherapy may be an appropriate modality to meet the individual needs of the client.  If using teletherapy, providers shall follow the criteria outlined in Appendix U

7. Identified risk factors shall be documented in the individualized treatment plan.

Upon a client entering treatment, a provider shall develop a written treatment within 60 days, based on the relevant needs and risks identified in current and past assessments/ evaluations of the client. The individual treatment plan (ITP) serves an important role in the therapeutic process. The ITP serves as a guide for the client to navigate the change process and have a clear understanding of what is expected throughout treatment and shall be:

A. Based on the initial assessment of individual risks and needs

B. Be updated as needed through ongoing assessment of individual's risks and needs through validated risk assessments, as applicable, as well as response to treatment  (Refer to Appendix E "Sexual Offense History Decision Aid" and Appendix F "Sex Offense- Specific Intake Review for Clients Who Have Been in Prior Treatment.")

C. Written with clearly identifiable goals (action to be accomplished) and objectives (incremental steps to help the client accomplish the goal). The objectives shall be written based on the client's developmental abilities and be set in small increments to help the client gain a sense of success

D. A tool for the client written in a language the client can understand

E. Be modified based on a client reaching treatment goals or lack thereof

F. Include goals and objectives that are:

    a. Specific
    b. Measurable



CDOC/Nelson_00187

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    c. Attainable
    d. Realistic
    e. Timely

Individual Treatment Plans shall:

A. Be written in a format that allows the client to assess their level of progress toward meeting treatment goals throughout therapy

B. Be designed to address strengths, risks, and needs in areas identified by the evaluation (Refer to Section 2.000 and Appendix E "Sexual Offense History Decision Aid")

C. Incorporate relevant information from any risk assessments that have been completed and the outcomes

D. Incorporate all identified treatment content areas, as appropriate.

E. Utilize strength-based principles to increase protective factors and decrease risk.

F. Address social functioning and enhance the abilities of support systems to respond to the client's needs and concerns.

G. Support the development of and/or the consistency of the client's pro-social support system.

H. Include input from the victim or victim representative to enhance Support victim impact, empathy, and clarification goals. (See Section 9.000 for guidance).

I. Be reviewed and signed by the client, and the provider, (along with the provider's supervisor when applicable). A copy of the treatment plan shall be offered to the client and provided upon request.

J. Be reviewed at a minimum of every six months and each transition point, or revised as needed.

K. Clients in the maintenance phase of treatment shall have a treatment plan that is reviewed a minimum of every 12 months or sooner if pertinent information warrants a review.

L. Be provided to the referral source supervising officer when initially created, and whenever revised, and at a minimum of every 6 months. along with monthly summaries or progress reports per 5.210 C. The treatment plan may also be released to individuals with a valid release of information.

8. Deliver services in a manner that accommodates client characteristics.

    A. The provider shall employ treatment methods that are responsive to the assessed needs of the client and emphasize the physical and psychological safety



CDOC/Nelson_00188

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

of victims and potential victims. Treatment interventions shall be responsive to the client's level of intellectual functioning, learning style, personality characteristics, culture, mental and physical disabilities, motivation level, and level of denial.

*Discussion DD/ID: Achieving success in the above listed content areas for the client with developmental disabilities may require modifications based on the needs of the individual such as using pictures instead of written assignments, or using a data collection system by the treatment provider to document skills learned by the client. The presence of concrete thinking, difficulty with concepts and abstraction and the need for frequent repetition and simple, direct instruction is common.*

B.  Providers shall build upon client strengths and protective factors such as motivation to change, literacy skills, lifestyle stability, and pro-social support systems.

C.  Providers shall utilize strength-based interventions and approach oriented goals.

**8.** A provider shall model behavior and conduct himself/herself in a manner that is humane, non-discriminatory and consistent with their professional ethics and rules. Additionally, providers shall not allow personal feelings regarding a client's crime(s) or behavior to interfere with professional judgment and objectivity. When a provider cannot deliver the highest quality of service for any reason, the provider shall refer the client elsewhere.

## 3.162  Clients who Have Filed an Appeal

Where a court or the parole board has ordered a client to participate in treatment, and the client has subsequently filed a direct appeal or post-conviction motion  of the sex crime conviction, the client may assert a right against self-incrimination such that the client cannot comply with certain requirements outlined in the SOMB Standards and Guidelines (see section 3.160).

In such cases, the treatment provider shall obtain verification or written documentation that a direct appeal or post-conviction motion has been filed.  Once an appeal is verified, providers may modify the following Standards:

A.  Not discussing the offense of conviction
B.  Not completing clarification work specific to the offense of conviction
C.  Not discussing Sex History questions specific to the offense of conviction

*Discussion Point At the time of sentencing, clients have limited time to file a direct appeal. If the client is within this time frame, providers should not discharge the client or consider deniers' interventions.  Should a client refuse to answer questions and invoke their 5th amendment right against self-incrimination, and they have not provided verification an appeal has been filed or is in progress within 60 days of being accepted into treatment, it is recommended the client be assessed under 3.500 for Managing Clients in Denial.*



CDOC/Nelson_00189

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Based on the amount of time clients have to file a post-conviction motion, the appeals process can be lengthy. It is ultimately the responsibility of the client to provide documentation and updates to the treatment provider regarding the status of any subsequent appeal or post-conviction motions.*

The treatment provider shall require the client to adhere to all other components of treatment per these Standards and Guidelines unless a variance from the Board is in place. The treatment provider shall also notify the Application Review Committee (ARC) of the SOMB regarding the modification and submit updates regarding the status to ARC every six (6) months.

A variance to the SOMB is required prior to modifying the Standards and Guidelines for the following:

    A. 3.200 A Successful Discharge from Treatment: Successful completion of treatment shall be determined by the provider based on all clinical indicators.  Such a determination will be based on the client's overall change through the treatment process, including risk level, any existing criminogenic needs, and the client's sustained ability to integrate treatment concepts and tools (e.g., the Pro-Social Living Plan) into daily life. The provider shall discharge the client regardless of the length of time the client remains under supervision.

        a. It is important to note that until an appeal is complete unless the conviction is upheld cannot fully progress and be discharged successfully until they have met all the required components of sex offense-specific treatment as outlined in section 3.160.

    B. 5.735 Criteria for CST Approval of Supervised Contact with Secondary and Non-Victim Minor Children.

*Discussion Point: In rare cases, clients under appeal may be granted Use Immunity.  An agreement for "use immunity" is a court-ordered agreement between the defendant and the prosecutor that the defendant's statements and any evidence derived from those statements will not be used against them during a future prosecution.*

Treatment Providers have an ethical responsibility to be aware of the circumstances under which they are providing treatment to a client. This ethical responsibility does not require treatment providers to be aware of information outside of their professional role and capacity. Treatment providers shall ask clients if they have been granted Use Immunity.  If the client does not know, the treatment provider can assume no use immunity is in place and proceed accordingly. If a provider can verify a client has a Use Immunity Agreement, they can discuss the crime of conviction without those statements violating the client's 5th Amendment right against self-incrimination.  The Standards and Guidelines shall be followed as written if a Use Immunity agreement is determined to be in place.

*Discussion: Clients who are appealing the sex crime conviction can still benefit from participation in the sexual history behavior disclosure process, and discuss behaviors unrelated*



CDOC/Nelson_00190

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*to the conviction. Clients may also be able to participate in the sexual history polygraph process, excluding the crime of conviction, if determined to be appropriate to do so by the polygraph examiner and the CST.*

*Discussion:  A treatment provider has the right not to accept a referral based on the provider's determination that he/she cannot meet the needs of the client.*

**3.165  Use of Assessment Tools within Offense-Specific Treatment**

Polygraph and sexual interest/sexual arousal assessments shall be used in treatment (see Section 6.000 and Section 7.000). These assessments can assist in learning more about a client's sexual history, sexual interest or arousal, and daily behaviors and compliance. These assessments can encourage honesty, verify progress, promote discussions, and further build therapeutic rapport. The provider shall discuss assessment results with the client to determine how these results may change the clients' individual treatment plan. Discussion pertaining to unresolved assessment outcomes shall not be the sole indicator for discharge from offense-specific treatment. If the client refuses to answer incriminating sexual offense history questions, the CST shall convene to identify and implement alternative methods of assessing and managing risk and need (see Section 3.160 B.3). For further direction on the use of polygraph results see Sections 5.600 and 6.000.

*Discussion: Providers who utilize this data shall be aware of the limitations of these technologies and shall recognize that this data is only meaningful within the context of a comprehensive evaluation and treatment process.*

*Discussion DD/ID: Use of some of these assessments and testing instruments with clients with developmental disabilities is relatively new. Employing these results for the purposes of assessing risk and planning for treatment should be done cautiously. Please see Section 2.000 (DD) for additional standards pertaining to evaluations. Wherever possible, materials appropriate for use with clients with developmental disabilities shall be utilized instead of materials developed for a non-developmentally disabled population.*

**3.170  Group Composition**

A.  The ratio of treatment providers to clients in a treatment group shall not exceed 1:8. Treatment group size shall not exceed 14 clients. Larger groups may be convened solely for educational purposes.

*Discussion: When determining group size, a treatment provider should continually assess group dynamics to ensure the best size for healthy group functioning. When groups consistently exceed the 1:8 ratios, therapeutic benefit decreases substantially. While it is realistic to expect group size to occasionally fluctuate due to extenuating circumstances (e.g. holidays, clients making up a missed group, co-therapist illness), such increases in group size shall be temporary. People with additional needs, may need a smaller group to effectively progress through treatment.*

B.  Genders shall not be mixed in a sex offense-specific treatment group.



CDOC/Nelson_00191

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Discussion: For many individuals, gender identity and gender expression can lie on a spectrum. Allowing transgender individuals to participate in a group with peers that identify as the same sex as they do may have a greater potential for the successful completion of treatment. Placement of individuals that do not fall within the binary model of gender should be based on the best environment for the client and that which has all clients' best interests in mind.*

*Discussion: It is understood that informed supervision sessions, victim clarifications sessions and other modalities that do not require the same level of therapeutic work as a treatment group, may successfully contain, and sometimes require, a mix of genders to participate together.*

C. **Differentiating client risk is a critical part of the therapeutic process in order to limit the degree to which low risk clients are exposed to high risk clients,** because such exposure may increase a low risk client's risk to sexually re-offend. Treatment providers should not routinely assign clients to groups comprised of individuals presenting markedly dissimilar levels of risk. If circumstances necessitate facilitating groups with dissimilar levels of risk, the treatment provider shall implement strategies to monitor for potential harm, adverse dynamics, and undue influence on low risk clients. The treatment provider shall establish a rationale for the group composition when low risk clients are mixed with high risk clients and should explore opportunities to separate these populations. As a general rule, low risk clients should be identified and excluded from high risk clients in offense-specific treatment groups. Risk score shall be determined by the combined score derived from the static and dynamic risk assessment. Where a risk-level appropriate group is not available to a client, treatment providers should use alternative modalities such as individual therapy.

*Discussion: While some clients may remain in the same level throughout treatment, there is also the ability to move clients to a different level of treatment as clinically indicated. This process should be carefully facilitated based on new information such as changes in risk factors, mitigation of risk factors, or other emerging clinical issues. Providers may use their discretion for determining when and how clients should transition to a different group, if applicable and appropriate. When limited resources prevent the provider from establishing a low-risk treatment group, it is important to implement strategies and interventions that are based on client risk levels such as the use of individual sessions. Clients in all levels of treatment may be together for psycho-educational, non-therapeutic groups or classes.*[108]

---

[108] Lovins, B., Lowenkamp, C. T., & Latessa, E. J. (2009). Applying the risk principle to sex offenders: Can treatment make some sex offenders worse? The Prison Journal, 89(3), 344-357. Wakeling, H. C., Mann, R. E., & Carter, A. J. (2012). Do low-risk sexual offenders need treatment? The Howard Journal of Criminal Justice, 51(3), 286-299. Hanson, R. K., Bourgon, G., Helmus, L., Hodgson, S. (2009). The principles of effective correctional treatment also apply to sexual offenders: A meta-analysis. Criminal Justice and Behavior, 36(9), 865-891.



CDOC/Nelson_00192

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### 3.175  Safety Planning

The provider should encourage and support clients in the development of safety plans for activities to prepare clients to address potentially risky situations and develop adaptive coping responses to situations. Safety plans should address potentially risky situations while taking into account client needs and victim and community safety. Safety plans will be submitted to the Community Supervision Team (CST) for review.

### 3.180  Maintenance Phase of Treatment

The maintenance phase of treatment gives the client the ability to demonstrate the treatment gains and tools learned within offense-specific treatment. A client may move into the maintenance phase of treatment upon:

A. Completing all the treatment objectives outlined in the individualized treatment plan;

B. Sustaining compliance with the program expectations of treatment and supervision; and

C. Appearing ready for a more autonomous phase of treatment.

Movement into the maintenance phase of treatment should be the treatment provider's decision based on the client's risk and needs.

### 3.200  Discharge from Treatment

When discharging a client from treatment, providers shall document the type and reason for discharge within the discharge summary.

Types of Discharges:

A. Successful:

    1. Successful completion of treatment shall be determined by the provider based on all clinical indicators. Such a determination will be based on the client's overall change through the treatment process, including risk level, any existing criminogenic needs and the client's sustained ability to integrate treatment concepts and tools (e.g., the Pro-Social Living Plan) into daily life. The provider shall discharge the client regardless of the length of time the client remains under supervision.

    *Discussion Point: When clients are successfully discharged from treatment, it is recommended that providers utilize the Notice of Discharge Status Form (Appendix I). This form allows a therapist to share information regarding the defendant's compliance with the requirement for treatment. Although this form could be used with unsuccessful discharges, they are most beneficial when the client has discharged successfully as motions may be filed with the Court years after discharge, including issues regarding registration. Since court records are kept far longer than any other*



CDOC/Nelson_00193

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*forms of documentation, this practice will ensure documents remain available to the Courts and the client. Provider may also attach a copy of the discharge summary so the Court has more detailed information to consider as needed.*

There may be instances when a client is discharged from treatment before successfully completing offense-specific treatment. Circumstances of such discharges could include:

B. Unsuccessful:

1. The client's behavior is contradictory to the treatment and/or supervision conditions and the treatment provider, in consultation with the other CST members, determines that the client is no longer an appropriate candidate for the treatment program. (Reference section 5.200)

Reasons for this type of discharge shall include:

a. Behavioral non-compliance with supervision and/or treatment conditions
b. A client has re-offended
c. Lack of consistent engagement in treatment and they have failed to progress with treatment goals (i.e. failure to progress)

C. Administrative Discharge – Due to a change in the client's circumstances, the provider can no longer keep a client in treatment. This type of discharge shall not be considered unsuccessful and is inappropriate for clients who are considered non-compliant or failing to progress.

Reasons for this type of discharge may include:

1. Therapeutic Transfer – The treatment provider is unable to meet the client's needs and will need to refer the client to another agency. This discharge also includes when a client requests to change providers.

2. Medical Discharge – The client has a chronic medical condition that prohibits him from attending and benefiting from treatment.

3. Incompetency/Capacity Discharge – The client cannot benefit from treatment due to a current state of incompetency or lack of capacity.

4. Instability within the Community: The client lacks sufficient stability in the community and/or protective factors needed in order to engage in treatment effectively. Provider shall provide further recommendations in the discharge summary of how to address these issues which may include:

a. Transportation Barriers
b. Housing



CDOC/Nelson_00194

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    c.      Employment

    d.      Other treatment needs are a priority such as MH or Substance Use:

         i.   The client is willing to participate and cooperate however there are significant barriers to the client's compliance or ability to engage in treatment.

5. Deportation

6. Conflict of Interest (i.e. discharge due to pending complaint or legal matters)

7. Death of the Client

8. Sentence Discharge/Completion: The jurisdiction of the Court has ended prior to the client being able to finish all treatment requirements.

There may be times when a client is being administratively discharged, and the reasons for discharge are unlikely to change in the foreseeable future. In situations, where the provider feels the client has reached maximum benefit within treatment, they shall provide a detailed explanation of how the client meets the following definition:

**Maximum Benefit:** *A discharge, for this reason, is an indication that the client has made sufficient progress on treatment goals related to sexually abusive behavior, has addressed their risk of sexually offending, does not present with an active or acute risk of sexual harm, and is unlikely to make additional progress with continued treatment at this time.*

*Discussion Point: A discharge based on maximum benefit gained does not suggest that a client may not benefit from therapy, including sex offense specific therapy, in the future, that there are no additional treatment needs, or that the client has completed all treatment goals. It should also be noted that benefits gained from therapy may increase overtime outside of the context of therapy. It should also be noted that benefits gained from therapy may increase overtime outside of the context of therapy.*

### 3.210 Discharge Summaries

A. In instances of a successful discharge, the discharge summary shall be provided to the client and the referral source within 30 days of the date of discharge.

B. In the instances of a discharge that is other than successful, the discharge summary shall be provided to the referral source within 30 days of discharge. When clients request their unsuccessful discharge summary, a provider shall provide the discharge summary within 10 days of the request. Should it not be completed at the time of the request, it shall be provided within 10 days of its completion of the discharge summary.

Discharge summaries may be provided to other persons, with a valid release, as requested and appropriate.



CDOC/Nelson_00195

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The information recorded by the treatment provider shall include but not be limited to, the following:

1. Identification of the precipitating offense;

2. Length of time in treatment and any prior treatment, including a brief summary of reasons for prior discharge,

3. Current level of risk, including identification of specific risk and protective factors;

4. Type of Discharge:

     a. Successful
     b. Unsuccessful
     c. Administrative

5. Reason (s) for Discharge,

6. All Discharge summaries shall include documentation regarding the client's status and progress on all Treatment CORE Competencies which include, but are not limited to:

     A. Individualized Risk Factors

     B. Level of Accountability and Responsibility

     C. Core Treatment Objectives as required in 3.160(3) letters a through g, including any additional treatment plan goals.

     D. Providers shall document specific information regarding the status of the Sex History and polygraph process (if applicable) including dates, the examiner or agency and outcomes of Sex History polygraph exams.

     E. Contact with Minor Children.

          a. Providers shall document the following as applicable:
               i.    Specific Pathway for Contact
               ii.   CCS Results
               iii.  Progress in 5.735
               iv.   Approved Supervisor Information
               v.    Clarification/Reunification
               vi.   Any restrictions/limitations imposed by the CST regarding contact with minor children.

For unsuccessful or administrative discharges, providers shall document the following:



CDOC/Nelson_00196

A.  Specific violations of the treatment contract, non-compliance, or areas where the client has failed to progress.

B.  A summary of the client's progress regarding Core Competencies and Treatment Objectives. Specifically, on how the client has progressed, failed to progress or completed each competency during treatment.

C.  Methods that have not been successful or effective in increasing engagement within treatment and compliance with the conditions of treatment and supervision.

D.  Recommendations on what the clients need to increase their ability to be successful in treatment. Each recommendation shall include a clear and concise supporting explanation within the discharge summary.

### *3.300 Confidentiality*

### 3.310  Waivers of Confidentiality

When enrolling a client in treatment, a provider shall obtain a signed waiver of confidentiality based on the informed assent of the client. The information shall be provided in a manner that is easily understood, verbally and in writing, in the native language of the person (when available), or through other modes of communication as may be necessary to enhance understanding. The waiver of confidentiality shall extend to members of the CST and other individuals or agencies responsible for the supervision of the client.[109] A provider shall obtain the following waivers, which should each be completed as a separate document with its own signature from the client.

*Discussion Point: Waivers of Confidentiality are a requirement of participation in Sex Offense Specific Treatment as a condition of probation, parole, and community corrections.*

### 3.310  DD/ID

A.  The provider shall obtain the informed assent of the legal guardian, if applicable, and the informed assent of the client with developmental disabilities and/or intellectual disabilities for treatment. The guardian will be informed of the treatment methods, how the information may be used and to whom it will be released. The provider shall also inform the client with developmental disabilities and/or intellectual disabilities and the guardian about the nature of the provider's relationship with the client and with the court. The provider shall respect the client's right to be fully informed about treatment procedures.

---

[109] Colorado Revised Statutes (2020) 12-245-220 Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the person to whom the knowledge relates.



CDOC/Nelson_00197

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    B.  If informed assent cannot be obtained after consulting with the third party, then the provider shall refer the case back to the Community Supervision Team or the court.

**3.315**  Authorization for the Release of Information (ROI) When a provider needs to share information about a client with an entity not covered by the waiver of confidentiality a signed ROI shall be in place.[110]

    A.  Treatment ROI: This ROI shall explain that written and verbal information will be shared between the treatment provider and the individual or agency named on the ROI. The ROI must include information regarding the time limit of the authorization as well as the procedure to revoke the authorization.

    B.  Substance Use Disorder Treatment ROI: For clients undergoing substance use disorder treatment co-occurring with sex offender treatment, this ROI shall comply with the provisions of 42 C.F.R. § 2.31.

    C.  Research ROI: Prior to entering information into the SOMB Data Collection System the provider must have a signed research ROI. The provider shall inform the client that this ROI is voluntary and is solely for communication with the SOMB for the purpose of research related to the Standards and Guidelines for sex offender management in Colorado, in compliance with 45 CFR § 64.508.

    Discussion: Releases of Information are a voluntary aspect of Sex Offense Specific treatment. The ROI is an authorization by the client for the provider to share/receive confidential information from an identified individual or agency for the purposes of providing treatment services.

**3.320**  Waivers of confidentiality shall extend to the victim, the victim representative/therapist, the guardian ad litem of a child victim, the caseworker, the approved supervisor(s), the client's current partner, the guardian, or other individuals involved in the case.[111] This is especially important with regard to, but not limited to:

    A.  Client non-compliance with treatment;

    B.  Information about risk, threats, and possible escalation of violence;

---

110 Colorado Revised Statutes (2020) C.R.S. 12-245-220 Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the

person to whom the knowledge relates

111 Colorado Revised Statutes (2020) C.R.S. 12-245-220 Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the

person to whom the knowledge relates.



CDOC/Nelson_00198

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

C.  Decisions regarding clarification or reunification of the family, and

D.  A client's contact with past or potential child victims.

3.330  The provider shall notify all clients in writing of the limits of confidentiality imposed on therapists by the mandatory reporting law, Section 19-3-304, C.R.S. and to Section 12-43-219, C.R.S. [112]

3.340  The provider shall ensure that a client understands the scope and limits of confidentiality in the context of his/her particular situation, including the collection of collateral information, which may or may not be confidential.

### 3.400  Treatment Provider-Client Contract

3.410  The provider shall develop and utilize a written contract with each client prior to the commencement of treatment. The contract shall define the specific responsibilities of both the provider and the client. A client's failure to comply with the terms of the contract may result in discharge from treatment.

A.  The provider's responsibility is to practice within their professional standards as defined in the Colorado Mental Health Practice Act[113] and in the *Standards and Guidelines* established by the Colorado Sex Offender Management Board.

B.  The contract shall explain the responsibility of the provider to:

1.  List the costs of assessment, evaluation, and treatment, including all medical and psychological tests, physiological tests and consultations;

2.  Describe the waivers of confidentiality and limits of confidentiality pursuant to Section 3.300 of these *Standards and Guidelines*. A signed waiver is required for treatment to be provided;

3.  Describe the right of the client to refuse treatment and to refuse to waive confidentiality, as a result of which the provider will be unable to provide services. The contract shall also describe the potential outcomes of that decision;

4.  Describe the necessary procedures the client must follow in order to revoke a waiver of confidentiality;

---

112 Colorado Revised Statutes (2020) C.R.S. 12-245-220 Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the person to whom the knowledge relates.

113 Section 12-43-101, COLORADO REVISED STATUTES



CDOC/Nelson_00199

5. The provider shall notify all clients in writing of the limits of confidentiality imposed on therapists by the mandatory reporting law, Section 19-3-304, C.R.S. and to Section 12-43-219, C.R.S.

6. Provide instructions and describe limitations regarding the client's contact with victims, secondary victims, and minor children as listed in these *Standards and Guidelines*; and

7. Establish expectations for the client to provide for the protection of past and potential victims from unsafe and unwanted contact with the client.

C. The contract shall explain any responsibilities of the client, as applicable, to:

1. Pay for the costs of assessment and treatment, and include how a client may address any inability to pay with the provider. The client may also be required to pay for the costs of treatment for the victim(s) of the client's sexually abusive behavior, as well as secondary victims such as family members;

2. Attend and participate in sex offense-specific treatment, including cooperating with polygraph testing and sexual arousal/interest testing as directed in the *Standards and Guidelines* (see Section 3.165);

3. Comply with the limitations and restrictions as described in the terms and conditions of probation, parole, and/or community corrections;

4. Describe the responsibility of the client to protect community safety by avoiding risky, aggressive, or re-offending behavior, avoiding high risk situations, and by reporting any such behavior to the provider and the supervising officer as soon as possible;

5. Agree to abide by the limitations regarding the client's contact with victims, secondary victims, vulnerable populations and minor children as outlined in the SOMB's *Standards and Guidelines*; and

6. Agree to support the protection of past and potential victims from unsafe and unwanted contact with the client.

*Discussion: In addition, the provider may incorporate additional limits and expectations based upon the client's identified risks, needs and patterns of behavior. For example, limits may be placed regarding the use of pornography/sexually stimulating material, substance use, or internet use, as appropriate.*



CDOC/Nelson_00200

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### 3.420  Client Files

Providers shall maintain client files in accordance with the professional standards of their individual disciplines and with Colorado state law and federal statutes on health care records.[114] Client files shall:

A.  Document the goals of treatment, the methods used, and the client's observed progress, or lack thereof, toward reaching the goals in the treatment plans;

B.  Record specific achievements, failed assignments, rule violations and consequences; and

C.  Accurately reflect the client's treatment progress, sessions attended and changes in treatment

D.  A client's contact with past or potential child victims.

### 3.500 Acceptance of Responsibility and Accountability

Acceptance of responsibility concerns the degree that the client believes the sex offense was due to their own personal decisions and actions as opposed to external causes.[115] It is related to accountability, which involves taking actions to repair and prevent future harm.[116] Taking responsibility and accountability includes, but is not limited to, acknowledgment of the sexually abusive behavior, ownership of being the cause of the sexually abusive behavior, and understanding the impact the behavior has had on the victim and secondary victims.[117] It also includes having internal motivation and taking actions to apply changes to one's life to ensure no sexually abusive behavior is ever committed again.

Underpinning the emphasis on responsibility and accountability is the assertion that clients will be more likely to engage with, complete, and benefit from treatment to address their offending if they take substantial responsibility and accountability for their abusive behavior.[118] For example, research supports that desistance from sex offending involves cognitive transformations, including recognition of harm and reappraisal of personal responsibility for problems and offending.[119] Research has also shown that denial of responsibility and having a

---

[114] CCR 726-1-16 - RECORDS REQUIRED TO BE KEPT AND RECORD RETENTION (COLORADO REVISED STATUTESSection's 12-43-203(3), 12-43-222(1)(u)) (a)General. Except as provided in subsection (g) of this Rule, every social worker shall create and shall maintain records on each of her/his social work/psychotherapy clients. Every social worker shall retain a record, as defined in subsection (b) of this Rule, on each social work/psychotherapy client for a period of seven (7) years, commencing on the termination of social work/psychotherapy services or on the date of last contact with the client, whichever is later.

[115] McGrath, R. J., Cummin, G. F., & Lasher, M. P. (2013). *Sex offender treatment intervention and progress scale manual*. Authors.

[116] Pavelka, S., & Thomas, D. (2019). The evolution of balanced and restorative justice. *Juvenile & Family Court Journal, 70*(1), 37-58.

[117] Secondary victims refer to those individuals indirectly harmed by the offending. It includes, but is not limited to, the family of the victim of the sexual offending and the family of the individual who committed the sexual offending.

[118] Levenson, J. S. (2011). "But I didn't do it!" Ethical treatment of sex offenders in denial. *Sexual Abuse: A Journal of Research and Treatment, 23(3)*, 346-364.; Witt, P. H., & Yeoman, A. (2019). Denial among sex offenders: Does it make a difference. *Criminal Justice Research Review, 20*(2), 43-47.

[119] Farmer, M., McAlinden, A., & Maruna, S. (2015). Understanding desistance from sexual offending: A thematic review of research findings. *Probation Journal, 62*(4), 320-225; Harris, D. A. (2014). Desistance from sexual offending: Findings from 21 life history narratives. *Journal of Interpersonal Violence, 29*(9), 1544-1578; Kras, K. M., & Blasko, B. L., (2016). Pathways to desistance among men convicted of sexual offenses: Linking post hoc accounts of offending behavior and outcomes. *International Journal of Offender Therapy and Comparative*



CDOC/Nelson_00201

negative attitude toward treatment are factors associated with higher rates of non-completion, while higher motivation and treatment engagement are factors associated with treatment completion.[120] Non-completion of sex offense treatment programs, in general, has been associated with higher rates of sexual and other recidivism.[121]

Having the client accept responsibility and be accountable are also important components of victim-centered practices.[122] Per Colorado Revised Statutes, "The board shall develop and implement methods of intervention for adult sex offenders, which methods have as a priority the physical and psychological safety of victims and potential victims and which are appropriate to the assessed needs of the particular offender, so long as there is no reduction in the safety of victims and potential victims."[123] Addressing acceptance of responsibility for those convicted of a sexual offense can also serve the purpose of supporting and empowering victim healing and recovery.[124]

Acceptance of responsibility contrasts with denial and minimization of responsibility. Denial is a psychological defense mechanism that protects the ego from anxiety-producing information.[125] Denial and minimization of offending can also involve normal conscious actions to avoid internal or external consequences associated with offending. Denial of the evidence can be a derivative of defiant or oppositional orientations, which could be more indicative of those with characterological issues. Those with this presentation are also more likely to make false admissions to evade consequences, compared to shame or guilt. Although denial and minimization may be associated with other risk factors,[126] research has not produced consistent findings that denial increases the risk for sexual re-offense.[127] Rather, in the RNR model, denial

*Criminology, 60*(15), 1738-1755; Richards, K., Death, J., & McCarten, K. (2020). Toward redemption: Aboriginal and/or Torres Strait Islander men's narratives of desistance from sexual offending. *Victims & Offenders, 15*(6), 810-833.

[120] Olver, M. E., Stockdale, K., & Wormith, J. S. (2011). A meta-analysis of predictors of offender treatment attrition and its relationship to recidivism. *Journal of Consulting & Clinical Psychology, 79,* 6-21.

[121] Craissati, J., South, R., & Bierer, K. (2009). Exploring the effectiveness of community sex offender treatment in relation to risk and re-offending. *Journal of Forensic Psychiatry and Psychology, 20*(6), 769-784; Olver, M. E., Stockdale, K. C., & Wormith, J. S. (2011). A meta-analysis of predictors of offender treatment attrition and its relationship to recidivism. *Journal of Consulting & Clinical Psychology, 79,* 6-21.

[122] Gromet, D. M., Okimoto, T. G., Wenzel, M., & Darley, J. M. (2012). A victim-centered approach to justice? Victim satisfaction effects on third party punishments. *Law & Human Behavior, 36*(5), 375-389; Strang, H., & Sherman, L. W. (2003). Repairing the harm: Victims and restorative justice. *Utah Law Review, 1,* 15-42.; United Nations (2023, November 7). Victims rights first: What is a victim-centered approach? https://www.un.org/en/victims-rights-first#:~:text=What%20is%20the%20victim%2Dcentred,affiliation%20of%20the%20alleged%20perpetrator.

[123] Colorado Revised Statutes (2023). 16-11.7-103. Sex Offender Management – creation – duties – repeal.

[124] Koss, M. P. (2014). The RESTORE program of restorative justice for sex crimes: Vision, Process, and Outcomes. *Journal of Interpersonal Violence, 29*(9), 1623-1660.;

[125] American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176//appi.books.9780890425787

[126] Helmus, L, Hanson, R. K., Babchishin. K. M., & Mann, R. E. (2013). Attitudes supportive of sexual offending predict recidivism: A meta-analysis. *Trauma, Violence, & Abuse, 14*(1), 34-53; Houtepen, J.A.B.M, Sijtsema, J. J., & Bogaerts, S. (2014). From child pornography offending to child sexual abuse: A review of child pornography offender characteristics and risks for cross-over. *Aggression and Violent Behavior, 19,* 466-473; Mann, R. E., Hanson, R., K., & Thornton, D. (2010). Assessing risk for sexual recidivism: some proposals on the nature of psychologically meaningful risk factors. *Sexual Abuse: A Journal of Research and Treatment, 22*(2), 191-217; Nunes, K. L., & Jung, S. (2013). Are cognitive distortions associated with denial and minimization among sex offenders? *Sexual Abuse: A Journal of Research and Treatment, 25*(2), 166-188.

[127] Harkins, L., Beech, A. R., & Goodwill, A. M. (2010). Examining the Influence of denial, motivation, and risk on sexual recidivism. *Sexual Abuse, 22*(1),79-94; Harkins, L., Howard, P., Barnett, G. D., Wakeling, H., & Miles, C. (2015). Relationships between denial, risk, and recidivism in sexual offenders. *Archives of Sexual Behavior, 44*(1), 157-166; Langton, C. M., Barbaree, H. E., Harkins, L., Arenovich, T., McNamee, J., Peacock, E. J, Dalton, A., Hansen, K., Luong, D., & Marcon, H. (2008). Denial and minimization among sexual offenders: Posttreatment presentation and association with sexual recidivism. *Criminal Justice and Behavior, 35*(1), 69-98; Mann, R. E., Hanson, R., K., & Thornton, D. (2010). Assessing risk for sexual recidivism: some proposals on the nature of psychologically meaningful risk factors. *Sexual*



CDOC/Nelson_00202

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

is considered an issue of responsivity to treatment that can indirectly reduce treatment efficacy.[128]

Denial and minimization can vary in magnitude and type from categorical denial (i.e., maintaining innocence related to an offense) to partial denial (i.e., minimization of some aspect of the offense or its impact).[129] Research and practice attest to secrecy, denial, and defensiveness being frequently exhibited by clients, particularly prior to or at the early stages of treatment.[130] Although most clients are able to accept responsibility and begin to take accountability for the sexual offense relatively soon after conviction, some clients do not. Extreme resistance or defensiveness to accepting responsibility for offending impedes treatment engagement, progress, and efficacy.[131] It is also highly distressing and emotionally damaging to victims.[132]

The process of acceptance of responsibility for a sexual offense can take many forms and can change over the course of someone's treatment. It should be understood that some individuals may present with lower levels of responsibility at the initial stages of evaluation and treatment due to a lack of insight into their behavior, self-preservation, and limited understanding of treatment concepts at this stage. As clients gain better awareness of potential thought distortions, justifications, and general awareness of behavior, they may present with a higher level of responsibility than was initially identified. This dynamic should be considered when determining a client's initial level of responsibility. The process is reflected within the 'stages of change' in the Transtheoretical Model of Behavior Change (TTM).[133]

Stage one is *pre-contemplation*. Pre-contemplation is characterized by clients not considering changing their behavior, which may manifest as denial or extreme minimization of responsibility, as well as disinterest or rejection of treatment. Other client characteristics may also influence pre-contemplation, such as the client having low self-efficacy or belief in their ability to change, self-esteem issues that interfere with acknowledging a need to change,

*Abuse, 22(2),* 191-217; Nunes, K., Hanson, K., Firestone, P., Moulden, H., Greenberg, D. & Bradford, J. (2007). Denial predicts recidivism for some sexual offenders. *Sex Abuse, 19*(2), 91-105.

[128] The responsivity principle involves programs using empirically informed treatment approaches that promote engagement and learning while also encouraging program adaptations for individual needs such as cultural heritage, language barriers, and trauma histories; see Craissati, J. (2015). Should we worry about sex offenders who deny their offences? *Probation Journal, 62*(4) 395-405; Olver, M. E. (2017). The Risk-Need-Responsivity Model: Applications to sex offender treatment. In D. P. Boer, A. R. Beech, T. Ward, L. A. Craig, M. Rettenberger, L. E. Marshall, & W. L. Marshall (Eds.), *The Wiley handbook on the theories, assessment, and treatment of sexual offending* (pp. 131-1329). Wiley: Blackwell.

[129] Craissati, J. (2015). Should we worry about sex offenders who deny their offences? *Probation Journal, 62*(4) 395-405.

[130] Dietz, P. (2020). Denial and minimization in sex offenders. *Behavioral Science & Law, 38,* 571-585.

[131] Blagden, N., Winder, B., Gregson, M., & Thorne, K. (2013) Working with denial in convicted sexual offenders: A qualitative analysis of treatment professionals' views and experiences and their implications for practice. *International Journal of Offender Therapy and Comparative Criminology, 57(3),* 332-356.; Levenson, J. S. (2011). "But I didn't do it!" Ethical treatment of sex offenders in denial. *Sexual Abuse, 23(3),* 346-364.; Ware, J., Marshall, W. L., & Marshall L. E. (2015) Categorical denial in convicted sex offenders: The concept, its meaning, and its implication for risk and treatment. *Aggression & Violent Behavior, 25(B),* 215-226.

[132] Levenson, J. S., & Prescott, D. S. (2009). Treatment experiences of civilly committed sex offenders: A consumer satisfaction survey. *Sexual Abuse, 21(1),* 6-20.; Levenson, J. S., Prescott, D. S., & D'Amora, D. A. (2010). Sex offender treatment: Consumer satisfaction and engagement in therapy. *International Journal of Offender Therapy & Comparative Criminology, 54(3),* 307-326.; Levenson, J. S., Macgowan, M. J, Morin, J. W., & Cotter, L. P. (2009). Perceptions of sex offenders about treatment: Satisfaction and engagement in group therapy. *Sexual Abuse, 21(1),* 35-56.

[133] Prochaska, J. O., & di Clemente, C. C. (1982). Transtheoretical therapy: Toward a more integrative model of change. *Psychotherapy: Theory, Research, & Practice, 19,* 276-288.; Tierney, D. W., & McCabe, M. P. (2005). The utility of the Trans-Theoretical Model of behavior change in the treatment of sex offenders. *Sexual Abuse, 17*(2), 153-170.



CDOC/Nelson_00203

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

doubts about the effectiveness of treatment, or opposition to being required to attend treatment.[134]

Stage two is *contemplation*. Contemplation is characterized by an emerging recognition of a need to address problematic behaviors, which may manifest as beginning to accept responsibility for some aspects of the offense while still being resistant and defensive to fully acknowledging the offending and accepting the need for treatment. The client may fluctuate between seeing the benefits of taking responsibility and engaging with treatment and wishing to avoid responsibility and the potential costs of engaging with treatment.

Stage three is the *preparation stage*. The preparation stage is characterized by readiness to engage in treatment, which is typically associated with accepting much or all of the responsibility for the offense and making a commitment to change. Clients start accepting help and resources to support their change, including more realistically identifying what changes are needed and how these can be implemented. Clients may begin to have noticeable increases in internal locus of control and self-efficacy.[135]

Stage four is the *action stage*. The action stage is characterized by clients engaging in treatment to learn and apply the help and skills being offered. Acceptance of responsibility and accountability become more stable and integrated into the client's personal identity. By engaging in treatment interventions, such as offense clarification, clients may be able to continue to develop a fuller sense of responsibility and accountability for the offense.

Stage five is the *maintenance stage*. The maintenance state is characterized by the client having made the necessary changes to lower the risk for sexual re-offense and successfully maintaining these changes despite potential challenges. By this stage, motivation to change is expected to be predominantly internal (i.e., due to a personal desire to change) rather than external (i.e., system imposed).  As part of this, the client self-regulates to maintain their acceptance of responsibility and accountability despite reductions in professional services and engaging more broadly within the community.

*Discussion: When assessing a client for progress in treatment, the CST should consider the client's progress accepting responsibility and accountability for the sexual offense, the likely reasons for difficulties progressing, and the potential for additional interventions to achieve progress.*

---

[134] Blagden, N., Winder, B., Gregson, M., & Thorne, K. (2014). Making sense of denial in sexual offenders: A qualitative phenomenological and repertory grid analysis. *Journal of Interpersonal Violence, 29*(9), 1698-1731; Ware, J., Blagden, N., & Harper, C. (2020). Are categorical deniers different? Understanding demographic, personality, and psychological differences between denying and admitting individuals with sexual convictions. *Deviant Behavior, 41*(4), 399-412.

[135] Farmer, M., McAlinden, A., & Maruna, S. (2015). Understanding desistance from sexual offending: A thematic review of research findings. *Probation Journal, 62*(4), 320-225; Kras, K. M., & Blasko, B. L., (2016). Pathways to desistance among men convicted of sexual offenses: Linking post hoc accounts of offending behavior and outcomes. *International Journal of Offender Therapy & Comparative Criminology, 60*(15), 1738-1755; Richards, K., Death, J., & McCarten, K. (2020). Toward redemption: Aboriginal and/or Torres Strait Islander men's narratives of desistance from sexual offending. *Victims & Offenders, 15*(6), 810-833.



CDOC/Nelson_00204

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**3.510  Levels of Responsibility**

The following is a description of the different levels of acceptance of responsibility.[136]  These are intended to be used as a guide to help determine client acceptance of responsibility for the referring or index sex offense, and potential client treatment Accountability Intervention. They should be used in conjunction with the remainder of 3.500. Treatment providers should collaborate with other members of the CST when determining a client's level of acceptance of responsibility. It is imperative that the offense-specific evaluator or treatment provider has the final discretion due to clinical judgment and expertise in this specific area.

Level 0: Accepts Full Responsibility

This level consists of clients who present as accepting full and complete responsibility for the unlawful sexual behavior involved in the referring or index offense (i.e., internal locus of control), and do not place any blame elsewhere (i.e., external locus of control). They do not justify their intent behind its occurrence or minimize its importance or harmful impact on the victim. These clients demonstrate high motivation to change.

Level 1:  Accepts Most Responsibility

This level consists of clients who present as accepting most of the responsibility for the unlawful sexual behavior involved in the referring or index offense but may place some blame elsewhere. They may either justify their intent behind its occurrence and/or minimize its importance or harmful impact on the victim. These clients demonstrate some internal motivation to change.

Level 2: Accepts Some Responsibility

This level consists of clients who partially acknowledge their unlawful sexual behavior involved in the referring or index offense but deny many aspects of the offense or place most of the blame on other factors. A key aspect of Level 2 responsibility is that the client takes responsibility for having committed sexual offense behavior to some extent and is willing to discuss this behavior in offense-specific treatment. Clients at this level may:

- Deny intending to harm the victim or fail to recognize the harm caused.
- Admit to some parts of the offense but state that their behavior differed from what is recorded in the official reports.
- Acknowledge having engaged in harmful sexual behavior in the past but deny the current offense,
- Exhibit some motivation to engage in treatment, even if it's only externally motivated.

---

[136] The utility of a multifaceted construct of denial and other forms of minimization are emphasized as opposed to more simplified and dichotomous (yes or no) formats such as categorical denial vs. not in denial. The importance of a continuous measure of denial has been supported by the literature in order to further distinguish an offender's criminogenic risks and amenability to engage in the therapeutic process (see for example, Langton, 2008; Levenson, 2011; Levenson and Macgowan, 2004).



CDOC/Nelson_00205

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Clients who are evaluated and found to be in Level 0, Level 1, or Level 2 are not prohibited from participation in sex offense-specific treatment solely based on these levels of accountability.

Level 3: Accepts No Responsibility (i.e., Categorical Denial)

This level consists of clients who present as not accepting <u>any</u> responsibility for <u>any</u> unlawful sexual behavior (i.e., no internal locus of control) and demonstrate no accountability for the referring or index sex offense, (i.e., presenting the unlawful sexual behavior entirely from an external locus of control perspective), also known as categorical denial. They deny committing the current unlawful sexual behavior or any similar behavior. They may not recognize the harmful impact sexual offending behavior has on victims, related to their own behavior or in general, and present as having no motivation to change. Clients presenting with this level of denial may blame the victim or the system, and/or present as excessively hostile or defensive.

*Discussion: A client's level of responsibility can change as they move through the criminal justice system and engage in sentence management. This may include the client presenting with a higher level of responsibility at the beginning of treatment than initially identified in the offense-specific evaluation. It is important, therefore, to reassess the level of responsibility when referred for treatment.*

*Discussion: Clients under appeal are not the same as clients in denial. The SOMB has a process to address the treatment needs of such clients. For more information, see Section 3.162.*

### 3.520  *Level 3 Accepts No Responsibility: Accountability Intervention*

Clients assessed to be in Level 3: Accepts No Responsibility (i.e., Categorical Denial) are not suitable for sex offense-specific treatment because they do not acknowledge being responsible for any sexual offending or having a related need for change. Instead, they shall undergo an Acceptance of Responsibility: Accountability Intervention designed to diminish their categorical denial and improve their amenability to participate in offense-specific treatment.

The Accountability Intervention should be performance-based and establish clear expectations for successful advancement to offense-specific treatment. It should include activities to develop a therapeutic relationship[137], address responsivity barriers that hinder accepting responsibility, and increase motivation to address criminogenic needs. The Accountability Intervention will be conducted separately from regular offense-specific treatment.

The objective of the Accountability Intervention is for the client to accept responsibility for the referral or index sexual offense consistent with Level 2: Accepts Some Responsibility, or lower. Acceptance of responsibility for additional areas of sexual offending (e.g., all aspects of the current offense or additional past sexual offenses) should be further addressed as part of

---

[137] A therapeutic alliance between the therapist and the client consists of three core elements: (1) an agreement on the treatment goals, (2) collaboration on the tasks that will be used to achieve the goals, and (3) an overall bond that facilitates an environment of progress and collaboration (see for example, Flinton & Scholz, 2006; Levenson, Prescott & D'Amora, 2010; Marshall et al., 2002; Polaschek & Ross, 2010; Schneider & Wright, 2004).



CDOC/Nelson_00206

the sex offense-specific treatment plan, but should not limit the client's completion of the Accountability Intervention and progressing to sex offense-specific treatment.

*Discussion: In rare cases, a client may initially admit to a sexual offense within the 90-day timeframe only to recant the admission later. In this situation, the client may continue to complete the Accountability Intervention if it is still within the 90-day period. However, in considering any extension to the Accountability Intervention, the provider and the CST should consider whether the client made the admission for the sole purpose of evading an unsuccessful discharge from the Accountability Intervention. If this is the case, the provider and CST should be cautious about granting another 90-day period to achieve level 2 designation unless there is evidence the client is progressing toward the Accountability Intervention goals and there is confidence the client will progress to offense-specific treatment with additional intervention.*

3.530    Acceptance of Responsibility: Accountability Intervention shall only be provided by treatment providers who also meet the requirements to provide sex offense-specific treatment, as defined in these Standards in section 4.000.

3.540    Treatment providers, in consultation with the CST, must establish specific goals and tasks for clients who do not accept responsibility for their unlawful sexual behavior. These measurable goals shall be outlined in a treatment plan and will establish whether clients have reached the eligibility threshold for referral to offense-specific treatment at the end of three months or earlier. It is especially important to document the client's responsibility for their unlawful sexual behavior.

3.545    The Accountability Intervention may include, but not be limited to, the following treatment goals[138]:

- Addressing victim impact
- Developing a therapeutic relationship
- Decreasing stigma and shame
- Focusing on distorted thought patterns related to the offense
- Supporting client motivation
- Use of client support systems
- Addressing client trauma history
- Providing psychoeducation

The Standards and Guidelines emphasize the importance of all client interventions being culturally relevant and responsive given the client's specific social and cultural background (for more information, see Guiding Principle 16). Research suggests that certain clients may have

---

[138] Colorado Sex Offender Management Board Provider Data Management System, *Denial Policy Brief #3*, January 19, 2024.



CDOC/Nelson_00207

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

difficulties with acceptance of responsibility based in part on these factors, and the provider shall address these needs as part of the Accountability Intervention goals.[139]

3.550   Polygraph examinations may be a useful tool in supporting client acceptance of responsibility. Clients in Level 3: Accepts No Responsibility (i.e., Categorical Denial) shall be referred for an instant offense polygraph examination. Physiological assessment instruments addressing sexual arousal or interest may be used to assist this process. These assessments may be applied to clients evaluated to be at any level of Acceptance of Responsibility in accordance with Section 6.000 of the Standards and Guidelines.

*Discussion: In the rare case where an instant offense polygraph examination is determined to have no significant reactions (no deception indicated) related to the instant offense, Standard 6.000 should be reviewed for guidance. In particular, the polygraph examination results shall not be the sole determining factor in treatment decisions, regardless of whether the exam is determined to be significant reactions (deception indicated) or no significant reactions (no deception indicated). The purpose of the Accountability Intervention is not to determine the guilt or innocence of the client, but instead to provide an opportunity for the client to begin to accept responsibility for unlawful sexual behavior. If at the end of the Accountability Intervention, the client remains at Level 3: Accepts No Responsibility, regardless of the results of the instant offense polygraph, the client* should be discharged per Standard 3.560 below.

*Discussion: In addition to requiring the client to undergo an instant offense polygraph regarding the offense of conviction, the CST may also require the client to undergo maintenance polygraph testing to monitor current behavior and enable the CST to respond to concerns quickly.*

3.560   The Accountability Intervention shall be limited to 90 days unless the treatment provider clinically assesses, in consultation with the CST, that the client is sufficiently progressing toward the Accountability Intervention goals to justify an extension for a prescribed period of time not to exceed 90 days, unless there are extenuating circumstances. An extension may be appropriate when the provider  identifies specific interventions that will support the client in progressing to sex offense-specific treatment. The provider shall document the client's progress on the Accountability Intervention goals to support this extension.[140]

Clients who progress from Level 3 to either Level 2 or Level 1 during the course of the Accountability Intervention should progress to Sex Offense-Specific Treatment from the Accountability Intervention.

Clients who remain at Level 3: Accepts No Responsibility (i.e., categorical denial) after the Accountability Intervention is completed shall be discharged as Accepting No Responsibility and Unable to Progress to Sex Offense-Specific Treatment from the Accountability Intervention.

---

[139] See findings from the SOMB project examining denial levels: Collie, R., Dalen, A., Zhang, Y., & Lobanov-Rostovsky, C. (2024). *Sex Offender Management Board Annual Legislative Report: January 2024*, Colorado Department of Public Safety; Colorado Sex Offender Management Board Provider Data Management System, *Denial Policy Brief #3*, January 19, 2024.

[140] Levenson, J.S. (2011). "But I Didn't Do It!": Ethical Treatment of Sex Offenders in Denial. *Sexual Abuse. 23 (3)*; Yates, P. M. (2009). Is sexual offender denial related to sex offense risk and recidivism? A review and treatment implications. *Psychology, Crime & Law, 15 (2)*.



CDOC/Nelson_00208

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Providers shall complete a discharge summary for the Accountability Intervention for those who remain in Level 3: Accepts No Responsibility.

The discharge summary shall include recommendations to address criminogenic, non-criminogenic, or responsivity treatment needs, as applicable. In rare cases, a client may be recommended to undergo another Accountability Intervention with the same or a different provider if clear clinical indicators are suggesting potential success in a repeat intervention (see Section 5.210(D)). Finally, as part of the discharge summary, the provider may recommend other non-sex offense-specific treatment interventions for consideration by the CST and/or the Court, as appropriate, based on clinical assessment after the Accountability Intervention is completed.

*Discussion: When assessing a client for progress, the CST should consider the following factors before granting any extension: 1) Level of risk to sexually re-offend; 2 ) Level of risk to commit a new criminal offense; 3) Protective factors; 4) Engagement and progress made in the Accountability Intervention process; 5) Compliance with supervision conditions; 6) Victim input, as it is important to support victim recovery; 7) Criminogenic needs, including but not limited to, the following: Risk-related sexual interests/arousal and behavior patterns, sexual preoccupation, pro-offending attitudes and beliefs, intimacy deficits, emotional congruence with children, callousness and pervasive anger or hostility, self-regulation deficits, social deviance, impulsive criminal lifestyle, dysfunctional coping; and 8) Any other factor making treatment ineffective for the client.*

*Discussion: When evaluating whether to extend the Accountability Intervention for clients persisting at Level 3: Accepts No Responsibility, the provider will need to consider whether the client is continuing to benefit from the intervention or is likely to gain benefits in the future in accordance with the provider's license under the Colorado Mental Health Practice Act.*

The Colorado Mental Health Practice Act states the following: "The general assembly hereby finds and determines that, in order to safeguard the public health, safety, and welfare of the people of this state and in order to protect the people of this state against the unauthorized, unqualified, and improper application of psychology, social work, marriage and family therapy, professional counseling, psychotherapy, and addiction counseling, it is necessary that the proper regulatory authorities be established and adequately provided for."[141] One of the prohibited activities for treatment providers includes "has failed to terminate a relationship with a client when it was reasonably clear that the client was not benefiting from the relationship and is not likely to gain such benefit in the future."[142]

The Mental Health Practice Act is a consideration for providers when deciding whether to extend the Accountability Intervention. Providers can make a clinical determination as to whether continuing to provide the Accountability Intervention in the absence of any clinical

---

[141] Colorado State Statutes. (2023). The Colorado Mental Health Practice Act Legislative Declaration. 12-45-101.

[142] Colorado State Statutes. (2023). The Colorado Mental Health Practice Act Prohibited Activities. 12-45-222 (1) (k).Thank



CDOC/Nelson_00209

indicators of progress or client motivation to change is in keeping with the Mental Health Practice Act. It is not the purview of these Standards and Guidelines to interpret the applicability of the Mental Health Practice Act to providers.  However, if a client remains in Level 3: Accepts No Responsibility (i.e., Categorical Denial) at the end of the Accountability Intervention, denies having any sex-offense criminogenic needs to address, and demonstrates lack of motivation for further treatment, there appear to be few clear clinical benefits for extending the Accountability Intervention. The provider should also consider if there are any clinical reasons for further intervention within the parameters of sex offense-specific treatment as defined in these Standards. While many clients may face significant clinical adjustment issues due to their conviction, the primary focus of the Accountability Intervention should be to help the client acknowledge their involvement in unlawful sexual behavior, recognize their related treatment needs, and progress to offense-specific treatment. The Accountability Intervention is not intended for clients to solely focus on non-criminogenic needs, nor is it meant for clients to use as a way to avoid participating in offense-specific treatment or evade consequences for not following treatment conditions.

*3.570 DD/ID*

An exception may be made for clients with developmental disabilities and/or intellectual disabilities who are in Level 3 Accepts No Responsibility and are strongly resistant after this three (3) month period of intervention. If the termination from treatment is not clearly indicated for a specific client, then a CST assessment and review shall occur at this 3-month mark to determine whether an extension of this Accountability Intervention followed by a second case review shall occur. Other options may be explored at this time and shall always consider the above-noted discussion point (3.560).



CDOC/Nelson_00210

### 3.600  Treatment of Clients Within the Department of Corrections

**3.610**  During incarceration and parole a continuum of treatment services shall be available to clients. [143]

**3.620**  Unless otherwise noted in this section, treatment for clients in prison shall conform to the *Standards and Guidelines* and for sex offense-specific treatment described in Section 3.000 and shall be provided by therapists who meet the qualifications for treatment providers described in Section 4.000.

Prior to beginning sex offense-specific treatment, a client who has been sentenced to the Department of Corrections (DOC), and is designated to participate in the Sex Offender Treatment and Management Program (SOTMP) and who did not receive a sex offense-specific evaluation at the time of the pre-sentence investigation shall receive a sex offense-specific evaluation.

### 3.630  SOTMP Treatment providers shall:

A. Prepare a summary of client's progress and participation in sex offender treatment and their institutional behavior. This summary shall be provided to the parole board prior to a release hearing;

B. Forward pertinent documents and reports to outpatient treatment providers upon request and with a valid release. (See *Section 9.000 Continuity of Care.*)

---

[143] See Colorado Revised Statutes 16-11.7-105.



CDOC/Nelson_00211

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Research Citations

The following Adult Standards and Guidelines in Section 3.000 have research support (the Standards are either footnoted or are supported by a review of the literature): 3.000, 3.100, 3.120, 3.130, 3.160, 3.162, 3.165, 3.170, 3.180, 3.200, 3.210, 3.310, 3.315, 3.320, 3.330, 3.410, 3.420, 3.500, 3.510, 3.530, 3.550, 3.560, 3.570, and 3.610. All footnotes and research references in these Standards were evaluated by the staff researcher and presented to the Standards Revision Committee regarding the revisions being discussed. Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revision process regardless of whether it supported the standard revision or not. This research was then incorporated into the Standards and presented to the SOMB for ratification by the Board. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender

The following Adult Standards and Guidelines in Section 3.000 were revised but do not have research support given their procedural nature: 3.175, 3.340, 3.520, 3.540, 3.580, 3.620, and 3.630. The SOMB staff did a search for research applicable to the Standards noted above. Research was not found applicable to these Standards, so in absence of research, the Standards are based on best practices procedures, professional association guidelines, and the professional expertise of the members of the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00212

# 4.000 Qualifications of Treatment Providers, Evaluators, and Polygraph Examiners Working with Sex Offenders

Pursuant to 16-11.7-106, C.R.S., the Department of Corrections, the Judicial Department, the Division of Criminal Justice of the Department of Public Safety, or the Department of Human Services shall not employ or contract with, and shall not allow sex offenders to employ or contract with any individual to provide sex offense specific evaluation or treatment services unless the sex offense specific evaluation or treatment services to be provided by such individual conform with these *Standards*.

**4.100 TREATMENT PROVIDER: Adult Associate Level (First Application):** Individuals who have not previously applied to the SOMB Approved Provider List, but who are working towards meeting provider qualifications for a treatment provider or evaluator, shall apply for Associate Level status using the required application. Initial listing at the Associate Level is good for one year to allow the provider time to develop competency in the required areas. The application shall be submitted and include a supervision agreement co-signed by their approved SOMB Clinical Supervisor, and a fingerprint card (for purposes of a criminal history record check pursuant to Section 16-11.7-106 (2)(a) (I), C.R.S) prior to beginning work with sex offenders.

A.  The applicant shall have a baccalaureate degree or above in a behavioral science with training or professional experience in counseling or therapy;

B.  The applicant shall hold a professional mental health license or be approved by the Department of Regulatory Agencies as an Unlicensed Psychotherapist, Certified Addiction Technician, Certified Addiction Specialist, Licensed Addiction Counselor, Licensed and Provisional Marriage and Family Therapist, Licensed Professional Counselor (Provisional or Candidate) Psychologist Candidate, or Clinical Social Worker, and not be under current disciplinary action that the ARC determines would impede the applicants' ability to practice as an SOMB listed provider;

C.  The applicant shall demonstrate competency according to the individual's respective professional standards and ethics consistent with the accepted standards of practice of sex offense-specific treatment;

D.  The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;



CDOC/Nelson_00213

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

E. The applicant shall submit to a current administrative background investigation (Section 16-11.7-106 (2)(a)(III), C.R.S.);

F. The applicant shall demonstrate compliance with Section 4 of the *Standards and has attested to the commitment to comply with these Standards and Guidelines* ;

G. The provider shall comply with all other requirements outlined in the SOMB Administrative Policies.

H. **DD/ID**
Associate Level Treatment Providers who want to provide treatment services to adult sex offenders with developmental/intellectual disabilities, shall demonstrate compliance with these *Standards* and submit an application demonstrating competency specific to working with this population.

I. The provider shall submit a signed supervision agreement outlining that:

1. The SOMB Clinical Supervisor shall review SOMB related work product (such as treatment plans and reports) conducted by the applicant. The SOMB Clinical Supervisor shall review, and co-sign all evaluations conducted by the applicant. The SOMB supervisor is responsible for doing due diligence to monitor and maintain awareness of the SOMB related clinical work performed by the applicant for which the supervisor is providing supervision and to ensure this work adheres to the requirements outlined within the *Standards and Guidelines*.

2. The SOMB Clinical Supervisor shall employ supervision methods aimed at assessing and developing required competencies. It is incumbent upon the supervisor to determine the need for co-facilitated treatment and the appropriate time to move the applicant from any co-facilitated clinical contact to non-co-facilitated clinical contact based upon that individual's progress in attaining competency to perform such treatment.

3. The frequency of face-to-face supervision hours specific to sex offense specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

*Discussion: The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*



CDOC/Nelson_00214

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**4.110  All Applicants Begin at the Associate Level (First Application):** With the possible exception of some out-of-state applicants, all applicants shall apply for, and be approved at, the Associate Level treatment provider, evaluator, or polygraph examiner status prior to applying for Full Operating Level.

    A.  **Out-of-State Applicants:** Individuals who hold professional licensure and reside outside Colorado may seek Full Operating Level or Associate Level status if they meet all the qualifications listed in these *Standards*. Required supervision hours must have been provided by an individual whose qualifications substantially match those of an SOMB Clinical Supervisor as defined in these *Standards*. Out-of-state applications will be reviewed on a case-by-case basis.

**4.120  Professional Supervision of <u>Associate Level Treatment Providers and Evaluators</u>:**

    A.  Supervision of Associate Level Treatment Providers shall be done by an approved SOMB Clinical Supervisor with treatment provider status in good standing.

    B.  Supervision of Associate Level Evaluators shall be done by an approved SOMB Clinical Supervisor with evaluator status in good standing.

    C.  Supervision of Associate Level Treatment Providers / Evaluators with the DD/ID specialty shall be done by an approved SOMB Clinical Supervisor with the DD/ID specialty.

    D.  The supervisor shall provide clinical supervision as stated in the Associate Level Section (4.100). Supervision hours for treatment and evaluation clinical work may be combined.

The supervisor shall review SOMB related work product (such as treatment plans and reports) conducted by the applicant. The SOMB Clinical Supervisor shall review, and co-sign all evaluations conducted by Associate Level Treatment Providers and Associate Level Evaluators.

**4.130  Required notifications to SOMB:** Providers listed under Section 4.100 shall provide the following notifications to SOMB, as applicable:

    A.  Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

        1.  Name
        2.  Treatment agency
        3.  Address
        4.  Phone number
        5.  Email address
        6.  Supervisor



CDOC/Nelson_00215

B. Notify the SOMB in writing within 10 days of any changes in their status with the Department of Regulatory Agencies (DORA). This includes being subject to the filing of a complaint, having a founded complaint from DORA, or changing a DORA approval category (e.g. from licensed to unlicensed) The SOMB may periodically contact DORA regarding an individual's licensure or registration status for information.

C. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contender plea, or deferred judgement (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.

**4.200 TREATMENT PROVIDER: Adult -- Associate Level (Initial 3 years):** An Associate Level Treatment Provider may treat sex offenders under the supervision of an approved SOMB Clinical Supervisor with treatment provider status under these *Standards.* Following initial listing at the Associate Level the provider may submit for continued placement on the provider list as an Associate Level Treatment Provider under Section 16-11.7-106 C.R.S. an applicant shall meet all the following criteria:

A. The applicant shall have a baccalaureate degree or above in a behavioral science with training or professional experience in counseling or therapy;

B. The applicant shall hold a professional mental health license or be approved by the Department of Regulatory Agencies as an Unlicensed Psychotherapist, Certified Addiction Technician, Certified Addiction Specialist, Licensed Addiction Counselor, Licensed and Provisional Marriage and Family Therapist, Licensed Professional Counselor (Provisional or Candidate) Psychologist Candidate, or Clinical Social Worker, and not be under current disciplinary action that the ARC determines would impede the applicants' ability to practice as an SOMB listed provider;

C. The applicant shall have completed face-to-face supervision hours specific to sex offense-specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

*Discussion: The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

D. Within the past five (5) years, the applicant shall have taken forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training as determined by the SOMB Clinical Supervisor and applicant based upon individualized training needs. If the applicant is applying to be a provider for sex offenders



CDOC/Nelson_00216

and adults, the training plan needs to reflect both populations. Please see the list of training categories.

E. The applicant shall submit documentation from their approved SOMB Clinical Supervisor outlining the supervisor's assessment of the applicant's competency in the required areas and support for the applicant's continued approval as an Associate Level Treatment Provider;

F. The applicant shall demonstrate competency according to the individual's respective professional standards and ethics consistent with the accepted standards of practice of sex offense-specific treatment;

G. The applicant shall submit to a current administrative background investigation (Section 16-11.7-106 (2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

H. The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

I. The applicant shall demonstrate compliance with the *Standards*;

J. The provider shall comply with all other requirements outlined in the SOMB Administrative Policies.

**4.210 Continued Placement of <u>Associate Level Adult Treatment Providers</u> on the Provider List:** Using a current re-application form, Associate Level Treatment Providers shall apply for continued placement on the list every 3 years by the date provided by the SOMB. Requirements are as follows:

A. The provider shall demonstrate continued competency related sexual offenders;

B. The applicant shall have completed face-to-face supervision hours specific to sex offense specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |



CDOC/Nelson_00217

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Discussion: The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

C. Every three (3) years the provider shall complete forty (40) hours of training which <span style="color:red">includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training</span> as determined by the SOMB Clinical Supervisor and applicant based upon individualized training needs.

These training hours may be utilized to meet the qualifications for both adult and juvenile treatment providers. The provider shall demonstrate a balanced training history. Please see the list of training categories.

D. The provider shall submit to a current administrative background investigation (Section 16-11.7-106 (2)(a)(III), C.R.S.). Reference checks will be completed as a part of the application process. The SOMB may also request additional references or further investigation as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

E. The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

F. The provider shall report any practice that is in significant conflict with the *Standards*;

G. The provider shall demonstrate compliance with the *Standards*;

H. The provider shall comply with all other requirements outlined in the SOMB Administrative Policies.

**4.220 Required notifications to SOMB:** Providers listed under section 4.200 shall provide the following notifications to SOMB as applicable:

A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment changes to contact information include any of the following:

1. Name
2. Treatment agency
3. Address
4. Phone number
5. Email address



CDOC/Nelson_00218

6. Supervisor

B. Notify the SOMB in writing within 10 days of any changes in their status with the Department of Regulatory Agencies (DORA). This includes being subject to the filing of a complaint, having a founded complaint from DORA, or changing a DORA approval category (e.g. from licensed to unlicensed) The SOMB may periodically contact DORA regarding an individual's licensure or registration status for information.

C. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contender plea, or deferred judgment (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision-making related to whether an individual should continue to be listed with the SOMB.

**4.300 TREATMENT PROVIDER: <u>Adult - Full Operating Level</u>:** Associate Level Treatment Providers wanting to move to Full Operating Level status (under Section 16-11.7-106 C.R.S.) shall submit an application and documentation of all of the requirements listed below, as well as a letter from the approved SOMB Clinical Supervisor indicating the provider's readiness and demonstration of required competencies to move to Full Operating Level provider. A Full Operating Level Treatment Provider may treat sex offenders independently and are not required per SOMB standards to have an SOMB approved Clinical Supervisor. Nothing within this section alleviates a provider from their duty to adhere to their ethical code of conduct pertaining to supervision and consultation.

A. The provider shall have been approved on the provider list in good standing at the Associate Level or shall have met the requirements at the Associate Level as outlined in 4.200;

B. The provider shall have attained the underlying credential of licensure or certification as a Psychiatrist, Licensed Psychologist, Licensed Clinical Social Worker, Licensed Professional Counselor, Licensed Marriage and Family Therapist, Clinical Psychiatric Nurse Specialist or Licensed Addiction Counselor, and not be under current disciplinary action that the ARC determines would impede the applicants ability to practice as an SOMB listed provider;

<u>OR</u>

The provider shall have maintained SOMB listing, in good standing, as an associate level treatment provider for at least 10 years (initial listing plus three renewal cycles) and be approved with the Department of Regulatory Agencies as a Unlicensed Psychotherapist, Certified Addiction Specialist, Marriage and Family Therapist (Provisional or Candidate), Licensed Professional Counselor (Provisional or Candidate), Psychologist Candidate, or Licensed Clinical Social Worker, and not be under current disciplinary action that the ARC determines would impede the applicants ability to practice as an SOMB listed provider;

C. The provider shall have demonstrated the required competencies.



CDOC/Nelson_00219

D. The provider shall have completed face-to-face supervision hours specific to sex offense specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

*Discussion: The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

*Providers should know the limits of their expertise and seek consultation and supervision as needed (i.e. clinical, medical, psychiatric). Adjunct resources should be arranged to meet these needs.*

E. Within the past five (5) years, the applicant shall have taken forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training (these hours are in addition to the 40 hours required for Associate Level for a total of 80 hours) of training as determined by the SOMB Clinical Supervisor and applicant based upon individualized training needs.

If the applicant is applying to be a provider for adult and juvenile, training must reflect both populations. Please reference the list of specialized training categories.

F. The provider shall demonstrate competency according to the individual's respective professional standards and ethics consistent with the accepted standards of practice of sex offense specific treatment;

G. The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

H. The provider shall submit to a current administrative background investigation (Section 16-11.7-106 (2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

I. The provider shall demonstrate compliance with the *Standards*;

J. The provider shall comply with all other requirements outlined in the SOMB Administrative Policies.

K. **DD/ID**



CDOC/Nelson_00220

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Full Operating Level Treatment Providers who want to provide treatment services to adult sex offenders with developmental/intellectual disabilities shall demonstrate compliance with these *Standards* and submit an application demonstrating competency specific to working with this population.

**4.310** **Continued Placement of <u>Full Operating Level Adult Treatment Providers</u> on the Provider List:** Using a current re-application form, treatment providers shall re-apply for continued placement on the list every 3 years by the date provided by the SOMB. Requirements are as follows:

   A. The provider shall have the underlying credential of licensure or certification as a Psychiatrist, Licensed Psychologist, Licensed Clinical Social Worker, Licensed Professional Counselor, Licensed Marriage and Family Therapist, Clinical Psychiatric Nurse Specialist or Licensed Addiction Counselor, and not be under current disciplinary action that the ARC determines would impede the applicants' ability to practice as an SOMB listed provider;

   OR

   The provider shall have maintained SOMB listing, in good standing, as an associate level treatment provider for at least 10 years (initial listing plus three renewal cycles) and be approved with the Department of Regulatory Agencies as a Unlicensed Psychotherapist, Certified Addiction Specialist, Marriage and Family Therapist (Provisional or Candidate), Licensed Professional Counselor (Provisional or Candidate), Psychologist Candidate, or Licensed Clinical Social Worker, and not be under current disciplinary action that the ARC determines would impede the applicants ability to practice as an SOMB listed provider;

   B. The provider shall demonstrate continued competency related to sex offenders based on; clinical experience, supervision, administration, research, training, teaching, consultation and/or policy development

   C. <span style="color:red">Every three (3) years the provider shall complete forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training</span> in order to maintain proficiency in the field of sex offense specific treatment and to remain current on any developments in the assessment, treatment, and monitoring of adults who have committed sexual offenses;

<span style="color:teal">If the applicant is reapplying to be a provider for adult and juvenile, training must reflect both populations.</span> Please reference the list of specialized training categories.

   D. The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;



CDOC/Nelson_00221

E. The provider shall submit to a current administrative background investigation (Section 16-11.7-106 (2) (a) (III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

F. The provider shall report any practice that is in significant conflict with the *Standards*;

G. The provider shall demonstrate compliance with the *Standards*;

H. The provider shall comply with all other requirements outlined in the SOMB Administrative Policies.

**4.320 Required notifications to SOMB:** Providers listed under section 4.300 shall provide the following notifications to SOMB as applicable:

A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

1. Name
2. Treatment agency
3. Address
4. Phone number
5. Email address
6. Supervisor

B. Notify the SOMB in writing within 10 days of any changes in their status with the Department of Regulatory Agencies (DORA). This includes being subject to the filing of a complaint, having a founded complaint from DORA, or changing a DORA approval category (e.g. from licensed to unlicensed) The SOMB may periodically contact DORA regarding an individual's licensure or registration status for information.

C. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contender plea, or deferred judgement (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.

**4.400 EVALUATOR: Adult Associate Level (First Application):** Individuals who have not previously applied to the SOMB Approved Provider List as an evaluator, but who are working towards meeting qualifications for an evaluator, shall apply for Associate Level status using the required application. Initial listing at the Associate Level is good for one year to allow the evaluator time to develop competency in the required areas. The application shall be submitted and include a



CDOC/Nelson_00222

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

supervision agreement co-signed by their approved SOMB Clinical Supervisor, and fingerprint card (for purposes of a criminal history record check pursuant to Section 16-11.7-106 (2)(a)(I), C.R.S) prior to beginning work with adults who have committed sexual offenses.

A.  The applicant shall be listed as an Associate Level or Full Operating Level Treatment Provider for adult sex offenders;

B.  The applicant shall demonstrate competency according to the individual's respective professional standards and ethics consistent with the accepted standards of practice of sex offense specific treatment;

C.  The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

D.  The applicant shall submit to a current administrative background investigation (Section 16-11.7-106 (2)(a)(III), C.R.S.);

E.  The applicant shall demonstrate compliance with the *Standards*;

F.  The applicant shall comply with all other requirements outlined in the SOMB Administrative Policies;

G.  **DD/ID**
Associate Level treatment evaluators who want to provide evaluation services to adult sex offenders with developmental/intellectual disabilities shall demonstrate compliance with these *Standards* and submit an application demonstrating competency specific to working with this population.

H.  The applicant shall submit a signed supervision agreement outlining that:

1.  The SOMB Clinical Supervisor shall review and co-sign all evaluations and reports by the applicant. The SOMB supervisor is responsible for all clinical work performed by the applicant.

2.  The SOMB Clinical Supervisor shall employ supervision methods aimed at assessing and developing required competencies. It is incumbent upon the supervisor to determine the need for co-facilitated evaluations and the appropriate time to move the applicant from any co-facilitated work to non-co-facilitated work based upon that individual's progress in attaining competency to perform such evaluations.

3.  The frequency of face-to-face supervision hours specific to sex offense-specific treatment and/or evaluation calculated as follows:



CDOC/Nelson_00223

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

> *Discussion: The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

**4.410** **Required notifications to SOMB:** Providers listed under section 4.400 shall provide the following notifications to SOMB as applicable:

A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

1. Name
2. Treatment agency
3. Address
4. Phone number
5. Email address
6. Supervisor

B. Notify the SOMB in writing within 10 days of any changes in their status with the Department of Regulatory Agencies (DORA). This includes being subject to the filing of a complaint, having a founded complaint from DORA, or changing a DORA approval category (e.g. from licensed to unlicensed) The SOMB may periodically contact DORA regarding an individual's licensure or registration status for information.

C. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contender plea, or deferred judgement (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above and will consider such information, including proper notification of the SOMB, in its decision-making related to whether an individual should continue to be listed with the SOMB.

**4.500** **EVALUATOR: Associate Level (Initial 3 years):** An Associate Level evaluator may evaluate adult sex offenders under the supervision of an evaluator approved at the SOMB Clinical Supervisor Level. To qualify to provide sex offender evaluation at the Associate Level under Section 16-11.7-106 C.R.S. an applicant shall meet all the following criteria:

A. The applicant shall be listed as an Associate Level or Full Operating Level Treatment Provider for adult sex offenders;



CDOC/Nelson_00224

B. The applicant shall have completed face-to-face supervision hours specific to sex offense specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

*Discussion*: *The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

C. Within the past five (5) years, the applicant shall have taken forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training as determined by the SOMB Clinical Supervisor and applicant based upon individualized training needs.

If the applicant is applying to be a treatment provider and evaluator for adult and juvenile, the training needs to reflect both populations. Please reference the list of specialized training categories.

D. The applicant shall demonstrate competency according to the individual's respective professional standards and ethics consistent with the accepted standards of practice of sex offense specific evaluations;

E. The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

F. The applicant shall submit to a current administrative background investigation (Section 16-11.7-106 (2) (a) (III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

G. The applicant shall demonstrate continued compliance with the *Standards*, particularly 2.000;

H. The provider shall comply with all other requirements outlined in the SOMB Administrative Policies.



CDOC/Nelson_00225

I. **DD/ID**
Associate Level and Full Operating Level Evaluators who want to provide evaluations to adult sex offenders with developmental/intellectual disabilities shall demonstrate compliance with these *Standards* and submit an application demonstrating competency specific to working with this population.

**4.510 Continued Placement of <u>Associate Level Adult Evaluators</u> on the Provider List:**
Associate Level evaluators shall apply for continued placement on the list every three (3) years by the date provided by the SOMB. Requirements are as follows:

A. The evaluator shall demonstrate continued competency related to adult sex offenders;

B. The applicant shall have completed face-to-face supervision hours specific to sex offense specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

*Discussion*: *The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

C. <span style="color:red">Every three (3) years the provider shall complete forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training</span> as determined by the SOMB Clinical Supervisor and applicant based upon individualized training needs. If the applicant is applying to be a treatment provider and evaluator the training needs to reflect both treatment and evaluation.

If the applicant is applying to be an evaluator for adult and juvenile, training must reflect both populations.  Please reference the list of specialized training categories.

D. The evaluator shall not have a conviction of or a deferred judgment for a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

E. The evaluator shall submit to a current administrative background investigation (Section 16-11.7-106 (2) (a) (III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;



CDOC/Nelson_00226

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

F.  The evaluator shall report any practice that is in significant conflict with the *Standards*;

G.  The evaluator shall demonstrate continued compliance with the *Standards*, particularly 2.000;

H.  The evaluator shall comply with all other requirements outlined in the SOMB Administrative Policies.

I.  **DD/ID**
    Associate Level and Full Operating Level Evaluators who want to provide evaluation and/or treatment services to adult sex offenders with developmental/intellectual disabilities shall demonstrate compliance with these *Standards* and submit an application providing information related to experience and knowledge of working with this population.

**4.520 Required notifications to SOMB:** Providers listed under section 4.500 shall provide the following notifications to SOMB as applicable:

A.  Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

    1.  Name
    2.  Treatment agency
    3.  Address
    4.  Phone number
    5.  Email address
    6.  Supervisor

B.  Notify the SOMB in writing within 10 days of any changes in their status with the Department of Regulatory Agencies (DORA). This includes being subject to the filing of a complaint, having a founded complaint from DORA, or changing a DORA approval category (e.g. from licensed to unlicensed) The SOMB may periodically contact DORA regarding an individual's licensure or registration status for information.

C.  Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contender plea, or deferred judgement (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.

**4.600 EVALUATOR: <u>Adult Full Operating Level</u>:** Associate Level evaluators wanting to move to Full Operating Level status shall complete the application and submit documentation of all of the requirements listed below, as well as a letter from the approved SOMB Clinical Supervisor indicating the evaluator's readiness and demonstration of required competencies to move to



CDOC/Nelson_00227

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Full Operating Level Evaluator. A Full Operating Level Evaluator may evaluate sex offenders independently and are not required per SOMB standards to have an SOMB approved Clinical Supervisor. Nothing within this section alleviates a provider from their duty to adhere to their ethical code of conduct pertaining to supervision and consultation.

A. The evaluator shall have the underlying credential of licensure or certification as a Psychiatrist, Licensed Psychologist, Licensed Clinical Social Worker, Licensed Professional Counselor, Licensed Marriage and Family Therapist, Clinical Psychiatric Nurse Specialist or Licensed Addiction Counselor, and not be under current disciplinary action that the ARC determines would impede the applicants' ability to practice as an SOMB listed provider;

**OR**

The provider shall have maintained SOMB listing, in good standing, as an associate level treatment provider for at least 10 years (initial listing plus three renewal cycles) and be approved with the Department of Regulatory Agencies as a Unlicensed Psychotherapist, Certified Addiction Specialist, Marriage and Family Therapist (Provisional or Candidate), Licensed Professional Counselor (Provisional or Candidate), Psychologist Candidate, or Licensed Clinical Social Worker, and not be under current disciplinary action that the ARC determines would impede the applicants ability to practice as an SOMB listed provider;

B. The evaluator shall be simultaneously applying for, or currently listed as, a Full Operating Level Treatment Provider;

C. The evaluator shall have demonstrated the required competencies based on; clinical experience, supervision, administration, research, training, teaching, consultation, and/or policy development;

D. The evaluator shall have completed face-to-face supervision hours specific to sex offense specific treatment and/or evaluation calculated as follows:

| Direct Clinical Contact Hours per Month | Minimum Supervision Hours per Month |
|---|---|
| 0-59 | 2 |
| 60-79 | 3 |
| 80 or more | 4 |

*Discussion*: *The initial supervision meeting must be in-person, face-to-face supervision at the beginning of the supervision relationship. After these initial meetings, alternate forms of supervision (phone or some type of video conferencing) may be utilized.*

E. Within the past five (5) years, the applicant shall have taken forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training (these hours are in addition to the 40 hours required for Associate Level for a total of 80 hours) of training as determined by the SOMB Clinical Supervisor and applicant based upon individualized training needs.



CDOC/Nelson_00228

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

If the applicant is applying to be a treatment provider and evaluator, both adult and juvenile, the training needs to reflect both treatment and evaluation. If the applicant is applying to be an evaluator for adult and juvenile, training must reflect both populations. Please see the list of training categories.

F.  The evaluator shall demonstrate competency according to the individual's respective professional standards and ethics consistent with the accepted standards of practice of sex offense specific evaluations;

G.  The evaluator shall not have a conviction of, or a deferred judgment for a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

H.  The evaluator shall submit to a current administrative background investigation (Section 16-11.7-106 (2) (a) (III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing.);

I.  The evaluator shall demonstrate compliance with the *Standards*, particularly 2.00;

J.  The evaluator shall comply with all other requirements outlined in the SOMB Administrative Policies.

K.  **DD/ID**
    Associate Level and Full Operating Level Evaluators who want to provide evaluations to adults with developmental/intellectual disabilities who have committed sexual offenses shall demonstrate compliance with these *Standards* and submit an application providing information related to experience and knowledge of working with this population.

**4.610  Continued Placement of <u>Full Operating Level Adult Evaluators</u> on the Provider List:** Using a current re-application form, evaluators shall apply for continued placement on the list every 3 years by the date provided by the SOMB. Requirements are as follows:

A.  The evaluator shall have the underlying credential of licensure or certification as a Psychiatrist, Licensed Psychologist, Licensed Clinical Social Worker, Licensed Professional Counselor, Licensed Marriage and Family Therapist, Clinical Psychiatric Nurse Specialist or Licensed Addiction Counselor, and not be under current disciplinary action that the ARC determines would impede the applicants' ability to practice as an SOMB listed provider;

<u>OR</u>

The provider shall have maintained SOMB listing, in good standing, as an associate level treatment provider for at least 10 years (initial listing plus three renewal cycles) and be



CDOC/Nelson_00229

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

approved with the Department of Regulatory Agencies as a Unlicensed Psychotherapist, Certified Addiction Specialist, Marriage and Family Therapist (Provisional or Candidate), Licensed Professional Counselor (Provisional or Candidate), Psychologist Candidate, or Licensed Clinical Social Worker, and not be under current disciplinary action that the ARC determines would impede the applicants ability to practice as an SOMB listed provider;

B.  The evaluator shall demonstrate continued competency related to sex offenders based on; clinical experience, supervision, administration, research, training, teaching, consultation, and/or policy development.

C.  The evaluator may re-apply for listing as a Full Operating Level Adult Treatment Provider and Evaluator.

<u>**OR**</u>

The evaluator may discontinue their listing as a Full Operating Level Adult Treatment Provider and be placed on the Provider List as an evaluator only.

D.  <span style="color:red">Every three (3) years the provider shall complete forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training</span> in order to maintain proficiency in the field of sex offense specific treatment and evaluation and to remain current on any developments in the assessment, treatment, and monitoring of adults who have committed sexual offenses.

If the applicant is reapplying to be an evaluator for adult and juvenile, the training needs to reflect both populations. Please see the list of training categories.

E.  The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a Court a plea of guilty or nolo contender to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these *Standards* as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

F.  The evaluator shall submit to a current administrative background investigation (Section 16-11.7-106 (2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

G.  The evaluator shall report any practice that is in conflict with the *Standards*;

H.  The evaluator shall demonstrate continued compliance with the *Standards*, particularly 2.000;

I.  The evaluator shall comply with all other requirements outlined in the SOMB Administrative Policies.



CDOC/Nelson_00230

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**4.620  Required notifications to SOMB:** Providers listed under section 4.600 shall provide the following notifications to SOMB as applicable:

A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

1. Name
2. Treatment agency
3. Address
4. Phone number
5. Email address
6. Supervisor

B. Notify the SOMB in writing within 10 days of any changes in their status with the Department of Regulatory Agencies (DORA). This includes being subject to the filing of a complaint, having a founded complaint from DORA, or changing a DORA approval category (e.g. from licensed to unlicensed) The SOMB may periodically contact DORA regarding an individual's licensure or registration status for information.

C. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contender plea, or deferred judgement (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.

**4.700  CLINICAL SUPERVISOR:** Full Operating Level Treatment Providers and/or Evaluators wanting to provide supervision to Associate Level Treatment Providers and/or Evaluators shall submit an application documenting of all of the requirements listed below, as well as a letter from their current approved SOMB Clinical Supervisor indicating the provider's readiness and demonstration of required competencies to add the listing of Clinical Supervisor. Clinical Supervisors may only provide supervision in the areas they are currently approved (e.g. adult, sex offenders, DD, treatment, evaluation.)

A. The applicant shall be listed as a Full Operating Level Treatment Provider and/or Evaluator.

B. The applicant shall have attained the underlying credential of licensure or certification as a Psychiatrist, Licensed Psychologist, Licensed Clinical Social Worker, Licensed Professional Counselor, Licensed Marriage and Family Therapist, Clinical Psychiatric Nurse Specialist or Licensed Addiction Counselor, and not be under current disciplinary action that the ARC determines would impede the applicant's ability to practice as an SOMB listed provider;

C. The applicant shall receive supervision from an approved SOMB Clinical Supervisor for assessment of his/her supervisory competence.



CDOC/Nelson_00231

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

D. The applicant must be assessed as competent of SOMB Clinical Supervisor competency #1 prior to advancing to providing supervision under the oversight of their approved SOMB Clinical Supervisor.

E. Once the applicant is deemed competent in competency #1 he/she shall begin providing supervision under the oversight of his/her approved SOMB clinical supervisor.

F. Upon application the applicant shall submit competency ratings from his/her approved SOMB Clinical Supervisor using the "Competency Based Assessment for Approval as a Supervisor", including a letter of recommendation and narrative that addresses the following:

1. How the applicant has stayed current on the literature/research in the field (e.g. attending conferences, training, journals, books, etc.)

2. Research that can be cited to support the applicant's philosophy/framework.

3. How evolving research/literature has changed the applicant's practice.

4. How supervision content/process has been impacted in response to emerging research/literature in the field.

G. The applicant must maintain a listing in the areas he/she are providing supervision and must maintain compliance with the applicable *Standards* of his/her listing.

H. Within the past five (5) years, the applicant shall have taken forty (40) hours of training which includes the SOMB Introductory training to the Standards or the SOMB Standards Booster training (these hours are in addition to the 40 hours required for Full Operating level for a total of 80 hours) of training. Applicants shall also obtain (as a part of the required 80 hours) training specific to Clinical Supervision consistent with any requirements of their respective licensing board of the Department of Regulatory Agencies (DORA).

It is recommended that applicants be approved as Full Operating Level provider for a minimum of 6 months prior to applying to be listed as an SOMB Clinical Supervisor. The current supervisor has the discretion to shorten this time frame when the applicant has previous supervisory experience or demonstrates advanced competency in clinical supervision.

A. APPLICATION FOR APPROVAL AS AN SOMB CLINICAL SUPERVISION

Applicants may apply for approval as an SOMB clinical supervisor once they have met the required qualifications and completed the following;

a. Receive supervision from an approved SOMB clinical supervisor for assessment of their supervisory competence.
b. Be assessed as competent in SOMB clinical supervisor Competency #1.
c. Provide supervision, when deemed appropriate, under the oversight of their SOMB clinical supervisor.



CDOC/Nelson_00232

**4.750  Continued Placement  of Clinical Supervisors on the Provider List:** Clinical Supervisors shall continue to attend training as required by their respective licensing board(s) of the Department of Regulatory Agencies (DORA).

**4.800  Period of Compliance:** A listed treatment provider or evaluator, who is applying or reapplying, may receive up to one year or as deemed by the Application Review Committee to come into compliance with any *Standards*. If they are unable to fully comply with the *Standards* at the time of application, it is incumbent upon the treatment provider or evaluator to submit in writing a plan to come into compliance with the *Standards* within a specified time period.

**GRACE PERIOD FOR RENEWAL**

Providers who do not submit an application for renewal of their approved provider status by the date of expiration of their status will have a 30-day grace period in order to submit their application materials without having to start over with an Application One. Failure to submit application materials within 30 days after the date of expiration for approved provider status will require providers to begin the application process over by submitting Application One.

**ELIGIBILITY FOR FUTURE RENEWAL ONCE PROVIDER APPROVAL HAS EXPIRED**

Providers who allow their approved provider status to expire may be considered for return to listing status within 1 year of the expiration of their status. The Application Review Committee will consider whether to reinstate a provider to the approved provider list without having to begin the Application process over based on factors such as history of listing status, the reason for the expiration of the status, and what work the provider has been doing since the approved provider status ended to remain competent in the field.

**4.810  Denial of Placement on the Provider List**

The SOMB reserves the right to deny placement on the Provider List to any applicant to be a treatment provider, evaluator, clinical supervisor or polygraph examiner under these *Standards*. Reasons for denial include but are not limited to:

A.  The SOMB determines that the applicant does not demonstrate the qualifications required by these *Standards*;

B.  The SOMB determines that the applicant is not in compliance with the *Standards* of practice outlined in these *Standards*;

C.  The applicant fails to provide the necessary materials for application as outlined in the application materials and the administrative policies and procedures;

D.  The SOMB determines that the applicant exhibits factors (boundaries, impairments, etc.) which renders the applicant unable to treat clients;

E.  The SOMB determines that the results of the **Administrative background** investigation, the references given or any other aspect of the application process are unsatisfactory.



CDOC/Nelson_00233

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**4.820 Movement between Adult and Juvenile Listing Status:** Providers who are Full Operating or Associate Level Treatment Providers, Evaluators, and/or Polygraph Examiners for adult sex offenders may apply to be listed as an Associate Level Treatment Provider, Evaluator, and/or Polygraph Examiner for juveniles who have committed sexual offenses.

The Full Operating or Associate Level Treatment Provider, Evaluator, and/or Polygraph Examiner for adult sex offenders shall submit the required application outlining relevant competency with the application criteria as identified in these *Standards*, and identify any experience or training that may be considered for equivalency to these criteria. The Application Review Committee (ARC) shall determine if the submitted documentation substantially meets the application criteria or not, and will provide written notification of any additional needed experience or training.

**4.830 Not Currently Practicing:** When a listed provider is not currently providing any court ordered or voluntary sex offense specific treatment, evaluation, or polygraph services, including not performing peer consultation or clinical supervision for this population but wishes to retain their listing status.

A. A listed provider who wishes to move to not currently practicing status needs to inform the SOMB in writing of this change in status. The listed provider will be moved to the administrative inactive side on the approved provider list under not currently practicing status.

B. The listed provider will be required to submit a reapplication of the not currently practicing status at the time of his/her regularly scheduled reapplication time. There will be no minimum qualifications for maintaining this status (e.g. clinical experience, supervision, training, etc.) outside of submission of a letter indicating the listed provider is not currently practicing and a $25 reapplication administrative fee.

C. The listed provider may not remain under not currently practicing status longer than 2 reapplication cycles (6 years). Following completion of the second reapplication submission timeframe, the listed provider must either relinquish listing status completely or submit reapplication to resume providing listed services.

D. Before a listed provider who is under not currently practicing status may resume providing sex offense specific treatment, evaluation, or polygraph services, the provider shall notify the SOMB in writing of the intention to resume providing such services (including the name of a supervisor for those who were Associate Level providers, or a required peer consultant for those who were Full Operating Level Providers) and receive written verification from the SOMB of the submission.

E. Within 1 year of resuming providing listed services, the listed provider who was formerly under not currently practicing status shall submit the applicable reapplication packet. The listed provider shall meet the minimum reapplication qualifications (e.g. training, clinical experience, competency, staying active in the field, etc.) to maintain prior listing level (Associate or Full Operating level).



CDOC/Nelson_00234

**4.840** **Original Waiver Clause:** The original Adult *Standards* allowed the SOMB to grant, for a period of one (1) year following the effective date of publication, a waiver of the underlying credential of licensure or academic degree above a baccalaureate to individuals who could document extensive experience in providing services to adults who have committed sexual offenses. The waiver process was not intended to be available at any time after one (1) year past the effective date of publication of the Adult *Standards*. There is currently no provision for the granting of this waiver.



CDOC/Nelson_00235

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### 4.900 POLYGRAPH EXAMINER – Adult Associate Level (First Application):

Individuals who have not previously applied to the SOMB Approved Provider List as a Polygraph Examiner and are seeking their initial approval shall apply for Associate Level status using the required application. Initial listing at the Associate Level is good for one year to allow the provider time to develop competency in the required areas. The application shall be submitted and include a supervision agreement co-signed by their Full Operating Level Polygraph Examiner, and fingerprint card (pursuant to Section 16-11.7-106 (2), C.R.S.) within 30 days from the time the supervision began. To qualify to administer post-conviction sex offender polygraph tests at the Associate Level, an applicant shall meet all of the following requirements:

**A.** The examiner shall have graduated from an accredited American Polygraph Association (APA) school and shall have a baccalaureate degree from a four (4) year college or university;[144]

OR

For examiners approved prior to June 5, 2023, the examiner shall have graduated from an accredited American Polygraph Association (APA) school and have a minimum of a high school diploma,

**B.** The applicant shall demonstrate competency according to the individual's respective professional standards (American Polygraph Association) and ethics consistent with the accepted standards of practice of sex offense specific examinations;

**C.** The applicant shall submit to a current administrative background investigation (Section 16-11.7-106(2)(a)(III), C.R.S.).

**D.** The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a court a plea of guilty or nolo contendere to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these Standards as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

**E.** The applicant shall comply with all other requirements outlined in the SOMB Administrative Policies.

### 4.900  DD/ID

**A.** Individuals wanting to provide polygraph services to sex offenders with developmental/ intellectual disabilities shall demonstrate compliance with and submit an application providing information related to experience and knowledge of working with this population.

---

[144] Colorado Revised Statutes 16-11.7-106 (1.5)(c)  Any polygraph examiner must have graduated from an accredited American polygraph association school and have a baccalaureate degree from a four-year institution of higher education. The department of corrections shall complete compliance monitoring of contracted providers and polygraph examiners who are not approved by the board pursuant to subsection (1) of this section on an annual basis.



CDOC/Nelson_00236

**4.910  All Applicants Begin at the Associate Level (First Application):** All applicants shall apply for, and be approved at, the Associate Level polygraph examiner status prior to applying for Full Operating Level.

A. **Out-of-State Applicants:** Individuals who have the required credentials and education, that reside outside Colorado may seek Associate Level status if they meet all the qualifications listed in these *Standards*. Required supervision hours must have been provided by an individual whose qualifications substantially match those of an SOMB Supervisor as defined in these *Standards*. At the time of approval, out-of- state applications shall be supervised by a Full Operating Polygraph Examiner to ensure compliance with the *Standards and Guidelines*. Length of supervision shall be determined by the supervising examiner. Out-of-state applications will be reviewed on a case-by-case basis.

B. **Equivalency Applications:** Individuals who have prior experience conducting polygraphs may apply and be reviewed on a case by case basis for approval. This experience may be conducting polygraphs for a law enforcement or any other governmental agency.

4.920 Professional Supervision of <u>Associate Level Polygraph Examiners</u>:

A supervision agreement shall be signed by both the polygraph examiner and their supervisor. The supervision agreement shall specify supervision occurring at a minimum of two (2) hours of one-to-one direct supervision monthly, and that the supervisor is ultimately responsible for the test results.

The applicant shall have an application on file with the SOMB that includes the supervision agreement. Supervision must continue for the entire time an examiner remains at the Associate Level. The supervision agreement must be in writing.

The supervisor of a polygraph applicant shall review samples of the audio/video recordings of polygraphs and/or otherwise observe the examiner; and provide supervision and consultation on question formulation for polygraph exams, report writing, and other issues related to the provision of polygraph testing of post-conviction sex offenders. The supervisor shall review and co-sign all polygraph examination reports, as well as review all charts for all examinations completed by an Associate Level polygraph examiner under their supervision.

Additional components of supervision may include, but are not limited to:

A. Preparation for a polygraph examination;

B. Review/live observation of an examination;

C. Review of video and/or audio tapes of an examination; and

D. Review of other data collected during an examination.



CDOC/Nelson_00237

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

4.920    DD/ID Professional Supervision of Associate Level Polygraph Examiners with Developmental/Intellectual Disability Specialty

The applicant must have a Full Operating Level Polygraph Examiner with the Developmental/ Intellectual Disability Specialty providing supervision of these exams.

4.925 Required notifications to SOMB:

Providers listed under section 4.900 shall provide the following notifications to SOMB as applicable:

A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

   1. Name

   2. Treatment agency

   3. Address

   4. Phone number

   5. Email address

   6. Supervisor

B. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contendere plea, or deferred judgment (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.

4.930 POLYGRAPH EXAMINER - Associate Level (Initial 3 years):

An Associate Level polygraph examiner may administer post-conviction sex offender polygraph tests under the supervision of a Full Operating Level Polygraph Examiner under the *Standards and Guidelines*. To qualify to administer post-conviction sex offender polygraph tests at the Associate Level, an applicant shall meet all of the following requirements:

A. The examiner shall have graduated from an accredited American Polygraph Association (APA) school and shall have a baccalaureate degree from a four (4) year college or university;[145]

---

[145] Colorado Revised Statutes 16-11.7-106 (1.5)(c)  Any polygraph examiner must have graduated from an accredited American polygraph association school and have a baccalaureate degree from a four-year institution of higher education. The department of corrections shall



CDOC/Nelson_00238

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**OR**

For examiners approved prior to June 5, 2023, the examiner shall have graduated from an accredited American Polygraph Association (APA) school, have a minimum of a high school diploma, and shall have maintained SOMB listing, in good standing, as an associate level Polygraph Examiner since the initial approval.

B. The applicant shall complete a minimum of fifty (50) polygraph exams, on post-conviction or post-adjudication individuals while operating under the Associate Level status;

C. The applicant shall demonstrate competency according to the individual's respective professional standards (American Polygraph Association) and ethics consistent with the accepted standards of practice of sex offense specific examinations;

D. The applicant shall complete the American Polygraph Association (APA) approved forty (40) hour training specific to post-conviction sexual offending (PCSOT).

E. The Applicant shall complete the SOMB Introductory or Standards Booster Training.

These training hours may be utilized to meet the qualifications for both adult and juvenile polygraph examiners;

F. The applicant shall submit to a current **administrative background** investigation (Section 16-11.7-106(2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

G. The applicant shall submit quality assurance protocol forms from three (3) separate examinations submitted to three Full Operating Level Polygraph Examiners from outside the examiner's agency. When possible exams of each type shall be submitted to different examiners.  If an examiner is not conducting a particular type of exam this should be discussed with the applicable supervisor and identified within the application. Peer review must be conducted by the Polygraph Examiner annually at a minimum.

DD/ID
Individuals wanting to provide polygraph services to sex offenders with developmental/intellectual disabilities, shall ensure one (1) of the **quality assurance examinations** submitted is on a DD/ID individual. There is no requirement to what type of exam needs to be submitted.

H. The applicant shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a court a plea of guilty or nolo contendere to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved

---

complete compliance monitoring of contracted providers and polygraph examiners who are not approved by the board pursuant to subsection (1) of this section on an annual basis.



CDOC/Nelson_00239

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

applicant to practice under these Standards as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

I.  The applicant shall demonstrate compliance with the *Standards and Guidelines*; and

J.  The applicant shall comply with all other requirements outlined in the SOMB Administrative Policies.

**DD/ID**
Individuals wanting to provide polygraph services to sex offenders with developmental/ intellectual disabilities shall demonstrate compliance with and submit an application providing information related to experience and knowledge of working with this population.

4.940 Continued Placement of <u>Polygraph Examiner Associate Level</u> on the Provider List:

Polygraph examiners at the Associate Level shall apply for continued placement on the list every three (3) years by the date provided by the SOMB. Requirements are as follows:

A.  The examiner shall have graduated from an accredited American Polygraph Association (APA) school and shall have a baccalaureate degree from a four (4) year college or university;

<u>OR</u>

For examiners approved prior to June 5, 2023, the examiner shall have graduated from an accredited American Polygraph Association (APA) school, have a minimum of a high school diploma, and shall have maintained SOMB listing, in good standing, as an associate level Polygraph Examiner since the initial approval.

B.  The applicant shall complete a minimum of fifty (50) polygraph exams on post-conviction sex offenders while operating under the Associate Level status;

C.  The applicant shall demonstrate competency according to the individual's respective professional standards (American Polygraph Association) and ethics consistent with the accepted standards of practice of sex offense specific examinations;

D.  The examiner shall complete a minimum of forty (40) hours (which includes SOMB Introductory or Boosters Training) of continuing education every three (3) years as determined by the supervisor and examiner based upon individual training needs in order to maintain proficiency in the field of polygraph testing and to remain current on any developments in the assessment, treatment, and monitoring of sex offenders.

These training hours may be utilized to meet the qualifications for both adult and juvenile polygraph examiners;

E.  The examiner shall submit to a current Administrative background investigation (Section 16-11.7-106(2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance



CDOC/Nelson_00240

with the *Standards*. The references shall relate to the work the applicant is currently providing;

F. The applicant shall submit quality assurance protocol forms from one <u>(1) examination [Sex History preferred] for each population submitted to a Full Operating Level Polygraph Examiner from outside the examiner's agency.</u> When possible exams of each type shall be submitted to different examiners. Peer review must be conducted annually at a minimum.

DD/ID
Individuals wanting to provide polygraph services to sex offenders with developmental/intellectual disabilities, shall submit an additional quality assurance protocol form from a separate exam, to a full operating examiner with the DD/ID listing.

G. The examiner shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a court a plea of guilty or nolo contendere to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these Standards as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

H. The examiner shall report any practice that is in significant conflict with the *Standards and Guidelines*;

I. The examiner shall demonstrate compliance with the *Standards and Guidelines*; and

J. The examiner shall comply with all other requirements outlined in the SOMB Administrative Policies.

4.950 Movement to Full Operating Level:

Associate Level Polygraph Examiners wanting to move to Full Operating Level status shall complete and submit documentation of:

A. The examiner shall have graduated from an accredited American Polygraph Association (APA) school and shall have a baccalaureate degree from a four (4) year college or university;

**OR**

For examiners approved prior to June 5, 2023, the examiner shall have graduated from an accredited American Polygraph Association (APA) school, have a minimum of a high school diploma, and shall have maintained SOMB listing, in good standing, as an associate level Polygraph Examiner for at least 10 years (initial listing plus three renewal cycles);

B. The examiner shall have conducted at least two hundred (200) post-conviction, fifteen (15) juvenile **post adjudication polygraph exams**.



CDOC/Nelson_00241

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

C. The applicant shall demonstrate competency according to the individual's respective professional standards (American Polygraph Association) and ethics consistent with the accepted standards of practice of sex offense specific examinations;

D. The examiner shall submit a letter from their supervisor indicating the examiner's readiness to move to Full Operating Level status, including documentation of having completed the professional supervision components, and the examiners adherence and compliance with standards.

E. The applicant shall submit quality assurance protocol forms from one <u>(1) examination for each population submitted to a Full Operating Level Polygraph Examiner from outside the examiner's agency.</u>  Peer review must be conducted annually at a minimum.

DD/ID
Individuals wanting to provide polygraph services to sex offenders with developmental/intellectual disabilities, shall submit an additional quality assurance protocol form from a separate exam, to a full operating examiner with the DD/ID listing.

4.955 Required notifications to SOMB:

Providers listed under section 4.950 shall provide the following notifications to SOMB as applicable:

A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

   1. Name

   2. Treatment agency

   3. Address

   4. Phone number

   5. Email address

   6. Supervisor

B. Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contendere plea, or deferred judgment (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.



CDOC/Nelson_00242

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

4.960 POLYGRAPH EXAMINER - <u>Full Operating Level</u>:

Polygraph examiners who administer post-conviction sex offender polygraph tests shall meet the minimum standards as indicated by the American Polygraph Association as well as the requirements throughout these Standards.

Polygraph examiners who conduct post-conviction sex offender polygraph tests on adult sex offenders shall adhere to best practices as recommended within the polygraph profession.

To qualify at the Full Operating Level to perform examinations of adult sex offenders, an examiner must meet <u>all</u> the following criteria:

A.  The examiner shall have graduated from an accredited American Polygraph Association (APA) school and shall have a baccalaureate degree from a four (4) year college or university;

    <u>OR</u>

    For examiners approved prior to June 5, 2023, the examiner shall have graduated from an accredited American Polygraph Association (APA) school, have a minimum of a high school diploma, and shall have maintained SOMB listing, in good standing, as an associate level Polygraph Examiner for at least 10 years (initial listing plus three renewal cycles)

B.  The examiner shall have conducted at least two hundred (200) post-conviction sex offender polygraph exams.  The applicant shall ensure to complete both adult and juvenile exams in order meet the qualifications and provide services for both populations.

    *Discussion: Post conviction sex offender polygraph tests completed for juvenile offenders and/or tests completed for approval as an Associate Level polygraph examiner status may be included for Full Operating Level polygraph examiner approval.*

C.  Following completion of the curriculum (APA school) cited in these Standards, the applicant shall have completed an APA approved forty (40) hours of training within five (5) years of application specific to post-conviction sexual offending which focuses on the areas of evaluation, assessment, treatment and behavioral monitoring and includes, but is not limited to the following:

    1.  Pre-test interview procedures and formats.

    2.  Valid and reliable examination formats.

    3.  Post-test interview procedures and formats.

    4.  Reporting format (i.e. to whom, disclosure content, and forms).

    5.  Recognized and standardized polygraph procedures.

    6.  Administration of examinations in a manner consistent with these Standards.

    7.  Participation in sex offender multidisciplinary teams.

    8.  Use of polygraph results in the treatment and supervision process.



CDOC/Nelson_00243

9.  Professional standards and conduct.

10. Expert witness qualifications and courtroom testimony.

11. Interrogation techniques.

12. Maintenance/monitoring examinations.

13. Periodic/compliance examinations.

The successful completion of an APA approved forty (40) hour training specific to post-conviction sexual offending (PSOT) as referenced above <u>will</u> meet the qualifications for both adult and juvenile polygraph examiners.

Ten (10) of the forty (40) hours shall be specific to the treatment of adult sex offenders. These training hours may be utilized to meet the qualifications for both adult and juvenile polygraph examiners. Training hours must include the SOMB Introductory training to the Standards or the SOMB Standards Booster training.

If an examiner wishes to substitute any training not listed here, it is incumbent on the examiner to write a justification demonstrating the relevance of the training to this standard;

D.  Individuals wanting to provide polygraph services to sex offenders with developmental/intellectual disabilities shall demonstrate compliance with and submit an application providing information related to experience and knowledge of working with this population.

E.  The examiner shall demonstrate competency according to the individual's respective professional standards and conduct all examinations in a manner that is consistent with the reasonably accepted standard of practice in the clinical polygraph examiner community;

F.  The examiner shall submit to a current Administrative background investigation (Section 16-11.7-106(2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

G.  The examiner shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a court a plea of guilty or nolo contendere to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these Standards as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

H.  The examiner shall demonstrate compliance with the *Standards and Guidelines*;

I.  The examiner shall comply with all other requirements outlined in the SOMB Administrative Policies.



CDOC/Nelson_00244

4.970 Continued Placement of a <u>Full Operating Level Polygraph Examiner</u> on the Provider List:

Polygraph examiners at the Full Operating Level shall apply for continued placement on the list every three (3) years by the date provided by the SOMB. Requirements are as follows:

A. The examiner shall have graduated from an accredited American Polygraph Association (APA) school and shall have a baccalaureate degree from a four (4) year college or university;

<u>OR</u>

For examiners approved prior to June 5, 2023, the examiner shall have graduated from an accredited American Polygraph Association (APA) school, have a minimum of a high school diploma, and shall have maintained SOMB listing, in good standing, as an associate level Polygraph Examiner for at least 10 years (initial listing plus three renewal cycles).

B. The successful completion of an APA approved forty (40) hour training specific to post-conviction sexual offending (PSOT) as referenced above <u>will</u> meet the qualifications for both adult and juvenile polygraph examiners.

Ten (10) of the forty (40) hours shall be specific to the treatment of adult sex offenders. These training hours may be utilized to meet the qualifications for both adult and juvenile polygraph examiners. Training hours must include the SOMB Introductory training to the Standards or the SOMB Standards Booster training.

If an examiner wishes to substitute any training not listed here, it is incumbent on the examiner to write a justification demonstrating the relevance of the training to this standard;

C. The examiner shall conduct a minimum of one hundred (100) post-conviction polygraph examinations in the three (3) year listing period on adult sex offenders;

D. The applicant shall demonstrate competency according to the individual's respective professional standards (American Polygraph Association) and ethics consistent with the accepted standards of practice of sex offense specific examinations;

E. The examiner shall submit to a current Administrative background investigation (Section 16-11.7-106(2)(a)(III), C.R.S.) that includes satisfactory references as requested by the SOMB. The SOMB may also solicit such additional references as necessary to determine compliance with the *Standards*. The references shall relate to the work the applicant is currently providing;

F. The applicant shall submit quality assurance protocol forms from one <u>(1) examination [Sex History preferred]</u> for each population submitted to a Full Operating Level Polygraph Examiner from outside the examiner's agency.  Peer review must be conducted annually at a minimum.

DD/ID



CDOC/Nelson_00245

Individuals wanting to provide polygraph services to sex offenders with developmental/intellectual disabilities, shall submit an additional quality assurance protocol form from a separate exam, to a full operating examiner with the DD/ID listing.

G. The examiner shall not have a conviction of, or a deferred judgment for, a municipal ordinance violation, misdemeanor, felony, or have accepted by a court a plea of guilty or nolo contendere to a municipal ordinance violation, misdemeanor, or felony if the municipal ordinance violation, misdemeanor, or felony is related to the ability of the approved applicant to practice under these Standards as reviewed and determined by the Application Review Committee. A certified copy of the judgment from a court of competent jurisdiction of such conviction or plea shall be conclusive evidence of such conviction or plea;

H. The examiner shall report any practice that is in significant conflict with the *Standards and Guidelines*;

I. The examiner shall demonstrate compliance with the *Standards and Guidelines*; and

J. The examiner shall comply with all other requirements outlined in the SOMB Administrative Policies.

DD/ID
Individuals wanting to provide polygraph services to sex offenders with developmental/ intellectual disabilities shall demonstrate compliance with and submit an application providing information related to experience and knowledge of working with this population.



CDOC/Nelson_00246

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

4.975 Period of Compliance:

A listed polygraph examiner, who is applying, may receive up to one year or as deemed by the Application Review Committee to come into compliance with any Standards. If they are unable to fully comply with the *Standards and Guidelines* at the time of application, it is incumbent upon the polygraph examiner to submit in writing a plan to come into compliance with the *Standards and Guidelines* within a specified time period.

GRACE PERIOD FOR RENEWAL

Polygraph Examiners who do not submit an application for renewal of their approved examiner status by the date of expiration of their status will have a 30-day grace period in order to submit their application materials without having to start over with an Application One. Failure to submit application materials within 30 days after the date of expiration for approved status will require examiners to begin the application process over by submitting Application One.

ELIGIBILITY FOR FUTURE RENEWAL ONCE PROVIDER APPROVAL HAS EXPIRED

Polygraph Examiners who allow their approved examiner status to expire may be considered for return to listing status within 1 year of the expiration of their status. The Application Review Committee will consider whether to reinstate an examiner to the approved provider list without having to begin the Application process over based on factors such as history of listing status, the reason for the expiration of the status, and what work the examiner has been doing since the approved status ended to remain competent in the field.

4.980 Denial of Placement on the Provider List

The SOMB reserves the right to deny placement on the Provider List to any applicant to be a treatment provider, evaluator, clinical supervisor or polygraph examiner under these Standards. Reasons for denial include but are not limited to:

A. The SOMB determines that the applicant does not demonstrate the qualifications required by these Standards;

B. The SOMB determines that the applicant is not in compliance with the *Standards and Guidelines* of practice outlined in these Standards;

C. The applicant fails to provide the necessary materials for application as outlined in the application materials and the administrative policies and procedures;

D. The SOMB determines that the applicant exhibits factors (boundaries, impairments, etc.) which renders the applicant unable to treat clients; and

E. The SOMB determines that the results of the Administrative background investigation, the references given or any other aspect of the application process are unsatisfactory.



CDOC/Nelson_00247

4.985 Not Currently Practicing: When a listed examiner not currently providing any court ordered or voluntary sex offense specific treatment, evaluation, or polygraph services, including not performing or providing supervision for this population but wishes to retain their listing status.

    A. A listed provider who wishes to move to not currently practicing status needs to inform the SOMB in writing of this change in status. The listed provider will be moved to the administrative inactive side on the approved provider list under not currently practicing status.

    B. The listed provider will be required to submit a reapplication of the not currently practicing status at the time of their regularly scheduled reapplication time. There will be no minimum qualifications for maintaining this status (e.g. clinical experience, supervision, training, etc.) outside of submission of a letter indicating the listed provider is not currently practicing and a $25 reapplication administrative fee.

    C. The listed provider may not remain under not currently practicing status longer than 2 reapplication cycles (6 years). Following completion of the second reapplication submission timeframe, the listed provider must either relinquish listing status completely or submit reapplication to resume providing listed services.

    D. Before a listed provider who is under not currently practicing status may resume providing sex offense specific treatment, evaluation, or polygraph services, the provider shall notify the SOMB in writing of the intention to resume providing such services (including the name of a supervisor for those who were Associate Level providers, or a required peer consultant for those who were Full Operating Level Providers) and receive written verification from the SOMB of the submission.

    E. Within 1 year of resuming providing listed services, the listed provider who was formerly under not currently practicing status shall submit the applicable reapplication packet. The listed provider shall meet the minimum reapplication qualifications (e.g. training, clinical experience, competency, staying active in the field, etc.) to maintain prior listing level (Associate or Full Operating level).

4.990 Required notifications to SOMB:

Providers listed under section 4.1000 shall provide the following notifications to SOMB as an examiner

    A. Notify the SOMB in writing within two (2) weeks of changes to contact information. In such cases where a change in agency affiliation has occurred, individuals shall be required to provide updated information, where applicable on the treatment provider/client contract, description of program services, supervision agreement, and any other information pertinent to the change of employment Changes to contact information include any of the following:

        1. Name

        2. Treatment agency

        3. Address



CDOC/Nelson_00248

4.  Phone number

5.  Email address

6.  Supervisor

B.  Notify the SOMB in writing within 10 days of any arrest, conviction, nolo contendere plea, or deferred judgment (other than a traffic violation of 7 points or less) for a municipal ordinance violation, misdemeanor, or felony, and sentence plea. The SOMB will be updated by the Colorado Bureau of Investigation of any of the above, and will consider such information, including proper notification of the SOMB, in its decision making related to whether an individual should continue to be listed with the SOMB.



CDOC/Nelson_00249

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# List of Specialized Training Categories

| Training Category | Training Areas |
|---|---|
| **Sex offense-specific training** may include but is not limited to training from these areas: | ▪ Sex offender evaluation and assessment<br>▪ Sex offender treatment planning and assessing treatment outcomes<br>▪ Community supervision techniques including approved supervisor training<br>▪ Treatment modalities:<br>  o Group<br>  o Individual<br>  o Family<br>  o Psycho-education<br>  o Self-help<br>▪ Sex offender treatment techniques including:<br>  o Evaluating and reducing denial<br>  o Behavioral treatment techniques<br>  o Cognitive behavioral techniques<br>  o Relapse prevention<br>  o Offense cycle<br>  o Empathy training<br>  o Confrontation techniques<br>  o Safety and containment planning<br>▪ Sex offender risk assessment<br>▪ Parental Risk Assessment<br>▪ Crossover<br>▪ Objective measures including:<br>  o Polygraph<br>  o Plethysmograph<br>  o Viewing Time (VT)<br>▪ Psychological testing<br>▪ Special sex offender populations including:<br>  o Sadists<br>  o Psychopaths<br>  o Developmentally/<br>   Intellectually disabled<br>  o Compulsives<br>  o Juveniles<br>  o Females<br>▪ Family clarification/ visitation/reunification<br>▪ Pharmacotherapy with sex offenders<br>▪ Impact of sex offenses<br>▪ Assessing treatment progress<br>▪ Supervision techniques with sex offenders<br>▪ Offender's family stability, support systems and parenting skills<br>▪ Sex offender attachment styles<br>▪ Knowledge of laws, policies and ethical concerns relating to confidentiality, mandatory reporting, risk management and offender participation in treatment<br>▪ Ethics<br>▪ Philosophy and Principles of the SOMB<br>▪ Trauma and vicarious Trauma |



CDOC/Nelson_00250

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

| Training Category | Training Areas |
|---|---|
| **Victim specific training** may include but are not limited to training from these areas: | ▪ Victim impact<br>▪ Victim treatment and recovery<br>▪ Victim experience in the criminal justice system<br>▪ Contact, Clarification and reunification with victims<br>▪ Secondary victims<br>▪ Victim Rights Act (VRA)<br>▪ Prevalence of sexual assault<br>▪ Human trafficking<br>▪ Victim Centered approach to treatment and supervision |
| **Adult specific training** may include but are not limited to training from these areas: | ▪ Prevalence of sexual offending by adults<br>▪ Victimization rates<br>▪ Typologies of adult sex offenders<br>▪ Continuing research in the field of adult sexual offending<br>▪ Anger management<br>▪ Healthy sexuality and sex education<br>▪ Learning theory<br>▪ Multicultural sensitivity<br>▪ Understanding transference and counter-transference<br>▪ Family dynamics and dysfunction<br>▪ Co-morbid conditions, differential diagnosis<br>▪ Investigations<br>▪ Addictions and substance abuse<br>▪ Domestic Violence<br>▪ Knowledge of criminal justice and/or district court systems, legal parameters and the relationship between the provider and the courts<br>▪ Any of the topics in the above sex offense-specific category that is also specific to adult sex offenders<br>▪ Philosophy of treatment adult vs. juvenile |
| **Juvenile specific training** may include but are not limited to trainings from these areas: | ▪ Prevalence of sexual offending by juveniles/<br>▪ Victimization rates<br>▪ Typologies of juveniles who commit sexual offenses<br>▪ Continuing research in the field of sexual offending by juveniles<br>▪ Difference between juveniles and adults<br>▪ Philosophy of treatment adult vs. juvenile<br>▪ Clarification and contact with victims<br>▪ Reunification with families impacted by sexual abuse<br>▪ Healthy sexuality and sex education<br>▪ Multicultural sensitivity<br>▪ Developmental stages<br>▪ Understanding transference and counter-transference<br>▪ Family dynamics and dysfunction<br>▪ Co-morbid conditions, differential diagnosis<br>▪ Investigations<br>▪ Addictions and substance abuse<br>▪ Partner Violence<br>▪ Any of the topics in the above sex offense-specific category that is also specific to juveniles who sexually offend |
| **Developmental/ Intellectual Disabilities specific training** may include but are not limited to trainings from these areas: | ▪ Treatment, evaluation and monitoring considerations for the sex offender with developmental/intellectual disabilities<br>▪ Impact of disability on the individual<br>▪ Healthy sexuality and sex education for the sex offender with developmental/ intellectual disabilities<br>▪ Statutes, rules and regulations pertaining to individuals with developmental/intellectual disabilities<br>▪ Co-occurring mental health issues |



CDOC/Nelson_00251

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Research Citations

Section 4.000 is primarily focused on provider qualification-related procedures. There were no footnotes in this section based on this reason. However, this does not mean that Section 4.000 is not evidence-based. On the contrary, Section 4.000 was heavily guided by primary research that the SOMB did between 2012 and 2014 in addition to statutory requirements. The SOMB started discussing the qualifications of treatment providers, evaluators, and polygraph examiners of different levels, including Clinical Supervisor and competence-based training in 2012 at the Best Practices Committee meetings. Many of the initial discussions were guided by the book *The Fundamentals of Clinical Supervision and the Standards for Counseling Supervisors* by the American Association of Counseling. The SOMB carried out a survey and focus group study in 2014 before drafting relevant standards for Section 4.000. Several trainings on the Competence-Based Model occurred between 2014 and 2016. The Competence-Based Model training covered the entirety of Section 4.000.

The following qualifications of Treatment Providers, Evaluators, and Polygraph Examiners Working with adult sex offenders and juveniles who have committed sexual offenses have research support (the Standards are supported by a review of the literature): 4.100, 4.120, 4.200, 4.300, 4.310, 4.600, 4.610, 4.700, 4.900, 4.920, 4.950 4.960; and DD/ID Standards in 4.100, 4.120, 4.200, 4.300, 4.400, 4.500, 4.510, 4.600, 4.900, 4.920, 4.930, 4.940, and 4.970.  All research references in these Standards were evaluated by the staff researcher and presented to the SOMB regarding the revisions being discussed. Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revision process regardless of whether it supported the standard revision or not. This research was then incorporated into the Standards and presented to the SOMB for ratification by the Board. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as they related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender

The following Standards and Guidelines in Section 4.000 were revised but do not have research support given their procedural nature: 4.110, 4.130, 4.210, 4.220, 4.310, 4.320, 4.410, 4.510, 4.520, 4.610, 4.620, 4.810, 4.820, 4.830, 4.840, 4.910 (Out-of-State Applicants), 4.925, 4.940, 4.950, 4.955, 4.970 (Continued Placement), 4.985 (Movement between Adult and Juvenile Listing Status; Not Currently Practicing; Original Waiver Clause; Movement to Full Operating Level), 4.990 (Required notifications to SOMB). The SOMB staff did a search for research applicable to the Standards noted above. Research was not found applicable to these Standards, so in absence of research the Standards are based on best practices procedures, professional association guidelines, and the professional expertise of the members of the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Pursuant 16-11.7-106 of the Colorado Revised Statutes, the SOMB "shall develop an application and review process for treatment providers, evaluators, and polygraph examiners who provide services pursuant to this article to adult sex offenders and to juveniles who have committed sexual offenses."



CDOC/Nelson_00252

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The Following Standards and Guidelines in Section 4.00 were revised to ensure compliance with the statute:

**Requirement for Background check** [146]**:** 4.100(E), 4.200(G), 4.210(D), 4.300(H), 4.310(E), 4.400(D), 4.500(F), 4.510( E), 4.600(H), 4.610(F), 4.900(D), 4.930(E), 4.940(E), 4.960(F), 4.970, (D),

**Listing of Providers with DD/ID Qualifications** [147]**:** 4.100 (H), 4.300(K), 4.400(G), 4.500(I), 4.510(I), 4.600(K), 4.900(A), 4.930(J), 4.940(K), 4.970(J),

[Top of the Document](#)

---

146 Colorado Revised Statutes 16-11.7-106(2) (III) The board shall require a person who applies for placement, including a person who applies for continued placement, on the list of persons who may provide sex-offender-specific evaluation, treatment, and polygraph services pursuant to this article to submit to a current background investigation that goes beyond the scope of the criminal history record check described in subparagraph (I) of this paragraph (a). In conducting the current background investigation required by this subparagraph (III), the board shall obtain reference and criminal history information and recommendations that may be relevant to the applicant's fitness to provide sex-offender-specific evaluation, treatment, and polygraph services pursuant to this article.

147 Colorado Revised Statutes 16-11.7-103(4)(b)(I) The board shall develop, implement, and revise, as appropriate, guidelines and standards to treat adult sex offenders, including adult sex offenders with intellectual and developmental disabilities, incorporating in the guidelines and standards the concepts of the risk-need-responsivity or another evidence-based correctional model, which guidelines and standards can be used in the treatment of offenders who are placed on probation, incarcerated with the department of corrections, placed on parole, or placed in community corrections. Programs implemented pursuant to the guidelines and standards developed pursuant to this subsection (4)(b) must be as flexible as possible so that the programs may be accessed by each adult sex offender to prevent the offender from harming victims and potential victims. Programs must include a continuing monitoring process and a continuum of treatment options available to an adult sex offender as he or she proceeds through the criminal justice system. Treatment options must be determined by a current risk assessment and evaluation and may include, but need not be limited to, group counseling, individual counseling, family counseling, outpatient treatment, inpatient treatment, shared living arrangements, or treatment in a therapeutic community. Programs implemented pursuant to the guidelines and standards developed pursuant to this subsection (4)(b) must, to the extent possible, be accessible to all adult sex offenders in the criminal justice system, including those offenders with behavioral, mental health, and co-occurring disorders. The procedures for evaluation, identification, treatment, and monitoring developed pursuant to this subsection (4) must be implemented only to the extent that money is available in the sex offender surcharge fund created in section 18-21-103 (3).



CDOC/Nelson_00253

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 5.000 Standards and Guidelines for Community Supervision Teams Working with Adult Sex Offenders

................................................................................................................................................................

*5.000  The SOMB TEAMS Model and the Community Supervision Team (CST)*



**5.005** TEAMS is an acronym for Treatment, Engagement, Assessment, Management and Supervision. [148] This model guides the CST members to work collaboratively with each other to assist the client/offender in becoming a pro-social, productive member of society, and in order to enhance community safety. The foundations of the model are Victim and Community Safety, the use of Evidence Based and Research Informed Practices, Informed Public Policies and Collaboration.

*Community safety is enhanced when treatment providers and community supervision professionals' practice in their area of specialization and work together.* This collaboration should include frequent and substantive communication about information that will assist in reducing an offender's risk to the community. When the CST members respect individual roles and mutually agree upon their goals and the treatment and supervision interventions that will be pursued, the offender can be treated and managed more effectively.

---

[148] The TEAMS model was originally approved by consensus of the SOMB on February 19, 2016.



CDOC/Nelson_00254

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The components of the TEAMS Model are:

A. **Community Supervision** - Community supervision is made up of Probation, Parole, Community Corrections or a modified CST in the Department of Corrections.

B. **Evaluation and Assessments** – Evaluations include empirically validated instruments that determine risk. For the purpose of the TEAMS Model, assessments may include, but are not limited to, a polygraph report, viewing time instruments and/or a PPG. (See Section 2.000.)

C. **Treatment** - SOMB approved sex offense-specific treatment. Treatment may also include adjunct treatment for underlying mental health or drug and alcohol treatment. (See Section 3.000.)

D. **Support System** – The support system can be an individual(s), a family member(s) or an organization(s) that provides pro-social support to enhance offender motivation for positive behavioral change.

The goal of the CST's collaborative efforts is to engage offenders in treatment and supervision in order to decrease risk, enhance protective factors, and increase their intrinsic motivation for positive behavioral change.

**5.010** As soon as possible after the conviction and referral of a sex offender to probation, parole, or community corrections, the supervising officer should convene the initial meeting of the CST. When offenders are placed in institutions, "community" refers to the institutional setting and there is a modified CST.

Institutional treatment programs utilize a modified Community Supervision Team (CST) approach similar to that described in Section 5.000. Specifically, the polygraph examiner and SOMB approved treatment provider should work closely together, and other institutional professionals should be included in the CST as indicated. The SOMB approved clinical supervisor shall function as the head of the CST for purposes of convening the team.

**5.015** CST members should participate in regular staffings to share information and address pertinent issues. CSTs should communicate frequently enough to manage and treat sexual offenders effectively with community safety as the highest priority. When the CST members respect individual roles and mutually agree upon their goals and the treatment and supervision interventions that will be pursued, the offender can be treated and managed more effectively.

**5.020** Some offenders may have multiple supervising officers (e.g. a probation officer and parole officer, or a probation officer and community corrections case manager). In such cases, the supervising officers should determine the role each will serve in supervising the offender. As issues arise, agency representatives are encouraged to staff the matters and develop a coordinated response.

The following guidelines will help ensure a coordinated response in dual supervision cases:

A. The agency that has the longest jurisdiction over the offender should be the lead agency;



CDOC/Nelson_00255

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

B. If the offender is required to participate in offense-specific treatment, the lead agency should refer the offender to an SOMB approved provider who is utilized and approved by both agencies;

C. Housing assistance and other re-entry services should be provided and coordinated in a cooperative manner by both agencies to the extent they are able to assist;

D. Staffing and communication between the supervising officers of each agency is encouraged to take place according to a set schedule and may be conducted over the phone and by email;

E. If there is a significant disagreement or discrepancy in case management decisions, both officers should consider the offender's risk, protective factors and treatment needs, and apply the most appropriate plan;

F. Safety plans should be approved by both officers. Where there is a significant disagreement on whether to approve a safety plan, both officers should consider the offender's protective factors, risk and treatment needs, and approve the most appropriate plan;

G. As issues arise during dual supervision cases, agency representatives are encouraged to consistently communicate and obtain feedback to develop and ensure a coordinated team response as it pertains to issues which include, but are not limited to incentives, sanctions, technical violations, home visits and arrests;

H. Expectations should be clearly communicated to the defendant from both agencies and as they change over time; and

I. Each supervising officer must clearly communicate to the client his/her expectations with respect to each officer's duties/domains so that the client understands who is managing various issues in supervision, especially if the identity or role of the supervising officer changes over time.

**5.025** Each Community Supervision Team (CST) is established for a particular offender and is flexible enough to include any individuals necessary to ensure the best approach to management and treatment. CST membership may therefore change over time.

At a minimum, each CST shall consist of the following as deemed appropriate and applicable:

A. The supervising officer (except in the case of institutional settings, see Standards 5.005 and 5.010);

B. The offender's treatment provider;

C. Evaluators (as applicable);

D. The polygraph examiner (as applicable); and



CDOC/Nelson_00256

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

E.  The Victim Representative.

The team may include extended family members, other clinical professionals, law enforcement, spiritual leaders, peers, victim representatives, victims, coaches, employers and other individuals as deemed appropriate by the CST.

*Discussion:  It is important to note that each CST member (e.g., polygraph examiner and victim representative) may not be present at each CST meeting/staffing. However, CST members should maintain communication on a regular basis as a crucial part of the process. Victim representatives should be consulted to provide input for all CSTs, and will be more active in the cases when the actual victim is involved in the supervision and treatment of the offender. Victim representatives should always be included for consultation on safety concerns and victim contact, clarification and reunification.*

### 5.025  *DD/ID*

When the CST is formed around an offender with DD/ID issues it is important that the CST consult with and/or add as an adjunct member an individual(s) who may assist the offender's transition and who understands the unique needs presented by the offender.[149]\

Therefore, in addition to the core members of the CST, any of the following, when involved, should be added to teams supervising sex offenders who have developmental or intellectual disabilities:

B. Community Centered Board Case Manager

C. Residential Providers

D. Supported Living Coordinator

E. Day Program Provider

F. Vocational or Educational Provider

G. Guardians

H. Social Services

---

[149] Colorado Revised Statues 16-11.7-103(4)(b)(I) The board shall develop, implement, and revise, as appropriate, guidelines and standards to treat adult sex offenders, including adult sex offenders with intellectual and developmental disabilities, incorporating in the guidelines and standards the concepts of the risk-need-responsivity or another evidence-based correctional model, which guidelines and standards can be used in the treatment of offenders who are placed on probation, incarcerated with the department of corrections, placed on parole, or placed in community corrections. Programs implemented pursuant to the guidelines and standards developed pursuant to this subsection (4)(b) must be as flexible as possible so that the programs may be accessed by each adult sex offender to prevent the offender from harming victims and potential victims. Programs must include a continuing monitoring process and a continuum of treatment options available to an adult sex offender as he or she proceeds through the criminal justice system. Treatment options must be determined by a current risk assessment and evaluation and may include, but need not be limited to, group counseling, individual counseling, family counseling, outpatient treatment, inpatient treatment, shared living arrangements, or treatment in a therapeutic community. Programs implemented pursuant to the guidelines and standards developed pursuant to this subsection (4)(b) must, to the extent possible, be accessible to all adult sex offenders in the criminal justice system, including those offenders with behavioral, mental health, and co-occurring disorders. The procedures for evaluation, identification, treatment, and monitoring developed pursuant to this subsection (4) must be implemented only to the extent that money is available in the sex offender surcharge fund created in section 18-21-103 (3).



CDOC/Nelson_00257

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

I. Family Members

J. Authorized Representatives

K. Other Applicable Providers

## 5.030 DD/ID Responsibilities of Additional CST Members for Sex Offenders Who Have Developmental Disabilities

When the CST is formed around an offender with DD/ID issues and additional team members are added to the CST it is important that they meet the criteria below: [150]

A. Team members shall have specialized training or knowledge regarding sexual offending behavior, the management and supervision of sex offenders and the impact of sex offenses on victims;

B. Team members shall be familiar with the conditions of the offender's supervision and the treatment contract; and

C.  Team members shall immediately report to the supervising officer and the treatment provider any failure to comply with the conditions of supervision or the treatment contract or any perceived high-risk behavior.

## 5.050  Promoting and Monitoring Behavioral Change

The Teams Model promotes engagement of offenders by the CST in the treatment and supervision process to enhance protective factors, decrease risk and increase the offender's motivation for positive behavioral change. The SOMB enabling statute declares that "some sex offenders respond well to treatment and can function as safe, responsible and contributing

---

[150] Colorado Revised Statues 16-11.7-103(4)(b)(I) The board shall develop, implement, and revise, as appropriate, guidelines and standards to treat adult sex offenders, including adult sex offenders with intellectual and developmental disabilities, incorporating in the guidelines and standards the concepts of the risk-need-responsivity or another evidence-based correctional model, which guidelines and standards can be used in the treatment of offenders who are placed on probation, incarcerated with the department of corrections, placed on parole, or placed in community corrections. Programs implemented pursuant to the guidelines and standards developed pursuant to this subsection (4)(b) must be as flexible as possible so that the programs may be accessed by each adult sex offender to prevent the offender from harming victims and potential victims. Programs must include a continuing monitoring process and a continuum of treatment options available to an adult sex offender as he or she proceeds through the criminal justice system. Treatment options must be determined by a current risk assessment and evaluation and may include, but need not be limited to, group counseling, individual counseling, family counseling, outpatient treatment, inpatient treatment, shared living arrangements, or treatment in a therapeutic community. Programs implemented pursuant to the guidelines and standards developed pursuant to this subsection (4)(b) must, to the extent possible, be accessible to all adult sex offenders in the criminal justice system, including those offenders with behavioral, mental health, and co-occurring disorders. The procedures for evaluation, identification, treatment, and monitoring developed pursuant to this subsection (4) must be implemented only to the extent that money is available in the sex offender surcharge fund created in section 18-21-103 (3).



CDOC/Nelson_00258

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

members of society, provided that they receive treatment and supervision."[151] Supervision and treatment engagement is a critical component to measuring successful outcomes.[152]

### While it is the CST's duty to promote behavioral change, the responsibility of ultimate success or failure lies within the client.

**5.055** Promoting and monitoring behavioral change is the responsibility of each member of the CST. When working with offenders, incentives have been proven to be more effective than sanctions in promoting behavioral change. Incentives should be applied more frequently than sanctions then facilitating behavioral change.[153] Responses to negative behaviors should be applied commensurate to the severity of the violation or negative behavior.[154]

### Each member of the CST has a role in managing and monitoring behavioral change. Some of these roles may overlap between the community supervision officer and treatment provider. It is essential that the supervising officer and treatment provider work collaboratively to coordinate supervision and treatment to enhance behavior change progression. The team should work closely together to identify the progress of supervision and treatment goals while recognizing and respecting the expertise of each team member. It is critical for the supervising officer and treatment provider to work collaboratively when an offender's risk is at an increased level. Each member of the CST will defer to the expertise of the other in coordinating a response during times of increased risk. The response should take into consideration the offender's assessed risk, progress in treatment, and protective factors, and victim and community safety. Final decisions concerning matters of the court, court ordered terms and conditions or parole board directives will be made by the supervising officer in consultation with the treatment provider. Final decisions concerning matters of the treatment contract, components of treatment, or treatment issues in general will be made by the treatment provider or evaluator in consultation with the supervising officer. Rare exceptions to this Standard would be if the offender poses a documented public safety risk and the supervising officer must act quickly to address the risk to the community. Promoting and monitoring behavior change begins with

---

[151] Colorado Revised Statutes (2020) 18-1.3-1001: The general assembly hereby finds that the majority of persons who commit sex offenses, if incarcerated or supervised without treatment, will continue to present a danger to the public when released from incarceration and supervision. The general assembly also finds that keeping all sex offenders in lifetime incarceration imposes an unacceptably high cost in both state dollars and loss of human potential. The general assembly further finds that some sex offenders respond well to treatment and can function as safe, responsible, and contributing members of society, so long as they receive treatment and supervision. The general assembly therefore declares that a program under which sex offenders may receive treatment and supervision for the rest of their lives, if necessary, is necessary for the safety, health, and welfare of the state.

[152] Beggs, S. (2010). Within-treatment outcome among sexual offenders: A review. *Aggression and Violent Behavior, 15(5)*, 369-379; Drieschner, K. H. & Verschuur, J. (2010). Treatment engagement as a predictor of premature treatment termination and treatment outcome in a correctional outpatient sample. *Criminal Behavior and Mental Health, 20,* 86-99.

[153] Bonta, J. & Andrews, D. A. (2017). *The psychology of criminal conduct* (6th ed.). New York, NY: Routledge.; Payne & Dozier (2013). Positive reinforcement as treatment for problem behavior maintained by negative reinforcement. *Journal of Applied Behavior Analysis, 46(3),* 699-703; Robinson, Lowenkamp, & Lowenkamp (2015). Towards an empirical and theoretical understand of offender reinforcement and punishment. *Federal Probation, 79(1),* 3-10.; Wood, Wilson, & Thorne (2015). Offending patterns, control balance, and affective rewards among convicted sex offenders. *Deviant Behavior, 36(5),* 368-387.

[154] Bonta, J. & Andrews, D. A. (2017); Payne & Dozier (2013); Robinson et al. (2015); Wood et al. (2015).

Colorado Revised Statutes (2020) 18-1.3-1001: The general assembly hereby finds that the majority of persons who commit sex offenses, if incarcerated or supervised without treatment, will continue to present a danger to the public when released from incarceration and supervision. The general assembly also finds that keeping all sex offenders in lifetime incarceration imposes an unacceptably high cost in both state dollars and loss of human potential. The general assembly further finds that some sex offenders respond well to treatment and can function as safe, responsible, and contributing members of society, so long as they receive treatment and supervision. The general assembly therefore declares that a program under which sex offenders may receive treatment and supervision for the rest of their lives, if necessary, is necessary for the safety, health, and welfare of the state.



CDOC/Nelson_00259

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

assessing risk and identifying target behaviors that are directly related to specific criminogenic needs areas. Assessing need areas may focus on the following areas but are not limited to: [155]

**A.** Cooperation with Supervision and Treatment

**B.** Sexual Offense Responsibility

**C.** Sexual Risk Management

**D.** Sexual Behavior/Attitudes/Interest

**E.** Antisocial Behavior/Attitudes/Thoughts/Beliefs/Personality Pattern

**F.** Criminal Rule Breaking Attitudes or Behaviors

**G.** Social Influences

**H.** Problem Solving

**I.** Impulsivity

**J.** Treatment and Supervision Cooperation

**K.** Intimacy Deficits as seen in Family and Marital

**L.** Victim Impact/Empathy

The CST should consider these factors while individualizing each case. The team should collaboratively consider whether the best response is to continue working with the offender in the community, modifying the terms and conditions of supervision or the treatment contract, or to request the offender be regressed or revoked from community supervision. [156]

---

[155] McGrath, R. J., Cumming, G. F., & Lasher, M. P. (2013). *SOTIPS: Sex Offender Treatment Intervention and Progress Scale Manual*. 34(4), 575-608.

[156] Revised 2010 Center for Effective Public Policy – *Shaping Offender Behavior*, Mark Carey, The Carey Group.



CDOC/Nelson_00260

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### 5.100   Responsibilities of the Supervising Officer Within the Team

**5.105**   The supervising officer shall refer sex offenders for evaluation and treatment only to providers who are approved by the SOMB. [157] When making referrals, the supervising officer should consider the provider who will best maximize the offender's ability to learn by matching interventions to an offender's learning style, and who will motivate the offender to change by enhancing their strengths and abilities. [158] The supervising officer should ensure that sex offenders sign applicable Authorizations for Release of Information to allow for information sharing (see Section 9.000).

Some factors to consider when referring for sex offense-specific treatment include, but are not limited to: [159]

A. Recommendations of the Sex Offense-Specific Evaluation (SOSE);

B. Recommendations of the Presentence Investigation Report (PSIR);

C. Community safety;

D. Assessed risk factors (static and dynamic);

E. Assessed criminogenic factors (e.g. employment, family circumstances, etc.);

F. Level of supervision;

G. Offender's specialized needs such as mental illness, physical or developmental disability, and cultural differences;

H. Availability and proximity of services;

I. Continuity of care; [160]

---

[157] Colorado Revised Statues (2020) 16.11.7.106(1): The department of corrections, the judicial department, the division of criminal justice in the department of public safety, or the department of human services shall not employ or contract with, and shall not allow an adult sex offender or a juvenile who has committed a sexual offense to employ or contract with, an individual or entity to provide sex-offender-specific evaluation, treatment, or polygraph services pursuant to this article unless the sex-offender-specific evaluation, treatment, or polygraph services to be provided by the individual or entity conform with the guidelines and standards developed pursuant to section 16-11.7-103, and the name of the individual providing services is on the list created pursuant to paragraph (b) of subsection (2) of this section of persons who may provide sex-offender-specific services.

[158] Andrews, D. A., Bonta, J., & Wormith, J. S. (2011). The Expanded Risk-Need-Responsivity (RNR) Model [Table 1]. The risk-need-responsivity (RNR) model: Does adding the good lives model contribute to effective crime prevention. *Criminal Justice and Behavior, 38(7),* 735-755.

[158] See Section 16-117-105(2), C.R.S.

[159] If an offender has already begun treatment prior to supervision, the supervising officer may nonetheless require a change of provider if, in consideration of the factors, a change is warranted.

[160] The supervising officer should consider the therapeutic alliance and existing protective factors that potentially could be disrupted as a result of moving the offender.



CDOC/Nelson_00261

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

J. Offender stability factors (i.e. work, family situation); and

K. Other factors based on the offender's individualized strengths and needs.

**5.110** For offenders who begin community supervision on or after August 10, 2016, the supervising agency shall provide the offender with a choice of two appropriate treatment provider agencies[161] staffed by SOMB approved providers unless the supervising agency documents in the file that, based upon the nature of the program offered, the needs of the offender, or the proximity of the appropriate treatment provider agency, fewer than two such agencies can meet the specific needs of the offender, ensure the safety of the public and provide the supervising agency with reasonable access to the treatment provider agency and the offender during the course of treatment (Section 16-11.7-105(2), C.R.S ).[162]

*Discussion: A treatment provider has the right not to accept a referral based on the provider's determination that he/she cannot meet the needs of the client. For more information, refer to Section 3.000.*

**5.115** The supervising officer should require sex offenders who are transferred from other states through an Interstate Compact Agreement to participate in offense-specific treatment and comply with the specialized conditions of supervision contained in these Standards. For additional information regarding Interstate Compact Agreement rules, refer to the following:[163]. http://www.interstatecompact.org/Legal/RulesStepbyStep.aspx

**5.120** For offenders who present denial or minimization per 3.500, the supervision officer should use an individualized approach that employs an array of behavioral change and compliance monitoring strategies supported by research. These efforts to monitor compliance should focus on targeting non-sexual criminogenic risk factors and enhancing treatment responsivity. Consideration of sexual risk factors and progression in offense-specific treatment should be appropriately addressed in consultation with the treatment provider.

---

[161] Colorado Revised Statutes (2020) 16-11.7.105(2) For offenders who begin community supervision on or after August 10, 2016, the supervising agency of each adult sex offender and juvenile who has committed a sexual offense shall provide the offender with a choice of two appropriate treatment provider agencies staffed by approved providers unless the supervising agency documents in the file that, based upon the nature of the program offered, the needs of the offender, or the proximity of the appropriate treatment provider agency, fewer than two such agencies can meet the specific needs of the offender, ensure the safety of the public, and provide the supervising agency with reasonable access to the treatment provider agency and the offender during the course of treatment. Once selected, the treatment provider agency may not be changed by the offender without the approval of the community supervision team, the multidisciplinary team, or the court.

[162] Colorado Revised Statutes (2020) 16-11.7.105(2): For offenders who begin community supervision on or after August 10, 2016, the supervising agency of each adult sex offender and juvenile who has committed a sexual offense shall provide the offender with a choice of two appropriate treatment provider agencies staffed by approved providers unless the supervising agency documents in the file that, based upon the nature of the program offered, the needs of the offender, or the proximity of the appropriate treatment provider agency, fewer than two such agencies can meet the specific needs of the offender, ensure the safety of the public, and provide the supervising agency with reasonable access to the treatment provider agency and the offender during the course of treatment. Once selected, the treatment provider agency may not be changed by the offender without the approval of the community supervision team, the multidisciplinary team, or the court.

[163] Interstate Commission for Adult Offender Supervision: Rule 4.101 - Manner and degree of supervision in receiving state: A receiving state shall supervise offenders consistent with the supervision of other similar offenders sentenced in the receiving state, including the use of incentives, corrective actions, graduated responses, and other supervision techniques.



CDOC/Nelson_00262

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**5.125** The supervising officer should report the following to the treatment provider in a timely manner:

A. Violations of supervision conditions;

B. Change in supervision conditions;

C. Notable achievements, successes and incentives; and

D. Any other significant occurrence(s) in the offender's circumstances (e.g. arrest, health issues, employment status).

**5.130** The supervising officer should employ principles designed to encourage and reinforce pro-social and positive behaviors and that minimize anti-social behavior. The supervising officer should respond to violations commensurate with the seriousness of the behavior, especially if the risk that the offender may commit another crime has increased. Where appropriate, the supervising officer should consult with the CST using risk to re-offend as a key factor in determining the appropriate level of response. Responses should be tailored to address the individual's unique risk, needs and responsivity factors in a coordinated manner whenever possible. The CST should also consider the following when responding to violation behaviors:

A. Victim and community safety;

B. Using risk assessments that produce consistent results to inform decision making;

C. Responding to behaviors as quickly as possible;

D. Addressing every violation;

E. Informing offenders how responses to violations are determined; and

F. Avoiding overly restrictive sanctions that unnecessarily interfere with healthy behaviors and protective factors.

**5.135** The supervising officer should review the treatment provider's monthly written updates on the sex offender's status and progress in treatment.

**5.140** The supervising officer should be aware of the offender's treatment progress and periodically discuss and review with the offender any treatment issues that may arise.

**5.145**  The supervising officer should assess and periodically review the level of supervision.

**5.150** The decision to recommend early discharge from supervision should be a unanimous recommendation by all members of the CST. Sex offenders serving an indeterminate probation or parole sentence must serve the minimum of their sentence in accordance with §18-1.3-1004 C.R.S, and meet the criteria for reduction in supervision, found in the *Lifetime Supervision Criteria* included in Appendix W in these *Standards and Guidelines.*

**5.155** After consultation with the CST, the supervising officer may request an extension of supervision



CDOC/Nelson_00263

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

to allow an offender to successfully complete treatment if the treatment provider agrees it would be necessary and if it is statutorily permissible.

**5.160**  The CST should consider the offender's risk factors and protective factors as well as risk to the community before progressing or regressing an offender. The supervising officer in consultation with The CST should individualize incentives and sanctions to deliver consistent and tailored responses to each person's behavior with the goal of impacting short and long-term behavior change. To maximize effectiveness, responses should be swift, certain, proportional, consistent and linked to specific risk, needs and significance of the behavior.

Discussion: Responses to violations by Community Supervision Teams should be swift, certain, proportional, consistent and tailored to the offender's risk, needs and the significance of the behavior. [164] *These responses should be individualized to encourage behavior change with a unified approach and focus on victim protection and community safety.*

**5.165**  The supervising officer, in consultation with the CST, should not allow a sex offender who has been unsuccessfully terminated from treatment to re-enter a treatment program unless the treatment plan addresses the specific risk, need, and responsivity factors that led to the unsuccessful discharge from treatment.

**5.170**  If an offender successfully completes treatment and subsequently begins to demonstrate a partial or poor understanding of sexual offense risk factors and risk management strategies or consistently uses ineffective risk management strategies with several lapses; the supervising officer may refer the offender for an updated assessment. The assessment may include a sex offense-specific evaluation to determine whether there is a need to return the offender to treatment.

*Discussion: Because risk is dynamic, the CST should collaborate as to the level and duration of any change in the phase or level of supervision and treatment. The CST should defer to the expertise of individuals within their professional roles. The CST may utilize an updated sex offense-specific evaluation and should rely on current risk assessment to inform decision making.*

*Discussion: Just as an offender can progress through the modules and phases of treatment and supervision, an offender may be regressed through proper legal procedures, to a previous phase of supervision, treatment module or treatment program as determined by negative behavior or high-risk behavior. Such negative or high-risk behavior may include, but is not limited to, drug or alcohol use, failure to comply with treatment requirements, a significant negative change in residence or living situation, not maintaining a steady job or lack of stable employment, initiating contact with the victim(s), evidence of arousal to inappropriate stimuli or violating any of the terms and conditions of supervision.*

**5.175**  Supervising officers who are assigned to supervise sex offenders should successfully complete training programs prior to assuming their caseload, when possible. Officers should attend

---

[164] Wodahl, E. J., Ogle, R., Kadleck, C., & Gerow, K. (2013). Offender perceptions of graduated sanctions. *Crime & Delinquency, 59(8),* 1185-1210.



CDOC/Nelson_00264

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

annual continuing education specific to sex offender supervision and treatment issues. The amount of appropriate training should be determined by each agency. The training topics should include specific components of the TEAMS model such as evaluation and assessment, treatment, community supervision, risk, need and responsivity issues, victim impact and safety, and the role of offender support systems. It is also desirable for agency supervisors of officers managing sex offenders to be specifically trained in these areas.

*Discussion: Supervising Officers are encouraged to periodically attend group or individual treatment sessions as determined appropriate, in coordination with the treatment provider. The visiting supervising officer shall be bound by the same confidentiality rules as the treatment provider and should sign a statement to that effect. It is understood that the treatment team may set reasonable limits on the number and timing of visits in order to minimize any disruption to the group process. The successful completion of the above training is necessary prior to the supervising officer attending any individual or group treatment sessions of sex offenders under his/her supervision.*

### 5.200 Responsibilities of the Treatment Provider within the Team

The treatment provider is a CST member who is the subject matter expert regarding the treatment needs of the client/offender and who is responsible for providing sex offense-specific treatment in accordance with SOMB *Standards and Guidelines*. If the CST has questions or concerns related to the client/offender's treatment plan, they should be addressed with the treatment provider. The treatment provider shall be the ultimate authority related to the treatment of the client/offender. The CST models pro-social, collaborative co-operative behavior for clients/offenders when they are committed to the TEAMS approach, and communicates clearly and effectively with each other and with the client/offender.

**5.210** A treatment provider shall:

A. Report to the supervising officer, in a timely manner, all known violations of the provider/client contract, including those related to specific conditions of probation, parole, or community corrections;

B. Recommend to the CST any change in frequency or duration of contacts or any alteration in treatment modality that constitutes a change in the client/offender's treatment plan based on the individual risk and needs of the client/offender. Any permanent reduction in duration or frequency of contacts or permanent alteration in treatment modality shall be determined on an individual case basis by the provider and in consultation with the CST.

*Discussion: The treatment provider is the member of the CST with expertise in the area of treatment planning and is ethically responsible for making treatment recommendations. The CST should rely on this expertise in making decisions regarding the treatment and management of the client/offender.*

C. Provide to the supervising officer, on a monthly basis, written progress reports documenting a client/offender's attendance, financial status in treatment, participation in treatment, changes in risk factors, changes in the treatment plan and treatment progress.



CDOC/Nelson_00265

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

D. Submit a written discharge summary to the supervising officer pursuant to triggering events as listed in Section 3.200(B);

E. Upon request, submit a status report when a court or parole board intervention occurs;

F. Be prepared to testify in court, if necessary;

G. Coordinate with the CST all recommendations regarding child and victim contact, including clarification and reunification, in compliance with all pertinent aspects of Section 5.700 of these *Standards and Guidelines*.

H. Require the client/offender to complete safety plans for a variety of activities in the community (see Section 3.175) and review them in a timely manner.

I. Encourage the client/offender to obtain friends or family who can support treatment progress and include them in the client/offender's treatment when feasible and appropriate (see Section 5.500). The treatment provider should assist members of the client/offender's support system by providing them with educational opportunities regarding their role in enhancing the client's healthy re-integration to society and increasing accountability.

J. Utilize a victim-centered approach.

*Discussion: Early in the client/offender's treatment, the treatment provider should plan for ongoing victim input and determine if the victim wants to be involved. Involving the victim and/or victim representative during the course of treatment can create better outcomes for the victim, client/offender and their families. If the victim chooses not to be involved, the provider should utilize a victim representative to provide a victim perspective as defined in Section 5.400 (for additional information regarding a victim-centered approach, see Section 8.000.)*

**5.300  Responsibilities of the Polygraph Examiner within the Team**

A. The examiner shall make the final determination of questions used, and determine whether to administer a broader or more narrowly focused examination within the scope of the requested polygraph exam.

B. The polygraph examiner shall work collaboratively and participate as a member of the CST.

C. The polygraph examiner shall submit written reports to the probation officer and treatment provider for each polygraph exam as required in section 6.160.

D. Participation in CST meetings shall be on an as needed basis.

E. Polygraph examiners should address any questions regarding the technical aspects of the polygraph to the CST if needed.



CDOC/Nelson_00266

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**5.400   Responsibilities of the Victim Representative within the Team**

As a member of the CST, the primary responsibility of the victim representative is to provide an avenue for victims and their families to be informed and heard. Involving a victim representative on the CST has many benefits, including improving supervision of the offender, increasing offender accountability, building empathy for the victim, decreasing offender secrecy, preventing an unbalanced alignment with the offender and contributing to a safer community. The exchange of information between the victim or the victim representative and CST is crucial for the rehabilitation of the offender and is often beneficial for the healing of the victim.

The victim may choose not to provide or receive information. In that circumstance, the victim representative will contribute general input regarding the perspective of victim(s) to the CST. The victim representative should also provide general victim input in cases such as internet crimes when the intended victim is a law enforcement officer posing as a child or in cases where victims are unidentified in child sexual abuse images. Bringing the victim perspective is important in protecting potential victims and the community.

Upon convening, the CST should identify the best person to be the victim representative for each individual case, such as the victim therapist, a victim advocate, or other (refer to Resources for Victim Representation). Due to the importance of victim contribution to the CST for the reasons stated above, the victim representative should make reasonable attempts to contact the victim(s) in order to determine the victim's desired level of involvement and provide the victim(s) with accurate information regarding offender treatment and management. The CST shall orient the victim representative to the function of the team and the representative's role as a CST member.

**5.405** Victim Representative shall:

A. Assure that the CST is operating with a victim centered approach (see Section 8.000: Victim Impact and a Victim Centered Approach);

B. Assure that the CST is emphasizing victim safety, both physically and psychologically, throughout the treatment, supervision and management of the offender;

C. Share information received from the victim and concerns of the victim with the CST when available. Such information could include safety concerns, grooming behaviors, specifics of the offense and offending behaviors;

D. Convey information to the victim as agreed upon by the CST such as, but not limited to, terms and conditions of probation, general treatment contract, treatment and supervision timelines, offender location, progress in treatment and on supervision, victim clarification, family reunification planning and any other pertinent information as determined by the CST;

*Discussion: Teams should discuss what information can and should be shared, taking into account what information is valuable for the victim to feel safe and for the victim to feel that the community as a whole is protected. Teams have legal and ethical considerations when determining what information is appropriate for sharing with victims*



CDOC/Nelson_00267

*and should exercise good professional judgment. Victims are assisted by understanding why decisions are made in the interest of public safety. Even with support systems in place, the criminal justice system is still difficult for victims. Teams can honor and contribute to justice for victims by operating with a victim centered approach.*

E. Provide input on how CST decisions may affect victims, secondary victims or potential victims;

F. Assist the CST in ensuring that victim needs and perspectives are considered and responded to by the CST to the best of their ability;

G. Offer support, referrals, and resource information to the victim and victim's family;

H. Participate in CST meetings;

I. Contribute to the treatment content by providing the following types of information to the CST:

   1. Impact of sexual offending on victims, secondary victims, and the community;

   2. Recognition of harm done to victims;

   3. Restitution and reparation to victims and others impacted by the offense including the community;

   4. Impact of offender denial on victims; and

   5. Input regarding victim contact, clarification and family reunification when appropriate.

J. Submit questions from the victim to the CST for review and share the responses to these questions with the victim or explain why a question may not be answered. The representative can also explain to the victim why certain types of information cannot be shared;

K. Function as a liaison between the victim or victim therapist, and CST as needed;

L. Advocate on behalf of the victim for the non-offending parent and family members to support the victim, prioritize the victim's safety, physical and emotional well-being and to address the needs of the victim. This parental and family support is critical for the healing of the victim;

M. Assist with planning for the victim clarification sessions or family reunification, if appropriate to the case; and

N. Assist with issues related to newly identified victims, when necessary.



CDOC/Nelson_00268

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**5.500   Role of Family Members and Natural Supports within the Team**

The TEAMS Model recognizes that an individual's support system is an important factor in a person's motivation for change. Those who have offended are more likely to achieve success when they receive caring support from families [165] and other natural support systems (e.g. – friends, Circles of Support and Accountability, spiritual advisors, etc.) and the community. Such support encourages an individual's engagement in treatment, efforts to live a healthy and productive life, and success in meeting supervision requirements. [166]

CSTs should recognize that family members may possess important history, and should welcome information that can be valuable in the treatment and supervision of a person who has offended. Engaging an individual's family and friends supports behavioral change and enhances the safety of those who have been victimized and the community. When support system members understand and are supportive of treatment and supervision requirements, there can be a positive impact on the person who has been victimized, the community, and the person who has offended.

In situations where family members are providing support both to family members who have been victimized and to those who have offended against them, considerable challenges may arise. Family members should ensure that the support they are providing to the person who has committed the offense does not compromise or negatively impact the safety, physical or emotional well-being, and needs of the person who has been victimized. (For additional information, see Section 8.000: Victim Impact and A Victim Centered Approach).

If members of the support system are not prepared to fulfill this important role, the CST should help educate and guide them about the treatment process. Individuals under the supervision of the CST should be encouraged to include members of their support system in the change process. In some instances, it may be necessary for the CST to help the person who has offended to recognize that until potential support members address their own needs, they may not be capable or appropriate, at that point in time, to provide positive support.

In the event the CST has exhausted their efforts in providing education or guidance to the support system, and certain members of the support system have demonstrated over time that they are unable to provide positive support, the CST can temporarily choose to discontinue or limit the support system's involvement. The CST should continue to assess and work with the support system so that it can provide positive pro-social support in the future.

The CST should involve families and friends who support behavioral change which will enhance the safety of those who have been victimized and the community, as well as help the person who has offended to live a safe and pro-social life. As CST's accept and engage natural support systems within the treatment and supervision process, it is important to recognize that support offered by family members and friends falls along a continuum of involvement. This involvement can range from provision of basic needs and expression of care and concern to

---

[165] The term "family" is used in a broad sense and should be defined by the person who has offended.

[166] de Vries Robbé, M., Mann, R. E., Maruna, S., & Thornton, D. (2015). An exploration of protective factors supporting desistance from sexual offending. *Sexual abuse: a journal of research and treatment, 27(1)*, 16-33.; Willis, G. M., & Grace, R. C. (2009). Assessment of Community Reintegration Planning for Sex Offenders Poor Planning Predicts Recidivism. *Criminal Justice and Behavior, 36(5)*, 494-512; Willis, G. M., & Grace, R. C. (2008). The quality of community reintegration planning for child molester's effects on sexual recidivism. *Sexual Abuse: A Journal of Research and Treatment, 20(2)*, 218-240.



CDOC/Nelson_00269

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

direct engagement in treatment and supervision processes. All types of healthy support should be welcomed by CSTs. Examples of such support include but are not limited to:

A.  Assisting with basic needs such as housing, transportation and finances;

B.  Providing positive social support, healthy social interaction, encouragement, and role modeling;

C.  Participating in individual or family therapy sessions as agreed upon by the offender and treatment provider;

D.  Participating in supervision meetings as agreed upon by the offender and supervising officer;

E.  Providing peer support or mentoring to the offender;

F.  Becoming an Approved Supervisor (see Section 5.780 – 5.786);

G.  Becoming an Approved Community Support Person (see Section 5.790 -5.793); and

H.  Becoming a CDOC Approved Support Person (see CDOC Administrative Regulation 700-19).

*5.600 The Use of Polygraph within the Team* [167]

**5.605**  The polygraph shall be used (see Section 6.210 on suitability for testing) to gather information to assist the CST in individualizing their approach to the offender's risk and need, and to gauge how the offender will respond to supervision and treatment interventions. The polygraph shall be used in conjunction with other information to inform adjustments to supervision and treatment. The goal is to promote offender honesty and accountability. The polygraph results (see Section 6.000) shall not be used in isolation without considering information gathered from other behavioral monitoring tools. The polygraph shall not be used in isolation to remove protective factors. The CST response to behaviors utilizing the polygraph shall be based on offender risk and needs.

**5.610**  In instances when the CST has concerns related to an offender's suitability for testing, they shall consult with the polygraph examiner. The determination regarding an offender's suitability for polygraph testing rests with the polygraph examiner. [168]  (See Section 6.210 for additional information regarding suitability for polygraph testing.)

**5.615**  If pursuant to Standard 6.210, the polygraph examiner determines the offender is currently unsuitable for polygraph examination, the requirement for polygraph examination may be waived. This waiver is for the current polygraph only, and is not a permanent waiver. However, if the offender has a condition that is not likely to improve, the CST shall consider granting a waiver for future testing as well. If the CST determines that a waiver is appropriate, this decision, and the reason for the decision, shall be documented by the supervising officer and treatment provider.

---

[167] 5.60 Revised November 2017

[168] Polygraph examiners have experience and training specific to suitability of potential examinees. Therefore, the supervising officer and treatment provider should defer to the polygraph examiner's expertise regarding this subject matter.



CDOC/Nelson_00270

**5.620** If the CST determines that the polygraph shall be waived, they shall determine what information is being sought and if there are alternate methods which can be utilized to obtain this information. (See Section 6.210). Alternate methods may include the use of GPS or Electronic Monitoring, drug/alcohol testing, plethysmograph testing, viewing time (VT) assessment, and other case management practices such as collateral contacts, office and home visits, employment visits, computer and phone monitoring, and increased supervision and treatment requirements.

**5.625** Either the supervising officer or the treatment provider may collaborate with the polygraph examiner to determine content areas for question formulation. However, they shall defer to the polygraph examiner to make the final determination of question formulation, and to determine whether to administer a broader or more narrowly focused examination (see Section 6.030).

**5.630** The CST shall continually assess the ongoing use of maintenance/monitoring polygraphs, and may adjust the use of maintenance/monitoring polygraphs based on all clinical indicators, including prior polygraph results and an offender's risk and needs. The polygraph frequency may be increased when risk is elevated and decreased when the offender demonstrates engagement with supervision and treatment, and protective factors are enhanced. This change in risk should be measured by an objective dynamic risk assessment tool. (For additional information on maintenance and monitoring polygraph testing frequency, see Section 6.013.)

*Discussion: The following guidelines may be considered by the CST when determining maintenance/monitoring exam frequency: What information is being sought by the polygraph and how will this information inform treatment and supervision? Are there alternate methods which can be utilized to obtain the information being sought? What risk factor(s) is the CST concerned with and how is this factor(s) connected to the frequency of examinations? In addition, the CST should defer to the polygraph examiner to ensure appropriate testing parameters (e.g., timeframe, subject matter, etc.) suggested by the CST will result in an exam with a high degree of validity and accuracy. (For example, the CST may decrease the frequency of the maintenance exams to 9 months and monitoring exams to 1 year.) Question formulation is a key factor impacting test validity and therefore, should only be completed by the polygraph examiner (see Section 6.022).*

**5.635** CST decisions and responses shall not be based solely on the results of a polygraph examination. The polygraph results alone (e.g., no deception indicated, deception indicated, and inconclusive/no opinion results) and considered in isolation without additional information or disclosures, are not necessarily supportive of increased risk to re-offend.[169]  (See Sections 6.000 and 6.013.)

**5.640** Adjustments to treatment and supervision shall be based on risk and need as determined by all forms of clinical indicators including information from pre- and post-test interviews, offender behavior and accountability, transparency and engagement in treatment, dynamic risk assessment, information gained during clinical sessions, information provided by offender family and support systems, information received from victim sources, offender

---

[169] Grubin, D. (2008). The case for polygraph testing of sex offenders. *Legal and Criminological Psychology, 13,* 117-189.



CDOC/Nelson_00271

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

compliance to supervision terms and conditions and the treatment contract, and information gained through interaction with the supervising officer.

**5.645** The CST shall not make conditional for the offender any increase or decrease in supervision level, or any other consequence, based upon the finding of non-deceptive, inconclusive, or deceptive polygraph results.

**5.650** The CST shall discuss information learned from the polygraph examination (including pre- and post-test interviews/admissions) and determine the best course of response (see 5.630 above).

*Discussion: The CST should reinforce and support offender disclosure prior to a polygraph exam. Openness and honesty can be a new behavior for some offenders and should be identified as a strength in terms of treatment engagement and supervision compliance. The expectation for an offender is to disclose prior to the polygraph exam, and the CST should communicate this to the offender prior to the exam so the offender understands this expectation. Conversely, the CST must also respond to the disclosed supervision and treatment violation behavior with an emphasis on addressing criminogenic needs and target behaviors. The goal is to increase the probability of behavior change through responding to all behaviors. (See Section 5.050 – Promoting and Monitoring Behavioral Change.)*

**5.651** The treatment provider and supervising officer shall review the results of the polygraph exam report with the offender within the context of a treatment or supervision session, or a formal case staffing, if necessary (see Section 6.163 for more information). The treatment provider and supervising officer shall not provide a copy of the polygraph exam report to the offender for their personal use.

*Discussion: Treatment providers and supervision officers should be aware that when reviewing the polygraph exam report with the offender, showing the section of the report on the specific test questions and results may impact the validity of future exams for the offender. This limitation does not include the pre- and post-test interview information of the report, which the treatment provider and supervision officer can share with the offender as needed. However, CST members should consider sharing the test questions and results in a different method rather than showing the offender the actual polygraph exam report section (e.g. going over the test questions and results verbally, or writing out the results on a separate piece of paper).*

**5.652** When there are discrepancies between offender self-report and disclosure statements in the polygraph exam report, the supervising officer or treatment provider should contact the polygraph examiner in order to address the discrepancy. If necessary, the supervising officer or treatment provider can request that the polygraph examiner review the video recording and/or provide them with a copy of the video recording of the polygraph exam to verify disclosures. The supervising officer and therapist should discuss the results of the review and then meet with the offender to resolve the discrepancy (see Section 6.033 for more information). Following completion of the review, the CST shall return or destroy the video recording if requested by the polygraph examiner.

*Discussion: While the offender cannot obtain a copy of the video directly, the supervising officer or therapist can obtain a copy of the video to review with the offender if the offender*



135

CDOC/Nelson_00272

*identifies a discrepancy in disclosure. In such a circumstance, a similar process should occur as above.*

**5.653** The supervising officer or treatment provider should request a polygraph Quality Control Review if there are concerns about the results of a polygraph exam(s) that cannot be resolved through consultation with the polygraph examiner. The circumstances for initiating a Quality Control Review and the process to conduct the Review are currently discussed in Section 6.171.

**5.655** After consultation with the polygraph examiner, the CST may determine it not to be suitable that a follow-up polygraph examination be based solely on a deceptive or inconclusive polygraph exam. The CST shall determine if they can identify a specific area of concern related to follow-up testing. The CST shall consider if there are alternate methods to obtain the information being sought. When alternate methods exist to obtain the needed information, the CST shall use those methods when available. If it is determined that a follow-up test is required, the CST has discretion to refer the offender to a different polygraph examiner for follow-up testing. When a different polygraph examiner is used for follow-up testing, the new examiner shall be given a copy of the prior examination. In addition, the new examiner may speak with the original examiner, if necessary. (See Section 7.000 for requirements related to information sharing.)

*Discussion: Providing copies of the prior polygraph exam report and speaking with the prior polygraph examiner, if needed, will allow any necessary information to be supplied to the new examiner by the original examiner in order to complete an accurate and thorough re-examination.*

**5.660** If the supervising officer receives information that an offender is not in compliance with supervision following completion of treatment or while the offender is in aftercare, the supervising officer should determine the appropriate methods of assessing the information. The supervising officer should also consider the individual risk and protective factors of the offender and the nature of the information being sought. If it is determined that a polygraph exam is the most appropriate way to verify compliance, the supervising officer should consult with the polygraph examiner prior to the polygraph exam. The polygraph examiner will then determine which type of test should be conducted to assist in obtaining the information sought.

*Discussion:  When it is determined that a polygraph is required in these circumstances, the frequency of testing must follow the guidelines and timeframes specified in Section 6.013 (i.e., questions asked on maintenance exams should cover the previous nine (9) months and monitoring exams the previous year).*

**5.665** Once an offender has successfully completed treatment, the supervising officer will have the discretion to determine the frequency of polygraph examinations. If the offender remains compliant with supervision conditions, the supervising officer may remove any requirement for polygraph testing.

*Discussion: Discretion to determine the frequency of testing does not imply that frequency of polygraph testing can be increased beyond the recommendations in Section 6.013. The ability to no longer require polygraph examination is for offenders who have successfully completed treatment and are compliant with supervision. If there is evidence of non-compliance or the*



CDOC/Nelson_00273

*offender has demonstrated an increased risk to re-offend, then the supervising officer may determine that a polygraph is needed. The supervising officer should consult with the polygraph examiner to determine the appropriate timeframes for testing with the intention of maintaining consistent fidelity for polygraph testing (see Section 6.000).*



137

CDOC/Nelson_00274

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Research Citations

The following Adult Standards and Guidelines in Section 5.000 have research support (the Standards are either footnoted or are supported by a review of the literature and the statute): 5.00, 5.005, 5.025 and 5.030, 5.050, 5.055, 5.105, 5.110, 5.115, 5.120-5.150, 5.160-5.175, 5.200, 5.210, 5.300-5.650, and 5.652-5.665. All footnotes and research references in these Standards were evaluated by the staff researcher and presented to the Adult Standards Revisions Committee regarding the revisions being discussed. Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revisions process regardless of whether it supported the standard revision or not. This research was then incorporated into the Standards and presented to the SOMB for ratification by the Board. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender

The following Adult Standards and Guidelines in Section 5.000 were revised but do not have research support given their procedural nature 5.010, 5.015, 5.020, 5.155, and 5.651. The SOMB staff did a search for research applicable to the Standards noted above. Research was not found applicable to these Standards, so in absence of research the Standards are based on best practices procedures, professional association guidelines, and the professional expertise of the members of the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00275

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 5.700 Contact with Victims, Children and Vulnerable Adult Populations[170]

### 5.700 Sex Offenders' Contact with Victims, Minor Children, and Vulnerable Adult Populations

The highest priority of these Standards and Guidelines is to maximize community safety through the effective delivery of quality evaluation, treatment and management of sex offenders. To maximize community safety, safety plans need to be developed. Care should be taken to limit the offender's access to places and groups where he or she has a history of accessing victims (e.g. - bars, clubs, singles groups, senior centers, medical care facilities, campuses, etc.)

This section of the Standards and Guidelines outlines the SOMB protocols regarding an offender being approved by the CST to have contact with victims, minor children and vulnerable populations. This section also provides guidance regarding the approved community support and supervisor process, as well as procedures for victim and secondary victim clarification, and family reunification when appropriate. Given that risk is dynamic, the assessment of risk is an on-going process. When considering contact with any of these vulnerable populations, time in treatment and under supervision enhances the CST's ability to make informed decisions.

Sex offenders supervised by the criminal justice system may have more extensive sex offending histories than is generally identified in their official records.[171] (For example, an offender convicted of sexually assaultive/abusive behavior toward a child may later reveal to his treatment team that the offender also sexually assaulted an incapacitated adult.) Sexual offending is a significantly under reported crime.[172] Minor children are particularly vulnerable and unlikely to report or re-report abuse.[173] Domestic violence also has a negative impact on children,[174] and it is important the CST assess for domestic violence dynamics when considering contact and approved supervisors.

---

[170] Section 5.7 revised March 15, 2019

[171] Criminal Victimization, 2016 (NCJ 251150). Washington, DC: U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics; Lussier, P. Bouchard, M. & Bouregard, E. (2011). Patterns of criminal achievement in sexual offending: Unravelling the "successful" sex offender. *Journal of Criminal Justice, 39,* 433-444; Marchetti, C. A. (2012). Regret and police reporting among individuals who have experienced sexual assault. *Journal of the American Psychiatric Nurses Association, 18(1),* 32-39; Neutze, J., Grundmann, D., Scherner, G., & Beier, K. M. (2012). Undetected and detected child sexual abuse and child pornography offenders. *International Journal of Law and Psychiatry, (35),* 168-175.

[172] Criminal Victimization, 2016 (NCJ 251150); Kilpatrick, D. G., Saunders, B. E., & Smith, D. W. (2012). Youth victimization: Prevalence and implications (NCJ 194972). Washington, DC: U.S. Dept. of Justice, Office of Justice Programs, National Institute of Justice.; Langton, L., Berzofsky, M., Krebs, C., & Smiley-McDonald, H. (2012). Victimization not reported to the police, 2006-2010 (NCJ 238536). Washington, DC: U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics.; Marchetti (2012); Paige, J. & Thornton, J. (2015). Healing from intrafamilial child sexual abuse: The role of relational processes between survivor and offender. *Children Australia, 40(3),* 242-259; Tashjian, S. M., Goldfarb, D., Goodman, G. S., Quas, J. A., & Edelstein, R. (2016). Delay in disclosure of non-parental child sexual abuse in the context of emotional and physical maltreatment: A pilot study. *Child Abuse & Neglect, 58,* 149-159.

[173] Mc,Elvaney, R. (2015). Disclosure of child sexual abuse: Delays, non-disclosure and partial disclosure. What the research tell us and implications for practice. *Child Abuse Review, 24,* 159-169; Paige & Thornton (2015).

[174] Bair-Merritt, M., Zuckerman, B., Augustyn, N., & Cronholm, P. F. (2013). Silent Victims: An epidemic of childhood exposure to domestic violence. *The New England Journal of Medicine, 369(18),* 1673-1675.; Hamby, S., Finkelhor, D., Turner, H., & Ormrod, R. (2011). Children's



CDOC/Nelson_00276

**5.715  Definitions**

A.  **Approved Community Support Person (ACSP)** is a person who may support the offender in approved activities that do not involve contact for the purpose of interacting with a specific minor child(ren). This person is an individual who has met the criteria described in 5.790 through 5.793 and has been approved by the CST.

B.  **Approved Supervisors (AS)** are adults who have been approved by the CST to supervise contact between a client and a specified minor, victim or vulnerable person.  This person is an individual who has met the criteria described in 5.780 through 5.786 and has been approved by the CST.

C.  **Incidental Contact** with minor children involves contact with children as a result of regular or routine CST approved community access (e.g. - grocery store, bank, movies, sporting events, etc.). In such circumstances, the offender is not initiating contact with children or developing relationships with children. The offender does write and obtain approved safety plans for how to minimize and avoid interactions with children.  Incidental contact can become unapproved purposeful contact if the offender does not take steps to avoid any additional interaction with children in these circumstances.

*Discussion: There may be occasions when incidental contact with minors or vulnerable populations will be planned for and approved by the CST via safety planning (e.g. - employment, social activities and other approved ongoing activities).*

D.  **Own Minor Child** is a child under the age of 18 with whom the offender has a parental role.

E.  **Parental Role** is an established and on-going position of authority with routine primary caretaking responsibilities for a child(ren) not limited by legal, biological or marital status.

F.  **Positive Support Person** is a person who provides positive support for behavior change, who has verified disclosure and been approved by the CST. This can be a peer who has successfully progressed within sex offense-specific treatment and supervision. (See Section 5.500 Role of Family Members and Natural Supports within the Team).

G.  **Purposeful Contact** refers to any form of interaction with a victim, child or vulnerable person when the offender initiates the interaction and fails to minimize or avoid the incidental contact.  This contact includes, but is not limited to, the following:

1.  Having physical contact, face to face, or any verbal or non-verbal contact;

2.  Being in a residence;

3.  Being in a vehicle;

---

exposure to intimate partner violence and other family violence (NCJ 232272). *Office of Justice Programs*, 1-11; Martinez-Torteya, C., Bogat, G. A., von Eye, A., & Levendosky, A. A. (2009). Resilience among children exposed to domestic violence: The role of risk and protective factors. *Child Development, 80(2)*, 562-577.



CDOC/Nelson_00277

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

4.   Participating in visitation of any kind;

5.   Initiating correspondence through a third party including, but not limited to: written, electronic, telephone contact, voice messages, text messaging, e-mail, computer communication, correspondence through any social networking sites (including, by way of example, but not limited to Twitter, Facebook, Snapchat, and Instagram), or gifts;

6.   This standard does not preclude conversations with a person about a child as long as that communication does not attempt to communicate with the child through that person;

7.   Going to or loitering near places used primarily by minor children as defined by the CST; or

8.   Entering the premises, traveling past or loitering near any of the victims' residences, schools, day cares, places of worship or places of employment.

In extremely rare circumstances, an offender may have purposeful contact with a minor child or vulnerable person (without prior approval) based on an eminent danger to the child or vulnerable person. The CST should consider the context for this unapproved purposeful contact in the decision making related to addressing the violation of the contact prohibition.

*H.*   **Vulnerable Adult** populations are individuals who are less able to protect themselves because of diminished capacity due to age or cognitive capacity or are subject to someone in a position of trust.

## 5.720 Sex Offenders and Contact with Minor Children

The risk for a sex offender's potential contact with minor children should be carefully assessed due to the offender's documented history of illegal sexual behavior and due to the fact that children are vulnerable to being sexually abused. [175]   The offender can mitigate this risk through successful participation in treatment, which is difficult and takes time.  Consequently, decisions regarding minor child contact should be made based on all available clinical indicators. [176]

Currently, five pathways exist that enable an offender to have contact with minor child(ren):

A.   A Court or Parole Board has not prohibited contact with an offender's own non-victim minor child(ren).

---

[175] Statistics About Sexual Violence (2015). National Sexual Violence Resource Center: Info & Stats for Journalist.

[176] Such indicators may include, but are not limited to, interviews, quality of treatment participation, polygraph examination results and disclosures, scores on dynamic risk assessments, psychological evaluation results, behavioral observations, and collateral reports. These indicators should thoroughly inform decisions pertaining to an offender's progress in treatment, activities in the community, and contact with potentially vulnerable persons.



CDOC/Nelson_00278

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

B. The offender completes a Child Contact Screening,[177] the conclusions support contact between the offender and an own non-victim minor child(ren) and the CST approves such contact;

C. The CST determines that the offender has made sufficient progress and has achieved the criteria established in Section 5.735 in order to be approved for contact with an offender's own non-victim minor child(ren) or any other non-victim minor child(ren);

D. The offender has successfully completed the clarification process with the victim and the CST has approved contact; or

E. When Young Adult Modification Protocol (See Appendix C) is in place for an offender, the CST may approve contact with non-victim minor child(ren).

Discussion: The only pathways for an offender to have contact with children other than an own non-victim minor child is to meet Section 5.735 criteria or through Young Adult Modification Protocol.

When contact is not prohibited by the Court or Parole Board, the supervision officer cannot restrict or modify contact without a subsequent order by the Court or Parole Board. In such circumstances, treatment providers may choose whether to provide treatment while the offender has contact with an own non-victim minor child(ren), the offender forgoes such contact, or the treatment provider may decline to offer treatment while contact is allowed. Contact with other minor children, including those in the extended family and unrelated children, shall be prohibited until the CST determines otherwise, pursuant to the criteria set forth in these *Standards and Guidelines*. Additionally, if contact with an offender's own minor child is prohibited by the Court or Parole Board, the prohibition shall remain in place until the CST determines that the offender has met the conditions for contact and the Court or Parole Board order has been modified to allow the CST approved contact.

When an offender's own child is the victim of the offender's sexually abusive behavior and reunification is the goal, initial contact shall be via the clarification process and occur pursuant to Section 5.740. Exceptions may be appropriate pursuant to Section 5.760 Circumstances under which Criteria for Contact May be Waived.

Finally, in some instances, contact may not be approved due to safety concerns for the minor children. Such circumstances are further detailed in Section 5.725.

---

[177] Additional information regarding the Child Contact Screening is included in Section 5.730.



CDOC/Nelson_00279

### 5.725  Exclusionary Criteria for Any Form of Minor Child Contact

A.  Except as provided in Part B below, the offender is not eligible for any type of contact with minor children when there is a clinical diagnosis by an approved evaluator or treatment provider of:

1.  Pedophilia – Exclusive type per the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM);

     *Discussion: When there is a diagnosis of pedophilia or a diagnosis of a history of pedophilia, the evaluator should refer to the current version of the DSM to ensure that the diagnosis is accurate prior to excluding the offender from contact with a minor child or from participating in the CCS process.*

     **OR**

2.  Psychopathy <u>or</u> personality disorder as defined by the Psychopathy Checklist Revised (PCL-R) with a score of 30 or higher or per the Millon Clinical Multi-phasic Inventory (MCMI) with a score of 85 or more on each of the following scales: Narcissistic, Antisocial and Paranoid;

     **OR**

3.  Sexual sadism, as defined in the most current version of the DSM and/or via any standardized sadism assessment instrument.

B.  Contact may be considered by the CST for offenders who meet the above exclusionary criteria in the following circumstances:

1.  There may be instances when an offender meets the exclusionary criteria and a Court or Parole Board has not prohibited or restricted contact between an offender and his own minor child.

     The CST should continually assess such contact and determine if information indicates that such contact is contraindicated due to increased risk of the offender to the child. Concerns may also exist related to the effective treatment of the offender within the context of a Court or Parole Board Order allowing contact when one or more of the exclusionary criteria are diagnosed. In such cases, a Court or Parole Board Order is needed to preclude such contact. Therefore, the treatment provider shall communicate such information to the supervising officer.  If the CST is in agreement, then such information should be presented to the Court or Parole Board pursuant to local procedures.

2.  The offender no longer meets the clinical diagnosis associated with one of the exclusionary criteria after previously having received this diagnosis.

3.  The offender is nearing the end of the period of supervision and treatment, and the CST determines that monitoring the initial contact prior to the end of Court or Parole



CDOC/Nelson_00280

Board jurisdiction would be in the best interest of the child. (See Section 5.735 regarding child, guardian position on having contact).

## 5.730 Child Contact Screen (with own minor child)

The Child Contact Screen (CCS) is a tool to assist teams in decision making regarding a client's contact with their own children. A Court/Parole Board order is not necessary for a CCS to occur, although at times it may be ordered. The CCS is an alternative to criteria established in 5.700 that details what required treatment accomplishments prior to a client having contact with an own child. A CCS has the potential to expedite a client's ability to have contact with their own children prior to those treatment accomplishments occurring. This can occur when the client meets the criteria for the screening, results indicate contact is appropriate, and teams adopt those results.

When the following circumstances exist, a Child Contact Screening (CCS) may be initiated to assess the appropriateness of a client's contact with his/her own minor child(ren) (see definition in 5.710):

**A.** The client does not meet any of the exclusionary criteria in 5.725;

**B.** The client does not meet any of the disqualifiers in 5.733;

**C.** The client does not have two or more pre-screen factors in 5.734;

**D.** The client wants contact with his/her own minor child(ren) as defined in 5.710; and

**E.** The client does not have a history of victimizing any of his/her own minor child(ren), regardless of the victim's age, as substantiated by criminal or civil court history or by self-report.

A CCS must be conducted in conjunction with or after a sex offense specific-evaluation (SOSE) is completed and should be included as an addendum to the SOSE. A CCS may be conducted after a plea has been entered, after conviction, during incarceration, or upon acceptance of an Interstate Compact case, and shall be completed by an SOMB approved evaluator who is also approved by the SOMB to conduct CCSs. Contact with a client's own minor child(ren) shall be prohibited prior to, and during, the sex offense-specific evaluation unless such contact is not prohibited or restricted by the Court/Parole Board. When completed pre-plea, the CCS shall be completed consistent with these *Standards and Guidelines*.

After the pre-screen is completed and it is determined the client qualifies for a CCS, the evaluator shall complete all components of the CCS as indicated in 5.734. A recommendation regarding the client's appropriateness for contact with his/her own minor child(ren) cannot be made until a CCS has been completed and a CST has been convened. The completed CCS shall contain recommendations for the level and type of contact, if any. Contact is ultimately determined by the CST, unless contact is currently not prohibited or restricted by the Court/Parole Board. It is important to acknowledge that risk levels can change and contact



CDOC/Nelson_00281

must be continually assessed (see Section 5.736) and revised as necessary throughout the period of criminal justice supervision.

*Discussion: Though clients often desire to undergo a CCS as soon as possible, the SOMB recognizes that the accuracy of assessing a client's appropriateness for contact with his/her minor child(ren) increases with the duration that a client is engaged in treatment and supervision.*

*Discussion: The SOMB recognizes that in cases involving the county human or social service agency, where a criminal case has not been filed, it may be useful to conduct an evaluation similar to a CCS in conjunction with a sex offense-specific evaluation in order to make informed decisions regarding a client's contact with his/her own minor child(ren). This standard is not intended to preclude that from occurring. It is important to note that while the CCS can be informative regarding contact between the client and his/her own minor child(ren), it is not designed to be an evaluation or decision-making tool for the purposes of determining custody.*

5.731    Each step of the CCS process (pre-screen through recommendations) must be completed pursuant to these *Standards and Guidelines*. If the client refuses to participate in any part of the screening, the screening shall not be completed and contact shall not be permitted until further order of the Court/Parole Board or until the client has met 5.740 criteria.

5.732    Evaluators conducting CCSs shall:

A.  Be a current SOMB approved evaluator (see Section 4.500, 4.600);

B.  Shall obtain the most recent and updated information for the CCS process.

5.733    Disqualifying Criteria for A Child Contact Screening:

If a client meets the following criteria, they are disqualified from participating in a Child Contact Screening and **must** meet 5.735 criteria prior to approval for contact with his/her own child(ren), unless such contact is not prohibited or restricted by the Court/Parole Board. Disqualifying criteria includes:

A.   If a client meets the exclusionary criteria for contact with a minor child as discussed in Section 5.725; or

B.  If a client presents with a current diagnosis of Pedophilic Disorder – Non-Exclusive Type (per current version of the DSM) they are disqualified from participating.

*Discussion: When there is a diagnosis of pedophilia or a diagnosis of a history of pedophilia, the evaluator should refer to the current version of the DSM to ensure that the diagnosis is accurate prior to excluding the client from contact with his/her own minor child(ren) or from participating in the CCS process.*



CDOC/Nelson_00282

5.734   Child Contact Screen Process

A. Pre-Screen

The pre-screen process must be fully completed and verified prior to moving forward with the instrument. If information remains unverified, the evaluator shall suspend the Child Contact Screening until circumstances allow for a complete pre-screen to occur.

CCS Pre-Screen Chart (If no Exclusionary criteria)

| PRE-SCREEN FACTORS | PRE-SCREEN DATA SOURCES |
|---|---|
| If _2 or more factors_ indicated, ineligible for CCS and must meet criteria in 5.740 to have minor child contact | Evaluation Procedures or Documentation |
| Adult[178] history of illegal sexual behavior with child(ren) age 12 or younger[179] | Self-report[180] Criminal history Substantiated civil court history |
| Three or more unlawful sexual behaviors | Self-report Collateral Criminal history (conviction, factual basis, or plea agreement) Substantiated civil court history |
| Sexual interest or arousal to prepubescent Children | Valid baseline or initial PPG or VT[181] Self-report Criminal history of child pornography[182] |
| Unresolved CCS polygraph* | CCS polygraph |

∗   For offenders who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

---

[178] Adult is defined as 18 years old or older

[179] The age of 12 or younger is based on the distinction between pubescent and pre-pubescent development stages. There is disagreement in the current research regarding the onset of puberty, and the SOMB recognizes the limitations of defining the criteria based on a specific age.

[180] Admission made during polygraph assessments are considered self-report

[181] Tests that are inconclusive or show no response (flat line) are not valid and must be repeated or tested with the other procedures

[182] Conviction or documentation of history of seeking child pornography



CDOC/Nelson_00283

**B.** Child Contact Screen

**Interpersonal Relatedness**

| Required Areas of Evaluation | Risk Factors | Evaluation Procedures Key:<br>• **Required**<br>o **Optional** |
|---|---|---|
| Client's Attachment Style | Insecure Attachment, specifically Disorganized or Unclassified and Anxious | • History of Relationship Attachment<br>  • Clinical Interviews<br>  • Collateral Sources<br>o Suggested Instruments<br>  o Adult Attachment Interview (George, C., Kaplan, N., & Main)<br>  o The Attachment Style Questionnaire (ASQ: Feeney, Nollar & Hanrahan, 1994)<br>  o Batholomew Attachment Inventory<br>  o The Adult Attachment Projective (AAP: George)<br>  o Hazan & Shaver Adult Adult Attachment Scale |
| Client's Ability to Place Child's Needs Above Their Own | Lack of empathy for minor children in abusive situations | • Clinical Interviews<br>• Collateral Sources |



CDOC/Nelson_00284

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

| Required Areas of Evaluation | Risk Factors | Evaluation Procedures Key:<br>• **Required**<br>○ **Optional** |
|---|---|---|
| Offender's Ability for Family Stability | History of relationship-instability and prior absences from the home<br>Any history of domestic violence (DV): -use and/or threatened use of weapons in current or past offense or access to firearms[183]<br>- Obsession with the victim (i.e. stalking or monitoring, obsessive jealousy)[184]<br>- Victim safety concerns (i.e. client controls most of victim's daily activities)<br>- Client tried to strangle the victim[185]<br>- Physical violence increasing in severity<br>- Victim forced or coerced into sexual acts<br>- Victim pregnant at time of domestic violence offense and client aware[186]<br>- Victim is pregnant and client previously abused her during pregnancy[187]<br>- Violence and/or threatened violence toward family members, including child abuse[188]<br>- Attitude that supports/condones DV[189]<br>- Victim initiated separation within past 6 months related to DV[190]<br>- Prior attempted or Completed DV - treated[191] | • Clinical Interviews<br>• Collateral Sources |

[183] Kropp, R.P. & Hart, S.D. (2008). *Manual for the spousal assault risk assessment guide* (2nd ed.). Vancouver, BC: ProActive Resolutions, Inc.

[184] Campbell, J.C., Kozial-McLain, J., Webster, D., Block, C.R., Campbell, D., Curry, M.A., Gary, F., … & Manganello, J. (2004). *Research results from a national study of intimate partner homicide: The Danger Assessment Instrument* (NCJ 199710). Washington, DC: U.S. Department of Justice, National Institute of Justice.

[185] Mcquown, C., Frey, J., Steer, S., Fletcher, G. E., Kinkopf, B., Fakler, M., & Prulhiere, V. (2016). Prevalence of strangulation in survivors of sexual assault and domestic violence. *American Journal of Emergency Medicine, 34*, 1281-1285; Zilkens, R. R., Phillips, M. A., Kelly, M. C., Mukhtar, S. A., Semmens, J. B., & Smith, D. A. (2016). Non-fatal strangulation in sexual assault: A study of clinical and assault characteristics highlighting the role of intimate partner violence. *Journal of Forensic and Legal Medicine, 43*, 1-7.

[186] Finnbogadóttir, H., Dykes, A. K., & Wann-Hansson, C. (2016). Prevalence and incidence of domestic violence during pregnancy and associated risk factors: A longitudinal cohort study in the south of Sweden. *BMC Pregnancy and Childbirth, 16(1)*; Taillieu, T. L. & Brownridge, D. A. (2010). Violence against pregnant women: Prevalence, patterns, risk factors, theories, and directions for future research. *Aggression and Violent Behavior, 15,* 14-35.

[187] Finnbogadóttir et al. (2016); Taillieu & Brownridge (2010).

[188] Kropp, R.P. & Hart, S.D. (2008). *Manual for the spousal assault risk assessment guide* (2nd ed.). Vancouver, BC: ProActive Resolutions, Inc.

[189] Eckhardt, C. I., Samper, R., Suhr, L., & Holtzworth-Munroe, A. (2012). Implicit attitudes towards violence among male perpetrators of intimate partner violence: A preliminary investigation. *Journal of Interpersonal Violence, 27(3)*, 471-491; Kropp, R.P. & Hart, S.D. (2008). *Manual for the spousal assault risk assessment guide* (2nd ed.). Vancouver, BC: ProActive Resolutions, Inc.

[190] Bruton, C. & Tyson, D. (2018). Leaving violent men: A study of women's experiences of separation in Victoria, Australia. *Australian & New Zealand Journal of Criminology, 51(3),* 339-354; Campbell et al. (2004); Ellis, D. (2017). Martial separation and lethal male partner violence. *Violence Against Women, 23(4),* 503-519.

[191] Stalans, L.J. et al. (2004). Identifying three types of violent offenders and predicting violent recidivism while on probation: A classification tree analysis. *Law and Human Behavior*, 28(3), 253-271.



CDOC/Nelson_00285



CDOC/Nelson_00286

| Required Areas of Evaluation | Risk Factors | Evaluation Procedures Key:<br>• **Required**<br>○ **Optional** |
|---|---|---|
| Offender's Parenting Involvement/Skills | - History of non-payment of child support<br>- No prior access to minor child(ren) in a home environment[192]<br>- Poor parenting ability and disciplinary practices<br>- Minimal knowledge of child(ren)'s life<br>- Minimal knowledge of parenting Skills<br>- Any history of social services involvement, Minimal knowledge of child(ren)'s developmental stages & needs<br>- Poor parental boundaries<br>- History and risk of child abuse & neglect | • Parenting history<br> • Clinical Interview<br> • Collateral Sources (e.g., Social Services Records)<br> • If history of abuse, **MUST** conduct one of the following:<br>  ○ Child Abuse Potential Inventory (Milner, 1986)<br>  ○ SIPA (Stress Index for Parents of Adolescents)<br>  ○ ASPECT (Ackerman-Schoendorf Scales for Parent Evaluation of Custody) |
| Updated Supervision and Treatment Compliance | - History of poor compliance with supervision & treatment<br>- History of supervision & treatment[193] | • History of General Stability<br> • Clinical Interview<br> • Collateral Sources<br> • Criminal History<br><br> ○ Suggested Instruments<br>  ○ LSI-R (Level of Service Inventory-Revised)<br>  ○ PSI Report<br>  ○ DVRAG<br>  ○ |

---

[192] If the offender has not lived with children, an absence of problematic parenting should be considered unknown risk rather than lack of risk.

[193] If the offender has no prior history of supervision and treatment, an absence of noncompliance should be considered unknown risk rather than lack of risk.



CDOC/Nelson_00287

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Sexual Risk**

| Required Areas of Evaluation | Risk Factors | Evaluation Procedures Key:<br>• **Required**<br>**Optional** |
|---|---|---|
| Offender's Arousal to/Sexual Interest in Minor Child(ren) | - Arousal to or interest in minor child(ren) or animals or sadism | History of Risk-Related Sexual Interest or Arousal<br>• Clinical Interview<br>• Collateral Sources<br>• Polygraph Results<br>• VT Assessment or arousal assessment |
| *Contact with Custodial parent[194] or legal guardian regarding whether there is support for the contact between the client and own minor child* | | • Collateral interview with custodial parent or legal guardian |

5.735   Criteria for CST Approval of Supervised Contact with Secondary and Non-Victim Minor Children

This section applies for an offender to have approved, purposeful, supervised contact with a minor child who is either:
- Not the offender's own child (if the primary residential custodian is in support of the contact).
- The offender's own child where the Court or Parole Board has prohibited contact. A Court or Parole Board Order would be necessary to allow contact.
- The offender's own child where the Court or Parole Board has not prohibited contact, but the offender foregoes such contact.

At the time when considering contact with any specific minor child, the CST shall consider the child's best interest. The CST should ascertain whether the primary residential parent or legal guardian(s) is supportive of the contact and aware of the offense (i.e., a third party disclosure). The following criteria are not intended in situations when the offender may have incidental contact with a child in the community.  (See Section 5.715 for definition of incidental contact). This section applies when the CST and offender are ready for approved, supervised purposeful contact with a child.

*Discussion:   The CST should determine if a Court or Parole Board Order prohibiting contact exists.  If such an order exists, the existing order must be modified to allow for contact.*

---

[194] For the purposes of these *Standards and Guidelines*, primary residential custodian is the parent whom the child resides with and who is exercising daily parenting responsibility for the child.



CDOC/Nelson_00288

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Discussion: The Court's order to eliminate the prohibition for contact with the offender's own minor child does not override existing court orders specific to parenting issues or custodial arrangements. If the primary residential parent or legal guardian opposes contact, remedies must be pursued through the appropriate court of jurisdiction.*

In order to have contact with a child under the three circumstances identified above, the primary residential parent or legal guardian(s) of the child shall be informed of the offense. In addition, the child with whom the offender is going to have contact shall also be informed of the offense, with parental consent, when deemed appropriate by the CST based on the child's developmental level and the intended frequency and extent of the interaction with the offender (See J below for additional guidance). Treatment providers, in conjunction with the CST, shall assess the offender's progress and/or risk regarding the following criteria:

A.  The offender accepts full responsibility, without victim blaming, for the offending behavior.

B.  The offender is able to demonstrate understanding of the factors that led to the offending behavior and is able to establish a CST approved plan for managing risk factors to re-offense.

C.  The offender has demonstrated accountability and honesty to the satisfaction of the CST either through the sexual history polygraph process or by other clinical indicators[195] determined by the CST.  (See Section 6.000).  For offenders who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160(B)(3)(a) to determine how to respond. (For additional information on the use of the polygraph, see Section 5.600).

D.  The last maintenance polygraph and other clinical indicators have not raised concerns of the CST related to risk.

E.  The offender is able to identify and discuss individual risk factors and is able to actively manage these factors and does not exhibit any significant risk related behavior(s).

F.  The offender does not have new disclosures of high risk behavior that would put a child at risk.

G.  The offender consistently demonstrates the following:

    1.  The ability to manage all risk-related sexual arousal, sexual interest and/or behavior patterns through the use of cognitive and behavioral interventions as evidenced by the offender's Plethysmograph or Visual Time (VT) results.

---

[195] Clinical indicators can be anything that provides information about a client's overall clinical presentation, which may include but is not limited to interviews, quality of treatment participation, polygraph examination results and disclosures, scores on dynamic risk assessments, psychological evaluation, behavioral observations, and collateral reports.



CDOC/Nelson_00289

2.  An understanding of the impact of the abuse on the victim(s) and the victim's family, the offender's family, and the community, as evidenced by behavioral accountability and self-regulation.

3.  An understanding of and willingness to respect the minor child's verbal, non-verbal, and physical and emotional boundaries and need for privacy.

H.  The offender is willing to accept limits or prohibitions on contact as established by the CST. The offender is willing to plan for contact, to develop and utilize an approved safety plan for all contact, to accept supervision during contacts, and to terminate contact when directed by the CST, the Approved Supervisor, or the minor child or the primary residential parent or legal guardian(s) of the minor child. The safety plan shall be approved in advance and in writing by the CST and signed by the offender.

I.  The offender consistently demonstrates compliance with supervision conditions and demonstrates satisfactory progress in treatment.

J.  When determined necessary by the CST and when developmentally appropriate, the offender will satisfactorily participate in a treatment session[196] with the non-victim minor child,  (see Discussion below). The purpose of the session is to discuss behaviors relevant to the offender's risk. This discussion should include, but is not limited to, the following topics: Acknowledgment of engaging in abusive behaviors, identification of boundaries and limits of contact, rules for the offender regarding contact, specific information the minor child may need to know relevant to safety, who the approved supervisor is, an acknowledgment that it is okay for the minor child to communicate anything that makes them uncomfortable with the contact, and any additional information the CST determines is appropriate and necessary.

    *Discussion:  For example, there may be times when an offender is going to have limited ongoing contact with a child (e.g., family holiday gatherings where the offender is going to interact with a minor child relative relatively infrequently and have no further contact outside of these gatherings, etc.). In such instances, the CST may use discretion in whether to require a treatment session between the offender and the non-victim minor child.*

K.  The offender is willing to accept limits or prohibitions on contact as established by the CST with input from the minor child, minor child's primary residential parent or legal guardian(s), or minor child's therapist and will put the minor child's needs first.

L.  The CST should review and approve in advance any time an offender wants to give an item to a minor child such as a gift, card, picture, etc.

    For contact with minor children who are secondary victims (see Definitions Section), treatment providers, in conjunction with the CST, shall assess the following additional criteria when deciding upon contact with a specific minor child:

---

[196] A treatment session may include a session at the offender treatment provider's office, the child's therapist's office, a location in the community or any other place that will contribute to the child's comfort level with the interaction that is to take place.



CDOC/Nelson_00290

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

M. Assess whether the contact could have a positive or negative impact on the secondary victim child. For children who are capable of communicating an opinion regarding contact, the CST shall identify the wishes of the child either directly or indirectly through other qualified professionals. Contact with secondary victim minor children should not be allowed against the child's wishes. Please see Appendix B, Guidance Regarding Victim/Family Member Readiness for Contact, Clarification, or Reunification regarding secondary victims and section 5.745 regarding additional guidance related to implementing contact, clarification and family reunification procedures.

N. The best interests of the primary victim shall be considered in the decision to allow contact with secondary victim minor children.

*Discussion: In cases of intra-familial sexual abuse, the siblings (i.e. - secondary victims), suffer impact regardless of whether or not they were aware of the abuse. The siblings may be resentful of the victim as they observe preferential treatment. This preferential treatment is an example of the offender's grooming behaviors. Secondary victims do not understand grooming. The offender may use the non-abused children as rivals against the victim for purposes of gaining the victim's compliance. Secondary victims can be resentful toward the victim for "breaking up the family."*

*These damaged relationships and diverse impacts of the primary and secondary victims must be thoroughly explored by the CST prior to any discussion about contact with the offender and secondary victims. The primary victim can be hurt and negatively impacted when the offender is permitted to have contact with the siblings, but contact is prohibited with the primary victim. The victim may feel blamed for the abuse and further isolated from the family. Best practice is for clarification to occur with that primary victim before contact occurs with the secondary victims.*

O. Evaluate/examine for other indications of possible sexual abuse on siblings, even if there has been no report of sexual abuse and the offender has not been charged.

P. If available, review reports from the county Department of Human Services agencies.

Q. Assess the readiness of the family unit for this level of contact.

R. Consider the support system(s) of the primary and secondary victims.

S. Assess whether the secondary victim, including the primary residential parent or legal guardian(s), needs adjunct treatment services prior to doing treatment sessions with the offender. This can help address difficult family dynamics and inform the CST in making decisions about contact.

**5.736 Ongoing Assessment of Supervised Contact with Secondary Victim and Non-Victim Minor Children**

The CST shall continuously assess the offender's overall risk level as well as risk factors specific to the offender. If the offender's risk level increases as verified by clinical indicators, the team shall reassess approval of contact and the contact may be modified or discontinued.



CDOC/Nelson_00291

When assessing the offenders overall risk level, the CST shall consider all existing clinical indicators that provide information about a client's overall presentation. Such indicators may include, but are not limited to, interviews, quality of treatment participation, polygraph examination results and disclosures, scores on dynamic risk assessments, psychological evaluation results, behavioral observations, and collateral reports. These indicators should thoroughly inform decisions pertaining to an offender's progress in treatment, activities in the community, and contact with potentially vulnerable adults and minor children. In addition to these indicators, the CST shall also periodically review the criteria outlined in 5.735 A-S.

There may be instances when a Court or Parole Board has not prohibited or restricted contact between an offender and his own minor child.  In such cases, the CST should continually assess such contact and determine if information indicates that such contact is contraindicated due to increased risk of the offender to the child.  Concerns may also exist related to the effective treatment of the offender within the context of a Court or Parole Board Order allowing contact.  In such cases, a Court or Parole Board Order is needed to preclude such contact. Therefore, the treatment provider shall communicate such information to the supervising officer.  If the CST is in agreement, then such information should be presented to the Court or Parole Board pursuant to local procedures.

*Discussion: Parental separation and loss is traumatic for children of all ages. Repeated separation and loss can be even more detrimental to a child's overall development. Once the relationship between an offender and a child has been re-established (or established) care should be taken to not disrupt that relationship.  Stopping contact should not be used as a consequence for offender behavior because of the negative impact on the child. When safety concerns directly impacting the well-being of the specific child arise, CSTs should consider modifying contact to mitigate safety concern when clinically indicated.*

**5.738  Application of Sections 5.735 – 5.736 to Minors Under Age 18 and Young Adults Under age 25**

The intent of Standards 5.735-5.736 is not to prohibit minor children under the purview of these *Standards and Guidelines* from having contact with pro-social peers. Therefore, sections 5.735 through 5.736 should not apply to children under age 18 who are prosecuted as adults pursuant to C.R.S. §§19-2-517 and 19-2-518, and are seeking contact with pro-social peers.

CST's working with minors who are subject to these *Standards and Guidelines* as a result of prosecution in adult court should review the SOMB *Standards and Guidelines for the Evaluation, Assessment, Treatment and Supervision of Juveniles who have Committed Sexual Offenses* and consult with SOMB-approved treatment providers and supervising officers who have experience working with juveniles who have committed a sexual offense on topics such as safety planning.

When young adults are age 18 to age 25, the CST may exempt them from specific standards via the application of the *Young Adult Modification Protocol*. (See Appendix C for additional information regarding *Young Adult Modification Protocol.)*



CDOC/Nelson_00292

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Discussion:  Social isolation is an empirically established risk factor for juveniles who have committed a sex offense.[197]  Prohibiting minors from all contact with non-victim, pro-social minors who are peers, relatives, or otherwise relevant to their support systems solely because their case was prosecuted in adult court is without research support.*

### 5.740  Contact, Clarification, or Reunification with Minor-Aged Victims

It is important for the CST to use caution before allowing an offender contact with a known victim. A Child Contact Screening (CCS) is prohibited as an avenue for contact with known victims (see Section 5.732 re: disqualifiers for a CCS). The rationale for using caution in these matters is based on the knowledge that while minor children are among the most vulnerable potential victims, those previously victimized by the offender remain at high risk for re-victimization in a variety of ways.[198] This is due to the fact that the offender has already demonstrated a willingness and ability to engage in offending behavior against them, and it is highly unlikely that minor children will report further abuse.[199] CST members should be aware that research indicates younger minor children and those who know the perpetrator are least likely to report abuse in the first place,[200] and that many victims whose offenders were family members indicate they would not report abuse if it recurred due to the devastating consequences they experienced upon their first report.[201]

For these reasons, while some victims may express a desire for contact it may not actually be in their best interest. The CST must balance victim wishes with the paramount concern for victim safety. It is also important for the CST to resist pressure from an offender or victim's family regarding contact. The CST decision to allow victim contact shall be unanimous and based on consideration over a protracted period of time regarding:

A. The best interests of the victim;

B. Input from the victim's current or prior therapist, or in the absence of a therapist, a victim representative;

C. Input from the child's custodial parent or legal guardian;

D. The offender's achievement of all criteria listed in 5.735; and

[197] Hackett, S., Masson, H., Balfe, M., & Phillips, J. (2015). Community reactions to young people who have sexually abused and their families: A shotgun blast, not a rifle shot. *Children & Society, 29*, 243-254; van der Put, C. E., van Vugt, E. S., Stams, G. J. J., Deković, M., van der Laan, P. H. (2012). Short-term general recidivism risk of juvenile sex offenders: Validation of the Washington State Juvenile Court Prescreen Assessment. *International Journal of Offender Therapy and Comparative Criminology, 57(11),* 1374-1392.

[198] Lalor, K. & McElvaney, R. (2010). Child sexual abuse, links to later sexual exploitation/high-risk sexual behavior, and prevention/treatment programs. *Trauma, Violence, & Abuse, 11(4),* 159-177; National Coalition to Prevent Child Sexual Abuse and Exploitation. (2012). National Plan to Prevent the Sexual Abuse and Exploitation of Children. Retrieved from http://www.preventtogether.org/Resources/Documents/NationalPlan2012FINAL.pdf; Statistics About Sexual Violence (2015). National Sexual Violence Resource Center: Info & Stats for Journalist.

[199] Kilpatrick, D. G., Saunders, B. E., & Smith, D. W. (2012). Youth victimization: Prevalence and implications (NCJ 194972). Washington, DC: U.S. Dept. of Justice, Office of Justice Programs, National Institute of Justice.; Langton, L., Berzofsky, M., Krebs, C., & Smiley-McDonald, H. (2012). Victimization not reported to the police, 2006-2010 (NCJ 238536). Washington, DC: U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics.; Paige, J. & Thornton, J. (2015). Healing from intrafamilial child sexual abuse: The role of relational processes between survivor and offender. *Children Australia, 40(3),* 242-259.

[200] Kilpatrick et al. (2012); Langton et al. (2012).; Paige & Thornton (2015).

[201] McElvaney (2015); McElvaney, R., Greene, S., & Hogan, D. (2013). To tell or not to tell? Factors influencing young people's informal disclosures of child sexual abuse. *Journal of Interpersonal Violence, 29(5),* 928-947.



CDOC/Nelson_00293

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**E.** The presence of an Approved Supervisor (see 5.780).

Refer to Appendix B for best practice guidelines regarding victim or other family member readiness for clarification, contact, and reunification.

## 5.745 Victim clarification procedures[202]

Clarification procedures outlined in this section also include information and guidance for clarification with minor aged victims and victims who are adults.

Prior to initiating clarification procedures, treatment providers should obtain topic-specific training and utilize the expertise of experienced providers, as necessary.

A. **Clarification work**

Clarification work is a multi-step process that shall occur in sex offense- specific treatment whether or not the process progresses to clarification sessions with the victim, and should include the following:

1. Discussion between the therapist and the offender regarding the offender's sexually abusive behaviors.

2. Discussion with the offender about the clarification process and the importance of the process being victim-centered.

3. Any significant difference between the offender's statements, the victim's statements and corroborating information about the offense/abuse shall be resolved to the satisfaction of the CST, to include the victim therapist or victim representative. The offender is able to acknowledge the victim's statements without minimizing, blaming or justifying.

4. The offender evidences empathic regard through consistent behavioral accountability including an improved understanding of: the victim's perspective; the victim's feelings; and the impact of the offender's assaultive behavior.

5. The offender is prepared to answer questions and is able to make a clear statement of accountability, and provide reasons for victim selection to remove guilt and perceived responsibility from the victim.

6. Any sexual impulses are at a manageable level and the offender can utilize cognitive and behavioral interventions to interrupt risk-related fantasies as determined by continued assessment.

7. The offender evidences decreased risk by demonstrating changes listed in Section 3.160.

---

[202] DeMaio, C.M., Davis, J.L., and Smith, D.W. (2006). The use of clarification sessions in the treatment of incest victims and their families: An exploratory study. *Sexual Abuse: A Journal of Research and Treatment*, *18(1)*, 27-39.



CDOC/Nelson_00294

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

8. The offender will write clarification letters to each victim using the following steps:

   a. The SOMB approved provider shall contact the victim representative (the victim therapist involved in the case is the preferred representative) to explain the clarification process to the victim and determine if the victim wants to receive a clarification letter.  If the victim does not want to receive a clarification letter, or if there is no identified victim, the offender is still expected to complete steps b through f.

   b. Letters should be written assuming the victim will receive the letters, regardless of whether or not the letters will actually be sent at the time the letter is written.

      *Discussion: Victims may request the clarification letter in the future. Therefore, the therapist should make sure the letter is dated and retain the letter as part of the treatment file per record retention requirements.*

   c. Letters should be written in the offender's words and in a developmentally appropriate way that the victim can understand.  It is imperative that letters are written based on the individual needs of the victim(s).

   d. All letters shall be reviewed by a victim representative or a professional with experience in the clarification process with victims in order to provide an outside viewpoint of the letters.

   e. Letters should be revised based on input from reviewers.

   f. Once completed, the letter should never be sent directly by the offender to the victim. The letter shall be provided to the victim by the victim representative or another professional on the CST.

9. Mock clarification sessions with a victim representative may be a useful treatment process when the victim chooses to not participate in clarification, or clarification with the actual victim is not appropriate.

B. **Clarification with the victim**[203]

   The victim clarification process is designed to primarily benefit the victim. Through this process the offender accepts responsibility for the abusive behavior and clarifies that the victim has no responsibility for the offender's behavior,[204] which aids in helping the victim reduce self-blame and assign responsibility to the offender. The purpose of the clarification process is to address issues related to the damage done to the victim and family, grooming behaviors, and potential questions and topics for the offender to clarify to the victim.

   Clarification is a process that occurs over time, and should only begin when the offender is able to self-disclose about the offending behavior. Victim participation is never required,

---

[203] DeMaio et al. (2006).

[204] Hindman, J. (1989). Just Before Dawn, Alexandria Association.



CDOC/Nelson_00295

but is important when the plan includes ongoing contact between the offender and the victim. Clarification sessions should only occur based on the direction of the victim(s), not the family or offender. Clarification is always victim-centered and based on victim need.[205] This process requires collaboration with a victim therapist or representative as defined in section 5.700. Following clarification written work, the clarification process may then progress to the offender having therapeutic interaction with the victim in the mode the victim chooses (e.g., letters, phone contact, video conferencing, or face-to-face).

*Discussion: Whenever a victim has been in therapy, the victim's therapist is the preferred victim representative and should be consulted regarding the clarification process.*

*Discussion:  The CST should determine if a court or parole order prohibiting contact exists. If such an order exists, the existing order must be modified to allow for contact, including therapeutic contact.*

Secondary victims and significant persons in the victim's life are impacted by sexual offenses. Clarification with others who have been impacted by the offense may be warranted.

When conducted thoroughly utilizing a victim-centered approach, clarification provides benefits including healing and restoration to the victim and offender.

C. **Criteria for Clarification Sessions**

The clarification process may progress to clarification sessions between the offender and the victim when approved by the CST in consultation with the victim representative (the victim therapist involved in the case is the preferred representative) using the following criteria (Refer to Appendix B, "Guidance Regarding Victims/Family Member Readiness for Contact, Clarification, or Reunification" for further details):

*Discussion:  The CST should determine if a Court or Parole Order prohibiting contact exists. If such an Order exists, the existing order must be modified to allow for contact, including therapeutic contact.*

1. The victim requests clarification and the victim representative concurs that the victim will benefit from clarification.

2. The primary residential parent or legal guardian(s) of the victim (if a minor) is (are) informed of and give approval for the clarification process.

3. A specific issue polygraph examination shall be employed prior to clarification sessions under the following conditions:

    a. Significant discrepancy between the account of the offender who committed the sexual offense and the victim's description of the offense; or

---

[205] Digiorgio-Miller, J. (2002).  A Comprehensive Approach to Family Reunification Following Incest in an Era of Legislatively Mandated Community Notification.  Journal of Offender Rehabilitation. Vol. 35(2), 83-91.



CDOC/Nelson_00296

      b. To explore specific allegations or concerns that would affect the clarification process.

4. Information gained from a specific-issue polygraph may be critical to an effective victim clarification process and shall be considered when making decisions regarding victim clarification.

5. The offender is able to demonstrate the ability to manage risk-related sexual arousal, interests and behavior patterns specific to the victim.

6. Clarification sessions will be victim-centered and occur at a location or via a medium chosen by or acceptable to the victim. CST's may consider alternate forms of technology such as, video conferencing, on-line video communication, live or pre-recorded video presentations, etc. Ground rules should be established for a clarification session with input from the victim, which may occur via the Victim Representative on the CST.

## 5.748 Contact with victims who are currently under the age of 18

Contact **with a victim** is first initiated through the clarification process. Ongoing contact after clarification shall only occur at the request of the victim. Offenders must meet all requirements outlined in section 5.735, 5.740 and 5.745 prior to being allowed victim contact. Once those requirements have been met, and upon agreement of the CST, the offender may progress to contact outside of a therapeutic setting.

The CST shall:

A. Seek input from the victim's therapist or a victim representative regarding such contact;

B. Ensure all contact occurs in the presence of an Approved Supervisor (see 5.780), or professional member of the CST;

C. Ensure that the wishes of the victim as well as the recommendations of the victim representative support all the contact that occurs. An offender's therapist shall not initiate offender contact with a victim absent professional victim representative support;

D. Support the victim's wishes regarding contact with the offender to the extent that it is consistent with the victim's safety and well-being;

*Discussion: A common dynamic that may occur in families is direct or indirect influence or pressure on the victim to have contact with the offender. A third party professional assessment regarding victim needs may be warranted prior to contact with the offender.*

E. Arrange contact in a manner that places victim safety first. When assessing safety, psychological and physical well-being shall be considered;

F. Determine what types of contact are permissible based on offender risk factors and other considerations. The CST shall consider placing more boundaries and limitations on types of contact with known victims than may be required of the same offender with non-victim



CDOC/Nelson_00297

minor children. Contact possibilities occur on a continuum including written, telephone, and in-person and from non-physical to physical. The CST shall specify what is approved for the offender with each victim;

G. Closely supervise or monitor the contact process, including requiring that any concerns or rule violations be reported to the CST; and

H. Ensure the ongoing assessment of the victim's emotional, psychological and physical safety, and will immediately terminate contact if any aspect of the victim's safety is in jeopardy.

## 5.750  Unsupervised Contact with Offender's own Minor Child(ren) who are not Victims and are Currently Under the Age of 18

This section does not apply when contact is not prohibited by the Court or Parole Board.

*Discussion:  The CST should determine if a Court or Parole Order prohibiting contact exists.  If such an Order exists, the existing order must be modified to allow for contact, including therapeutic contact.*

The following criteria for unsupervised contact with own minor child(ren) should also be utilized by the CST when considering a CCS recommendation for contact.

A. Offenders being considered for unsupervised contact with their own minor child(ren) shall:

   1. Not meet any of the Exclusionary Criteria as referenced earlier in Standard 5.725;

   2. Have had ongoing supervised contact with their own minor child(ren);

   3. Continue to be assessed by the CST to have demonstrated compliance with all applicable standards in Sections 5.735 through 5.748 as assessed by any required maintenance/monitoring polygraph examination (see Section 6.000), and other clinical indicators;[206]

   4. Have demonstrated that supervised visits have been sufficient in quality, frequency, and duration as determined by the CST; and

   5. Have demonstrated satisfactory progress in treatment and consistent compliance with supervision and treatment conditions.

B. The criteria listed below shall be used by the CST when considering granting an offender unsupervised contact with his/her own minor child(ren). Offenders shall not be allowed to have unsupervised contact with minor child(ren) who are not their own minor child.

---

[206] Clinical indicators can be anything that provides information about a client's overall clinical presentation, which may include but is not limited to interviews, quality of treatment participating, polygraph examination results, scores on dynamic risk assessments, psychological evaluation, behavioral observations, and collateral reports.



CDOC/Nelson_00298

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

1. Where available and deemed appropriate based on the child's developmental level, the CST shall support the minor child's wishes when the minor child does not want to have unsupervised contact with the offender. In cases when the minor child wants unsupervised contact, the CST shall prioritize the best interest of the minor child including physical, psychological and emotional safety;

2. When there is a therapist working with the minor child, the therapist shall be consulted in the decision to grant unsupervised visitation;

2. If no longer in therapy, the CST should attempt to consult with the therapist who previously treated the minor child to discuss general issues surrounding unsupervised contact;

3. The CST shall ensure that the offender has an approved safety plan regarding the minor child involved;

4. The CST shall consider input from the primary residential parent or legal guardian when making any decision regarding any unsupervised contact with the offender's own minor child(ren). In such instances, the CST shall seek ongoing input from the custodial parent or legal guardian to ensure that contact is not posing undue risk to the child(ren). If such risk is identified, a subsequent Court or Parole Board Order is needed to preclude such contact. If the CST is in agreement, then such information should be presented to the Court or Parole Board pursuant to local procedures.

5. The CST shall assess the suitability of unsupervised contact while such contact is taking place.  If risk factors indicate unsupervised contact is no longer safe, the CST will need to seek modification of the court order if it currently allows unrestricted contact with the minor child(ren).

6. The CST shall thoroughly document reasons for all decisions made regarding an offender's unsupervised contact with own minor child(ren).

7. Unsupervised contact shall never be allowed for a sex offender diagnosed with any type of pedophilia (per current version of DSM) or with an established and ongoing pattern of risk-related sexual arousal, interest and behavior toward minor children (see Section 5.725.)

*Discussion: An established pattern is determined to exist when an offender has shown illegal, abusive or harmful sexual interest/arousal to minors via pattern of offending, self-report by the offender, or assessment of sexual interest/arousal over a period of time.*

When contact with the offender's own child(ren) has not been prohibited or restricted, there may also be instances when information indicates that such contact is contraindicated due to increased risk of the offender to the child. To restrict or preclude contact, a subsequent Court or Parole Board Order is needed. Therefore, the treatment provider shall communicate such information to the supervising officer. If the CST is in agreement, then such information should be presented to the Court/Parole Board pursuant to local procedures.



CDOC/Nelson_00299

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**5.751 Unsupervised Contact with an Offender's Grandchildren who are not Victims and Currently Under the Age of 18.**

> *Discussion: The CST should determine if a Court or Parole Board Order prohibiting contact exists. If such an Order exists, the existing order must be modified to allow for contact.*

> Unsupervised contact shall never be allowed for a sex offender diagnosed with any type of pedophilia (per current version of DSM) or with risk-related sexual interests or behavior patterns.

A. Offenders being considered for unsupervised contact with their non-victim minor grandchildren shall:

1. Not meet any of the Exclusionary Criteria as referenced in Standard 5.725;

2. Meet the criteria outlined in Standard 5.735 for contact with secondary and non-victim minor children;

3. Have participated in supervised contact which has been sufficient in quality, frequency and duration as determined by the CST;

4. Have had ongoing supervised contact with the grandchild(ren) and no CST concerns have risen from that contact; and

5. Have the approval and support from the custodial parent(s) or legal guardian(s) who are aware of the offender's sexual offending behavior.

B. The CST Shall:

1. Ensure that if the custodial parent or legal guardian are not the current acting approved supervisor, the treatment provider shall meet with the legal custodian or legal guardian prior to unsupervised contact occurring;

2. Continuously assess the suitability of unsupervised contact while such contact is taking place;

3. Continue to assess client compliance with treatment expectations, supervision requirements and safety planning; and

4. Thoroughly document reasons for all decisions made regarding an offender's unsupervised contact with their grandchild(ren).

**5.755 Family Reunification**

This section applies when the offender will be residing in the same residence with the victim or own minor non-victim child(ren). Family Reunification is defined as the offender living in the same residence with own minor child(ren).



CDOC/Nelson_00300

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Family reunification shall not occur for offenders who meet exclusionary criteria as outlined in Section 5.725 unless a Court/Parole Board Order does not prohibit or restrict contact by the offender with own child(ren). There may also be instances when information indicates that such contact is contraindicated due to increased risk of the offender to the child. To restrict or preclude contact, a subsequent Court/Parole Board Order is needed. Therefore, the treatment provider shall communicate such information to the supervising officer. If the CST is in agreement, then such information should be presented to the Court/Parole Board pursuant to local procedures.

Prior to considering family reunification, the offender shall have demonstrated compliance with all applicable standards in Section 5.735 (unless these criteria have been waived pursuant to the CCS), 5.740 and 5.745, and the CST shall unanimously agree that family reunification is appropriate.

Due to ongoing risk of re-offense, family reunification in cases when the offender has a history of incestuous behavior is rarely indicated.

The CST shall coordinate all efforts toward family reunification with any actively involved child protective agency.

Family reunification shall never take precedence over the safety (physical, sexual, and psychological) of any victim or the offender's own minor children. If reunification is indicated per the recommendations of the CCS or after careful consideration of the potential risks over an extended period of time, supervising officers and treatment providers in conjunction with the victim representative, shall carefully monitor the process through the conclusion of supervision. Family reunification is typically a gradual process marked by increasing contact both in terms of length of visits, and where the visits take place.

The CST shall confirm that the spouse/partner or primary caregiver is willing and able to fully support all conditions required by the CST, which includes active involvement in the offender's treatment process and any treatment in which the minor child(ren) are involved. The CST shall consider any past or present victimization by the offender of the spouse/partner or primary caregiver that would inhibit the person's ability to support the conditions necessary for family reunification. Confidentiality for a person who has been victimized, including a spouse/partner or primary caregiver, must be upheld.

### 5.760  Circumstances under Which Criteria May Be Waived

At the request of the victim or own minor child, there may be rare instances when the CST determines that brief contact prior to meeting criteria established in 5.740 is beneficial and appropriate.  In such instances contact shall:
- Be for the benefit of the victim or minor child;
- Have a specific purpose;
- Be supervised;
- Goal oriented; and



CDOC/Nelson_00301

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Be limited to no more than the amount of incidences of contact necessary to achieve the identified purpose and goal(s), which is typically no more than 2 sessions.

Contact may include letters, telephone contact or face to face interaction. Such contact must be well planned and facilitated by the offender's therapist and include the victim or minor child's therapist, or victim representative.  Care shall be taken to plan for the safety of the victim or minor child.  When no therapist for the own minor child is involved, the team shall seek the input from the Victim Representative.

*Discussion:  The CST should determine if a Court/Parole Board order prohibiting contact exists. If such an Order exists, the existing order must be modified to allow for contact. Such a task should not be placed on the victim.\*

*Discussion:  The removal of an offender from the family home is usually immediate. Children often do not have a chance to say good-bye and struggle with the sudden and unexplained loss of their caregiver or family member's removal from the home. It may benefit the child(ren) of the offender to participate in a therapeutic session for the offender to explain their absence (in terms developmentally appropriate for the child(ren). In such cases therapists shall ensure the offender is capable of explaining the absence in a manner that does not portray them as a victim or imply responsibility for the absence rests with the victim or other family members. Teams should also consider if, on an ongoing basis, allowing the child(ren) to write letters to the offender (through the offender's therapist) will assist the child(ren) in their grief and loss. Such communication may also benefit the offender to understand the impact of their behavior on the minor child(ren). In such cases, the child(ren) will need to understand that the offender will not be able to respond to child/victim initiated communication until approved by the CST.*

## 5.770  Contact with Adult Victims

The CST shall discuss and implement the appropriate clarification procedures, (see section 5.740) applicable and specific to the victim's needs.  The CST shall ensure that the adult victim's desires and best interests are adequately represented throughout the decision-making process. When making a determination about contact with an adult victim, the CST must be attentive to the possibility of ongoing enmeshment and abuse of power between the offender and the person victimized.  Factors specific to the offender and the relationship to the victim shall be considered, such as domestic violence, harassment and stalking.

If contact is approved, the CST shall specify what type of contact the offender is approved to have with each adult victim.  The CST shall determine the types of contact that are permissible based on offender and victim dynamics, known risk factors and other considerations including the type of contact the victim is requesting.  Contact possibilities occur on a continuum including written, telephone, and in-person, (therapeutic or otherwise), and from non-physical to physical.

*Discussion:  The CST should determine if a Court or Parole Board Order prohibiting contact exists.  If such an Order exists, the existing order must be modified to allow for contact. Such a task should not be placed on the victim.*

## 5.775  Contact with Vulnerable Adult Populations



CDOC/Nelson_00302

Treatment providers and other members of the CST shall not allow offenders to have unsupervised contact with individuals who are at particular risk for victimization. Vulnerable persons include individuals at risk for victimization due to diminished mental status, disability, incapacitation or victimization related to domestic violence or sexual assault.

Safety planning should identify potentially vulnerable populations and plan accordingly in relation to what is known of the offender's sexually offending behavior, sexual interests and arousal, and additional client-specific risk factors. The CST shall also take into consideration those individuals whose decision-making and self-protection skills are compromised due to mental health issues, substance misuse, physical limitations, or developmental or intellectual concerns.

### 5.780  Approved Supervisor

Approved Supervisors (AS) are adults who have been approved by the CST to supervise contact between a client and a specified minor, victim or vulnerable adult.

### 5.781  Qualifications of an Approved Supervisor

Prior to approving a person to be an Approved Supervisor, the applicant will meet the following qualifications:

A. Completes a criminal history background check (see Appendix O for additional information);

B. Understands the nature of an existing disability and how it impacts the risk, needs and responsivity of the offender;

C. Willing to discuss any personal victimization history to assess whether issues exist that would impede their role as an Approved Supervisor;

D. Agrees to participate in and support the intervention efforts of the CST;

E. Willing to maintain open communication with the CST and inform the CST about concerning behavior;

F. Agrees that protecting the minor child, victim or vulnerable person is the highest priority;

G. Recognizes the offender's responsibility for the seriousness of the sexually abusive behavior;

H. Demonstrates empathy for victims and acknowledges the impact sexual abuse has on victims; and

I. Empowers the offender to progress in treatment.

### 5.782  Disqualifications of an Approved Supervisor



CDOC/Nelson_00303

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Prior to allowing a person to be an Approved Supervisor, the person must voluntarily agree to all conditions and qualifications as outlined above in 5.781.

Approved Supervisor status is conditional and may be modified or removed if one of the following conditions exists or arises:

A. The Approved Supervisor is currently under the jurisdiction of any court or criminal justice agency for a matter that the CST determines could impact one's capacity to safely serve as an Approved Supervisor.

B. A conviction for child abuse or neglect, or for unlawful sexual behavior as defined by SOMB Statute or a founded sexual abuse assessment or dependency case that has been filed in civil court. If the Approved Supervisor has been investigated for unlawful sexual behavior, child abuse, or neglect they must present information requested by the CST so that the CST may consider the impact on the capacity to serve as an Approved Supervisor.

   *Discussion: In rare circumstances, the CST may choose to make an exception to the prohibition about a misdemeanor child abuse conviction. The reasons for this exception should be made by the unanimous agreement of the CST and documented in writing.*

C. If the Approved Supervisor demonstrates that they have developed a significant cognitive, mental health, substance abuse, health related or physical impairment that inhibits their ability to be an Approved Supervisor, the CST may request that the person remove themselves from serving in that capacity or modify their role.

D. A significant power differential exists in the relationship between the offender and the proposed Approved Supervisor and that power differential is likely to inhibit the person's ability to fulfill the responsibilities of the role (e.g., adult child of the offender).

E. Confidentiality for a client must be upheld.

F. Past or present victimization by the client of the potential Approved Supervisor that would inhibit the person's ability to fulfill the responsibilities of the role. Confidentiality for a victim in this situation must be upheld.

**5.783** At any time, the status of an Approved Supervisor can be removed or modified based on the following events or circumstances:

A. The Approved Supervisor fails to comply with and adhere to the conditions and qualifications as listed in Section 5.781. Failure to maintain compliance will result in the removal or modification of Approved Supervisor status.

B. An Approved Supervisor can request to the CST that they be removed from such status at any time and of their own volition as this is a voluntary status.

C. The CST may remove a person from the role of Approved Supervisor status based upon other concerning behavior or attitudes demonstrated by the Approved Supervisor. In cases in which this occurs, the CST must be in agreement, discuss the reason for the removal of such



CDOC/Nelson_00304

status with the Approved Supervisor and the offender, and document the reasons for the removal of the Approved Supervisor status.

D. Failure to maintain confidentiality by the Approved Supervisor will result in removal of the Approved Supervisor status.

**5.784** Treatment providers shall offer training for an Approved Supervisor. The training should be of sufficient duration for the candidate to learn, process and internalize information about the individual client's risks, needs and how they may respond to those risks and needs in their role as an Approved Supervisor.

A. At a minimum the training/education shall include:
- The offenders thorough disclosure of the offense and acceptance of all responsibility;
- The offender's sexual history disclosure to the extent deemed necessary as determined by the treatment provider;
- What constitutes sexual offending and other abusive behavior and the impact that it has on victims;
- The offender's cognitive distortions, risk factors, problematic, harmful or illegal sexual arousal patterns, pathways, grooming behaviors, Pro-Social Living Plan and an awareness that client risk factors are variable over time;
- The offender's treatment progress;
- Any offender mental health or substance misuse issues;
- Learning to identify cognitive distortions used to justify or excuse sexually abusive behavior;
- The offender's community supervision conditions, treatment contract expectations, and rules regarding the approved contact;
- The offender's requirement to provide the CST with a written safety plan for supervised contact;
- Any offender history of domestic violence and risk to a partner or to other family members; and
- The offender's potential ability to manipulate the Approved Supervisor and/or CST.

*Discussion: Because this training must be specific to the client, clients are encouraged to participate in the session(s) with their Approved Supervisor.*

*Discussion: If an Approved Supervisor has completed the criteria as outlined in section 5.784 then the person's status should transfer to another agency. The Approved Supervisor should not have to complete additional educational requirements if they remain in good standing.*

B. Providers shall require Approved Supervisors to attend education groups quarterly for a minimum of a year. After the initial year, Approved Supervisors, at a minimum, shall attend an individual session where the client and primary therapist are present, once every six months. These sessions shall be a place where concerns are discussed.

*Discussion: The SOMB recognizes that providers serving clients in rural areas experience unique challenges. When limited resources exist in rural areas, the provider shall document their plan to provide training and on-going support to Approved Supervisors.*



CDOC/Nelson_00305

C. Treatment providers shall have a process in place that allows for consistent communication between the Approved Supervisor and other members of the CST.  Such a process could include:
- Scheduled appointments with the therapist
- Scheduled appointments with the supervising officer
- Written communication
- Staffing(s)
- Support groups
- On-going training

## 5.785  Approved Supervisor Duties and Responsibilities

The treatment provider shall develop a written contract specific to the client and minor child(ren) having contact and confirm the contract is signed by the CST, the Approved Supervisor and the client. The contract shall require that the Approved Supervisor:

A. Maintains qualifications and stays current on the knowledge and responsibilities as discussed in Standards 5.781 through 5.784, including annually providing the CST with a Colorado Bureau of Investigation generated criminal history report that incorporates CCIC/NCIC information;

B. Shall not be under the influence of alcohol or substances which may inhibit or impair one's ability to effectively serve in the role as Approved Supervisor;

C. Maintains confidentiality regarding known victim information;

D. Assists client in maintaining compliance as specified by the CST;

E. Assists the client in abiding by the approved safety plan regarding contact;

F. Immediately terminates the visit if any aspect of the physical or emotional well-being of the child(ren) appears compromised or if the safety plan is not adhered to;

G. Reports concerns to the CST;

H. Maintains open and honest dialogue with members of the CST;

I. Provides the CST documentation of visits as requested;

J. Acknowledges their potential for civil liability for negligence in enforcing stated rules and limitations; i.e. a new criminal offense; and

K. Approved Supervisors shall comply with the requirements for approval as outlined in section to 5.780.

Approved Supervisor non-compliance with requirements may result in modification or discontinuance of their status as the Approved Supervisor.



CDOC/Nelson_00306

**5.786   The following shall be specified in the written Approved Supervisor contract:**

A.  Name(s) of the minor(s) with whom the Approved Supervisor is allowed to oversee any type of contact;

B.   Follow the duties and responsibilities of the Approved Supervisor as outlined in Section 5.785 and support the offender's approved safety plan for contact;

C.  If the Approved Supervisor is not in compliance with all of the requirements (see Section 5.780), the CST may discontinue or modify contact privileges and/or the approval status of the Approved Supervisor; and

D.  Advise that an Approved Supervisor's potential civil liability for negligence in enforcing stated rules and limitations.

E.  An Approved Supervisor can request to the CST that they be removed from such status at any time and of their own volition as this is a voluntary status.

**5.790   The Role of an Approved Community Support Person**

An Approved Community Support Person (ACSP) is a person approved by the CST to participate in community activities with the offender [see section 5.715(A)]. These activities do not include approved purposeful contact with a minor. Research indicates the likelihood of a client's success is enhanced with the existence of positive support, pro-social peers and engagement in pro-social recreational activities. [207]

**5.791   Qualifications of an Approved Community Support Person (ACSP)**

A.  They are aware of the nature of the offense and other offending behavior;

B.  They have received additional education as recommended by the treatment provider;

C.  They must agree to voluntarily support the offender in approved community activities which have been previously approved by the CST;

D.  They must understand that their role is a limited support role and does not extend to supervising any contact with minors;

E.  They must be willing to communicate concerning behavior and/or high risk behavior on the part of the offender to the CST;

---

[207] Andrews, D. A. & Bonta, J. (2010). *The Psychology of Criminal Conduct (5th ed.).* Newark, NJ: Matthew Bender.; Andrews, D. A., Bonta, J., & Wormith, J. S. (2011). The risk-need-responsivity (RNR) model: Does adding the good lives model contribute to effective crime prevention? *Criminal Justice and Behavior, 38(7),* 735-755.; Willis, G. (2010). Back to basics: Empirical support for the importance of release planning in reducing sex offender recidivism. *Sexual Abuse in Australia and New Zealand, 2(2),* 54-57; Willis, G. & Grace, R. (2008). The quality of community reintegration planning for child molester. *Sexual Abuse: A Journal of Research and Treatment, 20,* 218-240.



CDOC/Nelson_00307

F.  They must be willing to communicate unauthorized contact with minors to the CST in a timely manner;

*Discussion: While it is the responsibility of the offender to report unauthorized contact or violations, there remains an expectation that the ACSP will encourage such accountability and confirm the offender has been transparent and accountable to the CST when such contact or behavior occurs.*

G.  They must be able to model pro-social behavior for the offender;
H.  If they are currently under Court or Parole Board ordered supervision or enrolled in treatment they must be compliant with both; and

I.  They must support the goals of supervision and treatment.



CDOC/Nelson_00308

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**5.792  Criteria that disqualifies a person after being approved as an Approved Community Support Person (ACSP)**

A.  They no longer wish to, or are able to, be an ACSP;

B.  They fail to communicate openly with the CST;

C.  They demonstrate lack of support for the goals of the CST;

D.  They allow, in their presence, an offender to have unauthorized contact with a minor, victim or other vulnerable person;

E.  They fail to report unauthorized contact with a minor, victim or other vulnerable person;

F.  They fail to report any known violation to the CST;

G.  They have an active warrant for their arrest or engage in criminal activity while an ACSP; or

H.  They are under supervision or in treatment and have violated their own treatment or supervision conditions. The CST will suspend or terminate their ACSP status based upon the nature of the violation.

**5.793  Education for Approved Community Support Person**

The educational piece, which the therapist or the CST determines on an individual basis, should or could include the following:

A.  The clients thorough disclosure of the offense and acceptance of all responsibility;

B.  What constitutes sexual offending and other abusive behaviors and the ongoing risk factors;

C.  The client's treatment progress;

D.  That a client's risk may be variable over time and managed by adaptive coping responses;

E.  The client's community supervision conditions, treatment contract expectations, and rules regarding the approved activity; and/or

F.  The client's requirement to provide the CST with a written safety plan.

*Discussion:  Because this education must be specific to the client, clients are encouraged to participate in the session(s) with their support person(s).*

*Discussion:  If an ACSP has completed the criteria as outlined in Section 5.790 then the person's status should transfer to another agency.  The ACSP should not have to complete additional educational requirements if they remain in good standing.*



CDOC/Nelson_00309

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Research Citations

For the following Standards: 5.700-5.755, and 5.790-5.792

All footnotes and research references in these Standards were evaluated by the staff researcher and presented to the Standards Revision Committee regarding the revisions being discussed. Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revisions process regardless of whether it supported the standard revision or not. This research was then incorporated into the revisions and presented to the SOMB for discussion and a 20-day public comment period, allowing for stakeholder review of research incorporated, before being ratified by the Board on the aforementioned date. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

**https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender**

For the following Standards: 5.760-5.786, and 5.793

The Staff Researcher did a search for research applicable to the revisions being discussed, along with a solicitation for research from members of the Board's Committees and members of the public. Research was not found applicable to the revisions being discussed, so in absence of research the Committee moved forward with evaluating the revisions based on best practices, statutory requirements, professional association guidelines, and the professional expertise of the members of the Committees and the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00310

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 6.000 Standards of Practice for Post-Conviction Polygraph Testing (PCSOT)

**6.000 Post-Conviction Polygraph Testing (PCSOT)**

The polygraph is used to add incremental validity to treatment planning and risk management decisions regarding clients in community and institutional settings. The concept of "incremental validity" refers to improvements in decision making through the use of additional information sources. Benefits of polygraph testing include improved decision making, deterrence of problem behavior, and access to information that might otherwise not be obtained.[208]

Polygraph test results (see Section 6.151 A-D for specific types of test results) shall not be used as the sole determining factor in the supervision and treatment decision-making process.[209] The Community Supervision Team (CST) should consider all existing clinical indicators that provide information about a client's overall presentation. Such indicators may include, but are not limited to, interviews, quality of treatment participation, polygraph examination results and disclosures, scores on dynamic risk assessments, psychological evaluation results, behavioral observations, and collateral reports. These indicators should thoroughly inform decisions pertaining to a client's progress in treatment, activities in the community, and contact with potentially vulnerable persons.

Polygraph testing is one of several methods of behavioral monitoring. Additional forms of behavioral monitoring include drug/alcohol testing, plethysmograph testing, viewing time (VT) assessment, and other case management practices such as collateral contacts, office and home visits, employment visits, computer and phone monitoring, and increased supervision and treatment requirements.

---

[208] Bourke, M. L., Fragomeli, L., Detar, P. J., Sullivan, M. A., Meyle, E., & O'Reordan, M. (2015). The use of tactical polygraph with sex offenders. *Journal of Sexual Aggression, 21(3)*, 354-367; Elliot, E. & Vollm, B. (2018). The utility of post-conviction polygraph testing among sexual offenders. *Sexual Abuse, 30(4)*, 367-392; Gannon, T., Wood, J., Pina, A., Tyler, N., Barnoux, M., & Vasquez, E. (2014). An evaluation of mandatory polygraph testing for sexual offenders in the United Kingdom. *Sexual Abuse: A Journal of Research and Treatment, 26(2)*, 178-203.; Grubin, D., & Madsen, M. (2006). Accuracy and utility of post-conviction polygraph testing of sex offenders. *British Journal of Psychiatry, 188(5)*, 479-483; Spruin, E., Wood, J. L., Gannon, T. A., & Tyler, N. (2018). Sexual offender's experiences of polygraph texting: A thematic study in three probation trusts. *Journal of Sexual Aggression, 24(1)*, 12-24.

[209] Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking. (2014). *Sex offender management assessment and planning initiative*. Washington, D.C: US Department of Justice, Office of Justice Programs.


SOMB

CDOC/Nelson_00311

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**6.002 Expectation for Honesty**

The CST shall set the expectation for honesty and complete disclosure from the client. Such openness will contribute to community safety, the development of an appropriate treatment plan and successful progression through treatment.

**6.010 Recommended Guidelines for Polygraph Exam Timeframes**

Please note these timeframes are provided as recommendations for Community Supervision Team (CST) decision-making, which should ultimately be based on the risk, and supervision and treatment needs of the client.

A. Instant Offense Exam – Implement within first 3 months of denier's intervention, or at the start of sex offense specific treatment.

B. Sexual History Exams[210] – Implement within first 12 months of sex offense specific treatment.

C. Maintenance/Monitoring Exams – Implement within first 3 months of sex offense specific treatment, and continue on a regular basis every 6 months thereafter.

**6.011 Types of Post-Conviction Polygraph Examinations**

There are six different types of Post-Conviction polygraph exams:[211]

**A.** Instant Offense Exams

**B.** Sexual History Exams

**C.** Maintenance Exams

**D.** Sex Offense Monitoring Exams

**E.** Child Contact Screen Exams

**F.** Specific Issue Exams

CST members, including polygraph examiners, shall maintain the integrity of the distinct types of post-conviction polygraph examinations, and shall not mix questions

---

[210] For offenders who refuse to answer incriminating sexual history polygraph questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I.2 to determine how to respond.

[211] The American Polygraph Association identifies five types of polygraph exams: instant offense exams, prior-allegation exams, sexual history disclosure exams, maintenance exams, and sex offense monitoring exams. An issue-specific exam, such as the prior-allegation exam, may also be utilized by CSTs in supervising and treating sex offenders, as appropriate.



CDOC/Nelson_00312

among the various types of post-conviction exams, other than maintenance and monitoring exams which can be mixed. For example, an exam shall not combine a sexual history question regarding historical sexual offending behavior and a maintenance question regarding current alcohol consumption while under supervision.

**6.012 Instant Offense Polygraph Examination**

An <u>instant offense exam is</u> an event-specific polygraph for clients who deny any or all important aspects of the allegations pertaining to their present sex offense crime(s) of conviction.[212]

An instant offense polygraph examination shall be used by the CST to manage clients in denial as specified in Section 3.520, or prior to clarification with the victim, if there are any significant discrepancies between the clients and the victim, as specified in Section 5.752 D.

**6.013 Sexual History Polygraph Examination**

<u>A sexual history exam</u> assesses the client's history of involvement in unknown or unreported offenses and other sexual compulsivity, sexual pre-occupation, or sexual deviancy behaviors. Information and results from these examinations should be provided to the professional members of the CST to add incremental validity to decisions pertaining to risk assessment, risk management and treatment planning.[213]

Sexual history polygraph examination is most effective when initiated within the first year of treatment to assist clients with treatment engagement and progress.[214] The CST shall utilize the sexual history polygraph examination process as part of treatment planning as indicated in Section 3.165 I. 2., and as one clinical indicator to assess treatment progress as identified in Section 3.160 M, when clinically appropriate. For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I.2 to determine how to respond.

*Discussion: The use of the polygraph examination combined with the sexual history documentation prepared by the client as part of the group process underscores the*

---

[212] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[213] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[214] Konopasek, J.E. (2015). Expeditious Disclosure of Sexual History via Polygraph Testing: Treatment Outcome and Sex Offense Recidivism. *Journal of Offender Rehabilitation, 54(3),* 194-211.



CDOC/Nelson_00313

*SOMB's expectation for honesty and compliance from clients who have agreed to participate in supervision and treatment.*

A. The treatment provider shall ensure that the client has completed a written sexual history disclosure using the SOMB Sexual Behavior Disclosure Packet (see Appendix P) prior to the examination date. A sexual history polygraph examination should not be conducted until the client has written his/her sexual history and reviewed it in their treatment program. The treatment provider shall ensure that the polygraph examiner has access to a copy of the client's SOMB Sexual Behavior Disclosure Packet (see Appendix P) prior to or at the time of the exam. If the packet is not received by the time of the examination appointment, the examiner shall have the discretion of administering a sexual history polygraph examination or another type of examination. For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

*Discussion: Proper polygraph preparation by the client involves the thorough review of recent and past behaviors. If this preparation has not been completed, the treatment provider should consult with the examiner prior to an exam occurring. Clients should be prepared to be open and honest with the polygraph examiner as the first step of client accountability and community safety. Effective preparation has been shown to improve a client's ability to resolve questions and issues of concern.*

B. The sexual history polygraph examination process* shall cover the following areas:

   1. Sexual contact with underage persons (persons younger than age 15 while the client is age 18 or older);

   2. Sexual contact with relatives whether by blood, marriage, or adoption, or where a relationship has the appearance of a family relationship (a dating or live-in relationship exists with the person(s) natural, step or adoptive parent);

   3. Use of violence to engage in sexual contact including physical restraint and threats of harm or violence toward a victim or victim's family members or pets, through use of a weapon, or through verbal/non-verbal means; and

   4. Sexual offenses (including touching or peeping) against persons who appeared to be asleep, were drugged, intoxicated or unconscious, or were mentally/physically helpless or incapacitated.

   *For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

C. At the discretion of the CST, additional polygraph assessment may be necessary to explore the client's history of involvement in other paraphilias (e.g., internet-facilitated sexual offending including use of child sexual abuse images) including



CDOC/Nelson_00314

sexually compulsive behaviors, other illegal, abusive or harmful sexual activities, or unlawful sexual behaviors.

*Discussion: CST members should consult with the examiner regarding addressing the client's sexual history polygraph examination requirements in a series of narrowly focused examinations (e.g., single issue exam) instead of broader examination methods (e.g., multi-issue exam). The final decision related to the method for the sex history exam is made by the polygraph examiner.*

D. The CST shall consider utilizing relevant questions that ask the female client if she has helped or planned with anyone to commit a sexual offense, either against a minor-aged person, or a forcible sex act against anyone. Another area of consideration is whether she has been present when anyone has committed an illegal sex act. These questions should be covered in the female client's sex history exam, and can also be utilized during a monitoring polygraph exam. For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

*Discussion:* Problematic and concerning behaviors by female clients may not be detected or covered in the typical sex history questioning.

E. The CST, including the polygraph examiner, should convene a staffing if a client does not verify his/her sexual history via no significant reactions (indicative of non-deception) on polygraph results. The purpose of the staffing should be to identify how to address this issue in treatment and supervision planning, including any steps necessary to support the client in successfully completing the sexual history disclosure and polygraph examination process. For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

F. Under certain circumstances, the CST can waive the SOMB requirements for fully resolved sexual history polygraph examination results – such as when a client has already made substantial disclosures in all areas of inquiry and when additional information is unlikely to more fully inform the community supervision team about risk level, sexual deviancy or compulsivity patterns, and related treatment needs. For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

G. Sexual history polygraph examinations should generally be delayed for clients who are denying significant aspects of the instant offense, including any substantial discrepancies between the victim's and client's account of the abuse (see Section 3.500 regarding managing clients in denial). Proper procedure dictates that denial surrounding the details of the instant offense be satisfactorily resolved before



CDOC/Nelson_00315

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

proceeding to a more general sexual history polygraph. However, when history examinations do occur prior to resolving the index offense, test questions shall exclude reference to the victim(s) of the instant offense.

## 6.014 Maintenance/Monitoring Polygraph Examination

**A maintenance exam** thoroughly assesses, either periodically or randomly, the client's compliance with any of the designated terms and conditions of probation, parole, and treatment rules.[215]

**A sex offense monitoring exam** explores the possibility the client may have been involved in unlawful sexual behaviors including a sexual re-offense during a specified period of time. Other relevant questions dealing with behaviors related to probation and treatment compliance should not be included.[216]

*Discussion: Maintenance/monitoring exam questions can be covered on the same exam, however, the examiner should consider saliency of questions covered if utilizing the same exam.*

Maintenance/monitoring polygraph examinations shall be employed to periodically assess the client's honesty with community supervision team members and compliance with supervision and treatment. Maintenance/monitoring polygraph examinations shall be implemented every three to six months, starting within the first 90 days of treatment and then periodically thereafter. A minimum of two maintenance/monitoring polygraphs shall occur on an annual basis, except as allowed by this Section and Section 5.050, and can be completed more frequently based on the client's risk and need. Maintenance/monitoring polygraphs shall be employed more frequently with those clients who present as high-risk, have previously unresolved examination results, or may benefit from more active monitoring.

The CST shall regularly assess the ongoing use of maintenance/monitoring polygraphs, and may unanimously elect to adjust the use of maintenance/monitoring polygraphs based on all clinical indicators of a client's risk and need, which may include prior polygraph results. In the case of a client who consistently exhibits as lower risk based on such clinical indicators, the CST may decrease the frequency of the maintenance exams to 9 months and monitoring exams to 1 year.[217] In cases where only monitoring exams are being used on an annual basis, maintenance exams may still be employed on an as-needed basis to address specific identified supervision and treatment risk

---

[215] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[216] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[217] Note the different timeframes for maintenance (9 months) and monitoring (1 year) exams. The CST can use these timeframes but must address these issues separately during the exam if timeframes are going to be between 9 months and 1 year.



CDOC/Nelson_00316

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

concerns, but it is not appropriate to conduct maintenance exams covering time periods longer than 9 months.

*Discussion: The determination of whether or not a client is low risk should be based on all clinical indicators which demonstrate a reduction in risk behavior. This may include polygraph results with no significant reactions (indicative of non-deception) over a consistent period of time, as well as continued amenability and cooperation with treatment, supervision and polygraph examinations.*

*Discussion:* The maintenance/monitoring polygraph conducted in the absence of any new allegations or incidents of concern may be an effective deterrent to high risk or non-compliant behavior.[218] *The use of polygraph may reduce involvement in ongoing high risk behaviors, and improve treatment and supervision compliance.[219] In addition, the expectation of a polygraph exam assists clients in avoiding or controlling high risk behaviors.[220] For this reason, community supervision team members should consider the possible deterrent benefits of randomly scheduled maintenance/monitoring exams for clients.*

A.  Maintenance/monitoring polygraph examinations shall cover a wide variety of sexual behaviors and compliance issues that may be related to victim selection, grooming behaviors, deviancy activities or high-risk behaviors. Maintenance/ monitoring polygraph examinations shall prioritize the assessment and monitoring of the client's involvement in any non-compliance, high-risk, and deviancy behaviors that may change over time. Information obtained from these exams may signal an increase in risk level prior to re-offending if these behaviors were present, or a decrease in risk if they were absent. Narrowing the scope of maintenance/monitoring examinations can sometimes be helpful to address concerns about possible re-offending, and may be useful to resolve the concerns of the community supervision team. The purpose of maintenance/monitoring exams is to identify risk behavior prior to sexual reoffending.

*Discussion: It is generally understood in testing sciences that broader screening examinations, regarding multiple or mixed issues, offer greater screening utility through sensitivity to a broader range of possible concerns, but these tests can slightly diminish validity. More narrowly focused tests offer greater diagnostic specificity to support action or intervention in response to known incidents or specific allegations, and have greater validity. CST members should consult with the examiner regarding the type of monitoring/maintenance exam, and the final decision regarding the type of exam is made by the examiner.[221]*

---

[218] Buttars, A., Huss, T. & Brack, C. (2016). An analysis of an intensive supervision program for sex offenders using propensity scores. *Journal of Offender Rehabilitation, 55(1)*, 61-68; Spruin et al. (2018).

[219] Grubin & Madsen (2006); Spruin et al. (2018).

[220] Spruin et al. (2018).

[221] National Research Council (2003). *The Polygraph and Lie Detection.* Washington, DC: National Academies Press. Retrieved from: www.nap.edu/openbook.php?isbn=0309084369.



CDOC/Nelson_00317

C.  Maintenance/monitoring polygraph testing shall be based upon the requirements of the Standards as outlined in this section, including the client's risk and need. The timing of other polygraph testing, such as sexual history or instant offense exams, shall not be a factor in considering when to complete maintenance/monitoring exams. The CST may increase the frequency of maintenance/monitoring testing if the client's sexual history disclosure is unresolved.

## 6.015 Specific Issue Polygraph Examination

Specific issue polygraph examinations assess the details of a client's involvement in a known or alleged incident, or to help resolve any discrepancies or inconsistencies in the client's account of a known incident or allegation.

The CST shall not conduct specific issue polygraph examinations on active criminal investigations, unless by agreement with the investigators.

## 6.016 Child Contact Screen Polygraph Examination

Child Contact Screen (CCS) polygraph examinations shall be used to assist the community supervision team in making recommendations about contact with the client's own children who are not already known to be victims or siblings of victims. The CCS polygraph shall occur prior to the completion of the child contact Screen (pursuant to Standard 5.700). This examination is conducted in the absence of known or alleged offenses against the client's own children, and is conducted for the purpose of gathering information to assist in the assessment of the client's potential risk to offend against his/her own children. For clients who refuse to answer incriminating sexual offense history questions, including incriminating sexual offense history polygraph questions, providers shall refer to Standard 3.160 I. 2 to determine how to respond.

## 6.020 Communication with the Client

Informing test subjects of potential areas of inquiry is a generally accepted practice by CST members. However, the CST shall not advise clients of specific test questions prior to the scheduled appointment. The CST shall inform the client regarding the type of examination.

*Discussion: Discussing potential sanctions before or during the polygraph exam process, by any CST members, can have a negative impact on the exam results and should be avoided.*



CDOC/Nelson_00318

## 6.021 Communication with the Examiner

CST members shall discuss and collaborate with the examiner on the type of exam to be administered as well as any specific areas of concern. The examiner shall notify the CST, if known, when a polygraph examination is scheduled, and request needed information based upon the type of exam to be administered. The CST should provide supporting documentation related to the areas of concern, if available and appropriate.

## 6.022 Examiner Responsibility for Test Questions

The examiner shall make the final determination of questions used, and determine whether to administer a broader or more narrowly focused examination within the scope of the requested polygraph exam. The examiner shall note the reasons for the change in focus of the examination in the exam report, if such a change is made.

## 6.030 Follow-up Examinations

If the examination has unresolved responses to any test questions, communication between CST members shall occur to determine the best course of action, including whether or not to do a follow-up exam, the timeframe for any follow-up exam, and the areas of focus for any potential follow-up exam (See Section 5.600).

The CST should prioritize the investigation of more recent behaviors when evaluating the client's present stability or dynamic risk level. The CST should generally require that all test questions and all-time periods are satisfactorily resolved before moving on to another maintenance/monitoring exam with different questions or time-frames (See Section 5.600).

Per the APA model policy, the examiner shall discuss with the CST the use of the successive hurdles approach to polygraph to maximize both the informational efficiency and sensitivity of multiple or mixed-issue screening polygraphs, and the diagnostic efficiency and specificity of specific issue exams. Follow-up examinations should utilize a single-issue technique whenever increased validity is needed to resolve an issue.[222]

*Discussion: A successive hurdles approach may result in a focus on more concerning risk behavior and no longer testing on less serious risk factors that can be verified through other clinical indicators. It is not necessary to resolve all issues in follow-up maintenance/monitoring exams, but if the CST believes it important to return to a previously unresolved issue at a later date, timeframe parameters outlined in Section 6.013 must be followed.*

---

[222] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing*. [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org. For more information on the successive hurdles approach, see the APA Model Policy.



CDOC/Nelson_00319

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

A. Timeframes for follow-up examination shall be based on all clinical indicators of risk, need, and protective factors. Follow-up maintenance/monitoring exams should occur more frequently than the minimum required timeframe for such exams, and it is recommended that it occur within 60 days of the initial examination (see Section 5.630 and 5.655). The timeframe for testing shall be prioritized based on the client's level of risk, and can be adjusted based upon the client's preparedness to address and resolve any remaining issues of concern.

B. Resolution of remaining concerns upon follow-up testing shall be regarded as satisfactory resolution of the earlier test results.

*Discussion: The follow-up exam may cover the same timeframe as the unresolved test, or it may extend beyond the original timeframe to include the time lapse between the original exam and the follow-up. When scheduling the next maintenance exam, it is important to include timeframes not accounted for in previous testing. As outlined in Section 6.013, it is still the responsibility of the CST to ensure a minimum of 2 exams per year.*

C. In most cases it is recommended that the initial follow-up examinations be completed with the same examiner, but the CST can change examiners for later follow-up examinations, if appropriate. If a change in examiner takes place, the CST shall provide the results of the unresolved exams to the new examiner.

*Discussion: Non-deceptive test results are considered conclusive and the issue(s) under investigation shall be considered satisfactorily resolved. However, all clinical indicators of risk, need, and protective factors should be considered, including polygraph results.* Non-deceptive test results alone do not ensure safety on the part of the client, nor should they automatically result in reduced monitoring on the part of the community supervision team.

## 6.032 Supporting client accountability and addressing polygraph results

The CST, after receiving input from the polygraph examiner, shall review the results of polygraph exams and share relevant information in order to respond to the exam with the client. The CST should provide a consistent message to assist the client in addressing any unresolved polygraph issues.

## 6.033 Technical expertise of the examiner

Questions regarding the technical aspects of the polygraph shall be referred to the polygraph examiner. When any team member has difficulty understanding or interpreting written polygraph reports or results, he or she shall contact the polygraph examiner for clarification on technical questions, and refrain from interpreting polygraph results beyond what is contained in the report. Clients should discuss any



CDOC/Nelson_00320

questions or concerns related to the polygraph exam with the CST. If the CST is unable to provide the needed information, the CST may contact the polygraph examiner for clarification on the client's behalf.223

If the supervising officer and/or treatment provider has questions regarding information contained in the written polygraph report, they may request that the polygraph examiner review the audio and video recording of the exam to confirm the information provided. In addition, the supervising officer and/or treatment provider may also request a copy of the recording for review. If the client has questions regarding information contained in the written polygraph report, the client should discuss the questions with the supervising officer and treatment provider in an attempt to resolve them. The supervising officer and/or treatment provider may request a review of the video, as described above, on the client's behalf.

*Discussion: While the CST may consult with the polygraph examiner regarding technical aspects of the polygraph, it is not the polygraph examiner's role to recommend treatment or supervision interventions.*

## 6.100 Adherence to recognized standards

In addition to the SOMB Standards, polygraph examiners shall adhere to the established ethics, standards, examination techniques, and practices of the American Polygraph Association (APA) for Post-Conviction Client Testing (PCSOT), and the American Society for Testing and Materials (ASTM).

## 6.110 Equipment and instrumentation

Examiners shall use a computerized polygraph system consisting of five or more channel polygraph instrument that will simultaneously record the physiological phenomena of abdominal and thoracic respiration, electro-dermal activity, changes in cardiovascular activity, and additional component sensors to monitor and record in-test behavior.

## 6.120 Time allotted for examination

Each examination (including the pre-test, in-test, and post-test phases) shall be scheduled for a minimum of 90 minutes in duration. Examiners shall not conduct more than five post-conviction examinations per day.

---

223 American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org. The APA Model Policy (11.1.2) states, "Following the completion of the posttest review, examiners should not communicate with the examinee or examinee's family members regarding the examination results except in the context of a formal case staffing."



CDOC/Nelson_00321

*Discussion: Time periods for polygraph examinations may vary depending upon the type of exam being conducted and the individual being tested. Some exams may last less than 90 minutes and others may exceed 90 minutes, however, all exams shall be scheduled for a minimum of 90 minutes.*

## 6.130 Potential conflict of interest

In order to avoid a conflict of interest with an in-house polygraph examiner, the integrity of the distinct roles/perspectives of the CST must be preserved. The polygraph examiner and therapist or supervising officer must never be the same person. In community settings, the client shall not be mandated to test with the in-house examiner.

## 6.140 Authorization and release

The examiner shall obtain the client's agreement, in writing or on the audio/video recording, to a standard waiver/release statement. The language of the statement shall minimally include the client's voluntary consent to take the test, that all information and results will be released to professional members of the community supervision team, an advisement that admission of involvement in unlawful activities will not be concealed from authorities, and a statement regarding the requirement for audio/video recording of each examination.

For clients with a developmental disability, the examiner shall obtain the written agreement of the client with a developmental disability, and if applicable, the legal guardian, for participation in the polygraph examination and the release of information authorization.

*Discussion: Polygraph examiners are not mandatory child abuse reporters by statute; this includes polygraph examiners with clinical training. All members of the community supervision team who are mandatory child abuse reporters are responsible for assuring the timely and accurate reporting of child abuse to the appropriate authorities.*

## 6.141 Client background information

Prior to beginning the examination, the examiner shall elicit relevant personal information from the client consisting of brief personal and demographic background information, case background information, and medical/psychiatric health information (including medications) pertaining to the client's suitability for polygraph testing (see Section 6.210 regarding determination of suitability for testing).



CDOC/Nelson_00322

**6.142 Review of testing procedures**

The testing process shall be explained to the client, including an explanation of the instrumentation used.

**6.143 Pre-test interview**

The examiner shall conduct a thorough pre-test interview, including a detailed discussion regarding areas of concern (see Section 6.021 for CST communication to the examiner regarding areas of concern).

**6.144 Test questions**

Before proceeding to the in-test phase of an examination, the examiner shall review and explain all test questions to the client. The examiner shall not proceed until satisfied with the client's understanding of all test questions.

A.  Question construction shall be:

1.  Simple, direct, easily understood by the examinee, and tailored to the client;

2.  Behaviorally descriptive of the client's involvement in an issue of concern

    *Discussion: Questions about knowledge, truthfulness, or another person's behavior are considered less desirable but may be utilized;*

3.  Time limited (date of incident or timeframe);

4.  Absent of assumptions about guilt or deception;

5.  Free of legal terms and jargon;

6.  Avoid the use of mental state or motivational terminology.

B.  While the community supervision team members shall communicate all issues of concern to the examiner in advance of the examination date, the exact language of the test questions shall be determined by the examiner at the time of the examination (see Section 6.022 for more information).

**6.145 Number of test charts/presentations**

A minimum of three primary test charts/presentations shall be administered on the exam issue(s).



CDOC/Nelson_00323

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### 6.146 Post-test review

The examiner shall review preliminary test results, if available, with the client. Clients shall be given the opportunity to explain or resolve any reactions or inconsistencies.

### 6.147 Examination recording

Recording (audio and video) of polygraph examinations shall be required. Audio and video recording of the entire examination and the written report shall be maintained for a minimum of three years from the date of the examination. [224]

### 6.150 Examination results

All testing data shall be hand scored by the examiner. Computerized scoring algorithms may be used for comparative purposes and quality assurance in the field. The computer algorithm shall never be the sole determining factor in any examination.

### 6.151 Test scoring results [225]

The examiner shall render an opinion based on an empirically-supported scoring technique regarding the client's reactions to each test question:

A. No significant reactions, indicative of non-deception;

B. Significant reactions, indicative of deception;

C. No opinion/inconclusive;

D. The examiners shall note in the examination report and communicate with the CST regarding suspected attempts to manipulate the test results.

### 6.152 Prohibition against mixed results

The examiner shall not conclude the client has significant reactions, indicative of deception in response to one or more test questions and no significant reactions, indicative of non-deception in response to other test questions within the same examination. [226]

---

[224] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[225] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[226] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.



CDOC/Nelson_00324

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**6.160 Examination report**

The examiner shall issue a written report to the supervising officer and treatment provider within fourteen days of the examination. The report shall include factual and objective accounts of the pertinent information developed during the examination, including statements made by the examinee during the pre-test and post-test interviews.

*Discussion: If there are any disclosures during the polygraph exam related to violations of the treatment contract or the terms and conditions of supervision, or of a previously unknown sexual assault victim that create a significant risk either to the community or client, then the examiner should contact the supervising officer and treatment provider as soon as possible and prior to completing the written report.*

**6.161 Content of the examination report**

All polygraph examination written reports shall include the following information:

**A.** Date of examination;

**B.** Beginning and ending times of examination;

**C.** Reason for examination;

**D.** Referring or requesting agents/agencies (supervision officer and treatment provider);

**E.** Name of client;

**F.** Location of client in the criminal justice system (probation, parole, etc.);

**G.** Case background (instant offense and conviction);

**H.** Any pertinent information obtained outside the exam (collateral information if available);

**I.** Brief demographic information (marital status, children, living arrangements, occupation, employment status, etc.);

**J.** Statement attesting to the client's suitability for polygraph testing (medical/psychiatric/developmental);



CDOC/Nelson_00325

**K.** Date of last post-conviction examination (if known);

**L.** Summary of pre-test and post-test interviews, including disclosures or other relevant information provided by the client;

**M.** Examination questions and answers;

**N.** Examination results;

**O.** Reasons for inability to complete exam (if applicable);

**P.** Any additional information deemed relevant by the polygraph examiner (e.g., behavioral observations or verbal statements).[227]

## 6.162 Raw data and numerical scores

All numerical and computer scores shall be considered raw data and therefore shall not be disclosed in written examination reports.[228]

## 6.163 Information released only to professionals

Written polygraph reports and related work products shall be released only to the supervising officer and treatment provider, the court, parole board or other releasing agency, or other professionals as directed by the supervising officer and treatment provider.[229]
*Discussion: In order to ensure that the written polygraph report can only be released by the examiner, a statement of sole proprietorship should be included with the report.*

## 6.170 Peer reviews

The examiner shall seek peer review of at least two examinations per year using the protocol. Peer reviews shall consist of a systematic review of the examination report, test data, test questions, scored results, computer score (if available), audio/video recording (upon request), and collateral information. The purpose of the peer review shall be to facilitate a second professional opinion regarding a particular examination,

---

[227] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[228] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.

[229] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.



CDOC/Nelson_00326

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

to gain professional consensus whenever possible, and to formulate recommendations for the community supervision team.

## 6.171 Quality assurance reviews

The examiner is required to submit quality assurance reviews using the protocol form as part of the application and reapplication process (for more information, see Section 4.100).

## 6.172 Quality control reviews

*When a quality control review is requested by the supervising officer or treatment provider, the examiner shall provide the required exam information to the polygraph examiner who will complete the quality control review.*

Discussion: Quality control reviews may be initiated in response to a variety of circumstances, including but not limited to, when separate examinations yield differing test results regarding the same issue(s) and/or time period. This review would then be completed by the two examiners whose examinations yielded differing results. The purpose of this review is to clarify the reasons for the differing test results and formulate a recommendation for the community supervision team. If consensus cannot be reached, the team shall consult with a third, independent, SOMB listed full operating level polygraph examiner, agreed upon by both polygraph examiners, to review the conflicting information and offer an opinion regarding the issue. If differences in test results remain unresolved, both examinations shall be set aside and a new polygraph examination shall be conducted. Whenever consensus cannot be reached, the community supervision team must err on the side of community safety when considering their response. [230]

*Discussion: If a client would like to initiate a quality control review, the client must first discuss the concern with the supervising officer and treatment provider in an attempt to resolve the concern within the context of a case staffing. If, after having reported the concern to the supervising officer and treatment provider, and attempting to resolve the concern, the client still wishes to proceed with a quality control review, then the client may contract with an SOMB listed full operating level polygraph examiner to complete the review. The client is responsible for all costs associated with the quality control review in such circumstances.*

---

[230] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.



CDOC/Nelson_00327

### 6.173 Selection of the reviewing examiner

When initiating a quality control review, the supervising officer and treatment provider shall contact the original examiner and, together with the original examiner, select an independent, full-operating level polygraph examiner to complete an objective peer review.

The reviewing examiner shall contact the original examiner with any questions and feedback, and shall complete the quality control review and the one-page Quality Control Summary Report together with the original examiner.

*Discussion: It should not be assumed that a reviewer or reviewers present more expertise than the original examiner. Studies have found that results obtained by original examiners have outperformed those of subsequent reviewers.[231] Quality control reviews serve only to offer an additional professional opinion to further advise community supervision team members regarding a polygraph test whose decisions may be affected by the information and results obtained.*

### 6.174 Conclusions from the quality control review

The polygraph examiner shall complete the one-page Quality Control Summary Report, and the supervision officer and treatment provider shall include the Report in the client's treatment and supervision files. Quality control reviewers shall refrain from making global or generalized conclusions regarding an examiner's work or competence (which cannot be done based upon a single examination). If the original results are not endorsed by the reviewer, a specific empirical flaw must be identified, and the reviewing examiner shall limit professional opinions to the following conclusions:

A. Examination is supported - results shall be accepted;

B. Examination is not supported - results shall be set aside;

   *Discussion: Setting aside an examination result does not include removal of the examination report from the client's supervision and treatment files, but should include the addition of documentation regarding the community supervision team's response.*

D. Examination is supported but qualified by identifiable empirical limitations - results may be set aside or accepted with reasonable caution. Such qualifying limitations may include identifiable empirical limitations pertaining to client suitability, data quality,

---

[231] Horvath, F. S. & Reid, J. E. (1971). The reliability of polygraph examiner diagnosis of truth and deception. The Journal of Criminal Law, 62(2), 276 – 281; Kokish, R. (2003). The current role of post-conviction sex offender polygraph testing in sex offender treatment. *Journal of Child Sexual Abuse, 12(3-4),* 175-194.; Raskin, D. C., & Honts, C. R. (2001). The comparison question test. In M. Kleiner (Ed.), *Handbook of polygraph testing* (pp. 1-47). New York: Academic Press.



CDOC/Nelson_00328

and clarity of the issue/s under investigation, and are often noted by the original examiner in the examination report.

## 6.200 Suitability for testing

The supervising officer and treatment provider shall address suitability for testing related to issues such as severe medical, psychiatric, or developmental conditions as prescribed in Section 5.610. The supervising officer and treatment provider shall consult with the examiner before deciding whether to employ polygraph testing where there are questions related to suitability for testing. The CST shall not advise a client to discontinue taking prescriptions as directed by a medical or psychiatric professional as part of the assessment of suitability for testing.

## 6.210 Determination of suitability for testing

Polygraph examiners shall utilize the American Polygraph Association Suitability Criteria (see Appendix K-2) in making decisions related to suitability for testing.[232] Polygraph examiners shall not test clients who present as clearly unsuitable for polygraph testing at the time of the examination. The CST shall periodically review each client's suitability for polygraph testing. In cases where the client is determined to be unsuitable for polygraph testing, the CST shall consider other forms of behavioral monitoring.

## 6.211 Sensitivity to suitability considerations

If the CST determines that it is appropriate to use a polygraph examination with a client who presents with suitability considerations, the examiner shall conduct the examination in a manner that is sensitive to the client's physical, mental, or emotional condition. The examiner shall note in the examination report those conditions that may have affected the client's suitability for testing, and indicate the test results as "qualified" and to be viewed with caution

*Discussion: In this context, "qualified" means that the test results may not have the same level of validity as test results that are not complicated by suitability considerations.*

---

[232] American Polygraph Association (2016). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic version] Retrieved 11.22.2016, from http://www.polygraph.org.; American Polygraph Association (2018). *Model Policy for Post-Conviction Sex Offender Testing.* [Electronic Version] Retrieved 11.22.2019, from

https://apoa.memberclicks.net/assets/docs/Misc.Docs/PCSOT_Model_Policy_March_2018%20.pdf.



CDOC/Nelson_00329

**6.220 Language barriers**

The need for language translation, including both foreign languages and sign languages, shall be assessed by the CST on a case-by-case basis.

*Discussion: Polygraph examinations completed with the aid of a language interpreter should be regarded as "qualified" and the test results should be viewed with caution.*

**6.221 Selection of interpreters**

The polygraph examiner shall utilize a court certified interpreter, whenever possible. It is important that idiomatic language usage be done accurately and consistently across each successive test chart. Client's relatives or friends shall not serve as interpreters for polygraph examinations. The examiner shall inform the interpreter in advance about the process of the polygraph test. The examiner shall obtain from the interpreter a written translation, including a mirror translation, of each question presented during the in-test phase of an examination. This translation shall be prepared prior to the in-test phase and shall be maintained as part of the polygraph examination record.ch

**6.230 Cultural awareness**

Polygraph examiners shall be sensitive to ethnic or cultural characteristics when conducting examinations. Polygraph examiners shall attempt to elicit information regarding ethnic or cultural characteristics in advance of the examination date and shall conduct the examination in a manner that is sensitive to those ethnic or cultural characteristics.



CDOC/Nelson_00330

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Research Citations

For the following Standards: 6.000, 6.010-6.013, 6.030-6.033, 6.147, 6.151, 6.152, 6.161-6.173, and 6.210-6.230.

Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revisions process regardless of whether it supported the standard revision or not. This research was then incorporated into the revisions and presented to the SOMB for discussion and a public comment period, allowing for stakeholder review of research incorporated, before being ratified by the Board on the aforementioned date. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender

For the following Standards: 6.002, 6.014, 6.015, 6.020-6.022, 6.100-6.146, 6.150, 6.160, 6.174, and 6.200

The Staff Researcher did a search for research applicable to the revisions being discussed, along with a solicitation for research from members of the Board's Committees and members of the public. Research was not found applicable to the revisions being discussed, so in absence of research, the Committee moved forward with evaluating the revisions based on best practices, statutory requirements, professional association guidelines, and the professional expertise of the members of the Committees and the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00331

# 7.000 Continuity of Care and Information Sharing

Continuity of care is the process of delivering seamless service through integration, coordination and the sharing of information between MDT/CST members, including treatment providers. Due to the length of time many clients may be involved in treatment, the likelihood of changing providers is increased, resulting in additional challenges to continuity of care and information sharing. In an effort to maintain protective factors and reduce negative impacts to the client, it is important for all members of the current treatment team (MDT/CST) to collaborate with one another to avoid disruption to the continuity of care, keeping in mind continuity of care pertains to those clients beginning treatment, those returning to treatment, as well as those in aftercare programs. Continuity of care values the progress a client has achieved in treatment and supervision, and increases the client's investment in treatment by aligning services with individual needs.

**7.010  Value and benefit of continuity of care**

    A.  Continuity increases a client's investment in treatment and supervision, and leads to improved outcomes.

    B.  Continuity values and recognizes progress that has been achieved.

    C.  Continuity emphasizes the value of ongoing assessment of current needs.

    D.  Continuity prevents unwarranted repetition of services.

    E.  Continuity contributes to rapport building and aids in the therapeutic alliance.

**7.020**  Members of the MDT/CST should prioritize continuity of care through collaboration with past and present service providers. Examples include, but are not limited to, a client being sentenced to the Department of Corrections after a period of community supervision, and transitions between judicial districts.

**7.030**  Upon initiating services with a client, the MDT/CST should determine how to ensure continuity.

    A.  Treatment Providers shall obtain signed releases and request previous treatment records. [233]

---

[233] Colorado Revised Statute (2020) 12-245-220. Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the person to whom the knowledge relates.



CDOC/Nelson_00332

B. Treatment Providers shall have a structured process to assess current treatment needs. This process shall incorporate past records when available; however, the absence of records does not eliminate the need to assess current treatment needs.

C. Treatment providers and evaluators shall make every reasonable effort to identify and obtain past treatment records. In the absence of such records, it is the responsibility of the Treatment Provider to conduct a thorough and collaborative treatment review with the client, to determine what treatment has been completed, what components of treatment need additional focus, and what components of treatment have not yet been completed. *See Appendix F: Sex Offense-Specific Intake Review for Clients Who Have Been in Prior Treatment*, for an example.

   *Discussion: Treatment decisions shall be based on individualized risks, needs and responsivity factors, and requirements to repeat previously completed work (e.g. non-deceptive polygraph examination results, completed treatment components) should only be required with documented rationale for why repetition is needed.*

D. Treatment Providers shall use this information to determine current treatment needs and as a basis for initiating communication with MDT/CST members regarding treatment needs.

E. Other members of the MDT/CST (including polygraph examiners and supervising officers) should communicate with previous providers to determine service needs; this may include the continuation of services or implementation of new services.

**7.040  MDT/CST members, including treatment providers, should determine the level of service that is needed in relationship to what has already been completed.**

A. Previously approved conditions should not be modified solely based on a change in MDT/CST membership.

B. Treatment Providers shall have an identified system to gather information through collateral reports and client interviews, which gives them the ability to assess the treatment content areas outlined in the Standards. Treatment Providers shall use this information to determine level of progress, treatment areas of continued focus, and treatment areas that have been completed. A sample intake assessment form can be found in *Appendix F: Sex Offense-Specific Intake Review for Clients Who Have Been in Prior Treatment*.

C. Other members of the MDT/CST should have an identified system to gather information, either through collateral reports or client interviews, which gives them the ability to assess the previous services, provisions and level of community access, including 5.700 criteria and contact with minors. MDT/CST members should use this information to determine level of progress, service areas of continued focus, and level of community access.

   *Discussion: This process should include individuals who can provide information related to previous services, community access, previously approved conditions and/or restrictions. This can include, but is not limited to: support persons, family members, professionals, and previous providers. MDT/CST members, including treatment providers, should be mindful of the impacts to clients, family, and the community, when previously approved*



CDOC/Nelson_00333

*conditions are modified. Rationale for such a modification should be documented and connected to risk, need, and responsivity.*

## 7.100  Transition Points and continuity of care consideration

Throughout the continuum of services there may be a variety of transition points. The following sections are intended to provide guidance regarding some transition points, but this is not intended to be an exhaustive list of all possible transition points.

A.  Clients changing treatment providers.

    1.  Clients who have been granted permission for community activities should not have these privileges removed solely based on a change in treatment providers, unless compelling circumstances are present.

    2.  Current treatment providers may continue previously achieved conditions (e.g. contact with children) when such approval is documented by the previous treatment provider, and there is no new information to indicate such condition should be restricted.

    *Discussion:  For example, a previously granted condition, such as visitation with children, may need to be continued in the community with comparable safeguards (e.g. allowing supervised contact with children for an individual who previously had visitation within a structured environment).*

    3.  Members of the MDT/CST should discuss current privileges and activities and determine if these privileges and activities can be maintained in a manner in which community and victim safety is not compromised.

B.  Clients being released from the Department of Corrections (DOC) facilities who have been receiving treatment in the Sex Offender Treatment and Monitoring Program (SOTMP):

    1.  Members of the CST should review basic needs that the client will need to access in the community and develop an interim safety plan to meet these needs while the client is waiting to begin treatment in the community. A sample interim safety plan can be found in *Appendix J: Interim General Movement Safety Plan*.

    2.  Clients who have been granted permission for privileges or activities should not have these privileges or activities removed solely based on a change in living environment, unless compelling circumstances are present.

    3.  Members of the CST should discuss current privileges and activities and determine how these privileges and activities can be maintained in a manner in which community and victim safety is not compromised.

    *Discussion:  For example a previously granted condition such as visitation with children may need to be continued in the community with comparable safeguards (e.g. allowing supervised contact with children for an individual who previously had visitation within a structured environment).*



CDOC/Nelson_00334

4. When a client is released from the DOC SOTMP on parole or accepted into Community Corrections, the SOTMP treatment provider shall send all records, including a discharge summary and Risk Management Plan/Personal Change Contract, which:

   a. Describe the level of cooperation and institutional behavior.

   b. Describe participation in treatment, including treatment objectives addressed, completed, and left to complete.

   c. Suggest specific conditions of parole, including adjunct treatment recommendations.

   d. Indicate ongoing risk and protective factors

   e. Identify any Approved support person(s)

   f. Indicate length of time and engagement in treatment

C. Clients returning to treatment/supervision after a period of time out of treatment/supervision:

   1. Members of the MDT/CST, including the treatment provider and evaluator should have an identified system to gather information through collateral reports and client interviews, which gives them the ability to assess and determine privileges, activities and the level of treatment needs. See Appendix E for a sample matrix for recommendations.

### 7.200  Information Sharing

A. Importance of Information Sharing

   1. Current provider: Treatment Provider shall request all relevant and applicable previous records and will complete an assessment in the absence of such records. See Appendix F for a sample intake assessment.

   2. Previous provider(s): Upon receipt of a signed release of information the Treatment Provider shall release past treatment records to include: Individual Treatment Plan, Progress Summaries, summary of polygraph results, Discharge Summaries, and additional adjunct services provided.

   3. Supervising officer: Facilitate the exchange of relevant and applicable records.

B. Releases of Information

   1. Treatment providers, evaluators, polygraph examiners, and supervising officers shall be aware of and comply with all applicable laws and rules related to confidentiality and



CDOC/Nelson_00335

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

releasing of information (e.g. HIPAA, FERPA, 42 CFR, Mental Health Practice Act, Professional and Ethical codes of conduct).[234]

2. Members of the CST/MDT should also comply with relevant agency policies regarding information sharing.

C. Records

1. Treatment Providers, evaluators, polygraph examiners, and supervising officers should follow applicable policy and statutes related to records retention.

2. Court files are considered a permanent record and some information, such as discharge summaries, may be filed with the courts. By logging such information in the court record, it will remain available to clients and other parties to the case, subject to the court's discretion. It is recommended that Treatment Providers provide this information to ensure the client's involvement in treatment is part of the permanent court record and, if appropriate, may be considered by the court in future decision making.

   a. A court filing document for submitting a recommendation regarding registration for juveniles can be found in the appendices of those Standards.

   b. A court filing document for submitting information regarding participation in treatment for adults can be found in Appendix I.

D. Discharge Summaries

   a. Supervising Officers: Discharge information should be recorded by the supervising officer at the termination of community supervision, and should be available in the file and should include records of:

      1. Treatment progress

      2. Successful or unsuccessful completion of treatment

      3. Auxiliary treatment

      4. Community stability

      5. Residence

      6. Compliance with the supervision plan and conditions of probation/parole/community corrections

---

[234] Colorado Revised Statute (2020) 12-245-220. Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the person to whom the knowledge relates.



CDOC/Nelson_00336

      7.  Most current risk assessment

  b.  Treatment Provider: Discharge information shall be recorded by the Treatment Provider, and shall include, but not be limited to, the following:

      1.  Treatment goals and objectives completed

      2.  Current level of risk, including risk and protective factors

      3.  Successful or unsuccessful completion of treatment

      4.  Aftercare recommendations, if applicable



CDOC/Nelson_00337

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Research Citations

The following Adult Standards and Guidelines in Section 7.000 have research support (the Standards are either footnoted or are supported by a review of the literature): 7.010, 7.030, and 7.200.

All footnotes and research references in these Standards were evaluated by the staff researcher and presented to the SOMB regarding the revisions being discussed. Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revisions process regardless of whether it supported the standard revision or not. This research was then incorporated into the Standards and presented to the SOMB for ratification by the Board. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender

The following Adult Standards and Guidelines in Section 7.000 were revised but do not have research support given their procedural nature: 7.020, 7.040, and 7.100.

The SOMB staff did a search for research applicable to the Standards noted above. Research was not found applicable to these Standards, so in absence of research the Standards are based on best practices procedures, professional association guidelines, and the professional expertise of the members of the Board. Should research become available in the future pertaining to the topic of these Standards it will be evaluated and incorporated, should it be of sound quality.

Top of the Document



CDOC/Nelson_00338

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 8.000 Victim Impact and a Victim Centered Approach

**8.000** Sexual violence is a problem in Colorado. As communities are forced to face the issue of sexual abuse, many efforts are directed towards issues other than the victim who has been violated, the child robbed of their childhood, and the recovery and healing of the victims and their families. Victims can be overlooked as the criminal justice system focuses on the legal issues and the needs of the offender.

These Standards are designed to address the assessment, evaluation, treatment and monitoring of adult sex offenders. In order to accomplish the mission of effective management of adult sexual offenders and eliminating sexual re-offense, professionals must first start with understanding the trauma and suffering of victims. This section provides some information for professionals working with adult sex offenders and juveniles who have committed sexual offenses on the impact of sexual assault and the needs of victims.

In Colorado an estimated 1 in 3 women (36.2%) and 1 in 5 men (17.6%) will experience a sexual assault or attempted sexual assault in their lifetime.[235] Most victims first experience sexual assault as children or adolescents. Sexual assault is the most under reported crime in the United States. Only an estimated 19 – 23% of sexual crimes are reported to law enforcement[236]. Far fewer are prosecuted. Research indicates the younger the victim and the closer the relationship, the less likely a victim will report.[237]

Sexual crimes violate victims. Victims may experience chronic and severe mental and physical health symptoms, as well as social, familial, economic and spiritual harm. These symptoms cross over into all aspects of victims' lives, and victims often face long term impact and continue to struggle for recovery over the course of their lifetimes. Trauma from sexual assault changes the victim's world view, self-perception and sense of power and control. Family members of victims and communities as a whole are also negatively impacted by sexual offenses.

While the effects of sexual assault on victims are unique and may vary over time, common consequences of sexual assault include:

---

[235] Smith, S. G., Basile, K. C., Gilbert, L. K., Merrick, M. T., Patel., N., … Jain, A. (2017*).* National Intimate Partner and Sexual Violence Survey (NISVS): 2010-2012 State Report. *Centers for Disease Control and Prevention.*

[236] Marchetti, C. A. (2012). Regret and police reporting among individuals who have experiences sexual assault. *Journal of the American Psychiatric Nurses Association, 18(1),* 32-39.; Criminal Victimization, 2016 (NCJ 251150). Washington, DC: U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[237] Kilpatick, D., & McCauley, J. (2009). *Understanding National Rape Statistics.* National Resource Center on Domestic Violence; Paige, J. & Thornton, J. (2015). Healing from intrafamilial child sexual abuse: The role of relational processes between survivor and offender. *Children Australia, 40(3),* 242-259; Tjaden, P. & Thonnes, N. (2006). Extent, Nature and Consequences of rape victimization: Findings from the National Violence Against Women Survey. U.S. Department of Justice.



CDOC/Nelson_00339

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

- fear
- anxiety
- hypervigilance
- self-blame
- guilt
- shame
- depression
- anger
- irritability
- avoidance
- intrusive thoughts
- flashbacks
- nightmares and sleeping problems
- panic attacks
- Post-Traumatic Stress Disorder
- dissociative disorders
- physiological effects, such as headaches / chronic pain
- memory impairment
- disordered eating
- sexual behavior problems
- substance abuse
- self-injuring behaviors
- suicidal ideation and attempts
- failure to identify their experience as sexual assault or a crime
- minimization of their experience
- loss of trust
- low self-esteem
- impaired sense of self and identity
- difficulty with and loss of relationships and intimacy
- isolation
- loss of independence
- financial loss
- increased vulnerability to other victimizations

Often victims report significant distress over not being believed and feelings of intense guilt and shame. Many victims and their family members have been subjected by the offender to long term and intentional grooming behaviors. Victim impact is substantially reduced when victims are believed, protected and adequately supported. Acknowledging and addressing the impact to victims can aid in their long-term health and recovery. Recovery and healing of victims is possible and enhanced when teams operate with a victim centered approach.

**8.100** The Community Supervision Team shall operate with a victim centered approach.

A victim centered approach means that the needs and interests of victims require paramount attention by professionals working with sexual offenders. Individuals and programs working with sexual offenders should always have the victim and potential victims in mind. This means a commitment to protecting victims, not re-victimizing, being sensitive to victim issues and responsive to victim needs. A victim centered approach requires an avenue to receive victim input and provide information to victims. This balanced approach has many benefits, including improved treatment and supervision of the offender, increased accountability, enhanced support for victims and a safer community. Collaboration and information sharing enhances the supervision team's ability to maintain a victim centered approach.

Understanding these offenses from the perspective of the victim is important to comprehend the gravity of the offending behavior and see the full picture. Awareness of the impact of sexual assault is necessary for providers to operate with a victim centered approach. Professionals must recognize the harm done to victims, and apply this knowledge, to work effectively with offenders to internalize and demonstrate long term behavioral change. The impact to the victim



CDOC/Nelson_00340

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

informs and guides the decision-making process and assists professionals in prioritizing the safety and needs of victims of sexual crimes.

**8.200** The supervision team should help inform victims regarding the treatment and supervision process and share information on how this process demonstrates the commitment towards victim recovery, community safety and no new victims.

    A. Teams should respect the victims' wishes regarding their level of involvement and also understand that their interest may change over time.

    B. When communicating with victims, teams should consider what information can be shared and explain that not all information can be shared and why.

*Discussion: Teams should discuss what information can and should be shared, taking into account what information is valuable for the victim, for the victim to feel safe, and for the victim to feel that the community as a whole is being protected. Teams have legal and ethical considerations when determining what information is appropriate for sharing with victims and should exercise good professional judgment. Victims are assisted by understanding why decisions are made in the interest of public safety. Even with support systems in place, the criminal justice system is still difficult for victims. Teams can honor and contribute to justice for victims by operating with a victim centered approach.*

    C. Ongoing training regarding sexual victimization is recommended for all supervision team members and required by these standards to be an approved evaluator, polygraph examiner or treatment provider. Teams should (shall for juvenile) include a victim representative on the supervision team to ensure a victim centered approach is being implemented.

*Colorado Statutes and Guidance Pertaining to Victims*

The Colorado Revised Statutes state, "The Sex Offender Management Board shall develop and implement methods of intervention for adult sex offenders, which methods have as a priority the physical and psychological safety of victims and potential victims and which are appropriate to the assessed needs of the particular offender, so long as there is no reduction in the safety of victims and potential victims."[238]

The Colorado Victims' Rights Act (VRA) was passed by the voters in 1992. This Victims' Bill of Rights is part of the Colorado Constitution and ensures that victims have a right to be treated with fairness, respect and dignity and have a right to be heard when relevant informed and present at all critical stages of the criminal justice system. The legislative declaration of the Colorado Revised Statutes states, "The general assembly hereby finds and declares that the full and voluntary cooperation of victims of and witnesses to crimes with state and local law

---

[238] Colorado Revised Statutes (2020) 16-11.7-103 (4) (i) Standards for identification and evaluation of juvenile offenders. The board shall develop, prescribe, and revise, as appropriate, a standard procedure to evaluate and identify juveniles who have committed sexual offenses, including juveniles with developmental disabilities. The procedure shall provide for an evaluation and identification of the juvenile offender and recommend behavior management, monitoring, treatment, and compliance and shall incorporate the concepts of the risk-need-responsivity or another evidence-based correctional model based upon the knowledge that all unlawful sexual behavior poses a risk to the community and that certain juveniles may have the capacity to change their behavior with appropriate intervention and treatment. The board shall develop and implement methods of intervention for juveniles who have committed sexual offenses, which methods have as a priority the physical and psychological safety of victims and potential victims and that are appropriate to the needs of the particular juvenile offender, so long as there is no reduction in the safety of victims and potential victims.



CDOC/Nelson_00341

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

enforcement agencies as to such crimes is imperative for the general effectiveness and well-being of the criminal justice system of this state. It is the intent of this part 3, therefore, to assure that all victims of and witnesses to crimes are honored and protected by law enforcement agencies, prosecutors, and judges in a manner no less vigorous than the protection afforded criminal defendants.[239] (Please see C.R.S. Article 4.1 of Title 24 for a listing of all victims' rights.) All post-sentencing agencies have obligations under the VRA though victims must "opt in" to receive notification after sentencing.[240]

For more information regarding victim considerations in the school environment, please see the SOMB School Resource Guide.[241]

Colorado has one of the most comprehensive statutes pertaining to victims' rights in the nation. Victim services personnel exist in all levels of the criminal justice system, including law enforcement, prosecution, probation, community corrections, Department of Corrections and Division of Youth Corrections.

*Supporting Victims*

The following are common needs of sexual assault victims and ways in which members of the community supervision team can support victims and contribute to their healing and recovery:

Needs:

- Caring, compassionate response
- Physical and psychological safety/protection
- Being believed
- Therapy and other resources
- Opportunities for input
- Information regarding the offender management, supervision and treatment
- Accurate information being provided to the offender's and victim's support systems

---

[239] Colorado Revised Statutes (2020) 24-4.1-301 The general assembly hereby finds and declares that the full and voluntary cooperation of victims of and witnesses to crimes with state and local law enforcement agencies as to such crimes is imperative for the general effectiveness and well-being of the criminal justice system of this state. It is the intent of this part 3, therefore, to assure that all victims of and witnesses to crimes are honored and protected by law enforcement agencies, prosecutors, and judges in a manner no less vigorous than the protection afforded criminal defendants

[240] Colorado Revised Statutes (2020) 24-4.1-302.5 In order to preserve and protect a victim's rights to justice and due process, each victim of a crime has the following rights: (a) The right to be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process; (b) The right to be informed of and present for all critical stages of the criminal justice process as specified in section 24-4.1-302 (2); except that the victim shall have the right to be informed of, without being present for, the critical stages described in section 24-4.1-302 (2)(a), (2)(a.5), (2)(a.7), (2)(e.5), (2)(k.3), (2)(n), (2)(p), (2)(q), and (2)(u); (b.5) Repealed. (b.7) For a victim of a sex offense, the right to be informed of the filing of a petition by the perpetrator of the offense to terminate sex offender registration pursuant to section 16-22-113 (2) and (2.5); (b.9) The right to receive a free copy of the initial incident report from the investigating law enforcement agency; except that the release of a document associated with the investigation is at the discretion of the law enforcement agency based on the status of the case or security and safety concerns in a correctional facility, local jail, or private contract prison as defined in section 17-1-102, C.R.S.

[241] Colorado Revised Statutes (2020) 16-11.7.103 (4) (l) Educational materials. The board, in collaboration with law enforcement agencies, victim advocacy organizations, the department of education, and the department of public safety, shall develop and revise, as appropriate, for use by schools, the statement identified in section 22-1-124, C.R.S., and educational materials regarding general information about adult sex offenders and juveniles who have committed sexual offenses, safety concerns related to such offenders, and other relevant materials. The board shall provide the statement and materials to the department of education, and the department of education shall make the statement and materials available to schools in the state.



CDOC/Nelson_00342

Support:

- Listen to victims and allow them to be heard
- Provide information about team members' roles and responsibilities
- Reassure victims that the abuse was not their fault
- Hold the offender fully accountable
- Validate the victims' experience
- Acknowledge victims' strengths and ability to heal/recover
- Be clear regarding what information can and cannot be shared
- Be willing to repeat information
- Be sensitive to where victims are in their recovery process
- Advocate, as needed, for therapy for victims
  Recognize the impact of the trauma on the victims' behaviors, beliefs and emotions, and how those may be expressed
  Thank victims for reporting and going through the very difficult criminal justice process
- Recognize the importance of how clarification, contact or reunification are implemented (refer to section 5.000)

*Common Victim Concerns and Safety Issues*

- Location of the offender
- The negative impact of the victim encountering the offender in the community, especially in intra-familial cases, such as family functions

- The offender being able to manipulate the CST members in the same ways he/she manipulated the victim and victim's family
- Lack of trust that information regarding the offender's treatment and supervision is being provided
- The conditions of supervision, such as allowing contact with minors
- The offender continuing to deny, minimize or blame the victim for the abuse
- Whether or not the offender is demonstrating engagement in treatment and changing their behavior
- Whether or not the offender is telling the truth, demonstrating honesty through polygraphs or other means, and compliant on supervision
- Whether or not the offender is expressing genuine remorse for the abuse



CDOC/Nelson_00343

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Research Citations

The following Adult Standards and Guidelines in Section 8.000 have research support (the Standards are either footnoted or are supported by a review of the literature or statute): 8.000, 8.100, and 8.200 were supported by a review of the literature but they were not cited. All footnotes and research references in these Standards were evaluated by the staff researcher and presented to the Victim Advocacy Committee regarding the revisions being discussed. Not all research considered directly supported the revisions; however, the research was reviewed in its totality to inform the revisions process regardless of whether it supported the standard revision or not. This research was then incorporated into the Standards and presented to the SOMB for ratification by the Board. The research in these Standards was evaluated based on the quality of the research design and the quality/strength of their findings as it related to the revisions being discussed. The research reviewed and utilized in this revision can be found in the SOMB's online repository at:

https://dcj.colorado.gov/dcj-offices/domestic-violence-and-sex-offender-management/domestic-violence-and-sex-offender

Top of the Document



CDOC/Nelson_00344

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# 9.000 Standards for Plethysmography

### 9.100   Standards of Practice for Plethysmograph Examiners

**9.110** A plethysmograph examiner shall adhere to the "Guidelines for the Use of the Penile Plethysmograph," published by the Association for the Treatment of Sexual Abusers, ATSA Practitioner's Handbook[242] (See Appendix K-1 and K-3) and shall demonstrate competency according to professional standards and conduct plethysmograph examinations in a manner that is consistent with the reasonably accepted standard of practice in the plethysmograph examination community. [243]

**9.120** Plethysmograph examiners shall adhere to the following specific procedures during the administration of each examination:[244]

A. The examiner shall obtain the informed assent of the offender for the plethysmograph examination, and shall inform an offender of the examination methods, how the information will be used, and to whom it will be given. The examiner shall also inform the offender about the nature of the evaluator's relationship with the offender and with the court. The examiner shall respect an offender's right to be fully informed about the examination procedures, and results of the examination should be shared with the offender and any questions clarified;[245]

B. The examinee shall also sign a standard waiver/release of information statement. The language of the statement should be coordinated prior to the plethysmograph examination with the therapist, probation/parole officer, community corrections case manager, or prison treatment provider;[246]

---

[242] Plethysmographic testing measuring physiological changes associated with sexual arousal are also available for female sex offenders.

[243] Association for the Treatment of Sexual Abusers. (2014) ATSA Practice Guidelines For The Assessment, Treatment, And Management Of Male Adult Sexual Abusers.

[244] Association for the Treatment of Sexual Abusers. (2014) ATSA Practice Guidelines For The Assessment, Treatment, And Management Of Male Adult Sexual Abusers.

[245] 12-245-216. Mandatory disclosure of information to clients. (1) Except as otherwise provided in subsection (4) of this section, every licensee, registrant, or certificate holder shall provide the following information in writing to each client during the initial client contact: (a) The name, business address, and business phone number of the licensee, registrant, or certificate holder; (b) (I) An explanation of the levels of regulation applicable to mental health professionals under this article 245 and the differences between licensure, registration, and certification, including the educational, experience, and training requirements applicable to the particular level of regulation; and (II) A listing of any degrees, credentials, certifications, registrations, and licenses held or completed by the licensee, registrant, or certificate holder, including the education, experience, and training the licensee, registrant, or certificate holder was required to satisfy in order to complete the degree, credential, certification, registration, or license; (c) A statement indicating that the practice of licensed or registered persons in the field of psychotherapy is regulated by the division, and an address and telephone number for the board that regulates the licensee, registrant, or certificate holder; (d) A statement indicating that: (I) A client is entitled to receive information about the methods of therapy, the techniques used, the duration of therapy, if known, and the fee structure;

[246] Colorado Revised Statutes (2020) C.R.S. 12-245-220 Disclosure of confidential communications - definitions. (1) A licensee, registrant, or certificate holder shall not disclose, without the consent of the client, any confidential communications made by the client, or advice given to the client, in the course of professional employment. A licensee's, registrant's, or certificate holder's employee or associate, whether clerical or professional, shall not disclose any knowledge of the communications acquired in that capacity. Any person who has participated in any therapy conducted under the supervision of a licensee, registrant, or certificate holder, including group therapy sessions, shall not disclose any knowledge gained during the course of the therapy without the consent of the person to whom the knowledge relates.



CDOC/Nelson_00345

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

C.  The examiner shall elicit relevant biographical and medical history information from the examinee prior to administering the actual plethysmograph examination;

D.  The testing process shall be completely explained to the examinee, including an explanation of the instrumentation used and causes of general nervous tension;

E.  Test results shall be reviewed with the examinee; and

F.  The examiner must have received all pertinent and available case facts within a time frame sufficient to prepare for the examination.

**9.130** Plethysmograph examinations should never be used in isolation. The results must be utilized in conjunction with other evaluative measures or as a part of a treatment program to effectively assess risk.[247]

[Top of the Document](#)

---

[247] Association for the Treatment of Sexual Abusers. (2014) ATSA Practice Guidelines For The Assessment, Treatment, And Management Of Male Adult Sexual Abusers.



CDOC/Nelson_00346

# Appendix A: Sex Offender Management Board Administrative Policies

This appendix is designed for listed treatment providers, evaluators, and polygraph examiners pursuant to section 16-11.7-101-09, C.R.S., to explain the requirements of listing and the process of denial of placement to the list, complaints, and appeal. The SOMB does not have professional licensing authority, but rather statutory authority pursuant to section 16-11.7-101, et. seq. The provisions of these standards constitute the process of the SOMB related to listing, denial of placement, complaints, Standards Compliance Reviews, appeals and other administrative actions.

The Executive Director of the Department of Public Safety may suspend or modify any of these procedures in the interest of justice to avoid irreparable harm to crime victims or to the citizens of Colorado. If the situation warrants, the SOMB may exercise the option of seeking guidance from the Office of the Attorney General for possible legal action.

 LISTING AS A PROVIDER

1. This appendix applies to treatment providers, evaluators, and polygraph examiners who are listed in the following categories:

   a. Associate level provider status
   b. Full Operating level provider status
   c. Clinical Supervisor status
   d. Not currently practicing status

2. Providers not on the SOMB approved provider list, including any provider who is denied placement or removed from the Provider List, shall not provide any sex offense specific services pursuant to statute in Colorado to convicted adult sex offenders or juveniles who have committed sexual offenses. No referral source shall use any provider not on the approved provider list, denied placement or removed from the provider list per 16-11.7-106 C.R.S.

3. Approved providers shall submit data consistent with the SOMB's data collection plan and participate in, and cooperate with, SOMB research projects related to evaluation or implementation of the Standards or sex offender management in Colorado in accordance with sections 16-11.7-103 (4) (d), 16-11.7-103 (4) (h) (II), and 16-11.7-103 (4) (k), C.R.S.

4. Confidentiality of SOMB Files: The following information in the SOMB files, including application materials, for applicants, and individuals on the provider list, is considered confidential and is not available to the public, including listed providers: background investigations, criminal history checks, school transcripts, letters of recommendation, trade secrets, confidential commercial data including applicant forms created for business use, curriculum developed for the business and clinical evaluations, unfounded complaints, Standards Compliance Reviews (SCR) with no founded Standards violations, or any supplemental documentation, and information that, if disclosed, would interfere with the



CDOC/Nelson_00347

deliberative process of the SOMB's Application Review Committee(s) (ARC), and if disclosed to the public would stifle honest participation by the ARC. The Colorado Open Records Act applies to other materials (Section 24-72-201, C.R.S.).

Records related to violations and the outcome of a complaint or a For Cause SCR are part of the Approved Provider's file and can be made available to members of the public upon request through the Colorado Open Records Act (Section 24-72-201, C.R.S.).

5. <u>Period of Compliance</u>: A listed treatment provider or evaluator, who is applying or reapplying, may receive up to one year or as deemed by the Application Review Committee to come into compliance with any Standards. If they are unable to fully comply with the Standards at the time of application, it is incumbent upon the treatment provider or evaluator to submit in writing a plan to come into compliance with the Standards within a specified time period.

6. <u>Grace Period for Renewal</u>: Providers who do not submit an application for renewal of their approved provider status by the date of expiration of their status will have a 30-day grace period in order to submit their application materials without having to start over with an Application One. Failure to submit application materials within 30 days after the date of expiration for approved provider status will require providers to have to begin the application process over by submitting Application One.

7. <u>Eligibility for Future Renewal once Provider Approval has Expired</u>: Providers who allow their approved provider status expire may be considered for return to listing status within 1 year of the expiration of their status. The Application Review Committee will consider whether to reinstate a provider to the approved provider list without having to begin the Application One process over based on factors such as history of listing status, the reason for the expiration of the status, and what work the provider has been doing since the approved provider status ended to remain competent in the field.

A. <u>DENIAL OF PLACEMENT ON THE PROVIDER LIST</u>

The SOMB reserves the right to deny placement on the Provider List to any applicant to be a treatment provider, evaluator, or clinical polygraph examiner under these Standards. Reasons for denial include but are not limited to:

1. The SOMB determines that the applicant does not demonstrate the qualifications required by these ***Standards***;

2. The SOMB determines that the applicant is not in compliance with the ***Standards*** of practice outlined in these ***Standards***;

3. The applicant fails to provide the necessary materials for application as outlined in the application materials and the administrative policies and procedures;

4. The SOMB determines that the applicant exhibits factors (boundaries, impairments, etc.) which renders the applicant unable to treat clients;



CDOC/Nelson_00348

5. The SOMB determines that the results of the background investigation, the references given or any other aspect of the application process are unsatisfactory.

B. APPEAL PROCESS FOR DENIED PLACEMENT, REDUCTION IN APPROVAL STATUS OR ANY SPECIFIC LISTING STATUS ON THE PROVIDER LIST

Any applicant who is denied placement on the Provider List, receives a reduction in approval status or any specific status (e.g., a new listing category, or moving up to a higher provider level) on the Provider List will be supplied with a letter from the Application Review Committee (ARC) outlining the reasons and notifying the applicant of his or her right to appeal to the full SOMB. Appeals will be conducted in the following manner:

1. The applicant/listed provider must submit a request to the SOMB for an appeal in writing within 30 days of the notification of denial of placement or of any specific status on the Provider List to the SOMB.

2. The SOMB appeal process will consider only information that is relevant to the reasons for denial outlined by the ARC in the denial letter. The SOMB will consider the basis for denial or reduction in approval status, as well as information presented by the applicant or provider regarding the denial or reduction in status.

3. Instead of appearing in person at the appeal, the applicant/listed provider may request to participate by alternate electronic means with the SOMB.

4. Appeals will be governed by Section E of this Appendix A.

C. COMPLAINT AGAINST A LISTED PROVIDER

When a complaint is made to the SOMB about a Treatment Provider, Evaluator, or Polygraph Examiner on the Provider List, the complaint shall be submitted online or made in writing to the SOMB and signed by the complainant. Anonymous complaints will be accepted and reviewed in the same manner as all other complaints submitted to the SOMB. The appropriate complaint forms are available on the SOMB website. All complaints against treatment providers and evaluators on the Provider List will be forwarded for investigation and review to DORA pursuant to section 16-11.7-106(7)(a)(I), C.R.S. Concurrently, the SOMB will review and investigate the complaint for potential action pursuant to section 16-11.7-106(7)(b)(I), C.R.S. All complaints against polygraph examiners on the Provider List will not be forwarded to DORA.

Complaints regarding Treatment Providers, Evaluators, and Polygraph Examiners who have never been listed or who were not listed on the Provider List at the time of the complaint, are not appropriate for SOMB intervention. The SOMB will inform complainants that it does not have the authority to intervene in these cases but may refer complaints against Treatment Providers and Evaluators to DORA for further action. Complaints appropriate for SOMB intervention are those complaints against sex offender Treatment Providers, Evaluators, and Polygraph Examiners, who are on the Provider List, or who were on the Provider List at the time of the alleged violation. Complaints against a listed provider regarding actions of unlisted persons under the supervision of that individual, are also appropriate for SOMB intervention. Complaints filed against supervising officers should be sent directly to the agency/entity that employs the



CDOC/Nelson_00349

supervising officer (i.e., Probation, Parole, Human Services, etc.). Information on where to file a complaint against a supervising officer is available on the SOMB website.

Per 16-11.7-106 (7) (b) C.R.S., complaints will be reviewed and investigated in the following manner:

1. All complaints will be subject to an initial administrative review by the staff of the SOMB. This review will determine if the complaint process has been followed using the proper forms available on the SOMB website. Insufficient or improper filings may not be accepted for review and the SOMB staff will provide written notice of the deficiencies to the complainant.

2. SOMB staff will forward complaints to the ARC for review and will notify the complainant in writing of the receipt of the complaint.

   a. If the complaint fails to allege a Standards violation sufficiently, the ARC will notify the complainant in writing.

   b. Determinations under section 2.a. above are final and not subject to appeal.

3. If a complaint sufficiently alleges a Standards violation, ARC's review of the complaint (a process separate from any review contemplated or completed by DORA) may take any of the following actions (please note that these actions may be independent from any action taken by DORA and may or may not be the same as DORA's results):

   a. Determine complaint unfounded, and notify complainant and identified provider in writing.

      OUTCOME: No formal actions will appear on file for this identified provider regarding this complaint.

   b. Request clarifying information from the complainant and/or the identified provider.

   c. Contact the identified provider and complainant to determine if the complaint can be resolved informally through mutual agreement between the identified provider and complainant. Complaints and corrective actions that may be suitable for an offer to the complainant and provider for a mutual agreement may include but are not limited to required release of treatment records with a suitable release, a continuing education class, seeking consultation or supervision, or voluntary relinquishment of provider status, among other. Decisions related to use of mutual agreement will be made on a case-by-case basis. If mutual agreement can be reached as agreed upon by the complainant and provider, the complaint will be determined to be unfounded. The complainant will be notified in writing of the mutual agreement and the complaint will be unfounded. The information that a mutual agreement or the letter containing the terms of the mutual agreement will be available upon request. All inquiries to the SOMB regarding the identified provider will be responded to by disclosing only that the identified provider does not have any founded complaints against him/her (unless there was a prior founded complaint).



CDOC/Nelson_00350

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

OUTCOME: No founded complaint will appear on file for this identified provider regarding this complaint.

d. Request both parties appear before the ARC. Either party may request alternate electronic means with the ARC in lieu of appearing in person. The request to appear electronically must be made at the time of the request by the ARC to appear. Any decision to conduct a hearing is made at the sole discretion of the ARC. If the ARC holds a hearing regarding the complaint, the following procedures apply:

1. Both the complainant and identified provider will be notified in writing of the date, time and place for the hearing.

2. If mutual agreement resolving the complaint can be reached, the complaint will be determined to be unfounded. The complainant and identified provider will be notified in writing that the complaint will be unfounded. As an unfounded complaint, the details of the complaint remain confidential. The information that a mutual agreement or the letter containing the terms of the mutual agreement will be available upon request. All inquiries to the SOMB regarding the identified provider will be responded to by disclosing only that the identified provider does not have any founded complaints against him/her (unless there was a prior founded complaint).

OUTCOME: No founded complaint will appear on file for this identified provider regarding this complaint.

e. Request for SOMB Staff to further investigate the information contained in the complaint either directly or through investigators or consultants.

1. Conclude that a complaint is unfounded and the identified provider is notified of the results of the complaint

OUTCOME: No formal actions will appear on file for this identified provider regarding this complaint.

2. Conclude that a complaint is founded, and the identified provider is notified of the outcome of the complaint, which may include being issued a Letter of Removal from the Provider List. Any founded complaint in one approval category shall result in a review of the individual's other approval categories, and may impact these other approval categories as well (e.g., a founded complaint against an evaluator may impact the individual's treatment provider status as well).

OUTCOME: Referral sources will be notified and the identified provider will be taken off the list either 31 days from the date of issue of the Letter of Removal *OR* following the completion of the appeal process should either party appeal the decision. If the situation warrants, the SOMB may exercise the option of seeking guidance from the Office of the Attorney General for possible legal action.



CDOC/Nelson_00351

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

An appeal of a founded complaint by the ARC may be taken to the SOMB pursuant to Section D of this Appendix A.

D.  <u>APPEAL PROCESS</u>

Any complainant or identified provider who wishes to appeal a finding on a complaint, denial for placement on the Provider List for a specific listing status, the involuntary removal from the Approved Provider List, a reduction in approved listing status, or a Standards Compliance Review with a findings of a Standards violation may appeal the decision to the SOMB. Appeals will be conducted in the following manner:

1.  A request for appeal must be submitted to the SOMB in writing within 30 days of the date of the complaint finding letter.

2.  Both parties will receive notification of the date, time and place of the appeal and the deadline for submission of additional materials. These additional materials must be limited to 10 pages and 25 copies must be received by the SOMB 30 days prior to the hearing. Materials received after the deadline or not prepared according to these instructions will not be reviewed at the appeal.

3.  The SOMB will only consider information specific to the finding outlined by the ARC in the complaint finding letter.

4.  Copies of the complaint, application or standards compliance review materials (subject to redactions or other protections to comply with statutorily contemplated confidentiality concerns) considered by ARC will be provided to the SOMB and the parties at least 30 days prior to the hearing and the parties and the SOMB are expected to make every effort to maintain confidentiality of the materials.

5.  Either party may request alternate electronic means with the SOMB in lieu of appearing in person. The request must be made in writing at the time of the request for the appeal.

6.  Appeals will be scheduled in conjunction with regular SOMB meetings. The appellant must confirm, in writing, their ability to attend the scheduled appeal; failure of the appellant to do so may result in the appeal being dismissed. The SOMB staff and the SOMB chairperson will jointly review requests for a rescheduling of an appeal. Parties will be notified verbally or in writing, as applicable, regarding the decision on their request to reschedule. Requests to reschedule will be reviewed based on reasonable cause.

7.  Either party may bring one representative with them. Appeal hearings (in person or via electronic means) will be 80 minutes long: 20 minutes for a verbal presentation by the complainant; 20 minutes for presentation by the ARC; 20 minutes for the identified provider; and 20 minutes for questions and discussion by the Board. Applicable time periods may be modified upon request, by either party or a SOMB member, followed by a motion by a SOMB member and a vote on the motion.



CDOC/Nelson_00352

8. There must be a quorum of the SOMB to hear an appeal. ARC members count towards establishing a quorum, but must abstain from voting on the appeal per SOMB by-laws.

9. The SOMB will consider appeals in open hearing and audio record the proceedings for the record unless certain material must be considered by the SOMB in executive session pursuant to section 24-6-402 (3) (a) (III), C.R.S. Any vote will occur in open session.

10. The SOMB must vote on the original findings of the ARC. They must vote in one of the following three ways:

    a. Accept the finding of the ARC.
    b. Reject the finding of the ARC.
    c. Modify the finding or sanction of the ARC.

11. The results of the appeal will be documented via letter sent to both parties within 30 days of the date of the appeal hearing.

12. Complaint records will be retained for 20 years per the Division of Criminal Justice Records Retention Policy.

13. The appeal process in Appendix A is the sole SOMB remedy for a provider denied placement on or any specific status on the Provider List, a resolution of a complaint(s), or Standards Compliance Review with a finding of a Standards violation. The decision of the SOMB is final.

Contact information and relevant forms related to Appendix A may be found on the SOMB website at https://www.colorado.gov/pacific/dcj/form/file-complaint-somb.

## F. STANDARDS COMPLIANCE REVIEWS

Implementation of the *Standards and Guidelines* is an important part of the work of the SOMB. Mechanisms to verify compliance with the *Standards and Guidelines* serve as a way of promoting victim safety and the successful assessment, evaluation, and treatment of convicted adult sex offenders or juveniles who have committed sexual offenses.

Inquiries about the Standards and Guidelines may be screened by SOMB program staff using the Standards Compliance Review Criteria (per Application Review Committee Standard Operating Procedure) when providing training and technical assistance (TTA) to Approved Providers.

The purpose of Standard Compliance Reviews (SCR) is to review a provider's compliance with these *Standards and Guidelines*, and to identify innovative and exceptional practices in areas related to offender evaluation, assessment, and treatment. The ARC may conduct a SCR at any time. Once a provider has successfully completed an SCR, the provider will be exempt from random selection for six years.

A. Technical Assistance



CDOC/Nelson_00353

SOMB staff are authorized to answer questions, provide clarification, and provide support pertaining to the application and interpretation of the Standards as needed and applicable, on a case by case basis. SOMB Approved Providers and other individuals who use the Standards and Guidelines are encouraged to contact SOMB staff with questions when technical issues arise.

B.  Standards Compliance Reviews

The Application Review Committee (ARC) is authorized to initiate a Standards Compliance Review (SCR) for an Approved Provider at random, voluntarily or For-Cause under the authority of the SOMB. An SCR is the process wherein the ARC conducts a review of an Approved Provider's compliance with the Standards and Guidelines. This process may identify violations of standards, concerns with practices, opportunities for technical assistance, innovative approaches and/or best practices in areas related to client evaluation, assessment, and treatment. Pursuant to C.R.S. 16-11.7-103(4)(h.5), the ARC must perform compliance reviews on at least ten percent of treatment providers on the Approved Provider List every two years.

**1. Types of Standards Compliance Reviews**:

a) Voluntary - An individual Approved Provider may contact SOMB staff and volunteer to participate in a Standards Compliance Review (SCR). Self-selection for an SCR may offer the Approved Provider an opportunity to review aspects of their practice to determine if there are any areas that should be modified to ensure compliance with the Standards and Guidelines. This voluntary request will meet the SOMB requirements to receive a random SCR within required time parameters, but does not preclude the individual from receiving a for-cause SCR in the future.

b) Random – The ARC may conduct periodic SCRs of treatment providers on the Approved Provider List on a randomized basis to determine if a Provider is following the requirements of the Standards and Guidelines. Selection of Approved Providers subject to a random SCR will be drawn based on the Provider Identification Number in the Provider Data Management System (PDMS). The SOMB, on behalf of the ARC, will determine what services, documentation, or aspects of the Standards and Guidelines need to be reviewed as part of randomized SCRs.

c) For Cause – The ARC may vote to initiate an SCR for cause when information is obtained through technical assistance, processing of an application, or an anonymous complaint sufficiently alleges that an Approved Provider may not be complying with the Standards and Guidelines. The ARC, in conjunction with the SOMB staff, will evaluate the information received to determine the scope, credibility, and severity of the alleged circumstances. The SOMB staff and the ARC Chair shall determine the most appropriate method for investigating and resolving compliance issues or concerns.

2. The ARC may select one of the following Response Levels based on the information available concerning the Standards Compliance Review:



CDOC/Nelson_00354

a) Level 1 – Implementation Verification

A Level 1 SCR evaluates and determines whether an Approved Provider has implemented requirements of the Standards and Guidelines related to administrative, training, or MTT consultation actions.

b) Level 2 – Work Product Review

In addition to the requirements of Level 1, a Level 2 SCR evaluates and determines whether an Approved Provider is adhering to the requirements of the Standards and Guidelines related to written work product (e.g., offender evaluation summary report, treatment plans, monthly progress reports, Community Supervision Team/Multidisciplinary Team communications, treatment contracts, discharge summaries, etc.).

c) Level 3 – Site Visit & File Review

In addition to the requirements of Level 2, a Level 3 SCR is a comprehensive audit to determine if an Approved Provider is adhering to the requirements of the Standards and Guidelines. This may include a review of client files, attendance in group or individual therapy sessions, evaluations, or other services provided under the Standards and Guidelines.

For Level 3 reviews proper consents and/or releases shall be in place to ensure compliance with confidentiality requirements. In the instances of providers within an agency, the ARC will coordinate with the agency to implement the appropriate consents and approvals required by the agency in order to complete the review.

3. Provider Notification - Providers will receive a notification letter when they have been selected for an SCR and the type of SCR being administered. The notification letter will also include instructions regarding how to respond to the ARC. The Provider must submit all requested materials by the deadline identified in the notification letter. If multiple Providers within a single organization are subject to an SCR, the ARC may initiate one SCR process that incorporates the investigation of all Providers within the organization or agency.

4. SCR Review – Once information has been received, the ARC will review the Approved Provider's response to the SCR and any other relevant information concerning the Approved Provider in order to identify any Standard violations, as well as opportunities to implement innovations or incorporate best practices. Information related to the type of SCR, documentation request, and the response from the Approved Provider will remain confidential during the pendency of the SCR investigation and evaluation period.

5. ARC Determination – The ARC will notify the Approved Provider who is the subject of the SCR of the outcome of the review within 7 days of the ARC rendering a decision. The notification of the outcome will be provided in writing and will include any required



CDOC/Nelson_00355

follow up actions that the ARC deems necessary. The SCR will identify at least one or more of the following outcomes:

a) The Approved Provider is approved for continued placement on the Approved Provider List, and no further action is required at that time.

Outcome: The Approved Provider retains their level and their status is maintained. The ARC may provide general feedback for the Approved Provider for their consideration.

b) An innovative practice is identified as a best practice.

Outcome: The Approved Provider retains their level and their status is maintained. If an Approved Provider demonstrates skills, competencies, and abilities of a higher practice level, the ARC has the discretion of awarding an increase in practice level.

c) Standards violations are founded.

Outcome: The Approved Provider may be offered a Compliance Action Plan (CAP) to resolve the founded violations identified in the SCR. The ARC will determine whether the Approved Provider may retain their practice level or whether the practice level will be reduced while the CAP is in effect. The CAP will specify the timeframes, actions, and documentation needed by the Approved Provider to demonstrate that the founded violations have been resolved. The Approved Provider must demonstrate to the ARC that the founded violations have been resolved systemically. Once the Approved Provider has completed the CAP to the satisfaction of the ARC, the Approved Provider will retain their practice level. For Voluntary and Random SCRs, records related to resolved violations, the supplemental documentation, and the outcome of the SCR remains part of the Approved Provider's confidential file and not available to the public. The records related to violations and the outcome of a For Cause SCR are part of the Approved Provider's file and can be made available to members of the public upon request.

The ARC has the discretion to administer any action listed in Section IV of these Administrative Policies if:

i. The Approved Provider subject to a CAP declines, refuses, or fails to participate in the CAP required to resolve the founded violations.

ii. The Approved Provider subject to a CAP cannot resolve the founded violations or the Approved Provider is unable to demonstrate skills, competencies, and abilities consistent with the Provider's practice level.

d) A formal complaint will be opened by the SOMB and also forwarded to the Department of Regulatory Agencies (DORA), on behalf of the ARC.

Outcome: The ARC may determine that the SCR has resulted in founded violations that rise to the level of initiation of a formal complaint against the Approved Provider. The ARC will notify the Approved Provider that it will proceed with a formal complaint based on the findings of the



CDOC/Nelson_00356

SCR. A complaint will also be provided to the Department of Regulatory Agencies based on the findings of the SCR.

### G. VARIANCES

The purpose of the Standards Variance Process is to allow for a SOMB Approved Provider or applicant to seek approval for a temporary suspension of a specific Standard. The reasons for suspending a requirement of the Standards vary, but modifications to requirements of the Standards are limited to rare circumstances that are reviewed on a case-by-case basis. Variance requests can be related to the treatment of an individual under the purview of the *Standards* or to request a modification to the approval process.

A. Submitting A Variance Request – A Provider who is unable to comply with the requirements of the Standards may submit a variance proposal to the ARC for review. The proposal should be identified as a Standard Variance Request and must include the following components:

1. Identification of each Standard that is subject to the variance;

2. An overview of the unusual circumstances and documentation why compliance with the Standards is not possible;

3. A plan developed for the proposed variance of outlining the following:

a) Victim safety including re-offense

b) Ongoing assessment of risk and need

c) Timeframe

d) Written verification of CST/MDT consensus

B. Preliminary Review – SOMB Staff will perform an initial review of the request. If the request is not acceptable, the Staff will work with the Provider to modify and address any questions or concerns.

C. ARC Review – The ARC will review the Standards Variance Request. If the request is acceptable and does not pose a safety risk, the ARC may authorize preliminary approval of the Variance Request. A review of the approved Variance Request will be scheduled and presented at the SOMB. Variances that are not granted preliminary approval by the ARC will be scheduled for formal review by the Board at the next meeting. If approved, the ARC will ratify the Standards Variance Request and create a plan for conducting periodic reviews and any necessary documentation required for those reviews. The Provider will be notified in writing of the decision to approve or deny the variance.

D. If a variance is in place for more than two years, the Board may consider if a standards



CDOC/Nelson_00357

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

revision is necessary.

Contact information and relevant forms related to this appendix may be found on the SOMB website at https://www.colorado.gov/pacific/dcj/form/file-complaint-somb

Top of the Document



CDOC/Nelson_00358

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix B: Guidance Regarding Victim/Family Member Readiness for Contact, Clarification, or Reunification

The following are considerations for Community Offender Supervision Teams (CSTs) in determining readiness and ability to make informed decisions for individuals who have been victimized and have requested contact, clarification, or reunification, as well as readiness for parents/guardians and other children in the home. These are not to be construed as expectations that the victim must meet, but for the CST to be knowledgeable and able to assess family readiness. It is important to consider the following areas as a means of ensuring that the individual is not placed in a situation that could result in further victimization or could compromise their physical or emotional safety or well-being.

*Victim Readiness*

Contact and Clarification:

The person who has been victimized is able, based on their age and developmental level, to:

**A.** Acknowledge and talk about the abuse and the impact of the abuse without minimizing the scope (e.g. does not excuse the abuse based on frequency, beliefs about the offender's intent, etc.)

**B.** Accurately assess and identify the offender's responsibility for the abuse and aftermath and does not blame self.

**C.** Place responsibility on the offender and does not minimize or deny responsibility based on fear of repercussions.

**D.** Avoid perceiving self as destroyer or protector of the family.

**E.** Demonstrate assertiveness skills and is willing to disclose any further abuse or violations of a safety plan.

**F.** Demonstrate a reduction of symptoms and is not actively experiencing Post Traumatic Stress Disorder.

**G.** Express feeling safe, supported, protected and in control, but not controlling.

**H.** Maintain positive and supportive relationships with those who have demonstrated an ability to support them.

**I.** Demonstrate healthy boundaries, self-respect and empowerment.



CDOC/Nelson_00359

Reunification:

In comparison to contact or clarification, which typically occurs at specified periods of time and can often be highly structured, reunification occurs over an extended period of time, following clarification, and often without high levels of external structure. The following areas should be considered in addition to the factors listed above.

The person who has been victimized is able to:

A. Demonstrate awareness of previous grooming tactics of the offender.

B. Recognize ongoing grooming patterns.

C. Exercise assertiveness skills and confront the offender as needed.

D. Identify and seek out external support if needed.

*Non-Offending Parent or Guardian Readiness*

The non-offending parent or guardian:

A. Believes the victim's report of the abuse.

B. Recognizes and understands, without minimizing, the impact of the abuse on the victim.

C. Holds the offender solely responsible for the abuse without blaming the victim in any way.

D. Has received appropriate education regarding their role as a non-offending parent.

E. Demonstrates the ability to be supportive and protective of the victim.

F. Is more concerned with victim impact and recovery than consequences or inconveniences for the offender.

G. Has received appropriate education regarding sexual offender behavior.

H. Has received full disclosure of the extent of the offender's sexual offense(s)/abusive behavior(s).

I. Is aware of the grooming tactics used by the offender for not only the victim, but also other family members.

J. Supports and implements the family safety plan.

K. Demonstrates the ability to recognize and react properly to signs of high risk or offending behavior.



CDOC/Nelson_00360

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    **L.** Can demonstrate assertiveness skills that would allow him/her to confront the offender and is willing to disclose high risk or offending behavior.

*Secondary Victim, Sibling or Other Children in the Home Readiness*

This individual:

    **A.** Has an understanding of the nature of abuse and the impact on the victim.

    **B.** Does not blame the victim or minimize the abuse.

    **C.** Understands the offender is solely responsible for the abuse.

    **D.** Has received information about offender treatment and high risk and grooming behaviors.

    **E.** Can express the ways the abuse has affected and impacted his/her life.

    **F.** Demonstrates healthy boundaries, including the ability to identify and set limits regarding personal space and privacy.

    **G.** Is aware of the family safety plan.

Top of the Document



CDOC/Nelson_00361

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix C: Young Adult Modification Protocol

........................................................................................................................................................

*Young Adult Modification Protocol[248]*

The SOMB recognizes that due to responsivity[249] issues and the unique needs of some young adults, applying the Adult Standards without flexibility can be problematic. A different approach may be needed when addressing the unique challenges this population may poses.

Neurobiological research gives us a deeper understanding of adolescent and young adult brain development. This research indicates that the brains of many young adults, ages 18 to 25, are still developing thus it is imperative for CST/MDT members to assess and treat this population and consider allowing exceptions according to each individual regardless of where they are in the criminal justice system.[250, 251, 252, 253, 254, 255, 256, 257]

Offenders, ages 18-25 may be more inclined to make poor decisions. This may or may not be related to risk for recidivism. It is important for the CST/MDT to evaluate an offender's problematic behavior, specifically, when responding to violation or rule breaking behavior, to best determine whether or not it signifies an increase in risk and if so, what needs exist and what response best addresses those needs

---

[248] The following document was referenced throughout the development of this appendix: Center for Sex Offender Management (CSOM). (2014). Transition-Aged Individuals who have Committed Sex Offenses: Considerations for the Emerging Population. Retrieved from: http://www.csom.org/pubs/CSOM-Considerations-Emerging-Adult-Population.pdf.

[249] The Responsivity Principle means that correctional services are more effective when treatment and management services use methods which are generally more effective with offenders and when these services are individualized in response to the culture, learning style, cognitive abilities, etc. of the individual.

[250] Teicher, M., Anderson, S., Polcari, A., Anderson, C., & Navalta, C. (2002). Developmental neurobiology of childhood stress and trauma. *Psychiatric Clinics of North America*, 25, 397-426.

[251] Perry, D. (2006). Applying Principles of Neurodevelopment to Clinical Work with Maltreated and Traumatized Youth: The Neurosequential Model of Therapeutics. In Nancy Boyd (Ed.), *Working with Traumatized Children in Child Welfare* (pp. 27-52).

[252] Siegel, D.J. (2006). Brain, mind, and behavior. In D. Wedding & M. Stuber (Eds.), *Behavior and Medicine, Fourth Edition*. Cambridge, MA: Hogrefe & Huber.

[253] Siegel, D.J. (2006). An interpersonal neurobiology approach to psychotherapy: How awareness, mirror neurons and neural plasticity contribute to the development of well-being. *Psychiatric Annals, 36(4)*, 248-258.

[254] Steinberg, L. (2012). Should the science of adolescent brain development inform public policy? Issues in Science and Technology. Retrieved from: http://www.issues.org/28.3/steinberg.html.

[255] Steinberg, L. (2008). A social neuroscience perspective on adolescent risk-taking. *Developmental Review, 28*, 78-106.

[256] Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009). Are Adolescents Less Mature Than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop. *American Psychologist, 64*, 583-594.

[257] Steinberg, L. & Scott, E. (2003). Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty. *American Psychologist*, 58, 1009-1018.



CDOC/Nelson_00362

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

and manages risks. Such assessment should include strengths and protective factors.[258] The nature and severity of the behavior and the degree which it relates to risk should be commensurate with the appropriate interventions. Risk of harm to others must not be ignored and should be balanced when assessing impulsive behavior typical in adolescence versus criminal, anti-social characteristics which are indicative of risk.

Many young adults may present more like an adolescent rather than an adult. Research indicates over responding to non-criminal violations with this population can cause more harm than good for both the offender and the community.[259]

*Guiding Principles:*

**The following guiding principles, in addition to the guiding principles in the Adult Standards, are for Community Supervision Teams (CSTs)/Multi-Disciplinary Teams (MDTs) considering a recommendation of making exceptions to the Adult Standards for a specific Young Adult population.**

A. Victim and Community Safety are paramount. See Guiding Principle #3 in the Adult Standards and Guidelines for further detail.

B. Victim self-determination regarding involvement and input. See Guiding Principle #7 in the Adult Standards and Guidelines for further detail.

C. Sexual offenses cause harm.

D. Psychological well-being of victims is critical.

E. Focus needs to be on promoting strengths/health to reduce risk.

F. Emphasis on developing pro-social support systems.

G. Ensuring offender accountability for offending behavior.

H. Treatment planning includes development of social/interpersonal skills.

I. Treatment planning takes into account stages of brain development.

J. Not to minimize the impact to the victim but to improve/creating pathways for more effective treatment.

K. Collaboration of CST/MDT and review factors 1-10.

---

[258] Protective factors are conditions or attributes (skills, strengths, resources, supports or coping strategies) in individuals, families, communities or the larger society that help people deal more effectively with stressful events and mitigate or eliminate risk in families and communities.

[259] Teicher, M., Anderson, S., Polcari, A., Anderson, C., & Navalta, C. (2002). Developmental neurobiology of childhood stress and trauma. *Psychiatric Clinics of North America, 25,* 397-426.



CDOC/Nelson_00363

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Exclusionary Criteria:*

**(If previous records indicate or current testing establishes that one of the following is true)**

- **A.** Primary sexual interest/arousal in pre-pubescent individuals

- **B.** Clear documented pattern of sexual sadism

- **C.** Sexually Violent Predator

- **D.** Psychopathy

- **E.** Meets criteria for mental abnormality (Millon Clinical Multiaxial Inventory)

*Protective Factors:*

- **A.** In school/stable employment

- **B.** Living in a home and receiving developmentally appropriate supervision

- **C.** Pro-social support system

- **D.** Maturation

- **E.** No substance abuse

- **F.** No delinquent lifestyle

- **G.** Absence of severe MH-Axis I or II

- **H.** Compliance with treatment and supervision expectations

- **I.** Amenable to treatment, willingness to engage

- **J.** Lack of known multiple offenses

CSTs and MDTs are encouraged to look at young adult offenders, and develop individualized treatment plans and containment efforts based on the maturation and risk of the individual. Independent living skills, risk and protective factors should be discussed by CSTs/MDTs and factored into programming for the offender. CSTs/MDTs should consider consulting with other experienced adult or juvenile practitioners to assist in the development of effective treatment and supervision as well as to identify possible resources that may aid in information gathering. In some cases, it may be appropriate to use juvenile risk assessments with this population for informational purposes only, and with the understanding that using a juvenile risk assessment instrument on an individual over the age of 18 is not a validated assessment of risk. The CST/MDT based on a unanimous decision, is empowered to make exceptions to specific standards as needed and changes shall be clearly documented. After conducting a thorough evaluation in accordance with section 2.000 of the Standards, evaluators should



CDOC/Nelson_00364

document any recommendation to vary from, or waive a Standard with the appropriate rationale for such.

Risk in young adults will likely be best mitigated by ensuring the CST/MDT pays close and careful attention to risk, need, and responsivity principles[260] as well as dynamic and static risk factors and ensures all of these are assessed and addressed as major treatment targets. "Treatment should use methods, and be delivered in such a way as to maximize participants' ability to learn. To achieve this, treatment programs should selectively employ methods that have generally been shown to work. Further, participants' response to treatment will be enhanced by effortful attendance to their individual learning style, abilities and culture."[261]

It is important for CSTs to consider Section 5.700 in the Adult Standards when addressing issues of sibling/child contact. Standard 5.760 specifies circumstances when parts of 5.700 may be waived with unanimous decision of the CST. This might allow contact with adolescents in unique situations. CSTs/MDTs are encouraged to review young adult situations, and make decisions that help the offender be successful while maintaining community safety.

---

[260] The Risk Needs Responsivity (RNR) model indicates that the comprehensiveness, intensity and duration of treatment provided to individual offenders should be proportionate to the degree of risk that they present (the *Risk* principle), that treatment should be appropriately targeted at participant characteristics which contribute to their 3 risk (the *Need* principle), and that treatment should delivered in a way that facilitates meaningful participation and learning (the *Responsivity* Principle). DOC SOTMP Evaluation, 2012, Central Coast Clinical & Forensic Psychology Services.

[261] Andrews, D. A. & Bonta, J. (2006).*The Psychology of Criminal Conduct* (4th ed.).Newark, NJ: LexisNexis.



CDOC/Nelson_00365

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## *YOUNG ADULT MODIFICATION PROTOCOL*
### CRITERIA CHECKLIST

**Instructions:**

This form should be completed by the CST/MDT and serves as documentation for the client file. As new information becomes available, the CST/MDT should re-evaluate the inclusionary and exclusionary items to determine if there has been any change. An offender who meets criteria for the Young Adult Modifications at one point in treatment, may not meet the criteria at subsequent points in treatment, and therefore any modification to the Standards should not be considered automatic grounds for future modifications.

**Protocol for determining if the Individual meets criteria for Young Adult Modifications**

**Inclusionary Items:**    If you select YES to any of the following item, continue to Exclusionary Items.

Yes_____  No_____    Individual is aged 18-21 and adjudicated delinquent for a sex crime that occurred prior to the age of 18, subsequently convicted of a non-sex crime as an adult while remaining in the DYC.

Yes_____  No_____    Individual is aged 18-25, convicted as an adult for a non-sex crime with a history of a sexual offense.

Yes_____  No_____    Individual is aged 18-25, convicted of a sex crime that occurred prior to age 18.

Yes_____  No_____    Individual is aged 18-25, convicted as an adult for a sex crime (includes failure to register).

Yes_____  No_____    Individual is under the age of 18, charged and convicted as an adult for a sex crime and sentenced to YOS.

**Exclusionary Items:**    If you select YES to any of the following items, the individual will not meet criteria for Young Adult Modifications, and the applicable Standards shall be followed.

Yes_____  No_____    Primary Sexual Interest/arousal in pre-pubescent individuals.

Yes_____  No_____    Clear and documented pattern of sexual sadism.

Yes_____  No_____    Sexually Violent Predator as determined by the SVPASI.

Yes_____  No_____    Psychopathy (as determined by the PCL-R)

Yes_____  No_____    Meets criteria for a personality disorder as referenced in C.R.S. 16-11.7-103(4)(d) and determined by the SVPASI.

_____         _____
Treatment Provider Signature          Date          Supervising Officer Signature          Date



CDOC/Nelson_00366

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## YOUNG ADULT MODIFICATION PROTOCOL
## CRITERIA FLOW CHART

Individual is convicted or adjudicated of a sexual offense.

**Yes**

Is the Individual between the ages of 18-25 (or under the age of 18, charged and convicted as an adult)?

**No** → Follow applicable standards

**Yes**

Is any of the following True?

1. Aged 18-21 adjudicated delinquent for a sexual crime that occurred prior to age 18, subsequently convicted of a non-sex crime as an adult while remaining in the DYC.
2. Aged 18-25, convicted as an adult for non-sex crime with a history of a sex offense.
3. Aged 18-25, convicted of a sex crime that occurred prior to age 18.
4. Aged 18-25, convicted as an adult for a sex crime (includes failure to register).
5. An individual under the age of 18, charged and convicted as an adult for a sex crime and placed in YOS.

**No** → Follow applicable standards

**Yes**

Previous records or, if indicated, current testing establishes that one of the following is true;
1. Primary sexual interest/arousal in pre-pubescent individuals.
2. Clear documented pattern of sexual sadism.
3. Sexually Violent Predator (as designated by SVP instrument)
4. Psychopathy (as determined by PCL-R)
5. Meets criteria for a personality disorder as referenced in C.R.S. 16-11.7-103(4)(d) and determined by the SVPASI

**Yes** → Follow applicable standards

**No**

Young Adult Modification Protocol

[Top of the Document](#)



CDOC/Nelson_00367

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix D: Guidelines for the Use of Sexually Stimulating Materials

**Applicable Standards from the** *Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders (Adult Standards):*

**5.010** As soon as possible after the conviction and referral of a sex offender to probation, parole, or community corrections, the supervising officer should convene a Community Supervision Team (CST) to manage the offender during his/her term of supervision.

    A. Community and victim safety, and risk management are paramount when making decisions about the management and/or treatment of offenders.

**Applicable Standards (i.e. Additional Conditions of Supervision) from the** *Standards and Guidelines for the Evaluation, Assessment, Treatment and Supervision of Juveniles Who Have Committed Sexual Offenses (Juvenile Standards):*

**Appendix J (12)** You shall not possess or view any pornographic, X-rated or inappropriate sexually arousing material and you will not go to or loiter in areas where pornographic materials are sold, rented, or distributed. This includes, but is not limited to phone sex lines, computer generated pornography, and other cable stations that show nudity or sexually explicit material.

*INTRODUCTION: Why is the SOMB addressing the issue of sexually stimulating materials?*

The primary purpose for this appendix is to provide explanation and guidance to Community Supervision Teams (CSTs) and Multi-Disciplinary Teams (MDTs) regarding Adult Standard 5.620 and Juvenile Appendix J (12). In offering this guidance, the SOMB also seeks to enhance community and victim safety by specifically focusing on the individual risk, needs, and responsivity factors for each adult or juvenile who has sexually offended.

A goal of treatment is to help adults and juveniles who have sexually offended to gain an increased understanding of healthy, non-abusive sexuality. To achieve this treatment goal, treatment providers and supervision officers must engage the adult or juvenile in non-judgmental discussion of sexual topics and materials. The CST/MDT should support the development of healthy sexual relationships, when appropriate, that involve consent, reciprocity, and mutuality. In addition, other aspects of sexuality, including masturbation, should be addressed with the adult or juvenile who has sexually offended. The ultimate goal of treatment and supervision is to assist the adult or juvenile with ceasing the victimization of others and to terminate the reinforcement of illegal, abusive and harmful sexual arousal/interest and patterns of behavior.

It is understood that certain materials, such as sexually oriented or explicit materials, shall be prohibited, and that although the research on the impact of these materials is mixed, they may have a



CDOC/Nelson_00368

potentially negative impact on the propensity to sexually offend. However, other non-sexually oriented materials that are sexually stimulating in nature, as determined on an individualized basis, may have no such negative impact. Prohibiting all stimulating sexual materials for all adults and juveniles who have sexually offended may be counterproductive in that they may not adversely influence sexual deviancy, but may discourage an open discussion about sexual practices, interests, and patterns of behavior. Further blanket prohibitions on sexually stimulating materials also eliminate the opportunity for the CST/MDT to support the adult or juvenile in the development of non-abusive, healthy practices. Finally, given the primary goal of enhanced community and victim safety, the development of healthy sexuality can lead to decreased illegal, harmful and abusive sexual arousal/interest and patterns of behavior.

The following sections of this appendix will outline recommendations to the CST/MDT on how to make a determination about the types of sexually stimulating materials that may be allowed and disallowed for the individual adult or juvenile who has sexually offended.

**Definitions:**

For the purposes of this appendix, sexually oriented or explicit material is defined as pornographic images, videos, and narratives that may be viewed in print or on electronic devices such as a computer, television, gaming system, DVD player, VCR, video camera, voice recorder, pager, telephone, or cell or smart phone, and that require the viewer to be age 18 to purchase. Such materials are developed and viewed explicitly for sexual gratification purposes. On the other hand, sexually stimulating materials are non-pornographic materials that may lead to sexual interest or arousal, but were not developed exclusively with that goal in mind. Examples of materials that may be sexually stimulating depending upon the adult or juvenile who have sexually offended include incidental nudity within the context of a non-pornographic movie, sexually suggestive images, and non-sexual images such as underwear advertisements and pictures of children.

Nudity is neither sexually stimulating material in and of itself, nor does the fact that the representation or person viewed being clothed necessarily render it not sexually stimulating. The concern is a pornographic depiction emphasizing sexual/human devaluation. It is the context of the nudity and the thoughts generated in the mind of the adult or juvenile who has sexually offended that should be the concern of the CST/MDT when applying the concepts contained in this appendix. The CST/MDT should be mindful that the conviction or adjudication for a sexual offense does not render the adult or juvenile asexual, and this is not the goal of treatment or supervision. Instead, the goal is to develop an understanding of safe, non-abusive, and healthy sexual practices.

**Victim Safety and Risk Issues:**

When considering the potential relationship between sexually stimulating materials and sexual offending behavior, the CST/MDT is inevitably concerned with the propensity to re-engage in risky/harmful behavior that could potentially place the community and victims at risk by the adult or juvenile who has sexually offended. Allowing adults or juveniles the ability to have access to sexually stimulating materials may be viewed as socially undesirable, even if it contributes to overall health and pro-social growth. Therefore, the CST/MDT must always employ strategies to reduce risk and increase the opportunity for a successful outcome.



CDOC/Nelson_00369

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The primary practices that are essential to CST/MDT success in achieving a reduction in recidivism are based on four principles regarding the adult or juvenile who has sexually offended:

**A.** Effectively assess risk and criminogenic need, as well as overall strengths (also known as "protective factors"). Effective interventions should be closely matched to risk, need and responsivity factors;

**B.** Employ SMART, tailored supervision and treatment strategies;

**C.** Use incentives and graduated sanctions to respond promptly to observed behavior; and

**D.** Assist with the development of interests, activities and relationships that are incompatible with sexual offending rather than merely avoiding high-risk behaviors, which results in greater success in leading an offense-free life. Implement performance-driven personal management practices that promote and reward recidivism reduction.

It is also important to be sensitive to victim needs and issues with regard to the policy related to use of sexually stimulating materials. Ensuring that supervision and treatment planning efforts are individualized will help assist with this endeavor. For example, if an adult or juvenile who has offended sexually is allowed to utilize sexually stimulating materials, it is essential that the images do not represent a likeness of the victim. Victim representative (see Adult Standards Section 5.500 and Juvenile Standards Section 5.700) input should occur as well to ensure that the CST/MDT is making a balanced decision.

**Polygraph Issues:**

Polygraph exams should primarily focus on the use of sexually oriented or explicit materials while under supervision and in treatment by the adult or juvenile who has sexually offended, rather than attempting to identify the use of sexually stimulating materials. These questions may be asked in a variety of ways using terms such as pornography, pornographic, sexually explicit, and X-rated. Polygraph examiners should be aware of what sexually stimulating materials have been allowed by the CST/MDT for the individual adult or juvenile who has sexually offended. The CST/MDT should advise polygraph examiners more specifically what concerns there are when suggesting that maintenance or specific issue exams explore use of sexually oriented or explicit material, and indicate to the examiner if permission has been granted to the offender to have access to stimulating materials. Interviewing regarding both types of materials (sexually oriented or explicit, and sexually stimulating) during the polygraph exam may be useful for accountability purposes.

**Community Supervision Team (CST)/Multi-Disciplinary Team (MDT) Guidance:**

Sexually stimulating materials should be prohibited during the early phases of treatment and supervision for all adults and juveniles who have sexually offended. Once progress on treatment engagement and supervision compliance has been documented via a thorough assessment, the CST/MDT may make the decision on how to regulate and monitor stimulating sexual materials. In making this decision, the CST/MDT should consider what materials would not contribute to



CDOC/Nelson_00370

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

the further development and reinforcement of illegal, abusive, and harmful sexual arousal/interest and patterns of behavior for the adult or juvenile who has sexually offended. As noted above, the CST/MDT in their assigned role under the Standards should be mindful of community and victim safety first. The use of sexually stimulating materials should only be allowed after a thorough review in advance and specific written permission being granted from the CST/MDT. If granted, the use of specific stimulating sexual materials should be reflected in the treatment contract and case plan, terms and conditions of supervision, and safety planning. The CST/MDT should specifically document the rationale for the decision to allow the use (e.g., promote healthy sexuality, an approved masturbation plan, etc.) of specific sexually stimulating materials for each adult or juvenile who has sexually offended based on the following criteria:

A. Risk as assessed through the use of static and dynamic risk assessment measures

B. Criminogenic needs as assessed in the treatment and supervision plan

C. Characteristics of the instant offense and pattern of offending as identified by self-report in the sexual behavior disclosure packet, and as verified by non-deceptive sexual history polygraph exams, where appropriate

D. Illegal, abusive and harmful sexual arousal/interest based upon arousal/interest assessment, where appropriate. Materials related to the pattern of offending or that contribute to illegal, abusive or harmful sexual arousal/interest should always be prohibited.

E. Engagement in treatment and compliance with supervision, including progress and openness related to sexuality issues and activity, and reported use of sexually oriented or stimulating materials, as verified by monitoring polygraph and other forms of monitoring where appropriate. In addition, the presence or recurrence of denial of the facts of the underlying offense.

The process of approving the use of sexually stimulating materials is fluid in nature and should be discussed with the client throughout the supervision and treatment process, and continued monitoring to assure the goals of promoting healthy sexual and community safety is necessary. The CST/MDT should rescind approval for access to sexually stimulating materials as dictated by the behavior of or any regression in treatment or supervision by the adult or juvenile who has sexually offended.

The conditions of probation and parole as well as the treatment contract may currently contain language prohibiting possession or use of most of the materials pertinent to this appendix. The conditions of probation are essentially orders of the Court once a judge signs them and cannot be changed or amended without authority of the court. Conditions of parole are similar in nature to probation and must be approved by the Parole Board. Therefore, any modification must be approved by the judge or parole board. The treatment contract of each agency is probably the easiest to amend of all the documents, as it is signed by the adult or juvenile who has sexually offended at the beginning of treatment. Any approval of the use of sexually stimulating materials must be reflected in a modification to the treatment contract and plan, and if allowable by order of the Court or Parole Board, reflected in the probation or parole file.

**Healthy Sexuality:**



CDOC/Nelson_00371

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Many treatment curriculums for adults and juveniles who have sexually offended include a component on the development of healthy sexuality. The following information is offered to approved treatment providers working with this population.

### Sexual Expression

Human beings are sexual beings. Sexuality and sexual expression are integrally intertwined and inseparable from other fundamental human characteristics, specifically intimacy, interpersonal connectedness, belonging, and attachment. Healthy humans desire to be involved in relationships. Sexual expression is a part of intimate romantic relationships. Not everyone is capable of the reciprocity or other social skills that relationships entail, and often a sexual intimate relationship is not available to individuals for a number of reasons. However, therapy targets helping people move in the direction of being able to engage in reciprocal and mutual relationships.

### Masturbation

Masturbation is often employed as a way to supplement sexual expression in a relationship or in lieu of being able to gratify sexual needs in a relationship. Masturbation (when not compulsive and done privately) is a natural and healthy practice to express sexuality and gratify or relieve sexual needs/tension. Masturbation can serve as a means of reducing sexual needs that could become expressed in less appropriate or more harmful ways. As people do masturbate, stimuli for masturbation need to be based on healthy themes, such as closeness, intimacy, mutuality, reciprocity, and safety. This does not rule out visual stimuli which are ubiquitous. Prohibiting stimulating materials is problematic and impossible. Instead it is a task of treatment to determine which materials are "inappropriate," by not reinforcing the values and principles stated herein (e.g., mutuality, reciprocity, safety, etc.). On the other hand, stimuli that reinforce these values are not problematic. It is not the goal of treatment to eliminate sexuality or sexual expression, rather to direct it to appropriate themes.

### Teaching Healthy Sexuality

Treatment providers address healthy sexuality in a number of ways. One way is by discussing sexual needs, preferences and expression in an open nonjudgmental manner. This serves as *modeling* in that the client can observe a therapist discuss sexuality in a mature, open and non-defensive manner; the client learns to do the same. Sexual expression needs to be discussed in a treatment setting.

### Sexual Diversity

Cultural, social and individual differences are accepted in healthy sexuality and one shows respect for these differences. As long as it is not harmful activity, a healthy attitude is open to the fact that others have needs that are not like our own. Examples are represented in the G.L.B.T.Q. community; there should be no discrimination on the basis of orientation and preference when they are legal and not harmful to others.

### Healthy Boundaries, Roles, and Safe Sex



CDOC/Nelson_00372

Case No. 1:24-cv-03588-PAB-TPO     Document 35-2     filed 06/30/25     USDC Colorado
pg 238 of 375

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Consent is quintessential to healthy sexual expression. Consent involves equality of the individuals to make informed decisions. People are always very different from one another but must be equal in their ability to consent to engage in sexual behavior with one another. Consent involves *communication in advance* of what will take place (sexual activity) between two individuals. It involves mutuality and reciprocity. Large disparities in power and influence are antithetical to these principles. Likewise, the needs and desires of both parties are negotiable and negotiated; an agreement is reached prior to the activity ensuing. Similarly, activities that are not permissible must be communicated and respected. Education related to issues of consent and barriers to consent including impairment due to alcohol or drug consumption, and the intellectual capacity of both parties should be addressed. Safe sexual practices are a requirement of healthy sexuality.

**CONCLUSION:**

This appendix has attempted to clarify the differences between sexually oriented or explicit materials from sexually stimulating materials. While the former is prohibited by terms and conditions of supervision and the treatment contract, the latter may be allowed at some point in treatment and supervision based upon the suggested criteria in this appendix. In addition, the exploration of concepts related to healthy sexuality are seen as critical for the therapeutic rehabilitation of the adult or juvenile who has sexually offended.

Top of the Document



CDOC/Nelson_00373

# Appendix E: Sexual Offense History Decision Aid

**Guidelines for Evaluation of Male Adults Who Have Committed Sex Offenses as an Adult and Have a New Non-Sex Crime.**

These guidelines are for sex offense-specific evaluations of male adults who have a past sex offense as an adult and a new non-sex offense, who meet the following statutory definition of a sex offender:

> A. Per statute 16-11.7-102 (2) (a) (II) C.R.S., "A sex offender means any person who is convicted in the state of Colorado on or after January 1, 1994, of any criminal offense, if such person has previously been convicted of a sex offense as described in subsection (3) of this section in the state of Colorado, or if such person has previously been convicted any other jurisdiction of any offense that would constitute a sex offense as defined in subsection (3) of this section, or if such person had a history of any sex offense as defined in subsection (3) of this section."

These guidelines also apply to male adults who have a past sex offense as an adult and who are convicted of Failure to Register. [262]

Per statute, all sex offenders in the state of Colorado "as part of the presentence or probation investigation (are) required pursuant to section 16-11-103, to submit to an evaluation for treatment, an evaluation for risk, procedures required for monitoring of behavior to protect the victims, and potential victims, and an identification developed pursuant to section 16-11.7-103 (4)." Further, all sex offenders in the state of Colorado are required, as part of any sentence to probation, commitment to the Department of Human Services, sentence to community corrections, incarceration with the Department of Corrections, placement on parole, or out-of-home placement to "undergo treatment to the extent appropriate to such offender based upon the recommendations of the evaluation and identified made pursuant to section 16-11.7-104…" [263] Finally, sex offenders sentenced to community supervision (probation or parole) may be supervised by specialized sex offender supervision officers and subject to some or all of the specialized terms and conditions of supervision developed for sex offenders. [264]

---

[262] Failure to register is a new non-sex offense criminal conviction.

[263] See 16-11.7-105 C.R.S.

[264] See 18-1.3-1007 C.R.S.



CDOC/Nelson_00374

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## INTRODUCTION

The *Guidelines for Evaluation of Male Adults Who Have Committed Sex Offenses as an Adult and Have a New Non-Sex Crime* includes a series of protocols and a decision aid. The Guidelines are designed to be used with the applicable Colorado SOMB Standards and Guidelines for the Assessment, Evaluation, Treatment, and Behavioral Monitoring of Adult Sex Offenders (hereafter referred to as the SOMB Adult Standards and Guidelines). The Guidelines are provided to assist Evaluators in meeting the SOMB Adult Standards and Guidelines when these evaluations are requested but are not a required protocol.

## GUIDELINE PROTOCOLS

### Use of SOMB Approved Evaluators

An Adult Evaluator should be used when the current non-sex crime, including Failure to Register, and the most recent sex offense, occurred when 18 years or older.

For young adults aged 18-25 years, Evaluators should also consult the SOMB Young Adult Modification Protocol.

### Multidisciplinary Collaboration

The Evaluator should seek relevant background information, including the discharge summary, from the prior Community Supervision Team (CST) and any adjunct treatment providers, if available. Evaluators are encouraged to use judgment in the amount of effort given if the information is difficult to obtain. Evaluations should not be unnecessarily delayed when prior treatment information is unavailable.

The Evaluator should document the information gained from other sources in the evaluation and document all unsuccessful attempts to gain information in the client record.

The Evaluator should be available to consult with the PSI Officer to answer questions about the evaluation and to review the treatment recommendations as needed.

If the evaluation is before the individual enters a plea, the evaluation may need updating following conviction and sentencing. If the Evaluator who completed the pre-plea evaluation is no longer available, a new Evaluator can complete the update.

### Evaluator Competency

Evaluators should be familiar with this Appendix and the applicable SOMB Adult Standards and Guidelines. Evaluators new to the Time-Free actuarial tables or risk calculator who apply this method are encouraged to seek training, consultation, and clinical supervision as needed.



238

CDOC/Nelson_00375

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## DECISION AID

The decision aid is to assist Evaluators and for use in conjunction with the applicable Colorado SOMB Adult Standards and Guidelines. While available to use, it is not a required protocol. Evaluators should use clinical judgment when determining the most appropriate evaluation of the client and when making recommendations within the requirements of the SOMB Adult Standards and Guidelines Section 2.000. The evaluation should give due consideration *within an overall assessment of risk* to the past sexual offending, the amount of time residing sex offense-free in the community, and the new non-sex crime.

When using the decision aid or other methods, Evaluators should take care to consider individual differences and the potential impact on the suitability of assessment instruments, recidivism risk, and desistance processes. Individual differences include race-ethnicity, immigration status, sexual orientation, gender identity, mental health, developmental-cognitive disabilities, and physical disabilities. Evaluators should also take care to ensure any assessment instruments used are appropriately normed and validated.

The decision aid incorporates research on projected lifetime sexual recidivism risk, desistance, and protective factors, alongside existing research and best practices. Of relevance, recent research demonstrated that the amount of time male adults with a sex offense history reside in the community sex offense-free has a risk-reducing effect on sexual recidivism rates. The research also found that a new conviction for non-sex offending has a risk-increasing effect.[265] From that research, an actuarial method to estimate 20-year sexual recidivism rates for adult males with a history of sex offending and a new non-sex conviction is available.[266] The actuarial approach can be applied using either the published Time-Free Actuarial Risk Tables[267] or the Time-Free Risk Calculator.[268] An overview of how to apply these methods is provided below.

The concept of desistance is built into the decision aid and included in the Time-Free actuarial methods. Desistance refers to when the risk of new sex offending is very low and not different from the risk posed by others without convictions for sex offending.[269] To meet the desistance threshold, an individual with a history of sex offending and a new non-sex conviction has to reside in the community without any known sex offending for a sufficient number of years. The number of years needed varies by the risk level at the time of release or community sentencing. For example, someone at high risk must reside in the community sex offense-free for several years longer to meet the desistance

[265] Hanson, R. K., Harris, A. J. R., Letourneau, E., Helmus, L. M., & Thornton, D. (2018). Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy, and Law, 24*(1), 48-63. https://doi.org/10.1037/law0000135.

[266] Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse, 33*(1), 3-33. https://doi.org/10.1177/1079063219871573. See also Helmus, L. M., Lee, S. C. Phenix, A., Hanson, R. K., Thornton, D. (2021). *Static-99R & Static-2002R Evaluator's Workbook*. SAARNA. https://saarna.org/static-99/

[267] Published in Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse, 33*(1), 3-33. https://doi.org/10.1177/1079063219871573.

[268] The Lifetime Residual Risk Calculator is an Excel file and is free to download from: https://saarna.org/static-99/. A user manual is available free to download from: https://saarna.org/download/user-manual-lifetime-residual-risk-calculator-2/. See also Helmus, L. M., Lee, S. C. Phenix, A., Hanson, R. K., Thornton, D. (2021). *Static-99 & Static-2002R Evaluator's Workbook*. SAARNA. https://saarna.org/static-99/

[269] A statistical threshold for defining desistance is when a sexual offender's risk for a new sexual offense is no different than the risk presented by individuals who have no prior sexual offense history but who have a history of non-sexual crime. See Hanson, R. K., Harris, A. J. R., Letourneau, E., Helmus, L. M., & Thornton, D. (2018). Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy, and Law, 24*(1), 48-63. https://doi.org/10.1037/law0000135.



239

CDOC/Nelson_00376

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

threshold than someone at moderate risk at release. The desistance threshold in the actuarial tables and calculator is when the 20-year sexual recidivism rates are under 3%.[270] At the desistance level, further sex offense-specific treatment is usually not indicated.[271]

Research on potential *protective factors* that mitigate risk and are part of the desistance process has also progressed, supporting inclusion within an overall evaluation of risk and treatment recommendations.[272]

**Decision Aid Format**

The decision aid is illustrated in a flowchart that outlines three phases.

**The <u>first phase</u> involves determining the individual's <u>current</u> sexual recidivism risk following the period in the community sex offense-free.**

Use either of the actuarial Time-Free methods (i.e., the published tables or the downloadable calculator) or an alternative best practice assessment suitable for the individual. The use of an actuarial method should occur within an *overall evaluation* of risk and consideration of treatment needs that attends to static and dynamic risk factors, protective factors, and strengths. The evaluation should include due consideration of the time sex offense-free in the community and the new non-sex crime. An advantage of the Time-Free actuarial method is that it statistically combines the effect of risk factors, time sex offense-free, and new non-sex conviction into a single risk estimate. Additional assessment can focus on other relevant factors not included or sufficiently covered in the Time-Free actuarial assessment. Such factors may include dynamic risk factors, if not part of the actuarial instrument used, or protective factors. If not using a Time-Free actuarial method, the evaluation should follow best practices according to the SOMB Standards and Guidelines Section 2.000 and sufficiently attend to each relevant area.

An overview is provided below on how to apply the actuarial Time-Free methods. Although these methods were developed using data on the first non-sex conviction, the approach is applicable when there are multiple non-sex convictions since the most recent sex offense. Guidance is included below on how to approach the evaluation of the additional non-sex convictions.[273]

**The <u>second phase</u> involves considering additional factors that influence the need for <u>current</u> sex offense-specific treatment.**

---

[270] Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse, 33*(1), 3-33. https://doi.org/10.1177/1079063219871573.

[271] Hanson, R. K., Bourgon, G., McGrath, R. K., Kroner, D., D'Amora, D. A., Thomas, S. S., & Tavarez, L. P. (2017). *A five-level risk and needs system: Maximizing assessment results in corrections through the development of a common language.* New York, NY: The Council of State Governments Justice Center.

[272] Nolan, T., Willis, G. W., Thornton, D., Kelley, S. M., Beggs Christofferson, S. (2022). Attending to the positive: A retrospective validation of the Structured Assessment of Protective Factors-Sexual Offense Version. *Sexual Abuse, 35*(2), 1-20. https://doi.org/10.1177/10790632221098354; Willis, G. M., Kelley, S. M., & Thornton, D. (2020). Are protective factors valid constructs? Interrater reliability and construct validity of proposed protective factors against sexual reoffending. *Criminal Justice & Behavior, 47*(11), 1448-1467. https://doi.org/10.1177/0093854820941039.

[273] The frequency and density of the additional non-sex convictions are factors external to the actuarial assessment and considered within an overall evaluation of risk. See Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse, 33*(1), 3-33. https://doi.org/10.1177/1079063219871573.



CDOC/Nelson_00377

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The considerations in the second phase align with the Five-Level Risk and Needs System[274] and the expertise of the Best Practices Committee. The considerations are <u>not</u> exhaustive. Other considerations may apply to specific individuals. Evaluators should use their clinical judgment. The considerations need not be "all present" or "all absent" to proceed through the pathways. Instead, they are factors to consider when determining the best combination of recommendations. Evaluators should apply clinical judgment in determining their significance.

**The <u>third phase</u> involves considering the appropriate treatment recommendations.**

The intention is for final treatment and sentence recommendations to be matched to the risk-need level of the individual, taking into consideration treatment responsivity and non-sex offending patterns. The options are: no recommendation for offense-specific treatment, targeted offense-specific treatment (e.g., a refresher program or treatment on a specific domain or criminogenic need), and comprehensive sex offense-specific treatment. In some instances, high-intensity comprehensive offense-specific treatment may be appropriate, but the individual may not be suitable for a community-based setting.

Any sex offense-specific treatment recommendations shall be consistent with the SOMB Adult Standards and Guidelines Section 2.000. Evaluators may assess other non-sex offending treatment needs also. When doing so, Evaluators should use reliable and validated methods to screen or assess non-sex offending risk, criminogenic needs, and related psychosocial factors. The presence, type, and severity of criminogenic needs associated with non-sex offending may overlap or be distinct from those for sex offending. Where sex offense-specific and non-sexual offending treatment needs coexist, Evaluators should consider the combination and sequencing of treatment recommendations.

**Applying the Time-Free Actuarial Methods**

Thornton et al. (2021) published lifetime risk estimates for male adults with a history of sex offending who remain sex offense-free in the community but have a new non-sex conviction. The method allows evaluations to statistically account for the risk-reducing effect of time sex offense-free in the community and the risk-increasing effect of having a new non-sex conviction since the most recent sex offense. Evaluators can use <u>either</u> the Time-Free Actuarial Tables published by Thornton et al. (2021) or the Time-Free Risk Calculator available for free download at <u>https://saarna.org</u>. Provided below is the relevant Time-Free Actuarial Table (see Table 1). Provided also is a simplified version that highlights only the thresholds for desistance by initial risk level at the time of release or community sentencing (see Table 2).

To use the <u>Time-Free Actuarial Table</u> determine the following:

(1) *The male adult's sexual recidivism risk level at the time of release to the community for the current (most recent) sex offending.*

   For male adults who served prison time for their sex offending, this is the sexual recidivism risk evaluation closest to their release date. For male adults sentenced to the community only, this

---

[274] Hanson, R. K., Bourgon, G., McGrath, R. K., Kroner, D., D'Amora, D. A., Thomas, S. S., & Tavarez, L. P. (2017). *A five-level risk and needs system: Maximizing assessment results in corrections through the development of a common language.* New York, NY: The Council of State Governments Justice Center.



CDOC/Nelson_00378

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

is the sexual recidivism risk evaluation at the start of the community-based sentence. For male adults with multiple past sex offenses, use the sexual recidivism risk evaluation for the most recent sex offense.

In most cases, a validated, actuarial evaluation of sexual recidivism risk will have occurred before release or community supervision which can be accessed and used as part of the current evaluation. Where the appropriate past sexual recidivism risk evaluation is unavailable or unsuitable, the Evaluator will need to complete (essentially reconstruct) the actuarial assessment for the time of release. For Static-99R assessments, the total score and risk level are in Table 1.[275] For other instruments (e.g., VASOR, SOTIPS, or VASOR/SOTIPS combinations)[276], Evaluators can use either the risk level in Table 2 as a guide or the Time-Free Calculator.

(2) *The number of years sex offense-free in the community.*

Calculate the years at liberty in the community since the most recent sex offense by subtracting time served for either technical violations or new non-sex offending. Only count full years living in the community toward years sex offense-free. For example, a male adult in the community for 3 ½ years without sex offending counts as three years. Do not count periods where extensive monitoring precluded an opportunity to offend (e.g., stringent GPS monitoring or constant oversight). Under those circumstances, it is unlikely a time-free effect occurred.

(3) *The number of non-sex convictions since the most recent sex offense.*

Count only non-sex convictions after the most recent sexual offense and since release (or the start of the community sentence, where applicable). Non-sex convictions do not include technical violations, even where the violation resulted in a return to prison.[277] Only new non-sex convictions count here.[278] A conviction for failure to register is a new non-sex conviction.[279]

The research for the Time-Free Actuarial Tables and Time-Free Risk Calculator determined the effect for the first non-sex conviction only. Therefore, treat the additional non-sex convictions as factors external to the Time-Free actuarial assessment. Consider the frequency, density, and type of that additional non-sex offending within the overall risk evaluation.

When multiple instances of non-sex conviction are present since the most recent sex offense, use

---

[275] The Static-99R is designed for use with adult males already charged or convicted of a least one sexual offense against a child or non-consenting adult. It is not recommended for use with females or use with young male adults less than 18 years old at the time of release. In limited instances, the Static-99R may be applicable to male juveniles who committed a sexual offense when 17 years of age and who are released when 18 or older. The *Static-99R manual revised (2016)* discusses the limitations of use with adolescents who committed a sexual offense and who are released once 18 or older.

[276] The VASOR-2 and SOTIPS are designed for use with adult males who have been committed at least one qualifying sexual offense when 18 years or older.

[277] If a technical violation results in a return to prison, then the time spent in prison is subtracted from the time sex offense-free in the community (see step 2).

[278] The non-sexual conviction must be a criminal offense that is sufficiently serious it could lead to jail time or community supervision. Citations that would not result in jail time or community supervision are not included here.

[279] For further discussion, see pages 5-6 of the *User Manual Lifetime Residual Risk Calculator* https://saarna.org/download/user-manual-lifetime-residual-risk-calculator-2/.



CDOC/Nelson_00379

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

the total years at liberty in the community since the most recent sex offense as the follow-up year on the Time-Free Actuarial Tables.[280]

(4) *The appropriate reference group*.

The Routine/Complete Samples should be the default reference group unless there is a strong case-specific justification to use the High-Risk/High-Need Samples reference group.[281] The primary consideration is whether a significant density of risk factors external to the actuarial measure is present that indicates the male adult is a member of a higher-risk group than placed by the risk assessment. For example, there are significant dynamic risk factors not being factored into the initial actuarial risk level.[282]

The <u>Time-Free Risk Calculator</u> requires a similar process as the Time-Free Actuarial Tables. However, the calculator provides recidivism rates for any actuarial measure used, not specifically the Static-99R. The calculator also provides a tool to help determine time-free in the community using date data. Input into the Time-Free Calculator involves completing several clearly labeled data fields. An associated manual is freely downloadable that provides detailed instructions.[283]

Table 1 presents Thornton et al.'s (2021) Routine/Complete Samples sexual recidivism risk table for male adults with a past sex offense conviction and a subsequent non-sex conviction.[284] The numbers are the percent projected to re-offend sexually over 20 years follow-up in the community. For example, the projected rate for a male adult with a Static-99R score of 2 (Level III/Moderate Risk) at release with a new non-sex conviction after five years is 7.7%. This projected rate of sexual recidivism is comparable to that of someone with moderate risk at release (Static-99R, Level III, score 1-2).[285] If a male adult with the same risk score had a first non-sex conviction after 11 years sex offense-free in the community, the projected rate is 2.8% and below the threshold for desistance. In the latter scenario, the male adult has a very low risk of sexual recidivism over the next 20 years, even though a new non-sex offense was committed.

---

[280] In cases where it has been several years since the conviction for the first non-sexual offense (e.g., the individual has been several years on community supervision already), the follow-up year would be years at liberty in the community since the index sexual offense, subtracting time served from calendar time. This is included in the calculations used in the Time-Free Risk Calculator. As previously noted, where there are multiple non-sexual offense convictions, the frequency, density, and type of these additional convictions should be considered within the overall evaluation of risk.

[281] See Hanson, R. K., Thornton, D., Helmus, L., & Babchishin, K. M. (2016). What sexual recidivism rates are associated with Static-99R and Static-2002R scores? *Sexual Abuse, 28*, 218-252. https://doi.org/10.1177/1079063215574710.

[282] This is particularly relevant if the individual has a low-to-moderate score on an actuarial measure that only considers static factors when there is strong evidence for higher risk based on the evaluation of dynamic risk factors. See Hanson et al. (2016) for an explanation of the effect of using different reference samples and guidance on the selection of the reference group. Alternatively, the Routine/Complete Samples reference group could be used, and the additional dynamic risk could be factored clinically into the overall evaluation of risk.

[283] The Lifetime Residual Risk Calculator is an Excel file and is free to download from: https://saarna.org/download/time-free-in-the-community-calculator-excel/. A user manual is available free to download from: https://saarna.org/download/user-manual-lifetime-residual-risk-calculator-2/. See also Helmus, L. M., Lee, S. C. Phenix, A., Hanson, R. K., Thornton, D. (2021). *Static-99R & Static-2002R Evaluator's Workbook*. SAARNA. https://saarna.org/static-99/

[284] Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse, 33*(1), 3-33. https://doi.org/10.1177/1079063219871573.

[285] This interpretation was achieved by comparing the current expected 20-year rate of sexual recidivism (7.7%) against the projected rates in the Projected Residual Risk Table 7 from Thornton et al. (2021). The interpretation can also be achieved by comparing the current expected sexual recidivism rate against those in the revised Static-99R normative data for routine/complete samples (Table S4) published by Lee, S. C. & Hanson, R. K. (2021). Updated 5-year and new 10-year sexual recidivism rate norms for Static-99R with routine/complete samples. *Law & Human Behavior, 45*(1), 24-38. https://saarna.org/download/new-lee-s-c-hanson-r-k-2021-updated-5-year-and-new-10-year-sexual-recidivism-rate-norms-for-static-99r-with-routine-complete-samples-law-and-human-behavior-451-24-38/



CDOC/Nelson_00380

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

In Table 1, two sets of values are underlined. One set runs down across the right side of the table and marks the transition out of the highest Static-99R risk category (level IVb; above 35%) to the next lower risk category. The other set of underlined values runs down across the left side of the table and marks the transition into the lowest risk category (level I; below 3%). The transition into the lowest risk category is the transition to the desistance threshold.

Table 2 is a simplified version of Table 1 that shows the risk level and range of years living sex offense-free in the community needed to reach the desistance threshold. Column one is the risk level at the time of release or community sentence (without Static-99R scores). The risk level nomenclature was changed to be consistent with common instruments and the SOMB Adult Standards and Guidelines. Low through High risk was substituted for Level I through IVb. Column two shows the years sex offense-free in the community required for the desistance level for each initial risk level.

As shown in Table 2, when the risk level at release is higher, more years living sex offense-free in the community (up to 20) are required to lower risk to desistance levels. For example, someone at Low-Moderate risk at release who commits a non-sex offense requires seven years in the community sex offense-free to meet the desistance threshold. In contrast, someone at Moderate-High risk at release who commits a non-sex offense requires 15-16 years in the community sex offense-free to meet the desistance level.

Table 2 shows the *range* of years required in the community sex offense-free for desistance in column 2 for each of the initial risk scores within a risk category. For example, an initial risk score at the low end of the moderate risk category requires nine years in the community sex offense-free to reach desistance. In comparison, an initial risk score at the high end of the moderate risk category requires 13 years. When applying the range of years to individual cases, a conservative approach is to take the upper number of years. However, Evaluators should consider the overall evaluation of risk and whether there are factors supporting desistance at the lower range of years.



CDOC/Nelson_00381

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Table 1. Projected Sexual Residual Risk for Adult Men with a History of Sexual Offending and a New Non-Sexual Conviction: Routine/Complete Samples. [286] [287]

**Table 5.** Projected Residual Risk (Sexual Recidivism Rates as Percentages) From Time of Release Up to 20 Years Sex Offense Free in the Community for Routine/Complete Samples by Time of First Nonsexual Recidivism.

| Follow-up year | Initial risk (based on Static-99R scores) | | | | | | | | | | | | |
| | Level I | | Level II | | Level III | | | Level IVa | | Level IVb | | | | |
| | −3 | −2 | −1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| <1 | 2.6 | 3.8 | 5.5 | 8.0 | 11.0 | 15.5 | 21.4 | 28.9 | 38.2 | 48.8 | 60.4 | 71.6 | 81.3 | 88.9 |
| 1 | 2.3 | 3.3 | 4.7 | 6.9 | 9.6 | 13.6 | 18.8 | 25.5 | 34.1 | 44.1 | 55.3 | 66.6 | 76.8 | 85.3 |
| 2 | 2.0 | 2.8 | 4.1 | 6.0 | 8.3 | 11.8 | 16.5 | 22.5 | 30.3 | 39.5 | 50.2 | 61.3 | 71.9 | 81.2 |
| 3 | 1.7 | 2.4 | 3.5 | 5.2 | 7.2 | 10.3 | 14.4 | 19.7 | 26.8 | 35.2 | 45.2 | 56.1 | 66.7 | 76.5 |
| 4 | 1.5 | 2.1 | 3.1 | 4.5 | 6.2 | 8.9 | 12.5 | 17.2 | 23.5 | 31.2 | 40.5 | 50.8 | 61.3 | 71.4 |
| 5 | 1.2 | 1.8 | 2.6 | 3.9 | 5.4 | 7.7 | 10.8 | 15.0 | 20.6 | 27.5 | 36.0 | 45.7 | 55.9 | 66.0 |
| 6 | 1.1 | 1.5 | 2.2 | 3.3 | 4.6 | 6.6 | 9.3 | 13.0 | 17.9 | 24.0 | 31.7 | 40.7 | 50.4 | 60.4 |
| 7 | 0.9 | 1.3 | 1.9 | 2.8 | 3.9 | 5.7 | 8.0 | 11.1 | 15.4 | 20.9 | 27.8 | 36.0 | 45.1 | 54.8 |
| 8 | 0.8 | 1.1 | 1.6 | 2.4 | 3.3 | 4.8 | 6.8 | 9.5 | 13.3 | 18.0 | 24.1 | 31.5 | 39.9 | 49.1 |
| 9 | 0.6 | 0.9 | 1.4 | 2.0 | 2.8 | 4.1 | 5.8 | 8.1 | 11.3 | 15.4 | 20.8 | 27.4 | 35.0 | 43.5 |
| 10 | 0.5 | 0.8 | 1.2 | 1.7 | 2.4 | 3.4 | 4.9 | 6.8 | 9.6 | 13.1 | 17.7 | 23.5 | 30.3 | 38.0 |
| 11 | 0.5 | 0.7 | 1.0 | 1.4 | 2.0 | 2.8 | 4.1 | 5.7 | 8.0 | 11.0 | 15.0 | 20.0 | 25.9 | 32.8 |
| 12 | 0.4 | 0.5 | 0.8 | 1.2 | 1.6 | 2.3 | 3.3 | 4.7 | 6.6 | 9.1 | 12.5 | 16.7 | 21.9 | 27.9 |
| 13 | 0.3 | 0.4 | 0.6 | 0.9 | 1.3 | 1.9 | 2.7 | 3.8 | 5.4 | 7.4 | 10.2 | 13.8 | 18.1 | 23.3 |
| 14 | 0.2 | 0.3 | 0.5 | 0.7 | 1.0 | 1.5 | 2.2 | 3.0 | 4.3 | 6.0 | 8.2 | 11.1 | 14.7 | 19.0 |
| 15 | 0.2 | 0.3 | 0.4 | 0.6 | 0.8 | 1.2 | 1.7 | 2.4 | 3.3 | 4.6 | 6.4 | 8.7 | 11.6 | 15.1 |
| 16 | 0.1 | 0.2 | 0.3 | 0.4 | 0.6 | 0.9 | 1.2 | 1.8 | 2.5 | 3.5 | 4.8 | 6.5 | 8.7 | 11.4 |
| 17 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.6 | 0.9 | 1.2 | 1.7 | 2.4 | 3.4 | 4.6 | 6.2 | 8.1 |
| 18 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.5 | 0.8 | 1.1 | 1.5 | 2.1 | 2.9 | 3.9 | 5.1 |
| 19 | <0.1 | <0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.5 | 0.7 | 1.0 | 1.4 | 1.8 | 2.4 |
| 20 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

*Note.* Recidivism rate projections based on 5-year logistic regression estimates from Hanson, Thornton, Helmus, and Babchishin (2016). Underlined values mark the transition out of Level IVb (above 35%) and into Level I (less than 3%).

[286] Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse, 33*(1), 3-33. https://doi.org/10.1177/1079063219871573.

[287] In cases where it has been several years since the conviction for the first non-sexual offense (e.g., the individual has been several years on community supervision already), the follow-up year would be years at liberty in the community since the index sexual offense, subtracting time served from calendar time (Thornton et al., 2021). As previously noted, where there are multiple non-sexual offense convictions, the frequency and density of these additional convictions should be considered within the overall evaluation of risk.



CDOC/Nelson_00382

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Table 2. Number of Years Required Sex Offense Free in the Community For Desistance By Risk Level At Release For Adult Men With a History of Sexual Offending and a First Non-Sexual Conviction (Routine/Complete Samples)[288]

| RISK LEVEL AT TIME OF RELEASE (BASED ON VALIDATED RISK MEASURE) | RANGE OF YEARS OFFENSE-FREE IN THE COMMUNITY REQUIRED FOR  DESISTANCE* |
| --- | --- |
| Low Risk | < 1 - 2 years |
| Low-Moderate Risk | 5 - 7 years |
| Moderate Risk | 9 - 13 years |
| Moderate-High Risk | 15 - 16 years |
| High Risk | 17 - 19 years |

*The *range* of years is the number required for desistance at the lower and upper scores within that risk level.

When using this method, remember

- The tables only apply to male adults with a history of sex offending and a new non-sex conviction. The tables are not suitable for juveniles, adults whose conviction for sex offending was only as a juvenile, or females. [289]
- When there is more than one non-sex conviction following the most recent sex offense, the frequency, density, and type of additional convictions should be considered external to the actuarial estimates and considered as part of an overall risk evaluation.
- Non-sex convictions do not include technical violations. Failure to Register is considered a new non-sex conviction, not a technical violation.
- The routine/complete samples should be the default reference group unless there is a strong case justification for using the High-Risk/High-Need Samples reference group.
- The risk classifications, including desistance, are only specific to sexual recidivism risk and do not provide information about risk for non-sexual recidivism.
- Table 2 shows the *range* of years required in the community sex offense-free for desistance across the initial risk scores within that risk category. When determining whether there is sufficient evidence for desistance or not, Evaluators should consider the overall evaluation of risk.

---

[288] In cases where it has been several years since a conviction for the first non-sexual offense (e.g., the individual has been several years on community supervision already), the follow-up year would be years at liberty in the community since the index sexual offense, subtracting time served from calendar time (Thornton et al., 2021). As previously noted, where there are multiple non-sexual offense convictions, the frequency, density, and nature of these additional convictions should be considered within the overall evaluation of risk.

[289] In limited instances, the Static-99R can be used with male juveniles who committed a sexual offense when 17 years of age and who are released when 18 or older. The Static-99R manual revised (2016) discusses the limitations of use with adolescents. The VASOR-2 and SOTIPS are only intended for use with males who committed at least one qualifying sexual offense when 18 years or older.



CDOC/Nelson_00383

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Decision Aid for Evaluation of Male Adults Who Have Committed Sex Offenses as an Adult and Have a New Non-Sex Crime**

**Conduct Evaluation of Current Sexual Recidivism Risk Level**

*Use either the Time-Free actuarial tables or the Time-Free Risk Calculator method (see guidelines), OR use an alternative best practice method suitable for the client, consistent with SOMB Adult Standards and Guidelines Section 2.000.*
*Ensure the evaluation focuses on the current risk of sexual recidivism following the period of time sex offense-free in the community since the most recent sex offense(s). This may not be the same as the risk at the time of release/community sentencing.*

*Preferably the evaluation includes use of one or more actuarial instruments that involve assessment of dynamic as well as static risk factors. Within the overall evaluation of risk level, consideration should be given to the combination of static and dynamic risk factors, protective factors and strengths, time sex offense-free in the community, and new nonsexual offending.*

**Is current sexual recidivism risk at desistance level?**

————**YES**————————————————————————————**NO**————

**Other Factors To Consider When Determining Recommendations (all do not need to be present, apply clinical judgment)**

**Other Factors To Consider When Determining Recommendations (all do not need to be present, apply clinical judgment)**

Low-Mod/Moderate Intensity Intervention Needs

Moderate-High/High Intensity Intervention Needs

**Offense-Specific Risk-Needs**
- non-sex crime does not share characteristics with sex offending -
- no sex offense criminogenic needs present that would benefit from treatment -
- no significant concerns about compliance with safety plan -

——**NO**——

**Offense-Specific Risk-Needs**
- non-sex crime does not share characteristics with sex offending -
- some criminogenic needs present, may be transitory, mild, or 1-2 main areas -
- no evidence of paraphilic disorder associated with sexually abusive behavior -

——**NO**——

**Offense-Specfic Risk-Needs**
- multiple criminogenic needs present, some chronic or severe, but manageable in the community -
- paraphilic disorder associated with sexually abusive behavior, SVP status, or psychopathy may be present, but manageable in the community -

——**NO**——

**Protective Factors/Strengths**
- has protective factors that mitigate any residual risk/concern -
- may be potential negative impact of intervention on protective factors -
- history of good past sentence compliance -

——**NO**——

**Protective Factors/Strengths**
- may have engaged in past sex offense-specific treatment -
- protective factors developing (although criminogenic needs may impact full effective use of resources/strengths) -
- amenable to treatment and history of adequate past sentence compliance -

——**NO**——

**Protective Factors/Strengths**
- complied minimally with past sentence(s) -
- basic capacity and willingness to engage in treatment/management -

**YES**

**YES**

**YES**

Where the individual is at desistance level and there are no significant or ongoing additional criminogenic needs consider recommending no sex offense-specific treatment or supervision terms and conditions.

Determine any recommendations for non-sex offense treatment and supervision (eg, substance abuse or mental health treatment) based on evaluation of non-sex offending risk-need.

Where the individual has low-mod to moderate intensity intervention needs, and there are limited significant additional concerns, consider recommending targeted sex offense-specific treatment with accompanying supervision terms and conditions. It is anticipated that treatment will be shorter-term and focused on specific risk-need issues. Give consideration to whether there is any indication for a child contact screen.

Determine if any additional recommendations for non-sex offense treatment and supervision (eg, substance abuse treatment) are indicated based on evaluation of non-sex offending risk-need.

When the individual has mod-high or high intensity intervention needs, or there are significant risk-need concerns, consider recommending comprehensive sex offense-specific treatment with standard sex offender supervision terms and conditions. Conduct relevant child contact screen and make associated recommendations.

Determine any recommendations for non-sex offense treatment and supervision based on evaluation of non-sex offending risk-need.

Where there is a need for high intensity treatment but the individual is assessed as unsuitable for community-based supervision due to the level of risk, treatment amenability, and/or nature and severity of non-sex offending, indicate this to the referring agency.



CDOC/Nelson_00384

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Guidelines for Evaluation of Juvenile or Adult Males Who Have Committed Sex Offenses as a Juvenile Only and Have a New Non-Sex Crime**

These guidelines are for sex offense-specific evaluations of juvenile or adult males who have a past sex offense as a juvenile only[290] and a new non-sex crime, who meet the statutory definition of a sex offender:

> A. Per statute 16-11.7-102 (2) (a) (II) C.R.S., "A sex offender means any person who is convicted in the state of Colorado on or after January 1, 1994, of any criminal offense, if such person has previously been convicted of a sex offense as described in subsection (3) of this section in the state of Colorado, or if such person has previously been convicted any other jurisdiction of any offense that would constitute a sex offense as defined in subsection (3) of this section, or if such person has a history of any sex offense as defined in subsection (3) of this section."

These guidelines also apply to juvenile or adult males who have a past sex offense as a juvenile only and who are convicted of Failure to Register.[291]

Per statute, all sex offenders in the state of Colorado "as part of the presentence or probation investigation (are) required pursuant to section 16-11-103, to submit to an evaluation for treatment, an evaluation for risk, procedures required for monitoring of behavior to protect the victims, and potential victims, and an identification developed pursuant to section 16-11.7-103 (4)." Further, all sex offenders in the state of Colorado are required, as part of any sentence to probation, commitment to the Department of Human Services, sentence to community corrections, incarceration with the Department of Corrections, placement on parole, or out-of-home placement to "undergo treatment to the extent appropriate to such offender based upon the recommendations of the evaluation and identified made pursuant to section 16-11.7-104…"[292] Finally, it is noted that sex offenders sentenced to community supervision (probation or parole) may be supervised by specialized sex offender supervision officers and subject to some or all of the specialized terms and conditions of supervision developed for sex offenders.[293]


**INTRODUCTION**

The *Guidelines for Evaluation of Juvenile or Adult Males Who Have Committed Sex Offenses as a Juvenile Only and Have a New Non-Sex Crime* includes a series of protocols and a decision aid. The Guidelines are designed to be used with the applicable Colorado SOMB Standards and Guidelines for the Evaluation, Assessment, Treatment, and Supervision of Juveniles Who Have Committed Sexual Offenses (hereafter referred to as the SOMB Juvenile Standards and Guidelines). The Guidelines are provided to assist Evaluators in meeting the SOMB Juvenile Standards and Guidelines when these evaluations are requested but are not a required protocol.

**GUIDELINE PROTOCOLS**

---

[290] The juvenile standards apply when the past sex offending was committed when a juvenile only and no sex offenses have been convicted or adjudicated as an adult.

[291] Failure to register is a new non-sex offense criminal conviction.

[292] See 16-11.7-105 C.R.S.

[293] See 18-1.3-1007 C.R.S.



CDOC/Nelson_00385

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Use of SOMB Approved Evaluators**

A Juvenile Evaluator should be used if both the current non-sex crime, including Failure to Register, and the most recent sex offense are adjudicated as a juvenile (i.e., prior to age 18 years).

An Adult Evaluator should be used if the current non-sex crime, including Failure to Register, occurred as an adult (i.e., when 18 years or older) and the most recent sexual offense was adjudicated as a juvenile. Although the client is an adult, the SOMB Juvenile Standards and Guidelines apply as the past sex offense was adjudicated as a juvenile. Ideally, an Evaluator with both Juvenile and Adult listed provider status is used, but when unavailable, the Adult-listed Evaluator should consult with a Juvenile-listed provider. The consultation should be documented in the client record and evaluation. For young adults aged 18-25 years, Evaluators should also consult the SOMB Young Adult Modification Protocol.

For further discussion and clarification about the correct application of the SOMB Juvenile and Adult Standards and Guidelines see the SOMB Bulletin *Applicability of the Adult or Juvenile Standards for Individuals Meeting the Definition of a Sexual Offender (16-11.7-102)*, dated June 5, 2014.

**Multidisciplinary Collaboration**

The Evaluator should seek relevant background information, including the discharge summary, from the prior Multi-Disciplinary Team (MDT) and any adjunct treatment providers, if available. Evaluators are encouraged to use judgment in the amount of effort given if the information is difficult to obtain. Evaluations should not be unnecessarily delayed when prior treatment information is unavailable.

The Evaluator should document the information obtained from other sources in the evaluation and document unsuccessful attempts to gain information in the client record.

The Evaluator should be available to consult with the PSI Officer to answer questions about the evaluation and to review the treatment recommendations as needed.

If the evaluation is before the individual enters a plea, the evaluation may need updating following conviction and sentencing. If the Evaluator who completed the pre-plea evaluation is no longer available, a new Evaluator can complete the update.

**Evaluator Competency**

Evaluators should be familiar with this Appendix and the applicable SOMB Adult and Juvenile Standards and Guidelines.

**DECISION AID**

The decision aid is to assist Evaluators and for use in conjunction with the applicable Colorado SOMB Juvenile Standards and Guidelines. While available to use, it is not a required protocol. Evaluators should use clinical judgment when determining the most appropriate evaluation of the client and when making recommendations within the requirements of the SOMB Juvenile Standards and Guidelines Section 2.000. The evaluation should give due consideration *within an overall assessment of risk* to



CDOC/Nelson_00386

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

the past sexual offending, the amount of time residing sex offense-free in the community, and the new nonsexual offending.

When using the decision aid or other methods, Evaluators should take care to consider individual differences and the potential impact on the suitability of assessment instruments, recidivism risk, and desistance processes. Individual differences include race-ethnicity, immigration status, sexual orientation, gender identity, mental health, developmental-cognitive disabilities, and physical disabilities. Evaluators should also take care to ensure any assessment instruments used are normed and validated for the appropriate age group. For evaluations of adults with a juvenile sex offense, adult sex offending risk instruments are typically not appropriate when the sex offense occurred only as a juvenile.[294] Juvenile sexual offending risk instruments are also typically not appropriate for use with adults.[295]

The decision aid incorporates research on juvenile sexual recidivism risk, desistance, and protective factors, alongside existing research and best practices.[296] Of relevance, research finds the sexual recidivism rate for male juveniles is lower than for male adults. Sexual recidivism estimates typically range from under 3% up to 9% over long follow-up periods (e.g., up to 20 years). Consistent with this, developmental life-course studies show most male juveniles who commit a sex offense are adolescent-limited and desist by adulthood. Nonetheless, that research also shows a small proportion do persist and sexually offend in adulthood. Consequently, a large proportion of male juveniles convicted or adjudicated of a sex offense are low risk, while a small group presents a higher risk.

Research on rates of violent and general offending indicates many males with a juvenile sex offense conviction or adjudication commit other delinquent and non-sex offenses.[297] Developmental life-course studies indicate that for some individuals, non-sexual violent and general offending will persist while sex offending desists. Thus, determining the type of offending trajectory the individual presents can help inform treatment recommendations. In cases where the offending pattern indicates elevated

---

[294] For example, the Static-99R is designed for use with adult males and is not recommended for young male adults less than 18 years old at the time of release. The *Static-99R manual 2016* discusses the limitations of use with adolescents who committed a sexual offense and who are released once 18 or older. The VASOR-2 and SOTIPS are designed for use with adult males who committed a qualifying sexual offense when 18 years or older.

[295] For example, the J-SOAP-II is designed for use with boys aged 12-18 years of age who have been adjudicated for sexual offenses or have a history of sexually coercive behavior.

[296] Caldwell, M. F. (2016). Quantifying the decline in juvenile sexual recidivism rates. *Psychology, Public Policy, & Law, 22*(4), 414-426; Lobanov-Rostovsky, C. (2015). *Recidivism of juveniles who commit sexual offenses*. SOMAPI Research Brief: US Department of Justice, Office of Justice Programs; Lussier, P. McCuish, E., & Corrado, R. R. (2015). The adolescence-adulthood transition and desistance from crime: Examining the underlying structure of desistance. *Journal of Life Course Criminology, 1*, 87-117; Lussier, P., Van Den Berg, C., Bijleveld, C., & Hendriks, J. (2012). A developmental taxonomy of juvenile sex offenders for theory, research, and prevention: The adolescent-limited and high-rate slow desister. *Criminal Justice & Behavior, 39*(12), 1559-1581; Ozkan, T., Clipper, S. J., Piquero, A. R., Baglivio, M., & Wolff, K. (2020). Predicting sexual recidivism. *Sexual Abuse: A Journal of Research & Treatment, 32*(4), 375-399; Schwartz-Mette, Righthand, J. H., Dore, G., & Huff, R. (2020). Long-term predictive validity of the Juvenile Sex Offender Assessment Protocol-II: Research and practice implications. *Sexual Abuse: A Journal of Research & Treatment, 32*(5), 499-520; Worling, J. R., Littlejohn, A., & Bookalam, D. (2010). 20-year prospective follow-up study of specialized treatment for adolescents who offended sexually. *Behavioral Sciences and the Law, 26*, 46-57.

[297] Caldwell, M. F. (2016). Quantifying the decline in juvenile sexual recidivism rates. *Psychology, Public Policy, & Law, 22*(4), 414-426; Lussier, P. McCuish, E., & Corrado, R. R. (2015). The adolescence-adulthood transition and desistance from crime: Examining the underlying structure of desistance. *Journal of Life Course Criminology, 1*, 87-117; Lussier, P., Van Den Berg, C., Bijleveld, C., & Hendriks, J. (2012). A developmental taxonomy of juvenile sex offenders for theory, research, and prevention: The adolescent-limited and high-rate slow desister. *Criminal Justice & Behavior, 39*(12), 1559-1581; Ozkan, T., Clipper, S. J., Piquero, A. R., Baglivio, M., & Wolff, K. (2020). Predicting sexual recidivism. *Sexual Abuse: A Journal of Research & Treatment, 32*(4), 375-399; Schwartz-Mette, Righthand, J. H., Dore, G., & Huff, R. (2020). Long-term predictive validity of the Juvenile Sex Offender Assessment Protocol-II: Research and practice implications. *Sexual Abuse: A Journal of Research & Treatment, 32*(5), 499-520; Worling, J. R., Littlejohn, A., & Bookalam, D. (2010). 20-year prospective follow-up study of specialized treatment for adolescents who offended sexually. *Behavioral Sciences and the Law, 26*, 46-57.



CDOC/Nelson_00387

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

sexual recidivism risk, sex offense-specific treatment is indicated. In cases where the offending pattern indicates low sexual recidivism risk but higher risk for other violence or general offending, interventions to address non-sexual offending may be more appropriate.[298] In some cases, the overall risk may be low, and no treatment recommendations will be indicated. For example, when the client has lived without known offending for many years in the community and the new non-sex crime was due to situational or personal factors that have been sufficiently resolved.

Structured, empirically-informed juvenile risk assessment instruments are available to guide the assessment of risk and protective factors in male *juveniles*. Few have actuarial risk tables and so do not provide recidivism estimates.[299] A contributing factor is that it is technically challenging to distinguish juveniles who sexually recidivate from those who desist when the overall rate of juvenile sexual recidivism is low. Research on specific risk factors supports that deviant sexual interest or preoccupation is associated with higher rates of sexual recidivism and that treatment completion is associated with lower rates of sexual recidivism.[300]

Juvenile sex-offending risk instruments are not appropriate for use with adults, and adult sex-offending risk instruments are typically not appropriate when the sex offense occurred only as a juvenile.[301] Thus, the evaluation of male adults with a past juvenile sex offense primarily involves a clinical assessment.

**Decision Aid Format**

The decision aid is illustrated in a flowchart that outlines three main phases.

**The first phase involves evaluating the individual's current sexual recidivism risk following the period in the community sex offense-free.**

The past evaluation for the most recent sex offense should be obtained, if available. The past evaluation should be updated to be current. When the most recent sex offense was adjudicated as a juvenile, evaluations completed 6 months or more ago should be updated. If the past evaluation is unavailable or unsuitable, a new evaluation of the current sexual recidivism risk should be conducted.

---

[298] Kettrey, H. H. & Lipsey, M. W. (2018). The effects of specialized treatment on the recidivism of juvenile sex offenders: A systematic review and meta-analysis. *Journal of Experimental Criminology, 14*(3), 1-27.

[299] Barra, S., Bessler, C., Landolt, M. A., Aebi, M. (2018). Testing the validity of criminal risk assessment tools in sexually abusive youth. *Psychological Assessment, 30*(11), 1430-1443; Caldwell, M. F. (2016). Quantifying the decline in juvenile sexual recidivism rates. *Psychology, Public Policy, & Law, 22*(4), 414-426; Schwartz-Mette, Righthand, J. H., Dore, G., & Huff, R. (2020). Long-term predictive validity of the Juvenile Sex Offender Assessment Protocol-II: Research and practice implications. *Sexual Abuse: A Journal of Research & Treatment, 32*(5), 499-520.

[300] Kettrey, H. H. & Lipsey, M. W. (2018). The effects of specialized treatment on the recidivism of juvenile sex offenders: A systematic review and meta-analysis. *Journal of Experimental Criminology, 14*(3), 1-27; Kim, B., Benekos, P. J., Merlo, A. V. (2015). Sex offender recidivism revisited: Review of recent meta-analyses on the effects of sex offender treatment. *Trauma, Violence, & Abuse, Jan*, 1-13; Olver, M. E., Stockdale, K. C., & Wormith, J. S. (2011). A meta-analysis of predictors of offender treatment attrition and its relationship to recidivism. *Journal of Consulting and Clinical Psychology, 79*(1), 6-21; Ozkan, T., Clipper, S. J., Piquero, A. R., Baglivio, M., & Wolff, K. (2020). Predicting sexual recidivism. *Sexual Abuse: A Journal of Research & Treatment, 32*(4), 375-399; Ralston, C. A., & Epperson, D. L. (2013). Predictive validity of adult risk assessment tools with juveniles who offended sexually. *Psychological Assessment, 25*(3), 905-916; Schwartz-Mette, Righthand, J. H., Dore, G., & Huff, R. (2020). Long-term predictive validity of the Juvenile Sex Offender Assessment Protocol-II: Research and practice implications. *Sexual Abuse: A Journal of Research & Treatment, 32*(5), 499-520; Worling, J. R., Littlejohn, A., & Bookalam, D. (2010). 20-year prospective follow-up study of specialized treatment for adolescents who offended sexually. *Behavioral Sciences and the Law, 26*, 46-57.

[301] One exception is the possible use of the Static-99R when a juvenile committed the sexual offense when 17 years of age and was released when 18 or older. See the *Static-99R manual 2016* for a discussion of the limitations of the use of the Static-99R with juveniles.



CDOC/Nelson_00388

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The new evaluation should be consistent with the SOMB Juvenile Standards and Guidelines Section 2.000. The evaluation should give due consideration *within an overall assessment of risk* to potential static and dynamic risk factors, protective factors, and strengths. The evaluation should include due consideration of the time sex offense-free in the community and the new nonsexual offending.

For clients who are male juveniles, a structured, empirically informed juvenile risk assessment instrument should be used where suitable. For clients who are male adults, the evaluation will be primarily a clinical assessment of relevant factors. However, other instruments that assess non-sexual recidivism risk or psychological factors that are validated with male adults may be appropriate where relevant.

**The <u>second phase</u> involves considering additional factors that influence the need for any <u>current</u> sex offense-specific treatment.**

Research on base rates supports the position that males with a past juvenile sex offense have a low risk of sexual recidivism unless there is empirically-based evidence of higher risk. The factors listed that favor desistance or low offense-specific intervention needs are not exhaustive. Similarly, the factors listed that favor the presence of offense-specific intervention needs is not exhaustive. Other considerations may apply to specific individuals. Evaluators should use their clinical judgment. The considerations need not be "all present" or "all absent" to proceed through the pathways. Instead, they are factors to consider when determining the best combination of recommendations. Evaluators should apply clinical judgment in determining their significance.

**The <u>third phase</u> involves considering the appropriate treatment recommendations.**

The intention is for final treatment and sentence recommendations to be matched to the risk-need level of the individual, taking into consideration treatment responsivity and non-sexual offending patterns. The options are recommendations for standard supervision only, non-sex offense treatment (e.g., substance abuse or violence prevention), or sex offense-specific treatment. Any sex offense-specific treatment recommendations shall be consistent with the applicable SOMB Juvenile Standards and Guidelines Section 2.000.

Evaluators may assess other non-sex offending treatment needs. When doing so, Evaluators should use reliable and validated methods appropriate for the client to screen or assess non-sex offending risk, criminogenic needs, and related psychosocial factors. The presence, type, and severity of criminogenic needs associated with non-sex offending may be distinct from, or overlap, those for sex offending. Where sex offense-specific and nonsexual offending treatment needs coexist, Evaluators should consider the combination and sequencing of treatment recommendations.



CDOC/Nelson_00389

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Decision Aid for Evaluation of Juvenile or Adult Males Who Have Committed Sex Offenses as a Juvenile Only and Have a New Non-Sex Crime**

**Conduct Evaluation of Current Sexual Recidivsim Risk Level**

*Conduct a risk assessment suitable for the client, consistent with SOMB Juvenile Standards and Guidelines Section 2.000. Ensure the evaluation focuses on the current risk of sexual recidivism following the period of time sex offense-free in the community since the most recent sex offense(s). This may not be the same as the risk as the time of release/community adjudication.*

*If the client is a juvenile, it is preferable the evaluation includes the use of a structured, empirically-informed, instrument that assesses dynamic as well as static risk factors for juveniles. If the client is an adult (i.e., the sex offending was committed as a juvenile with a new non-sex crime committed as an adult), the evaluation will be a primarily clinical assessment of relevant factors. Other risk assessment instruments (e.g., general violence risk, general offending) or psychological instruments may be appropriate where relevant.*

*Within the overall evaluation of risk level, consideration should be given to the combination of risk factors, protective factors and strengths, time sex offense-free in the community, and the nature of the new non-sex crime.*

**Salient Factors To Consider When Determining Recommendations**
Research supports starting from the position that clients who have committed sex offenses as a juvenile only have a low risk of sexual recidivism unless there is empirically-based evidence of higher risk. Consider if the past juvenile sex offense(s) is consistent with lower risk and/or a generalist pattern of offending/delinquency, or signals higher risk for a persistent pattern of sexual offending.

**Evidence favors lower sex offense-specific treatment needs**
*(all do not need to be present, others not included may apply, apply clinical reasoning when evaluating presence and influence)*

- non-sex crime does not share characteristics with past sex offense(s) -
- successfully completed offense-specific treatment, if referred -
- evidence implementing relapse prevention in community -
- prior sex offense against single (female) victim -
- single sex offense adjudication/conviction -
- 3+ years past since sex offense -
- appears to have normative sexual interests -
- appears to have normative peer relationships -
- protective factors present/developing (e.g., engaged in school/work, family proactive/prosocial, appropriate peers, positive identity) -

**YES**

**Evidence favors higher sex offense-specific treatment needs**
*(all do not need to be present, others not included may apply, apply clinical reasoning when evaluating presence and influence)*

- failed to complete sex offense-specific treatment, if referred -
- little evidence implementinig relapse prevention at all or consistently -
- similarities between current non-sex crime and prior sex crime -
- sex offenses against 2+ victims and/or includes male victim -
- has 2+ past sex offense adjudications -
- deviant sexual interests appear probable or diagnosed -
- evidence of recent viewing of child pornography -
- socially isolated -
- risk factors present in family/community (eg, family resistant to sex offense-specific interventions/safety requirements, poor supervision) -

**YES**

**Evidence favors general or non-sexual violent offense-specific treatment needs**
*(all do not need to be present, others not included may apply, apply clinical reasoning when evaluating presence and influence)*

- has current non-sexual violent offense -
- multiple general offenses/adjudications -
- generally antisocial attitudes and beliefs evident -
- antisocial peer relationships -
- poor impulse and emotion regulation -
- substance abuse / mental health issues -
- family/community risk factors -

**NO**

**YES**

**Consider referral for sex-offense specific treatment. Include applicable sentence conditions.**
Where the individual has a moderate (or higher) risk of sexual recidivism and/or evidence of criminogenic concerns that would benefit from treatment, consider recommending sex offense-specific treatment with relevant supervision terms and conditions. Conduct any relevant child contact screens and make associated recommendations.

Determine any recommendations for non-sex offense treatment and supervision based on evaluation of nosexual offending risk-need.

**Consider standard supervision sentence**
Where the individual has a low risk level and there are no significant or ongoing additional criminogenic concerns, consider recommending no offense-specific treatment. Standard supervision may be appropriate.

**Consider referral for non-sex offense treatment. Include applicable sentence conditions.**
Where the individual has a low risk of sexual recidivism but evidences risk of further generalist or non-sexual violent offending, consider recommending non-sex offense treatment with relevant supervision terms and conditions.



253

CDOC/Nelson_00390

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### Guidelines for Evaluation of Adult or Juvenile Females Who Have Committed Sex Offenses and Have a New Non-Sex Crime

These guidelines are for sex offense-specific evaluations of adult or juvenile females who have a past sex offense and a new non-sex crime, who meet the statutory definition of a sex offender:

> A. Per statute 16-11.7-102 (2) (a) (II) C.R.S., "A sex offender means any person who is convicted in the state of Colorado on or after January 1, 1994, of any criminal offense, if such person has previously been convicted of a sex offense as described in subsection (3) of this section in the state of Colorado, or if such person has previously been convicted any other jurisdiction of any offense that would constitute a sex offense as defined in subsection (3) of this section, or if such person has a history of any sex offense as defined in subsection (3) of this section."

These guidelines also apply to adult or juvenile females with a past sex offense who are convicted of Failure to Register. [302]

Per statute, all sex offenders in the state of Colorado "as part of the presentence or probation investigation (are) required pursuant to section 16-11-103, to submit to an evaluation for treatment, an evaluation for risk, procedures required for monitoring of behavior to protect the victims, and potential victims, and an identification developed pursuant to section 16-11.7-103 (4)." Further, all sex offenders in the state of Colorado are required, as part of any sentence to probation, commitment to the Department of Human Services, sentence to community corrections, incarceration with the Department of Corrections, placement on parole, or out-of-home placement to "undergo treatment to the extent appropriate to such offender based upon the recommendations of the evaluation and identified made pursuant to section 16-11.7-104…" [303] Finally, it is noted that sex offenders sentenced to community supervision (probation or parole) may be supervised by specialized sex offender supervision officers and subject to some or all of the specialized terms and conditions of supervision developed for sex offenders. [304]

### INTRODUCTION

The *Guidelines for Evaluation of Adult and Juvenile Females Who Have Committed Sex Offenses and Have a New Non-Sex Crime* includes a series of protocols and a decision aid. The Guidelines are designed to be used with the applicable Colorado SOMB Standards and Guidelines for the Evaluation, Assessment, Treatment, and Behavioral Monitoring of Adult Sexual Offenders (hereafter referred to as the SOMB Adult Standards and Guidelines) and the Colorado SOMB Standards and Guidelines for the Evaluation, Assessment, Treatment, and Supervision of Juveniles Who Have Committed Sexual Offenses (hereafter referred to as the SOMB Juvenile Standards and Guidelines). The Guidelines are provided to assist Evaluators in meeting the SOMB Standards and Guidelines when these evaluations are requested but are not a required protocol.

---

[302] Failure to register is a new non-sex offense criminal conviction.

[303] See 16-11.7-105 C.R.S.

[304] See 18-1.3-1007 C.R.S.



CDOC/Nelson_00391

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**GUIDELINE PROTOCOLS**

**Use of SOMB Approved Evaluators**

An Adult Evaluator should be used when the current non-sex crime, including Failure to Register, and the most recent sex offense, occurred when 18 years or older.

An Adult Evaluator should be used if the current non-sex crime, including Failure to Register, occurred as an adult (i.e., when 18 years or older) and the most recent sexual offense was adjudicated as a juvenile. The SOMB Juvenile Standards and Guidelines apply, however, as the past sex offense was adjudicated as a juvenile. Ideally, an Evaluator with both Juvenile and Adult listed provider status is used, but when unavailable, the Adult-listed Evaluator should consult with a Juvenile-listed provider. The consultation should be documented in the client record and evaluation. For young adults aged 18-25 years, Evaluators should also consult the <u>SOMB Young Adult Modification Protocol</u>.

A Juvenile Evaluator should be used if both the current non-sex crime, including Failure to Register, and the most recent sex offense are adjudicated as a juvenile.

For further discussion and clarification about the correct application of the juvenile and adult standards, see the SOMB Bulletin *<u>Applicability of the Adult or Juvenile Standards for Individuals Meeting the Definition of a Sexual Offender (16-11.7-102)</u>*, dated June 5, 2014.

**Multidisciplinary Collaboration**

The Evaluator should seek relevant background information, including the discharge summary, from the prior Community Supervision Team (CST) or Multi-Disciplinary Team (MDT), as well as any adjunct treatment providers, if available. Evaluators are encouraged to use judgment in the amount of effort given if the information is difficult to obtain. Evaluations should not be unnecessarily delayed when prior treatment information is unavailable.

The Evaluator should document the information obtained from other sources in the evaluation and document unsuccessful attempts to gain information in the client record.

The Evaluator should be available to consult with the PSI Officer to answer questions about the evaluation and to review the treatment recommendations as needed.

If the evaluation is before the individual enters a plea, the evaluation may need updating following conviction and sentencing. If the Evaluator who completed the pre-plea evaluation is no longer available, a new Evaluator can complete the update.

**Evaluator Competency**

Evaluators should be familiar with this Appendix, the applicable SOMB Adult and Juvenile Standards and Guidelines, and the SOMB Adult Appendix M: Female Sex Offender Risk Assessment.



CDOC/Nelson_00392

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## DECISION AID

The decision aid is to assist Evaluators and for use in conjunction with the applicable Colorado SOMB Adult and Juvenile Standards and Guidelines. While available to use, it is not a required protocol. Evaluators should use clinical judgment when determining the most appropriate evaluation of the client and when making recommendations within the requirements of the SOMB Adult and Juvenile Standards and Guidelines Section 2.000 and the SOMB Adult Appendix M: Female Sex Offender Risk Assessment. The evaluation should give due consideration *within an overall assessment of risk* to the past sexual offending, the amount of time residing sex offense-free in the community, and the new non-sex crime.

When using the decision aid or other methods, Evaluators should take care to consider individual differences and the potential impact on the suitability of assessment instruments, recidivism risk, and desistance processes. Individual differences include race-ethnicity, immigration status, sexual orientation, gender identity, mental health, developmental-cognitive disabilities, and physical disabilities. Evaluators should also take care to ensure any assessment instruments used are normed and validated for the appropriate age group and female gender. [305]

The decision aid incorporates research on female sexual recidivism risk alongside existing research and best practice. Although the research with females is less developed than with males, some consistent findings have emerged. The sexual and violent recidivism rate for females is much lower than for males. Studies show the sexual recidivism rate is typically 1-3% over 5 to 10-year follow-up periods, excluding prostitution-related offenses. [306] This rate is about 4-5 times lower than male adults convicted of sex offending and lower than male juveniles convicted of sex offending. Consequently, the prototypical female convicted or adjudicated of a sex offense falls within the low-risk classification. [307]

For the subgroup of females whose conviction involves prostitution of a child or minor, research finds a higher number within the relatively small group of female sexual recidivists. [308] The most likely explanation is these crimes involve a significant economic element, and the perpetrators have higher levels of general criminality. [309] Research also shows females convicted of a sex offense have relatively low violent recidivism rates, commonly in the range of 4-8% inclusive of sexual recidivism. [310] The rates

[305] For example, the Static-99R, VASOR-2, SOTIPS, and J-SOAP-II risk assessment instruments are all designed and normed for males and not suitable for use with females.

[306] Cortoni, F., Hanson, R. K., & Coache, M. E. (2010). The recidivism rates of female sexual offenders are low: A meta-analysis. *Sexual Abuse: A Journal of Research & Treatment, 22*(4), 387-401; Epperson, E., Fuller, N., & Phenix, A. (2018). *Female sexual offender recidivism: An empirical analysis of registered female sex offenders in California.* SARATSO; McGinnis, W. J. (2015). *The validity of the Iowa sex offender risk assessment for predicting recidivism in female sexual offenders.* [Doctoral Thesis, University of Iowa]. University of Iowa Research Repository; Miller, H. A., & Marshall, E. A. (2019). Comparing solo- and co-offending female sex offenders on variables of pathology, offense characteristics, and recidivism. *Sexual Abuse, 31*(8), 972-990; Sandler, J. C., & Freeman, N. J. (2009). Female sex offender recidivism: A large-scale empirical analysis. *Sexual Abuse: A Journal of Research & Treatment, 21*(4), 455-473.

[307] Although they may have a range of criminogenic and non-criminogenic needs.

[308] Cortoni, F., Hanson, R. K., & Coache, M.-E. (2010). The recidivism rates of female sexual offenders are low: A meta-analysis. *Sexual Abuse: A Journal of Research & Treatment, 22*(4), 387-401; Sandler, J. C., & Freeman, N. J. (2009). Female sex offender recidivism: A large-scale empirical analysis. *Sexual Abuse: A Journal of Research & Treatment, 21*(4), 455-473.

[309] Cortoni, Sandler, & Freeman, N. (2015). Women convicted of promoting prostitution of a minor are different from women convicted of traditional sexual offenses: A brief research report. *Sexual Abuse: A Journal of Research & Treatment, 27*(3), 324-334.

[310] Cortoni, F., Hanson, R. K., & Coache, M. E. (2010). The recidivism rates of female sexual offenders are low: A meta-analysis. *Sexual Abuse: A Journal of Research & Treatment, 22*(4), 387-401; Epperson, E., Fuller, N., & Phenix, A. (2018). *Female sexual offender recidivism: An empirical analysis of registered female sex offenders in California.* SARATSO; McGinnis, W. J. (2015). *The validity of the Iowa sex offender*



CDOC/Nelson_00393

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

of any re-offense range from 10%-50% but with a substantial proportion involving more minor offenses. [311]

At present, research finds the only static risk factor consistently predictive of increased risk of female sexual recidivism is having more than one prior arrest or conviction for a sex offense. [312] In one large study, past child abuse convictions, more prior convictions, and older age of first sex offense were significantly associated with sexual recidivism, [313] but these factors have not been replicated in other studies. Several studies have highlighted possible dynamic risk factors (criminogenic needs) related to female *index* sex offending. However, index offending occurs before detection and sanction and does not reflect sexual recidivism per se. [314] Female-specific research on treatment outcomes, protective factors, and desistance processes for sexual recidivism is lacking.

In summary, the research consistently indicates that females with a conviction for a sex offense are typically at low risk for sexual recidivism. With higher rates of general re-offending, many may commit a new non-sex crime. Currently, there is no empirical evidence that a subsequent conviction for a non-sex crime increases the risk of future sexual recidivism. [315] Thus, research supports the position that females with a conviction for sex offending have a low risk of sexual recidivism unless there is compelling evidence of a higher risk. Such evidence may include a reported intention to re-offend sexually, disclosure of sexually deviant interests, being in a relationship with a partner who is at elevated risk of sex offending (i.e., a prior or potential co-offender), or having a history of sex offending that persisted despite detection (e.g., multiple arrests for sex crimes). Other risk-elevating factors may include having significantly compromised self-regulation skills that impair the ability to inhibit acting on inappropriate sexual urges, or the presence of significant criminogenic needs

[311] Cortoni, F., Hanson, R. K., & Coache, M. E. (2010). The recidivism rates of female sexual offenders are low: A meta-analysis. *Sexual Abuse: A Journal of Research & Treatment*, *22*(4), 387-401; Epperson, E., Fuller, N., & Phenix, A. (2018). *Female sexual offender recidivism: An empirical analysis of registered female sex offenders in California.* SARATSO; McGinnis, W. J. (2015). *The validity of the Iowa sex offender risk assessment for predicting recidivism in female sexual offenders.* [Doctoral Thesis, University of Iowa]. University of Iowa Research Repository; Miller, H., & Marshall, E. A. (2019). Comparing solo- and co-offending female sex offenders on variables of pathology, offense characteristics, and recidivism. *Sexual Abuse: A Journal of Research & Treatment*, *31*(8), 972-990; Sandler, J. C., & Freeman, N. J. (2009). Female sex offender recidivism: A large-scale empirical analysis. *Sexual Abuse: A Journal of Research & Treatment*, *21*(4), 455-473.

[312] Freeman, N. J., & Sandler, J. C. (2008). Female and male sexual offenders: A comparison of recidivism patterns and risk factors. *Journal of Interpersonal Violence*, *23*(10), 1394-1413; Marshall, E. A., & Miller, H. (2020). Arbitrary decision making in the absence of evidence: An examination of factors related to treatment selection and recidivism for female sexual offenders. *Journal of Sexual Aggression*, *26*(2), 178-192.

[313] Sandler, J. C., & Freeman, N. J. (2009). Female sex offender recidivism: A large-scale empirical analysis. *Sexual Abuse: A Journal of Research & Treatment*, *21*(4), 455-473.

[314] Potential criminogenic needs associated with index sexual offending indicated in research are inappropriate sexual interests and sexual self-regulation, offense-supportive cognitions, intimacy and social functioning deficits including emotional congruence with a child and child-adult boundary distortions, self-regulation issues including substance abuse/dependence, previous victimization, and male coercion and dependency (co-offending). Distal vulnerability (risk) factors include victimization, mental illness, interpersonal problems, and ongoing life stressors. Research has clearly shown that females convicted of sexual offending are a heterogeneous group, with variety present in their offending, distal and proximal risk factors, offense pathways, and motivational influences. See Cortoni, F. & Gannon, T. (2017). The assessment of female sex offenders. In D. P. Boer et al. (Eds.), *The Wiley handbook on the theories, assessment, and treatment of sexual offending*, Vols. 1-3, (pp. 1017-1036). Chichester, UK: Wiley Blackwell.

[315] In contrast to research with adult male sex offenders that has demonstrated a small risk-increasing effect of conviction for a subsequent non-sex offense. See Hanson, R. K., Harris, A. J. R., Letourneau, E., Helmus, L. M., & Thornton, D. (2018). Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy, and Law*, *24*(1), 48-63; Thornton, D., Hanson, R. K., Kelley, S. M., & Mundt, J. C. (2021). Estimating lifetime and residual risk for individuals who remain sexual offense free in the community: Practical applications. *Sexual Abuse: A Journal of Research and Treatment*, *33*(1), 3-33.



CDOC/Nelson_00394

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

associated with past sex offending. The exception is the subgroup of females with a history of prostituting a child or minor. This subgroup should be considered as posing a higher base-rate risk of further prostitution-related sex offending, particularly if a general criminal or antisocial lifestyle is present.

**Decision Aid Format**

The decision aid is illustrated in a flowchart that outlines three main phases.

**The first phase involves evaluating the individual's current sexual recidivism risk following the period in the community sex offense-free.**

The past evaluation for the most recent sex offense should be obtained, if available. The past evaluation should be updated to be current. Note that when the most recent sex offense was adjudicated as a juvenile, evaluations completed 6 months or more ago should be updated. If the past evaluation is unavailable or unsuitable, a new evaluation of the current sexual recidivism risk should be conducted. The new evaluation should be consistent with the applicable SOMB Adult and Juvenile Standards and Guidelines Section 2.000 and the SOMB Adult Appendix M: Female Sex Offender Risk Assessment. The evaluation should give due consideration *within an overall assessment of risk* to potential static and dynamic risk factors, protective factors, and strengths. The evaluation should include due consideration of the time sex offense-free in the community and the new nonsexual offending.

For females, the evaluation will be primarily a clinical assessment of relevant factors. The use of standardized risk assessment instruments developed and normed solely on males is prohibited. [316] Other instruments that assess non-sexual recidivism risk or psychological factors that are validated with females may be appropriate where relevant.

The evaluation of risk and treatment needs should attend to potentially static and dynamic risk factors, protective factors, and strengths. The evaluation should include due consideration of the time sex offense-free in the community and the new non-sex crime.

**The second phase involves considering additional factors that influence the need for any current sex offense-specific treatment.**

Research supports the position that females with a conviction for sex offending have a low risk of sexual recidivism unless there is compelling evidence of higher risk. The potential factors listed that favor desistance or having low sex offense-specific intervention needs are not exhaustive. Similarly, the potential factors listed that favor the presence of sex offense-specific intervention needs is not exhaustive. Other considerations may apply to specific females. Evaluators should use their clinical judgment. The considerations need not be "all present" or "all absent" to proceed through the pathways. Instead, they are factors to consider when determining the best combination of recommendations. Evaluators should apply clinical judgment in determining their significance.

**The third phase involves considering the appropriate treatment recommendations.**

---

[316] See SOMB Adult Standards and Guidelines Appendix M: Female Sex Offender Risk Assessment.



CDOC/Nelson_00395

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

The intention is for final treatment and sentence recommendations to be matched to the risk-need level of the individual, taking into consideration treatment responsivity and non-sexual offending patterns. The options are recommendations for standard supervision only, non-sex offense treatment (e.g., substance abuse or mental health treatment), or sex offense-specific treatment. Any sex offense-specific treatment recommendations shall be consistent with the applicable SOMB Adult or Juvenile Standards and Guidelines Section 2.000.

Evaluators may assess other non-sex offending treatment needs. When doing so, Evaluators should use reliable and validated methods to screen or assess non-sex offending risk, criminogenic needs, and related psychosocial factors. The presence, type, and severity of criminogenic needs associated with non-sex offending may be distinct from, or overlap, those for sex offending. Where sex offense-specific and non-sex offending treatment needs coexist, Evaluators should consider the combination and sequencing of treatment recommendations.



CDOC/Nelson_00396

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Decision Aid for Evaluation of Adult or Juvenile Females Who Have Committed Sex Offenses and Have a New Non-Sex Crime**

**Conduct Evaluation of <u>Current</u> Sexual Recidivsim Risk Level**

*Conduct a risk assessment suitable for the client, consistent with Section 2.000 of the applicable SOMB Adult or Juvenile Standards and Guidelines and the SOMB Adult Appendix M: Female Sex Offender Risk Assessment. Ensure the evaluation focuses on the <u>current risk of sexual recidivism</u> following the period of time sex offense-free in the community since the most recent sex offense(s). This may not be the same as the risk at the time of release/community adjudication. Ensure the evaluation is informed by gender-specific research on sexual offending and sexual recidivism.*

*The evaluation will be primarily a clinical assessment of relevant factors. Use of standardized risk assessment instruments developed and normed solely with males is prohibited. Other risk assessment instruments (e.g., general violence risk, general offending) or psychological instruments validated with females may be appropriate where relevant. The overall evaluation of risk should assess potentially static and dynamic risk factors, protective factors and strengths, time sex offense-free in the community, and the nature of the nonsexual offending.*

**Salient Factors To Consider When Determining Recommendations**
Research supports starting from the position that females have a low risk of sexual recidivism unless there is compelling empirically-based evidence of higher risk.

**Evidence favors desistance/low sex offense-specific intervention needs**
*(all do not need to be present, others not included may apply, apply clinical reasoning when evaluating presence and influence)*

- non-sex crime <u>does not</u> share characteristics with past sex offense -
- single past sex offense adjudication/conviction -
- completed offense-specific treatment, if referred/available -
- established self in community for reasonable period (eg, 2-3 years) -
- evidence implementing relapse prevention in community -
- protective factors present/developing (eg, engaged in school/work, family proactive/prosocial, appropriate peers, positive identity) -


**YES**

**Evidence favors higher sex offense-specific intervention needs**
*(all do not need to be present, others not included may apply, apply clinical reasoning when evaluating presence and influence)*

- non-sex crime shares characteristics with past sex offending -
- client discloses intention or valid concern that will re-offend sexually -
- client discloses deviant sexual interests, or there is clear evidence that deviant sexual interests are significant and a current problem (such as recent viewing of child pornography) -
- client is involved in relationship with partner with known risk of sex offending (prior or potential co-offender) -
- client has 2+ past sex offense arrests/adjudications/convictions and other evidence of enduring risk such as the continued presence of criminogenic needs (potentially dynamic risk factors) associated with prior sex offending -
- client has 1 or more past prostitution-related sex offenses and there are indications of a continuing criminal or antisocial lifestyle -
- client has significantly compromised self-regulation/self-control (eg, due to major mental illness, major substance abuse/dependence, severe personality disorder) that impairs ability to inhibit acting on inappropriate sexual urges -
- client continues to have significant criminogenic needs associated with past sex offending that are not adequately managed or mitigated -

**Evidence favors general or non-sexual violent offense-specific intervention needs**
*(all do not need to be present, others not included may apply, apply clinical reasoning when evaluating presence and influence)*

- has current non-sexual violent offense -
- multiple general offenses/adjudications -
- assessed as moderate + risk of nonsexual reoffending -
- generally antisocial attitudes and beliefs evident -
- antisocial peer and intimate relationships evident -
- poor impulse, emotion, and self-regulation problems evident -
- substance abuse / mental health issues evident -
- family/community risk factors evident -


**NO**

**Consider standard supervision sentence**
Where there is a low risk of sexual and non-sexual recidivism and there are no significant criminogenic concerns, consider recommending no treatment. Standard supervision may be appropriate.


**YES**

**Consider referral for sex offense-specific treatment. Include applicable sentence conditions.**
When there is a moderate (or higher) assessed risk of sexual recidivism and/or evidence of significant criminogenic concerns that would benefit from treatment, consider recommending sex offense-specific treatment with relevant supervision terms and conditions. Conduct any relevant child contact screens and make associated recommendations.

Determine any recommendations for non-sex offense treatment and supervision based on evaluation of non-sex offending risk-need.

**Consider referral for <u>non-sex</u> offense treatment. Include applicable sentence conditions.**
Where there is a low risk of sexual recidivism but moderate or higher risk of non-sexual reoffending, consider recommending non-sex offense treatment with relevant supervision terms and conditions.

[Top of the Document](#)



CDOC/Nelson_00397

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix F: Sex Offense-Specific Intake Review for Clients Who Have Been in Prior Treatment

*Sex offense-specific Intake Review for Clients Who Have Been in Prior Treatment*

The Colorado Sex Offender Management Board (SOMB) supports SOMB Listed Treatment Providers providing comprehensive intake assessments for clients seeking entry into a treatment program with a prior history of sex offense-specific (SOS) treatment. This document should be used as guidance in conjunction with the applicable SOMB Adult or Juvenile standards. The SOMB's purpose in developing this document is to ensure continuity of care via a thorough review of relevant prior treatment and supervision information to aid in the planning of treatment needs for the client. To this end, it is imperative that the Treatment Provider make every reasonable effort to identify and obtain past treatment records. In the absence of such records, it is the responsibility of the Treatment Provider to conduct a thorough and collaborative treatment review with the client to determine what treatment has been completed, what components of treatment need additional focus, and what components of treatment have not yet been completed. Through the completion of this review, a client's individual treatment needs can be determined. Clients should not be required to re-start treatment solely due to a change in Treatment Providers and the lack of available information from the prior Treatment Provider. On the other hand, mere completion of a treatment objective does not preclude the client from repeating such an objective if behavioral indicators suggest the need for additional treatment in this area.

The following information shall be reviewed collaboratively with the client to determine the starting point for the current treatment. It is recommended that this documented **be completed by the primary therapist** over the course of the first 2-3 sessions. This form may also be used for an on-going re-assessment of client treatment needs, as well as a final assessment at the time of discharge.



CDOC/Nelson_00398

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Client's Name:

DOB:

Therapist completing intake:

Date of intake:

Index Offense:

Past convictions / Adjudications:

Has the client previously received SOS treatment?  ☐ Yes   ☐ No
        If yes, list previous providers:

Has the client signed releases to talk with previous treatment providers?  ☐ Yes        ☐ No

Length of time previously in treatment:

Does the client have any certificates of completion/documentation of treatment module completion? ☐ Yes  ☐ No
If yes, list certificates/documentation:

Reason for discharge or transfer:

Have the following individuals been contacted for collateral information?
        ☐ Probation/Parole Officer      ☐ Family      ☐ Victim Therapist or DA's office
        ☐ Past Providers
        ☐ DHS Caseworker / DYC

What barriers or obstacles interfered with the client's successful engagement with the prior treatment, if any?

What factors aided the client in being successful in treatment? (What worked well?)

What are the client's strengths?

Have specialized assessments (Polygraph, PPG, ABEL/Affinity) been completed?  ☐ Yes        ☐ No
        Identify and provide results:

What was the date of the last Sex offense-specific Evaluation?
        Risk assessment results:
        Results in terms of critical treatment needs:
        Recommendations for treatment planning:

Current Risk Level:

Are there any specific conditions that have been previously set by the CST/MDT?
        Provide details:
Are there any activities or special accommodations that have been previously approved by the CST/MDT?
        Provide details:

Are there any approved safety plans in place at this time?
        Provide details:

What recommendations have been made by previous treatment providers?



CDOC/Nelson_00399

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Which standards are applicable for the client?     ☐ Adult  ☐ Juvenile
### *For clients subject to Adult standards:*

| Yes | No | Partial | Accountability / Empathy |
|-----|-----|---------|--------------------------|
| ☐ | ☐ | ☐ | Is the client is able to be accountable about their offense by openly discussing their offense without blame or minimization? |
| ☐ | ☐ | ☐ | Is the client able to discuss their full sexual history? |
| ☐ | ☐ | ☐ | Is the client able to identify and articulate the impact on their victims? |
| ☐ | ☐ | ☐ | Is the client able to articulate empathy for their victims? |
| ☐ | ☐ | ☐ | Does the client present with any level of denial? |
| ☐ | ☐ | ☐ | Is the client able to discuss and manage any illegal, abusive or harmful sexual urges or fantasies? |
| ☐ | ☐ | ☐ | Is the client able to discuss the clarification process and identify what steps they have taken? |

| Yes | No | Partial | Treatment |
|-----|-----|---------|-----------|
| ☐ | ☐ | ☐ | Is the client able to identify their support system? |
| ☐ | ☐ | ☐ | Is the client able to educate their support system regarding their risk factors? |
| ☐ | ☐ | ☐ | Is the client able to discuss their thoughts, feelings and behaviors that facilitate sexual re-offense or other victimizing behaviors? |
| ☐ | ☐ | ☐ | Is the client able to identify and discuss adaptive and pro-social behaviors to prevent abusive behavior and are they able to articulate healthy sexual functioning? |
| ☐ | ☐ | ☐ | Is the client able to discuss personality traits and deficits related to their risk for re-offending? |
| ☐ | ☐ | ☐ | Is the client able to identify any deficits in their social and relationship skills? |
| ☐ | ☐ | ☐ | Has the client strengthened these skills? |
| ☐ | ☐ | ☐ | Is the client able to discuss a plan for preventing re-offense and can they discuss how they have shared this plan with their support system? |
| ☐ | ☐ | ☐ | Is the client able to discuss and demonstrate skills to manage issues of anger, power, and control? |



CDOC/Nelson_00400

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

| Yes | No | Partial | Additional Information |
|---|---|---|---|
| ☐ | ☐ | ☐ | Has 5.700 criteria been met? |
| ☐ | ☐ | ☐ | Has a CCS been completed? |
| ☐ | ☐ | ☐ | Are there additional adjunct treatment needs? (i.e. substance abuse, suicidal ideation, mental health needs, cognitive needs or challenges, etc.):<br><br>How have these needs been addressed in the past?<br><br>How will these needs be addressed at this time? |
| ☐ | ☐ | ☐ | Has a relapse prevention plan or Personal Change Contract been completed? |
| ☐ | ☐ | ☐ | Is there a Qualified Approved Supervisor? (as defined in standard 5.710) |
| ☐ | ☐ | ☐ | Is there an Approved Community Support Person (as defined in standard 5.710) or COSA who has or is currently able to provide support to the client? (include any training or classes the person or group has completed) |
| ☐ | ☐ | ☐ | Are there documented provisions that have been granted to the client previously? (i.e. contact with children, access to internet, approved activities, etc.) |

Upon completion of the intake review provide a brief narrative regarding how the above information was gathered and verified beyond solely client self-report. Include information about how the client is able to demonstrate internalization of treatment concepts.

Based upon the information gathered during the intake review the following recommendations are made regarding the current focus of treatment.

_____    _____
SOMB Treatment Provider - signature                SOMB Treatment Provider - printed name

_____    _____
Client – signature                                              Client - printed name

_____    _____
Supervisor - signature (where applicable)         Supervisor - printed name

Top of the Document



264

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix G: Disaster Emergency Management Safety Plan

**DISASTER EMERGENCY SAFETY PLAN (DESP)**
___ Judicial District, Adult Probation Department, Parole Region, or Community Corrections Facility

And/or
_____ Law Enforcement Agency

Sex Offender Unit

Name:  _____     Telephone Number: _____

Supervising Officer: _____     Telephone Number: _____

Treatment Provider: _____     Telephone Number: _____

Other Therapist: _____     Telephone Number: _____

In the event of a disaster (a natural or man-made event that negatively affects life, property, livelihood such as a fire, flood, weather event, etc.), I will implement the following Emergency Management Plan as developed with my supervising officer. I understand that all of the terms and conditions of registration and supervision, including no contact with children and victims, still remain in full force. I understand that my plan must include going to a safe location that does not violate my terms and conditions of supervision (e.g. no schools or other places where children, or my victim may be present), and that I am to remain accountable for all of my other safety plans and treatment requirements (e.g. treatment attendance, taking required psychotropic medication, checking in on schedule, etc.). Finally, I understand that a more comprehensive emergency risk management plan will be developed later with my treatment provider.

In the event of a disaster, I agree to keep in touch with my supervising officer and the other members of any community supervision team (CST) I may have. In addition, I agree to keep the following persons informed, on a daily basis, of my whereabouts, leaving good contact information with each of them.



CDOC/Nelson_00402

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

In case of emergency, I will keep in daily contact with at least one of the following:

(1)                                                    (2)

Name: _____       Name: _____

Address:_____       Address: _____

_____       _____

Phone:  (c) _____       Phone:  (c) _____

Phone:  (w) _____       Phone:  (w) _____

     [This person should reside outside of the impacted area]

(3)
Name: _____       The following list will remain off limits.

Address:  _____       _____

_____       _____

Phone:
(c) _____       _____

(w) _____       _____

(h) _____       _____

The overriding purpose of this emergency plan is to keep me and the public safe. Compliance with this plan by keeping in touch with my supervising officer and community supervision team will help keep me in compliance with my legal obligations by following the directives of my supervisors.

In an emergency, were my home not available for me to reside in, I intend to stay temporarily at one of the following locations:

_____

_____

I understand that if I have no other place to go that is safe and legal, then I will report to the local shelter and disclose my registration status to the shelter staff and law enforcement at the time I enter. I will take responsibility for contacting law enforcement immediately upon arrival at any shelter. I agree to follow all law enforcement instructions regarding housing and notifying my supervisor of any instructions that I receive.

My supervisor's agency contact or on call supervisor's number is _____.

Signature _____ Supervising Officer_____

DATE:_____ Date:_____

    Keep a copy of this Disaster Emergency Safety Plan with your other important papers.



266

CDOC/Nelson_00403

# Appendix H: Guidance to SOMB Listed Providers on the Use of Medical Marijuana, Prescription Medications and Over the Counter Medications by Sexual Offenders

**Approved January 15, 2016**

Recent legislation has impacted the use of medical marijuana by sexual offenders on probation. Probation officers are complying with this legislation.

**House Bill (H.B.) - 15-1267**

Pursuant to H.B. 15-1267, individuals on probation, including those convicted of a sex crime, are generally permitted to possess or use medical marijuana if they have a valid medical marijuana card. There are two exceptions to the individual being allowed to use medical marijuana:

A.  If the crime for which the probationer was convicted is a violation of Article 43.3 of Title 12, C.R.S. (Colorado Medical Marijuana Code), the probationer cannot use/possess medical marijuana. This is not discretionary on the part of the judge.

B.  The law provides that the court, on a discretionary basis, may prohibit use/possession if the "court determines, based on the assessment as required by section 18-1.3-209, a prohibition against the possession or use of medical marijuana is necessary and appropriate to accomplish the goals of sentencing as stated in 18-1-102.5." Probation officers are to provide the court with pertinent information regarding the assessment, and the court reaches a decision after considering the results of the assessment as well as the goals of sentencing.

Providers who have concerns about abuse/dependence may share those concerns with the probation officer, however, those concerns will not change the fact that a court's discretion relative to the use/possession of medical marijuana is extremely limited.

**Guidance to SOMB Listed Providers On the Use of Medical Marijuana, Prescription Medications, and Over the Counter Medications by Sexual Offenders**

In light of H.B. – 15-1267, the SOMB is offering the following guidance to SOMB Listed Providers. It is not uncommon for a client of therapeutic services to be under the care of a physician and be prescribed medication. This medication can be in the form of prescription narcotics for pain management,



CDOC/Nelson_00404

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

prescription psychotropic medication for mental health symptoms, or even medical marijuana. It is important for mental health professionals to consult with the client's medical provider to determine the effects of the medication, possible side effects, and potential impacts to the therapeutic process.

The Colorado Mental Health Practice Act (12-43-208 and 12-43-209) specifically prohibit a mental health professional from "engaging in the practice of medicine" or to "advise a client with reference to medical problems." The mental health professional should, however, assess during treatment sessions if a client's decision-making and judgement are affected by medication use. A client cannot be impaired during treatment and needs to be able to focus, be present, participate, and track content of treatment sessions. The prescription of a medication or medical marijuana by a physician does not prohibit a SOMB Listed Provider from also determining as necessary whether the medication or medical marijuana use is being abused by the client. The various ethical codes of conduct, including the American Counseling Association, discuss the "inability of incapacitated adults to give consent." In these cases the mental health professional should discuss the concerns with the client and other members of the treatment team to determine the best course of action.

*Specific Guidance Regarding Medical Marijuana and Clients in Treatment for a Sexual Offense*

**Obtain Information from the Probation Officer**
SOMB listed providers, in conjunction with the Community Supervision Team (CST), or Multidisciplinary Team (MDT, should obtain information from the probation officer regarding the allowance or prohibition of medical marijuana use while under court supervision.

**SOMB Listed Providers Agency Policies**
Ethical standards allow mental health professions, including SOMB Listed Providers, to determine which clients they accept, or do not accept, into treatment, and whether their program has policies or protocols in place to address client impairment due to substance or medication use, including medical marijuana.

**Confidentiality of the Marijuana Registry**
It is important to keep in mind that per the State Court Administrator's Office, a sex offender's "status on the medical marijuana registry is not public information. It is a class 1 misdemeanor to release or make public confidential information from the marijuana registry. Therefore, if the information regarding a person's status is to be released, it is important to secure a signed release of information from the client before doing so, or place with communication with the court under confidential cover."[317]

**Testing and Assessment Considerations**
Medical marijuana usage by clients in sex offense-specific treatment may affect their polygraph results. Therefore, the use of medical marijuana by clients subject to polygraph assessment should be discussed with the polygraph examiner and prescribing physician. The CST/MDT should make a determination about the suitability of a client for assessment utilizing polygraph, plethysmograph, VRT, and alternative monitoring and accountability measures.

---

[317] Memorandum from the State Court Administrator's Office (DPS 09-01, March 5, 2009).



CDOC/Nelson_00405

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix I: Notice of Discharge Status Form

......................................................................................................................................................

**INSTRUCTIONS TO THERAPISTS FOR DISCHARGE STATUS FORM:**
At the time of discharge from treatment, ***print or type*** the information requested by the form and sign in the signature block. Please select all applicable boxes to indicate status at time of discharge. Where text is underlined, please **circle one** option, *e.g.*, **have / have not**.

The form is to be filed in the court and under the case number ("M" or "CR") where the client was ordered to register as a sex offender. The address for each County and District Court in Colorado is to be entered in the caption and is available under "Find a Court" at:  http://www.courts.state.co.us/

This form may be filed with the court in person at the courthouse or submitted via U.S. Mail to the Clerk's Office at the court's mailing address. A Probation Officer may also assist you in properly filing this form with the court.

**PURPOSE OF THIS DOCUMENT:**
In Colorado, some clients will not become eligible or file a petition to be taken off the sex offender registry until many years or decades after their sentences have terminated. This form allows a therapist to share information with the court about a defendant's status at the time of termination from treatment and while authorizations remain in effect allowing the therapist to divulge this otherwise confidential information to the court.

Unlike most other records, court files are maintained forever. Consequently, by logging this information in the court record, it will remain available to clients and other parties to the case, in the court's discretion. Therapists are being asked to provide this documentation to ensure the client's involvement in treatment is part of the permanent court record and, if appropriate, may be considered by the court in future decision-making.

If the therapist would like to further expand on his/her description of the client's participation in treatment, s/he may attach a letter or report explaining his/her position more fully. Any documents received by the court under seal cannot be viewed by anyone else without subsequent court orders authorizing release.

**See next page for complete form.**

Top of the Document



CDOC/Nelson_00406

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

__ COUNTY __ DISTRICT COURT,

_____ COUNTY, COLORADO

_____ County Courthouse

Courthouse Address:


THE PEOPLE OF THE STATE OF COLORADO,
Plaintiff

v.

_____,
Defendant

| ♦ COURT USE ONLY♦ |
| --- |

Case Number:

(please indicate the case in which the client has been ordered to participate in offense-specific treatment)

Division:

## MOTION TO FILE THIS NOTICE AND ANY ATTACHMENTS UNDER SEAL & NOTICE OF DISCHARGE STATUS FROM SEX OFFENSE-SPECIFIC TREATMENT PROVIDER

*Motion to File Under Seal:* The undersigned requests the Court accept this notice and any attachments under seal. This filing contains confidential mental health treatment information that should be kept private, subject to any release, in whole or in part, that may occur with the knowledge, approval, and supervision of this Court.

*Notice:* This notice is being provided to advise the Court that (name of client) _____ entered into sex offense-specific treatment on _____ (date) and was discharged on _____ (date) with the following status(es) (please check all applicable boxes):

( )  having successfully completed treatment
( )  discharged unsuccessfully from treatment
( )  discharged prior to completing treatment but in good standing
( )  other:_____ (provider *may* note another discharge status here, *e.g.,* "transferred to another provider," "client reached end of sentence," and/or provide additional documentation)

**Name of Program:** _____

**Address:** _____

**Phone Number:** _____ **Fax Number:** _____

**Email Address:** _____
I have / have not attached additional documentation concerning Mr./Ms.
_____'s participation in offense-specific treatment.



CDOC/Nelson_00407

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

_____

Signature of SOMB-Approved Provider


_____

Printed name of SOMB-Approved Provider

License # / credential (if applicable):

_____

Dated: _____

Top of the Document



271

CDOC/Nelson_00408

# Appendix J: Interim General Movement Safety Plan

INTERIM GENERAL MOVEMENT SAFETY PLAN
Date: _____

NAME:            TELEPHONE NUMBER:

PAROLE OFFICER:               TELEPHONE NUMBER:

PROBATION OFFICER:               TELEPHONE NUMBER:

PROPOSED TREATMENT PROGRAM:

I am requesting permission to go to the following locations until I have been accepted into my treatment program and my General Movement Safety Plan is approved. Check all those that apply.

|  | Location | Time Allowed | Initials |
|---|---|---|---|
| **Food** |  |  |  |
| **Transportation** |  |  |  |
| **Cell Phone** |  |  |  |
| **Laundry** |  |  |  |
| **Haircut** |  |  |  |
| **Doctor** |  |  |  |
| **Mental Health Provider** |  |  |  |
| **Probation** |  |  |  |
| **Parole** |  |  |  |
| **Treatment Intake/Groups** |  |  |  |
| **Drug Monitoring** |  |  |  |
| **Banking** |  |  |  |
| **Job Search** |  |  |  |
| **Pharmacy** |  |  |  |



CDOC/Nelson_00409

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

| Computer Use Agreement | | | |
|---|---|---|---|
| Community Support / Re-Entry | | | |
| Other (Specify) | | | |

A safety plan is only a theoretical plan for action while a positive decision is a validated plan of action.

Client signature:_____

Probation officer signature:_____

Parole officer signature:_____

Top of the Document



CDOC/Nelson_00410

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix K-1: The Use of Phallometry, Viewing Time, and Polygraphy to Support Information-Gathering for Assessments

*Taken from the ATSA Ethical Standards and Principles for the Management of Sexual Abusers, the Association for the Treatment of Sexual Abusers 2014, (PP. 26-28, and 75-78).*

**7.00**   Members recognize that research-supported assessment methods such as phallometry and viewing time may be useful for (a) obtaining objective behavioral data about the client that may not be readily established through other assessment means; (b) exploring the reliability of client self-report; and (c) exploring potential changes, progress relative to treatment and other case management goals and objectives. Members appreciate that the polygraph for which reliability and validity questions remain may have utility in facilitating disclosure about sexual history, offense-specific behaviors, and/or compliance with treatment and other expectations.

**7.01**   Members obtain specific informed consent from clients prior to using phallometric, viewing time, and/or polygraph methods.

**7.02**   Members are familiar with the strengths and limitations of phallometric, viewing time, and polygraph methods (see Appendix B)[318] and note these issues when interpreting and communicating the findings from these methods.

**7.03**   Members take reasonable steps to obtain assurances that examiners utilizing phallometric, viewing time, and polygraph methods are appropriately trained in the use of such methods, use accepted methods, and adhere to applicable professional/discipline-specific standards or guidelines.

**7.04**   Members recognize that the findings from phallometric, viewing time, and polygraph methods are to be used in conjunction with other sources of assessment information, not as the single source of data for any assessment.

**7.05**   Members recognize that the results of phallometric, viewing time, and polygraph methods are not to be used as the sole criterion for the following:

    **A.**   Estimating level of risk for recidivism;

---

[318] Appendix B of *2014 ATSA Ethical Standards and Principles for the Management of Sexual Abusers, the Association for the Treatment of Sexual Abusers.*



CDOC/Nelson_00411

**B.** Making recommendations for release to the community from a correctional, institutional, or other non-community placement;

**C.** Determining treatment completion; or

**D.** Drawing conclusions regarding compliance with or violations of conditions of release or community placement.

**7.06** Members appropriately limit phallometry to the following purposes:

**A.** Assessing the client's relative sexual arousal and preferences regarding age and gender;

**B.** Evaluating the client's arousal responses to various levels of sexually intrusive or aggressive/coercive behaviors;

**C.** Exploring the potential role of offense-related sexual arousal in the client's sexually abusive or at-risk behavior and developing accompanying treatment goals; and

**D.** Monitoring the effectiveness of interventions involving the modification, management, and expression of both healthy and offense-related sexual arousal.

**7.07** Members appropriately limit the use of viewing time measures to the following purposes:

**A.** Assessing the client's sexual interests with respect to age and gender;

**B.** Exploring the potential role of offense-related sexual interests in the client's sexually abusive or at-risk behavior and developing accompanying treatment goals; and

**C.** Monitoring the effectiveness of interventions involving the modification, management, and expression of both normative and offense-related sexual interests.

**7.08** Members appropriately limit use of the polygraph to the following purposes:

**A.** Facilitating a client's disclosure of sexual history information, which may include sexually abusive or offense-related behaviors (generally disclosed in the interview portion of the examination);

**B.** Eliciting from the client clarifying information regarding the instant/index offense;

**C.** Exploring potential changes, progress, and/or compliance relative to treatment and other case management goals and objectives (through yes/no questions about adherence to specific treatment and other case management expectations); and/or

**D.** Making collaborative case management decisions about a client with other partners and stakeholders based on the information gleaned from the examination and interview.



CDOC/Nelson_00412

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Polygraph testing involves a structured interview during which a trained examiner records several physiological responses of the examinee. Following this interview, the examiner reviews the charted record and forms opinions about whether the examinee was non-deceptive or attempting deception when answering each of the relevant questions. Many regions and jurisdictions do not utilize polygraphy for a variety of reasons, including empirical questions about its reliability and validity, yet in many other jurisdictions it is a widespread practice.

Post-conviction sex offender polygraph testing is a specialized form of general polygraph testing. Although all principles applicable to general polygraph testing also apply to post-conviction sex offender testing, its unique circumstances generate additional challenges. Using post-conviction sex offender testing responsibly requires members to have at least a rudimentary understanding of how the polygraph works, its advantages and limitations, and special considerations related to its integration into work with individuals who have engaged in sexually abusive behaviors. As with any instrument or procedure, members should be familiar with current literature and obtain appropriate training before using or interpreting polygraph results.

Post-conviction sex offender testing is intended to serve the following objectives:

**A.** Facilitate a client's disclosure of sexual history information, which may include sexually abusive or offense-related behaviors (generally disclosed in the interview portion of the examination);

**B.** Eliciting from the client clarifying information regarding the instant/index offense

**C.** Exploring potential changes, progress and/or compliance relative to treatment and other case management goals and objectives (through yes/no questions about adherence to specific treatment and other case management expectations); and/or

**D.** Making collaborative case management decisions about a client with other partners and stakeholders based on the information gleaned from the examination interview.

Some research indicates that the polygraph examination can lead to clients providing increased information regarding their sexually abusive behaviors; however, as has been mentioned, test validity and reliability often vary widely across studies. Examiner and examinee characteristics, treatment milieu, instrumentation, procedures, examination type, base rates of attempted deception in the population being tested, and other idiosyncratic factors can also affect reliability and validity. Therefore, it is important for providers to become informed about types of tests that produce the most accurate findings. As well, it is possible that some of the information obtained through post-conviction sex offender testing might be fictitious, representing an accommodation to pressure for disclosures. The third objective of post-conviction sex offender testing —to gauge enhanced supervision and treatment compliance — has received only limited empirical attention.

Members' primary purpose for collecting sexual history information is to further inform, as a complement to other assessment data, clinical interventions and other management strategies. The usefulness of post-conviction sex offender polygraph testing as a "clinical" tool is based on its potential to elicit historical information, thus arguably allowing psychosexual behavioral



CDOC/Nelson_00413

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

patterns to be more fully revealed, better understood, and therefore more effectively managed and changed.

The American Polygraph Association, The National Association of Polygraph Examiners, and other polygraph associations have developed standards for certifying polygraph examiners who work in the management and treatment of sexual abusers, as well as standards for administering sexual abuser tests. Some states also regulate post-conviction sex offender testing standards and procedures. Members are familiar with laws, state regulations, and association guidelines governing post-conviction sex offender testing where they practice. Members work with examiners who meet certificate requirements and adhere to procedures recommended by a relevant polygraphists' organization.

Four types of post-conviction polygraph exams are commonly performed with individuals who have engaged in sexually abusive behavior:

**A.** Instant/Index Offense Tests are designed to explore and clarify discrepancies between the client's and the official descriptions of the conviction offense(s).

**B.** Sexual History Disclosure Tests are designed to facilitate a client's disclosure of sexual history information, which may include sexually abusive or offense-related behaviors, to their treatment provider prior or subsequent to the polygraph examination itself.

**C.** Maintenance/Monitoring Tests are designed to explore potential changes, progress, and/or compliance relative to treatment, supervision, and other case management goals, objectives, and expectations, based on specific yes/no questions pertaining to very specific and narrow expectations and goals that have been established.

**D.** Specific Issue Tests are generally designed using a yes/no format to explore a client's potential involvement in a specific prohibited behavior, such as unauthorized contact with a victim at a particular time.

Polygraph test accuracy is believed to be greatest when examiners focus on highly specified (i.e. single issue, narrow, and concrete) questions. Members cooperate with examiners in structuring tests that are responsive to program needs without unnecessarily compromising accuracy considerations.

Members must ensure that limits of confidentiality are fully disclosed to clients prior to polygraph testing, and that clients are afforded the opportunity for informed consent, specifically with respect to the ways in which the findings will be used and to whom the findings will be provided. Client disclosures of potentially incriminating information to mandated reporters can, lead to future prosecution. Members inform clients, in writing, of this potential dilemma and how it is addressed in their jurisdiction and program.

There is very limited empirical research on the use of polygraph with clients who have developmental disabilities and clients with low/borderline IQs. Therefore, further caution is advised if members use the polygraph for assessment, treatment, and management processes with these clients.



CDOC/Nelson_00414

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

As noted in the main body of this document, polygraph examination is not used as the sole criterion for determining illegal, abusive and harmful sexual interests, estimating a client's risk for engaging in sexually abusive behavior, recommending whether a client be released to the community, or deciding whether a client has completed a treatment program or to change a client's treatment status. When the polygraph is utilized, findings are to be interpreted in conjunction with other relevant information to inform decision making.

Top of the Document



CDOC/Nelson_00415

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix K-2: APA Model Policy for the Evaluation of Examinee Suitability for Polygraph Testing

**Model Policy for the Evaluation of Examinee Suitability for Polygraph Testing**[319]

1. <u>Statement of purpose.</u> This Model Policy is intended to assist polygraph examiners, referring professionals, program managers, law enforcement agencies and governmental organizations to make better decisions regarding the suitability of potential polygraph examinees to undergo testing that will further the goal(s) for which the testing is being considered. Policies regarding the assessment of examinee suitability are intended to protect examinees from undergoing examinations for which there is no potential benefit to themselves or their communities, and to avoid expenditure of resources for examinations that may not contribute to the goals of an investigation, candidate screening, risk assessment or risk management. This Model Policy should assist field examiners to make more effective and expeditious judgments about whether or not to proceed with an examination when there are questions about the suitability of an examinee.

2. <u>Scope of authority.</u> Examiners should be responsible for knowing and adhering to all legal and regulatory requirements. In the case of any conflict between the Model Policy and any legal practice requirements, the legal regulations should prevail. Examiners who work in jurisdictions and programs without local regulations should refer to this Model Policy as a guide.

3. <u>Goals of testing.</u> Polygraph testing is a decision support tool intended to add incremental validity to investigative and evidentiary decisions, and to risk assessment and risk management activities. Polygraph testing and polygraph test results should not replace or supplant the need for professional decision making. Any or all of the following objectives should be considered a sufficient reason to complete polygraph testing:

    A. Increased disclosure of information;

    B. Increased deterrence of problems (e.g., non-compliance or unsuitable persons);

    C. Increased detection of involvement or non-involvement in problem behaviors or criminal activities.

4. <u>Examinee suitability.</u> Persons who are suitable to undergo polygraph testing should minimally meet the following requirements:

---

[319] American Polygraph Association (2012). *Model Policy for the Evaluation of Examinee Suitability for Polygraph Testing.* [Electronic version] from http://www.polygraph.org.



CDOC/Nelson_00416

A. Age 12 or older.

   1. Functional maturity should be considered more important than chronological age when assessing suitability for polygraph testing. This Model Policy recommends that testing of an examinee should only occur when the person's Mean Age Equivalence (MAE) or Standard Age Score (SAS) is equivalent to that of a youth age 12 years or older, as determined through standardized psychometric testing (e.g., IQ testing, achievement and/or adaptive functioning), or when there is reasonable certainty the person is not functionally or developmentally impaired (e.g., developmental disorder, learning disorder, or serious emotional disturbance).

B. Adequate abstract thinking, as demonstrated by awareness of the context of the examination referral (i.e. reasons for the testing);

C. Insight into their own and others' motivation, as demonstrated by the ability to express basic reasons for being honest or dishonest and the basis for the concerns of the referring professional or retaining persons;

D. Possess a basic understanding of right from wrong, as demonstrated by an ability to verbalize potential reasons for being honest or dishonest, and the potential consequences for dishonesty or truthfulness;

E. Understand the difference between truth and lies, as demonstrated by the ability to recognize, describe or identify incidents, circumstances, or examples of lying and dishonesty;

F. Anticipate rewards and consequences for lying and behavior, an ability to verbalize potential rewards and consequences for honesty or dishonesty to the examination questions or other contexts; and

G. Maintain consistent orientation to date, time, and location, as demonstrated by independent functioning sufficient to transport oneself to the examination location at the scheduled date and time. (Examiners should rely on professional information sources to determine orientation or disorganized functioning when examinees are residing in or transported from institutional or secured settings.)

5. <u>Unsuitability for polygraph.</u> Examiners should not conduct polygraph examinations on individuals determined to be unsuitable. When available, examiners should consider psychological diagnostic information. Individuals deemed unsuitable for polygraph testing should not be tested until the identified conditions have improved, and when the individual is able to adequately attend to the examination context. Conditions that should preclude an examinee from suitability for polygraph testing include the following:

A. Psychosis (e.g., lack of contact with reality, including hallucinations or delusional thinking) or psychotic condition that is active, un-treated, or un-managed at the time of the examination;



CDOC/Nelson_00417

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

B. Mean Age Equivalence (MAE) or Standard Age Score (SAS) is below 12 years, as determined through standardized psychometric testing (e.g., IQ testing, achievement and/or adaptive functioning);

C. Severe mental retardation or measured IQ less than 55, as determined through standardized psychometric testing (e.g., IQ testing, and/or adaptive functioning);

D. DSM Axis V Global Assessment of Functioning (GAF) score of 50 or less, (e.g., persons who require continuous observation or assistance due to psychiatric or developmental conditions);

E. Any DSM Axis I mental health condition to include a severity specifier of "severe" or "with psychotic features" (i.e. indicative of a high potential adverse outcome) for any disorder; acute serious injury or illness, involving acute pain or distress; or

F. Observable impairment due to the influence of prescribed or non-prescribed controlled substances including alcohol.

6. <u>Special populations.</u> Examiners should conduct all examinations in a manner that is sensitive to any medical, mental health or developmental issues that may affect the examinee's functioning or the quality of the examination data. There is no published research or theoretical rationale suggesting that any medical, mental health, or developmental issues would result in erroneous examination results for individuals who meet the normal functional requirements for polygraph examinees. Ethical professional and empirical practices suggest that the application of normative data and normative interpretation rules to exceptional individuals (i.e. persons whose functional characteristics are outside the normal range of individuals in an intended population or sample) should always be regarded with caution.

A. <u>Medical.</u> Persons with some acute or chronic medical/physical conditions may be regarded as marginally suitable for polygraph testing, at which times the test results should be accordingly qualified and viewed with caution. However, there is no published research or theoretical rationale suggesting that any medical conditions would interfere with the polygraph test or that polygraph testing would interfere with known medical conditions.

1. Except as precluded by law or regulations, examiners should note in the examination report any diagnosed acute or chronic medical condition. Medical conditions, including stable injuries, depending on their severity, do not necessarily preclude an individual from being suitable for polygraph testing. However, it may at times be advisable to delay polygraph testing until the prospective examinee's health has improved.

2. Examiners should defer to medical professionals when determining the suitability of prospective examinees that are pregnant. Examiners should require a statement or waiver from a physician, or other medical professional, attesting to the fact that the pregnancy is normal and uncomplicated with no expected reason that polygraph testing would interfere with the pregnancy. Examiners should delay polygraph testing of any individual determined to be experiencing a medically complicated or high-risk pregnancy.



CDOC/Nelson_00418

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

B. <u>Medications.</u> Persons who require the administration of multiple prescription medications to manage the potentially overwhelming effects of a diagnosed medical or mental health condition may be regarded as marginally suitable for polygraph testing. Test results for these individuals should be accordingly qualified and viewed with caution.

   1. There is no theoretical rationale or published research suggesting that any medications would result in erroneous polygraph examination results. Clinical commonsense suggests that persons who function optimally while taking prescription medications may produce polygraph examination data of optimal interpretable quality while taking medications as directed by a doctor. There is no way to predict the exact effects of medications for any individual. Medication effects may vary with the types and numbers of medication, dosages, length of time on medications, in addition to the individual's physiology. Some increase in inconclusive results may occur from some medications, however, medications do not act differentially among the polygraph test questions, and no known increase in decision errors is expected from medication use.

   2. Except as precluded by law or regulations, examiners should note in the examination report a list of the examinee's reported prescription medications, and any corresponding acute or general medical health conditions, including the absence of understanding of the reasons for a prescription medication.

   3. Examiners should advise examinees who take prescriptions to take all prescription medications as prescribed by their medical or psychiatric provider.

C. <u>Psychiatric.</u> Persons who are actively psychotic should not undergo polygraph testing. However, individuals may be tested when their psychiatric conditions have stabilized. Individuals diagnosed with psychotic mental health disorders should be viewed as marginally suitable for polygraph testing. Test results for these persons should be reported as qualified and the test results should be viewed with caution.

   1. Except as precluded by law or regulations, examiners should note in the examination report any examinee that reports being diagnosed with a serious mental health condition, including medically or age-related dementia/delirium, and the use of psychotropic medications. Psychiatric conditions do not necessarily preclude an individual from being tested; although it may be important to delay polygraph testing until the individual's psychiatric issues are stable or effectively managed.

   2. Examiners should not test persons who require continuous observation or assistance until the individual's psychiatric and functional stability has improved.

D. <u>Developmental.</u> Persons with diagnosed developmental disorders should not be tested unless it can be reasonably expected that the goals of the program, investigation, agency, or individual can be met by the polygraph testing, and that the testing process will not jeopardize the health or safety of the examinee. These individuals should be viewed as marginally suitable for polygraph testing. Their test results should be accordingly qualified and viewed with caution.



CDOC/Nelson_00419

1. Examiners should determine suitability on a case-by-case basis for prospective examinees that have diagnosed developmental disorders, such as serious impairment in cognition/memory, learning, language, communication, conceptual functioning, or temporal/organization deficits.

2. Persons whose functioning is profoundly limited (e.g., whose measured IQ is less than 55), should be regarded as unsuitable for polygraph testing.

*Model Policy for Post-Conviction Sex Offender Testing - Revised March 2018*

1) Suitability for testing. Suitable examinees should, at a minimum, be expected to have a capacity for;

   A.  Abstract thinking;

   B.   Insight into their own and others' motivation;

   C.   Understanding right from wrong;

   D.  Telling the basic difference between truth and lies;

   E.  Anticipating rewards and consequences for behavior; and

   F.  Maintaining consistent orientation to date, time, and location.

2) Medications. Examiners should obtain and note in the examination report a list of the examinee's prescription medication(s), any medical or psychiatric conditions, and any diagnosed acute or chronic medical health conditions.

3) Trauma and dissociation. Examiners should consult with other professional members about a client's history on trauma and dissociation and proceed with caution.

4) Unsuitable examinees. Examiners should not test examinees who present as clearly unsuitable for polygraph testing at the time of the examination.

5) Psychosis. Persons who are acutely psychotic, suicidal, or have unstable or severe mental health conditions, including dementia, should not be tested.

6) Age. Persons whose chronological age is 12 years or greater should be considered suitable for polygraph testing unless they are substantially impaired. Polygraph testing should not be attempted with persons whose Mean Age Equivalency (MAE) or Standard Age Score (SAS) is below 12 years as determined by standardized psychometric testing (e.g., IQ testing, and adaptive functioning).

7) Level of functioning. Persons whose level of functioning is deemed profoundly impaired and warranting continuous supervision or assistance may not be suitable for polygraph testing.



CDOC/Nelson_00420

8)  Acute injury or illness. Persons suffering from an acute serious injury or illness involving acute pain or distress should not be tested.

9)  Controlled substances. Persons who's functioning is observably impaired due to the influence of non-prescribed or controlled substances should not be tested.

10) Team approach. Examiners should consult with other professional members of the multidisciplinary supervision and treatment team, prior to the examination, when there is doubt about an examinee's suitability for polygraph testing.

11) Incremental validity. When there are concerns about an examinee's marginal suitability for testing, examiners should proceed with testing only when the multidisciplinary supervision and treatment team determines that testing would add incremental validity to risk assessment, risk management, and treatment planning decisions through the disclosure, detection, or deterrence of problem behaviors.

Top of the Document



CDOC/Nelson_00421

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix K-3: Plethysmograph Examination and Viewing Time

*Taken from the ATSA Ethical Standards and Principles for the Management of Sexual Abusers, the Association for the Treatment of Sexual Abusers 2014 (PP. 70-75).*

### Phallometry

Phallometry is a specialized form of assessment used in treatment with individuals who have committed sexual offenses. Responsible use of phallometry results requires at least a rudimentary understanding of how phallometry works, and its advantages and limitations. As with any instrument or procedure, members are familiar with current literature and obtain appropriate training before using or interpreting phallometric testing results. Examiners receive training in phallometric testing in order to become knowledgeable about the technical aspects of the equipment and the appropriate protocols for conducting phallometric testing specific to the equipment being used. Examiners are also familiar with the research evidence on the reliability and validity of phallometric testing.

Phallometric testing using penile plethysmography involves measuring changes in penile circumference or volume in response to sexual and non-sexual stimuli. Circumferential measures (measuring changes in penile circumference) are much more common than volumetric measures (measuring changes in penile volume), which are used in only a few laboratories worldwide. However, there is good agreement between circumferential and volumetric measures once a minimal circumference response threshold is reached. Therefore, circumferential measures are the focus of this appendix.

Phallometric testing provides objective information about male sexual arousal and is therefore useful for identifying atypical sexual interests, increasing client disclosure, and measuring changes in sexual arousal patterns over the course of treatment.

Phallometric test results are not used as the sole criterion for determining atypical sexual interests, estimating risk for engaging in sexually abusive behavior, recommending that clients be released to the community, or deciding that clients have completed treatment programs. Phallometric test results are interpreted in conjunction with other relevant information (such as, the individual's offending behavior, use of fantasy, and pattern of masturbation) to determine risk and treatment needs. Phallometric test results are not to be used to draw conclusions about whether an individual has or has not committed a specific sexual crime. As well, there are limited data available regarding the use of the plethysmograph with clients who have developmental disabilities and clients with an acute major mental illness. Therefore, members need to exercise caution in using phallometry with these populations and in interpreting and reporting phallometric results.

Prior to testing, examiners screen clients for potentially confounding factors such as medical conditions, prescription and illegal drug use, recent sexual activity, and sexual dysfunction. Clients



CDOC/Nelson_00422

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

with active, communicable diseases, particularly sexually transmittable diseases, are not to be tested until their symptoms are in remission.

Specific informed consent for the testing procedure and release forms for reporting test results are obtained at the beginning of the initial appointment. Laboratories have a standard protocol for fitting gauges, presenting stimuli, recording data, and scoring.

Examiners use the appropriate stimulus set to assess sexual interests that are the subject of clinical concern. For example, examiners use a stimulus set with depictions of children and adults to test clients who have child victims or who are suspected of having a sexual interest in children. At a minimum, examiners have at least two examples of each stimulus category. Stimuli that are more explicit appear to produce better discrimination between individuals who sexually abuse and control subjects than less explicit stimuli. It is important to ensure that the stimuli are good quality and avoid any distracting elements.

Members are aware of the applicable legislation in their jurisdiction regarding the possession of sexually explicit materials. If permitted to use visual stimuli for testing of sexual interest in children, examiners use a set of pictures depicting males and females at different stages of physical development, ranging from very young, pre-pubertal children to physically mature adults. The use of neutral stimuli, such as pictures of landscapes without people present, may increase the validity of the assessment. The inclusion of neutral stimuli serves as a validity check because responses to sexual stimuli that are lower than responses to neutral stimuli might indicate faking attempts. Faking tactics include looking away from or not listening to stimuli. Audiotaped stimuli may also be used to assess sexual interest in children; if used, these stimuli clearly specify the age and sex of the depicted individuals.

For testing of sexual arousal to non-consenting sex and violence, examiners using audiotapes include stimuli describing consenting sex, rape, and sadistic violence. Stimuli depicting neutral, non-sexual interactions are also included. Stimuli can depict males or females, children, or adults.

The phallometric testing report includes a description of the method used for collecting data, the types of stimuli used, an account of the client's cooperation and behavior during testing, and a summary and description of the client's profile of responses. Client efforts to fake or other potential problems for the validity of the data or the interpretation of results are also reported.

The three most common means of scoring plethysmograph data are standardized scores, percentage of full erection, and millimeter of circumference change. Those using phallometric assessment are aware of the advantages and disadvantages of each scoring method. Research has found that standardized scores (e.g., z scores) increase discrimination between groups. Transforming raw scores to standardized scores for subjects who show little discrimination between stimuli can, however, magnify the size of small differences between stimuli. Raw scores, millimeter of circumference change, or scores converted to percentage of full erection may be clinically useful in the interpretation of results.

Deviance indices can be calculated by subtracting the mean peak response to non-deviant stimuli from the mean peak response to deviant stimuli. For example, a pedophilic index could be calculated by subtracting the mean peak response to stimuli depicting adults from the mean peak response to stimuli depicting prepubescent children. Thus, greater scores indicate greater sexual arousal to child stimuli.



CDOC/Nelson_00423

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Because the sensitivity of phallometric testing is lower than its specificity, the presence of atypical/deviant sexual arousal is more informative than its absence. Results indicating no atypical/deviant sexual arousal may be a correct assessment or may indicate that a client's atypical/deviant sexual interests were not detected during testing.

Research indicates that initial phallometric assessment results are linked with recidivism. Repeated assessments can be helpful to monitor treatment progress and to provide information for risk management purposes.

*Viewing Time Measures*

Viewing time measures are a specialized form of assessment used with individuals who have engaged in sexually abusive behaviors. Using the results of viewing time measures responsibly requires members to have at least a rudimentary understanding of how viewing time measures work, as well as their advantages and limitations. As with any instrument or procedure, members should be familiar with current literature and obtain appropriate training before using or interpreting viewing time testing results.

Currently, unobtrusively measured viewing time is primarily used to identify sexual interest in children. For instance, to test sexual interest in children, examiners have a set of pictures depicting males and females at different stages of development, ranging from very young children to physically mature adults. The relative amount of time clients spend looking at pictures of children (who are clothed, semi-clothed or nude, depending on the jurisdiction,) is compared to the time that the same adult spends looking at pictures of adults. Research suggests that, as a group, individuals who have engaged in sexually abusive behaviors against children look relatively longer at stimuli depicting children than adults. Unobtrusively measured viewing time correlates significantly with self-reported sexual interests and congruent patterns of phallometric responding among non-sexually abusive subjects. Little is known, however, about the value of retesting using viewing time as a measure of treatment progress.

As with any test, specific informed consent for the test procedure and release forms for reporting results are obtained prior to beginning testing. Examiners have a standardized protocol for presenting the stimuli, recording, and scoring. Examiners are familiar with the reliability and validity of the test. In particular, it is important that examiners know the degree to which the viewing time measure being used has been validated for the client population being assessed. Note that there is limited information specific to the use of viewing time with clients who have developmental disabilities. Currently this technology has primarily been used to identify sexual interest in gender and age. As well, there is limited information specific to the use of viewing time with clients with developmental disabilities.

The test report includes a description of the method used for collecting data, the types of stimuli used, an account of the client's cooperation and behavior during testing, and a summary and description of the client's responses. Client efforts to fake or other potential problems for the validity of the data or the interpretation of results are also included.

As noted in the main body of this document, viewing time is not to be used as the sole criterion for determining deviant sexual interests, estimating a client's risk for engaging in sexually abusive behavior, recommending whether a client be released to the community, or deciding whether a client has completed a treatment program. Viewing time test results are interpreted in conjunction with other relevant information (for example, the individual's offending behavior, use of fantasy, and



CDOC/Nelson_00424

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

pattern of masturbation) and are never to be used to make inferences about whether an individual has or has not committed a specific sexual crime.

# Appendix L: Female Sex Offender Risk Assessment

*Female Sex Offender Risk Assessment*
**White Paper**
**October 2013**

Currently the field of sex offender management and treatment is lacking any validated/standardized risk assessment instrument for the female sex offender population. As a result, providers and other stakeholders working with this unique offender type do not have an approved method of accurately assessing risk. Further, it is counterproductive and prohibited for risk assessment instruments normed on the male population to be used on the female population. Given that research has shown that clinical judgment is the *least* accurate indicator of risk and that standardized risk instruments are the preferred measure of risk, this a substantial and concerning gap in the field.

Female sex offenders represent less than 10% of all known sex offenders. [320] With such a small offender population there are challenges in gathering data resulting in a lack of research. [321] In fact, the field of sex offender management is 20 years behind regarding female sex offenders in comparison to male offenders. [322] Given that recidivism amongst this group appears to be very low, (meta analyses from 2005 to 2010 indicate female sexual recidivism is between 1-3%) effectively discerning accurate risk factors is extremely challenging and has proven to be a barrier to developing a standardized risk assessment thus far. [323] The Sex Offender Management Board (SOMB) is working toward developing a risk assessment, but this task has proven arduous and will realistically take a long time due to the necessary numbers needed for data collection as well as collaboration with other states and possibly nations this project requires.

---

[320] Cortoni, F., & Hanson, R.K. (2005). A review of the recidivism rates of adult female sexual offenders (Research Report 2005 No R-169). Ottawa, Ontario: Correctional Service of Canada, Research Branch; Cortoni, F., Hanson, R.K., & Coache, M.E. (2010). The recidivism rates of female sexual offenders are low : A meta-analysis. Sexual Abuse: A Journal of Research and Treatment, 22, 387-401; U.S. Department of Justice, Center for Effective Public Policy, Center for Sex Offender Management (2007). Female sex offenders. Retrieved from http://www.csom.org/pubs/female_sex_offenders_brief.pdf.

[321] Gannon, T. A., & Cortoni, F. (2010). Female sexual offenders: Theory, assessment, and treatment. Hoboken, NJ: John Wiley & Sons; Harris, D. A. (2010). Theories of female sexual offending. In T. A. Gannon & F. Cortoni (Eds.), Female Sexual Offending: Theory, Assessment, & Treatment. Hoboken, NJ: John Wiley & Sons; Lilly, J. R., Cullen, F. T., & Ball, R. A. (1995). Criminological theory: Context and consequences (2nd Ed.) Newbury Park, CA: Sage.

[322] Ford, H. & Cortoni, F. (2008). Sexual deviance in females: Assessment and treatment. In D. R.   Laws & W. O'Donohue (Eds.), Sexual Deviance: Theory, Assessment, and Treatment Vol. 2, New York: Guilford Press; Gannon, T. A., & Cortoni, F. (2010). Female sexual offenders: Theory, assessment, and treatment. Hoboken, NJ: John Wiley & Sons;

[323] Cortoni, F., Hanson, R.K., & Coache, M.E. (2010). The recidivism rates of female sexual offenders are low : A meta-analysis. Sexual Abuse: A Journal of Research and Treatment, 22, 387-401; Cortoni, F., & Hanson, R.K. (2005). A review of the recidivism rates of adult female sexual offenders (Research Report 2005 No R-169). Ottawa, Ontario: Correctional Service of Canada, Research Branch.



288

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

In the interim, the SOMB offers the following guidance to professionals working with this population. As new research emerges the SOMB will respond accordingly by incorporating updated information but until such time it is essential to utilize best practices. After a thorough review of current information from professional publications (books and peer reviewed journals by experts in the field) there appear to be some indicators that can be helpful when appraising risk of female sex offenders. [324] The following list is not intended to be all encompassing or to be used as a risk assessment, rather, professionals should consider the following factors in conjunction with sound clinical judgment as they may potentially be related to risk for female sex offenders:

A. Prior criminal history – i.e. anti-social orientation

B. Prior child abuse offenses – criminal history, social services, self-report

C. Denial or minimization of offending behavior

D. Distorted cognitions about sexual offending/abuse – Multi Phasic Sexual Inventory II and/or Abel

E. Intimacy deficits and problematic relationship(s) – Intimacy deficits can be defined as restrained capacity of an individual to exchange thoughts and feelings that are of personal significance with another individual who is highly valued. Problematic relationships can be relationships in which the individuals do not emotionally support one another, foster communication, or appropriately challenge one another. In addition, the individual may place a higher value on the relationship than his/her own personal worth. The relationship may contain unhealthy interaction, and does not effectively enhance the lives of the people involved. The individuals may not take responsibility for making their own lives or the relationship work.

F. Use of sex to regulate emotional state or fulfill need for intimacy. This can be viewed as an individual who engages in sexual behaviors as a coping mechanism to improve mood, increase self-esteem, reduce stress, achieve emotional well-being, solve problems and/or to avoid negative emotional states. Using sex to fulfill a need for intimacy may be seen as an individual who engages in sexual behaviors to meet emotional needs, to achieve a superficial/distorted sense of connection, and/ or to achieve emotional fulfillment through physical sexual acts.

G. Sexual gratification and instrumental goals such as revenge or humiliation

H. Substance abuse

I. Puts needs of co-offending partner above self and/or child(ren) and/or victim

J. Evidence of illegal, abusive and harmful sexual interest – Viewing Time

---

[324] Clark , D., & Howden-Windall, J. (2000). A retrospective study of criminogenic factors in the female prison population. London : Her Majesty's Prison Service; Denov, M. S., & Cortoni, F. (2006). Adult female sexual offenders. In C. Hilarski & J. Wodarski (Eds.) Comprehensive mental health practices with sex offenders and their families (pp. 71-99). New York: Hawthorne Press; Cortoni, F., Anderson, D., & Bright, D. (2002). Locus of control, coping and sexual offenders. In B. A. Schwartz & C. Cellini (Eds.), The sex offender (Vol. 4). Kingston, NJ : Civic Research Institute; Gannon, T. A., & Cortoni, F. (2010). Female sexual offenders: Theory, assessment, and treatment. Hoboken, NJ: John Wiley & Sons; Gannon, T. A., Rose, M. R., & Ward, T. (2008). A descriptive model of the offense process for female sexual offenders. Sexual Abuse: A Journal of Research and Treatment, 20(3), 352-374.



CDOC/Nelson_00426

**K.** Impulsivity – This can be viewed as engaging in behavior without adequate thought, the tendency to act with less forethought than do most individuals of equal ability and knowledge, or a predisposition toward rapid, unplanned reactions to internal or external stimuli without regard to the negative consequences of these reactions.

**L.** Documented presence of personality disorder (e.g. Borderline, which may impact emotional regulation, impulsivity and poor decision making).

It may benefit the clinician to focus on offender characteristics in conjunction with clinical judgment, [325] and to use the Level of Service Inventory Revised (LSI-R) to identify criminogenic risk and needs. Given that effective risk assessment is essential in evaluating, treating, and managing sex offenders, it may be tempting to utilize the plethora of standardized assessments available for male offenders. However, they are _prohibited_ for use with female offenders. [326] This is because the assessments were validated on the male population and are empirically based on the specific relationship between risk factors and recidivism, which is null and void with females. In addition, these assessments may misrepresent risk in female offenders.

The Board would like to remind stakeholders that offenses involving female sex offenders have a lower reporting rate than those involving a male offender. In addition, there are female offenders who are dangerous and require a high level of treatment and supervision. While they are a unique population, the behavior is similar and should be treated equally (e.g. non-compliance, instability, resistance, risk characteristics). Often females in the criminal justice system are treated differently due to individual, professional, cultural and social biases. However, inequity and inconsistency in sentencing, supervision, treatment, etc. based solely on gender differences does an injustice to the offender and the system and places the community at risk. The SOMB continues to promote individualized assessment and intervention efforts for all offenders regardless of gender and encourages the use of risk, need, responsivity principles. Furthermore, the SOMB endorses gender responsive interventions and evaluation. The very nature of sexual offenses requires that public and victim safety remain at the forefront of decision-making.

---

[325] Especially for those who have expertise working with female sex offenders; see Eldridge, H., & Saradjian, J. (2000). Replacing the function of abusive behaviors for the offender: Remaking relapse prevention in working with women who sexually abuse children. Remaking relapse prevention with sex offenders: A sourcebook, 402-426; Matthews, J. K. (1998). An 11-year perspective of working with female sexual offenders. In W. L. Marshall, Y. M. Fernandez, S. M. Hudson, & T. Ward (Eds.), Sourcebook of treatment programs for sexual offenders (pp. 259-272). New York: Plenum Press.

[326] Gannon, T. A., & Cortoni, F. (2010). Female sexual offenders: Theory, assessment, and treatment. Hoboken, NJ: John Wiley & Sons.



CDOC/Nelson_00427

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## A. Female Risk Areas- Quick Reference

Note: Research on female sex offenders is limited. However, there are some consistent findings. Recidivism amongst female sex offenders based on meta-analyses from 2005 to 2010 is between 1 and 3%. Excluding prostitution-related offenses, sexual recidivism rates were < 2-3% (over 5-10+ year follow-up period) and the violent recidivism rates (including sexual recidivism) are about 6%.

| Sexual Interests and Behaviors | Attitudes | Interpersonal | Self-Management |
|---|---|---|---|
| • Deviant/inappropriate sexual interests<br>• Unhealthy sexual dynamics<br>  ○ Use of sex to regulate emotional state or fulfill the need for intimacy<br>• Sexual gratification and instrumental goals such as revenge or humiliation<br>• More than one victim in index offense | • Distorted offense-supportive beliefs<br>  ○ Distortions conducive to sexual offending/abuse<br>• Child-adult boundary distortions<br>• Low self-esteem<br>• Antisocial orientation/attitudes | • Intimacy and social functioning deficits<br>  ○ Difficulties in intimate relationships<br>  ○ Interpersonal relationship deficiencies,<br>• Emotional identification/congruence with child<br>• Male coercion and dependency<br>  ○ Putting needs of co-offending partner above self and/or children and/or victim<br>• Victimization during childhood or adulthood<br>  ○ Bullied in school<br>  ○ Physical abuse/ previous violent partners<br>  ○ Antisocial peers | • Mental health difficulties<br>  ○ Emotion and self-regulation issues<br>  ○ Documented presence of personality disorder<br>  ○ Self-injury or suicide attempts<br>• Substance abuse<br>• Prior criminal history<br>  ○ Prior child abuse offenses<br>• Impulsivity<br>• Employment difficulties<br>• Low educational attainment |

Distal vulnerability (risk) factors
- Victimization
- Mental illness
- Interpersonal problems
- Ongoing life stressors

Consider all female sexual offenders to be **low** risk for sexual recidivism unless there is compelling evidence to the contrary. Such as:
- Disclosed intention to sexually re-offend
- Disclosed sexually deviant interests
- Established persistent pattern of sexual offending (despite detection, sanction, and/or treatment)
- Dramatically compromised self-regulation skills (due to mental illness, substance abuse, or psychological disturbance that impairs the ability to inhibit inappropriate/deviant sexual urges

Top of the Document



CDOC/Nelson_00428

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

# Appendix M: Computer Use Agreement for Sex Offenders

*Computer Use Agreement for Sex Offenders*

Client:_____ Supervising Officer/Designee:_____

By signing below, the above-named client indicates (s)he understands (s)he has the right to refuse consent to the items contained herein and that the client voluntarily agrees to be compliant with the following conditions:

_____ Client shall provide a complete and accurate inventory of all computers, computer-related equipment, and communications devices and services on an inventory form provided by the Probation Department. The client agrees to ensure that all information on the inventory is complete, accurate and current at all times and that they will not use or access any electronic storage or communication device or service not reported on the inventory form and specifically approved for use by the Probation Department.

_____ Client shall obtain prior approval from the Supervising Officer/Designee to engage in the following activities:
  _____ Web browsing (including but not limited to surfing).
  _____ Email (all email accounts must have prior approval).
  _____ Interpersonal communication (including but not limited to chatting, texting and instant messaging).
  _____ Producing web content (including but not limited to a web site, MySpace and other social networking site pages, YouTube, Podcasting, blogging, vlogging).
  _____ Participating in social networking activities.
  _____ Internet related telephone communication (including but not limited to using Voice Over Internet Protocol).
  _____ File sharing by any method (including, but not limited to Peer to Peer, Internet Relay Chat, attachments to emails, iTunes).

_____ Client shall not use the computer for any purpose which might further sexual activity. Such use includes, but is not limited to, possession or viewing of material that is sexual in nature.

_____ Client shall be prohibited from possessing or viewing certain materials related to, or part of, the grooming cycle for his/her crime. Such materials include, but are not limited to, the following:
  _____ Images of your victim.
  _____ Stories or images related to your crime or similar crimes.
  _____ Images which depict individuals similar to your victims (e.g. children).
  _____ Stories written about or for individuals similar to your victim.
  _____ Materials focused on the culture of your victim (e.g. children's shows or web sites).
  _____ Client shall be prohibited from using any form of encryption, cryptography, steganography, compression, password protected files and/or other method that might limit access to, or change the appearance of, data and/or images without prior written



CDOC/Nelson_00429

approval from the Supervising Officer/Designee. If, for work purposes, password protection is required on any system or files used by Client, the password shall be provided to the Supervising Officer/Designee upon request.

_____ Client shall be prohibited from avoiding the creation of, or altering or destroying records of computer use without Supervising Officer/Designee's approval. This includes, but is not limited to, deleting or removing browser history data regardless of its age, emptying the Recycler, the possession of software or items designed to boot into or utilize RAM kernels, alter or wipe computer media, defeat forensic software, or block monitoring software. This also includes a prohibition against restoring a computer to a previous state or the reinstallation of operating systems.

_____ Client consents to unannounced examination by Supervising Officer/Designee of any and all computer(s) and/or devices(s) to which Client has access for the limited purpose of detecting content prohibited by this document, conditions of probation, or court order. This consent to examine includes access to all data and/or images stored on any storage media (including but not limited to cell phones, iPods, PDA's, removable media, thumb drives, camera cards, game consoles, CDs, DVDs) whether installed within a device or removable and separate from the actual device.

_____ Client shall allow the installation of monitoring software and periodic examination of their computer at their own expense to insure compliance with the conditions of probation and this agreement. The client has no expectations of privacy regarding computer use or information stored on the computer if monitoring software is installed and understands and agrees that information gathered by said monitoring software may be used against him/her in any subsequent administrative or legal proceeding.

_____ That the conditions of usage may be modified by the Probation Department or their designee as needed and agrees to abide by all modifications of usage. The client has the right to refuse to abide by modifications of these conditions, but understands that their access to computers and communications devices may be revoked if they fail to comply with all conditions imposed by the Probation Department or their designee.

_____ Client specifically agrees to be responsible for all data, images and material on the computer and voluntarily consents to announced or unannounced searches by the Supervising Officer/Designee to verify compliance with these special conditions of supervision. The Client understands and agrees that his/her computer, related equipment, communication, and storage devices are subject to seizure by Supervising Officer/Designee if, during a search, any evidence of a violation or any evidence of a new crime is detected.

_____    _____    _____    _____
Client's Signature                      Date                  Supervising Officer's Signature        Date

Top of the Document



CDOC/Nelson_00430

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

# Appendix N: Digital Technology Use Factors

**Digital Technology Use Factors**
**Which Indicate Increased Sex Offender Investment**
**In Digital Sexual Content**

Jim Tanner, Ph.D.
KBSolutions Inc.
www.kbsolutions.com
lists@kbsolutions.com

I have been conducting forensic examinations of convicted sex offenders' digital devices since 1998. I worked as a cybercrime analyst for and with various state level probation departments during this period. My work environment was unique in that the offenders were convicted and on probation. I worked live on the offender's devices, in the offender's home or office environment and with the offender present. During my examinations I talked with the offender, discussed his/her cyber behavior and asked questions about what I was finding. This afforded me a fuller understanding of their cyber-sexual behavior than I would have obtained working on the device in a forensic lab or simply talking to an offender in absence of the device itself.

Based on more than 1,300 examinations of offenders' digital devices, I found 14 factors which indicate an offender has an investment in digital sexual content that is beyond the norm for convicted sex offenders. This investment often leads to resistance to containment/treatment and a higher probability of recidivism. While some of these factors may be benign for the public at large, they become important when found in the technology use of individuals charged with or convicted of sex crimes. It is when one's behavior draws the attention of law enforcement that the factors below become significant.

When considering the digital behavior of sex offenders, one should seek to understand the big picture of the offender's technology use and how it relates to sexual behavior (also see www.kbsolutions.com/beyond.pdf and www.kbsolutions.com/PornContraband.pdf). As offenders engage in more of the factors, their investment in cyber-sexual content increases. It has been my experience that increased investment in cyber-sexual content also leads to an increase in resistance to containment and treatment.

The elements described in the remainder of this paper are listed in no particular order. The reader should not assume any priority based on location within the list.



CDOC/Nelson_00431

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

*The 14 Factors:*

1. Surfing more than 10 hours a week of sexual content.

2. High ratio of sexual sites to general surfing, regardless of number of hours.

3. Saved versus cached material. As the ratio of saved to cached goes up, so does the risk.

4. Any cataloging of sexual content.

5. Low ratio of "Splash Page" to "Inside Site" images.

6. Membership in adult sites or organizations promoting sexual behavior.

7. Nude pictures of the offender on the offender's devices.

8. Pictures with sexual content taken by, created by, or altered by the offender.

9. Erotic literature written by the offender.

10. Trophy materials stored on the offender's devices.

11. User group or Peer to Peer activity seeking sexually explicit materials.

12. "Red Flag" Themes, if they have a significant number of images/files:

13. Internet grooming or solicitation of minors using any medium.

14. Use of technology for sexual content which indicates a more heavily invested approach:

Each of these factors are explained in the pages that follow. I believe a complete psycho-sexual evaluation cannot be obtained without both a polygraph and a digital technology examination. It is my intention that this paper serve as a checklist to evaluators, containment/treatment teams, and forensic examiners when considering the digital behavior of sex offenders.

As technology advances, changes will undoubtedly occur in the number and types of indicators related to cyber-sexual investment. I will endeavor to keep this paper updated as technology changes. This paper, in its most recent form will always be available at www.kbsolutions.com/KBS14Factors.pdf.

**Factor 1:** Surfing more than 10 hours a week of sexual content.

> Addiction to cyber-sex is a concern for those charged with or convicted of sex crimes. There is no hard and fast rule as to what constitutes a threshold of addiction. Each individual's pattern of sexual content use must be compared to their pattern of general (non-sexual) technology use.



CDOC/Nelson_00432

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

During my examinations I found that offenders who used digital sexual content more than 10 hours a week also reported higher incidence of intrusive sexual thoughts, illegal, abusive or harmful sexual ideation, and feeling like they were 'addicted' to technology use. Using technology more than 10 hours to obtain sexual content indicates enhanced investment in digital sexual content.

**Factor 2:** High ratio of sexual sites to general surfing, regardless of number of hours.

Regardless of the total number of hours spent on the Internet (or using technology), the ratio of sexual content to non-sexual content is an important indicator of investment in digital sex. Calculating the percentage of digital sexual activity to non-sexual digital activity gives the treatment team valuable information concerning investment. An offender who views sexual content 80 hours of 100 hours of technology use is different than the offender who views sexual content 10 hours of 100 hours technology use. Similarly, an offender who views sexual content 8 of 10 hours of technology use is different than the offender who views sexual content 1 of 10 hours of technology use.

The higher the percentage (ratio) of sexual content to general technology use, the higher the investment in digital sexual content.

**Factor 3:** Saved versus cached material.

Cached:    When browsing the Internet, all browsers automatically write the contents of the sites visited to the local hard drive in a special folder called a "cache". This content is automatically stored by the browser and is not a 'purposeful download' of the material. Its presence on the storage media simply indicates the offender visited the site and/or viewed the material. Cached material should be considered differently than material that is saved by the offender.

Saved:    When using a browser, the User can right-click on the content and save it to the local hard drive. This "Save As" function is built into all major operating systems. The User can place the content (picture, video, etc.) anywhere on the storage media, can name the folder it is placed in, and can change the name of the content being stored. This "Save As" function requires human interaction; it is not automatic. Thus, when something has been 'saved' it indicates the content is of special significance to the offender.

The percent of saved material (offender took action) to cached material (offender simply viewed the material), is an indication of the investment the offender has to digital sexual content. The higher the proportion of saved material, the greater the investment.

Additionally, evaluators and treatment team members should pay attention to the themes contained in the saved material. Saved material indicates special interest on the part of the offender.



CDOC/Nelson_00433

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

**Factor 4:**  Cataloging of sexual content.

Related to saving material is cataloging material. As indicated above, when a User saves material, they can create and name folders, rename content, and save the material in any organizational structure that makes sense to the offender. When offenders begin to organize saved material into categories they have become 'collectors'. Often the names of the folders are elucidating for evaluators and treatment teams. For example, folders named 'blondes, 'girls 13', or 'outdoors' give us an insight to the offender's cognitive structure.

Further, keeping sexual content (saving it outside the cache) indicates an offender's unwillingness to part with the material. They don't want to lose it, they want to keep it and use it again in the future. Organizing and cataloging the saved material is a major step further into the investment in sexual content. The organization and cataloging of material is done primarily for ease of access and focus. It is faster and easier for an offender to find specific content if they have it organized and cataloged.

Cataloging behavior indicates a substantial increase to the investment in digital sexual content.

**Factor 5:**  Low ratio of "Splash Page" to "Inside Site" images.

Splash Page:  When visiting a website, the first page that displays is the 'home' or 'splash' page. This page is the portal that is comes up when entering the top-level domain URL into a browser (e.g. www.youtube.com). The splash page on adult sites is an advertisement. Splash pages generally contain several smaller images designed to entreat the User into clicking deeper into the web site. The economics of web site management dictate that images on the splash page be limited in size. Smaller images load faster and take up less room on the screen. The goal of the site's splash page is to get the User to 'drill down' by clicking on items to go deeper into the site. Due to size limitations, splash page images are generally of lower quality and splash videos short in length.

Inside Site:  Material located on pages other than the splash page are accessible only by User action.

Once a User clicks through or drills down into a site, the images are larger (full sized), higher quality, and the videos generally longer. Drilling down into a site indicates the offender has more interest in the material.

The extent to which an offender skims across splash pages versus drills down into site content is an indicator of investment in digital content. This is related to the Pace element of the TRAPS model of assessing sex offender's computer use (www.kbsolutions.com/beyond.pdf).



CDOC/Nelson_00434

A thorough examination of URL histories indicates whether content was contained on a splash page or was deeper inside the site. However, a quick rule of thumb is to consider the size of the image on the media. Images smaller than 10kb are generally splash page content. Images between 10kb and 20kb could be either splash page or inside site material. Images larger than 20kb are generally found inside the site (the offender drilled down into the site to view it). The average splash page can have between 5 and 20 images. Pages located deeper in the site have fewer images (often only 1 image per page). Thus, even a 80:20 ratio of splash to inside can indicate significant drilling down behavior on the part of the offender.

Offenders found to have frequently drilled down into many sites (e.g. have a low ratio of splash page to inside site materials) demonstrate a higher investment in digital sexual content. Evaluators and treatment teams should also pay particular attention to the themes of the content viewed from inside sites - it is of interest to the offender.

**Factor 6:** Membership in adult sites or organizations promoting sexual behavior.

Adult web sites make money by selling memberships. The average adult site will give away 10-20 images as loss leaders to encourage visitors to purchase membership in the site. This is analogous to your local grocery store putting green beans on sale for 10 cents a can to get you into the store. The logic of loss leaders is that once in the store, you will also purchase other items at full price.

Adult sites work on the same principle. By giving away 10-20 images or short video clips free, they are betting the visitor will become interested in seeing the remainder of the site's content and be willing to purchase a membership to have access to the thousands of images/videos.

There are many adult sites available on the web. Because of the sheer number of sites in existence, there are literally tens of thousands of images and videos available free on the web. One could view sexual content for months, if not years, and never have to pay for any content. Thus, when an offender decides to pay money to purchase membership in a site, it is an indication of an increased investment (literally and figuratively) in sexual content.

Concomitantly, when an offender joins groups which promote sexual behavior (e.g. adultfriendfinder.com, squirt, alt, etc.), they are signifying an increased investment in and identification with sexual content. The type and focus of member groups should be carefully examined by the treatment team.

I caution the reader that I am not talking about behavior between non-offender consenting adults. Membership in adult sites or sexually focused groups for non-offenders is not at issue here. It is when one's behavior draws the attention of law enforcement that membership in such sites and groups becomes significant.



CDOC/Nelson_00435

**Factor 7:**  Nude pictures of the offender on the offender's devices.

It is my experience that approximately 25% of the offenders whose devices I examined had pictures of themselves nude on their devices. When images of the offender are found on their devices, it should raise the question "...what are they doing with the pictures?" Are they sharing them? With whom are they sharing?

Having nude pictures of themselves indicates an increased investment in defining themselves as a sexual object. The more graphic the images, the greater the investment in the offender seeing himself/herself primarily as a sexual object. This focus in self-definition is reflective of a resistance to containment and treatment.

It is important to note that I am not talking images commonly found among those participating in "sexting" behavior that is becoming more common among young people. I'm talking about images contained on the digital devices of individuals charged with or convicted of sex crimes, not adolescent 'felony stupid' behavior. Nor am I talking about behavior of or between non-offender consenting adults. It is when one's behavior draws the attention of law enforcement that the possession of self-erotic images becomes significant.

**Factor 8:**  Pictures with sexual content taken by, created by, or altered by the offender.

Images or videos do not have to contain the offender to be significant. If the offender has used their digital equipment to create sexual images or videos of others it again raises the question of what they are doing with them. The offender is a producer of adult material rather than just a consumer. This indicates an increased investment in digital sexual content. The created material might include artwork (digital or scanned) that the offender created.

It is also important to note whether the offender has altered digital sexual content. Altering would include cropping, editing, retouching, and morphing content. Other than removing copyright notices, any alteration of an image indicates increased investment in the digital content.

Again, I caution the reader that I am not talking about behavior of or between non-offender consenting adults. It is when one's behavior draws the attention of law enforcement that the manipulation of digital content becomes significant.

**Factor 9:**  Erotic literature written by the offender.

In the same vein as creating or altering images or videos, offenders who produce erotic literature are demonstrating an increased investment in sexual content. Adult ("erotic") stories abound on the Internet and in print. Some of the topics contained in erotic literature are illegal when found in images/videos (e.g. sex with children). For example, in June of 2010 there were 21,488 stories on literotica about incest and 9,787 stories about non-consensual sex (rape). Offenders who have shifted their focus in stimuli from images to text are often doing so to avoid prosecution. While the creation of such prose may be protected by the 1st Amendment, it should be of concern when the prose is created by sex offenders.



CDOC/Nelson_00436

The act of creative writing takes more imagery and focus than is commonly found among amateurs who produce sexual images/videos. Therefore, it is of concern when we find evidence that a sex offender has been producing written erotica.

Again, I caution the reader that I am not talking about behavior of or between non-offender consenting adults. It is when one's behavior draws the attention of law enforcement that the creation of written erotic content becomes significant. The presence of the material indicates an increased investment in sexual content.

If offender-produced erotica is discovered, the content of the material should be of great interest to the treatment team.

**Factor 10:** Trophy materials stored on the offender's devices.

Offenders often make the news articles/stories are often available in digital formats. In about 10% of the digital devices I examined, I found offenders saving articles, clippings, and/or video news stories about themselves. These articles constitute "trophy materials" and indicate the offender has not fully grasped the magnitude of their behavior.

Additionally, when victims are family members it is not uncommon to find pictures of the victim on the offender's digital devices. Sometimes this possession is inadvertent or unintentional post-conviction, often it is purposive. Examining the last access dates of images helps the treatment team determine whether the image should be considered trophy material or not (if viewed and kept after being told to remove images of the victim, it clearly constitutes trophy material).

If the local jurisdiction has web accessible sex offender registries, I find that approximately 10% of offenders will visit the registry and search for themselves and others within their community. When questioned about this behavior, offenders often tell me that it makes them feel less abusive or harmful to know others have done what they did. Looking themselves up may be curiosity, but surveying the registry for others constitutes behavior that indicates more than curiosity, it is a form of trophy activity.

The presence of trophy materials on the digital devices of sex offenders indicates a greater investment in their behavior.

**Factor 11:** Usegroup or Peer to Peer activity seeking sexually explicit materials.

Usegroups: Decades ago bulletin boards (Usegroups) were the primary source of sexual content. There are many Usegroups still in existence that appear to specialize in sexual content. The last time I counted (2008) 3.7% of all Usegroups focused on sexual content. There were 1,600 Usegroups dedicated to sexual content in 2008. Usegroup materials are primarily advertisements for adult sites and amateurs posting images. Downloading from Usegroups is time consuming (even when automated) and generally requires unpacking the content. Moreover, when



CDOC/Nelson_00437

downloading from a Usegroup, one does not know what they are getting. Hence, it is risky behavior. Few sex offenders will download from Usegroups (less than 2% in my experience). When you find an offender who continues to use this approach to gaining content, it indicates a heavy investment in sexual content.

Peer to Peer (P2P): P2P has blossomed in the past decade. Currently most of the exploitation of children material is passed via P2P. Sex offenders who are active in P2P are generally interested in receiving or distributing child pornography. In my experience offenders who are not interested in child pornography are not involved in P2P activities to any great extent. Finding P2P activity, especially high levels of P2P activity, on an offender's digital devices indicates an increased investment in sexual content, and more specifically an increased investment in illegal sexual content.

**Factor 12:** "Red Flag" Themes, if they have a significant number of images/files

As indicated in the TRAPS model ([www.kbsolutions.com/beyond.pdf](www.kbsolutions.com/beyond.pdf)), digital devices yield information about an offender's themes of interest. Categories of images are not themes until there is a consistent pattern found within the digital device. As a general rule of thumb, I do not consider something a theme unless I find more than 30-50 indications of interest (i.e. 30-50 pictures or videos, 15-20 searches for the same or similar topics, etc.). These themes are often unrelated to the behavior resulting in the precipitating offense. Knowing the offender's themes of interest substantially advances the job of containment and treatment.

More importantly when certain "Red Flag" themes are discovered, it signifies increased investment in illegal sexual behavior. The most common Red Flag themes I have found are (in order):

A.  Bestiality

B.  Exhibitionism

C.  Voyeurism

D.  Non-Consensual

E.  Minors/Children

A particularly important theme, Snuff materials (victim is killed), is rare but always significant.

Presence of any Red Flag theme indicates increased investment in sexual content.

**Factor 13:** Internet grooming or solicitation of minors using any medium.



CDOC/Nelson_00438

At the federal level a high proportion of cases involve child pornography or Internet grooming/solicitation of minors. These crimes are heinous. Fortunately, (or unfortunately, I'm not sure which), at the state and local level this is not the case. Only a small percentage of state level sex offenders are involved with child pornography or Internet solicitation/grooming of minors. Most state level offenders generate victims from a position of trust. Family, relatives, students, members of congregations, etc. are the common victim pool.

Most sex offenses are prosecuted at the state and local level. The sheer number of victims generated by state level sexual offenses is staggering. As a result, most offenders nationwide generate victims through a position of trust. My comments should not be construed to minimize the horrendous carnage visited upon children by federal level offenders. Nor are they intended to diminish the efforts or value of national efforts to catch Internet offenders. My intent is to point out that the vast number of victims are not groomed via digital technology.

Soliciting through digital devices is, then, "outlier" behavior. It violates the standard MO of sex offenders. Sex offenders groom the victim's environment as well as the victim. Internet solicitation and grooming violates this normal approach. It is impossible to groom the victim's environment over the Internet. Moreover, it is not possible to ensure who, exactly, your victim is. Offenders who solicit and groom over the Internet often recognize that it may be a cop they are grooming (has anyone not seen at least one episode of To Catch A Predator?). There are two kinds of individuals who will solicit or groom over the internet:

A.  The offender who is so stupid they don't know it could be a cop on the other end. This stupidity makes them dangerous. They could (and probably would) try anything.

B.  The offender who understands it may be a cop on the other end, but whose drive to get a victim outweighs their instinct for self-survival. These offenders generally ask "... are you a cop?" This overriding drive to get a victim makes them dangerous.

Offenders who solicit or groom through digital devices are high risk and should be treated as such.

When an offender's digital devices indicate they were used to initiate contact with, solicit, and/or groom minors, it is an indication that the offender has a significant investment in digital sexual content. If the presenting charge does not involve solicitation or grooming via digital devices, the presence of it on their devices should immediately raise the level of containment for any offender.

**Factor 14:** Use of technology for sexual content which indicates a more heavily invested approach

There are a few technologies which are not generally associated with sexual content. If an offender is found to have used these technologies to further sexual interests,



CDOC/Nelson_00439

it indicates an increased investment in digital sexual content and a concomitant increase in resistance to containment and treatment. These technologies are:

A.  IRC/IM (Chat/Instant Messaging).

B.  SMS/MMS (Texting - risk is determined by level of use and age of correspondents)

Top of the Document



CDOC/Nelson_00440

# Appendix O: Background Investigations for Approved Supervisors

*Background Investigations for Approved Supervisors*
**Adult Standards – Sex Offender Management Board**
**February 2015**

Approved Supervisor: a person who can supervise an adult offender's contact with a specified minor child or children. This person is an individual who has met the criteria described in the Standards, has been approved by the CST (Community Supervision Team) and has signed the contract.

In 2011 the Sex Offender Management Board (SOMB) revised Adult Standards and Guidelines, including sections discussing Approved Supervisor status, duties and responsibilities. Since that time, the SOMB has been made aware of several implementation challenges related to citizens attempting to obtain criminal history records for the purposes of becoming an approved supervisor. The SOMB has made several policy revisions to attempt to address this issue and improve the policy; however, these efforts have not significantly improved the ability of citizens to obtain criminal history records in a timely manner. The current policy approved by the SOMB is for potential approved supervisors to obtain their own criminal history information online through the FBI (Federal Bureau of Investigation), and then subsequently every three years online through CBI (Colorado Bureau of Investigation), at the discretion of the community supervision team (CST). However, the FBI process for a criminal history has demonstrated to take a long time (up to 6 months) to produce results. This is causing significant delays for offenders in obtaining appropriate approved supervisors. The SOMB continues to believe that a national criminal history check is appropriate, given that CBI checks do not include non-Colorado criminal history, even if it is time-consuming and costlier than the CBI criminal history check, but also recognizes the importance of expediency in approving supervisors.

Given the above concerns, the SOMB is again modifying its policy related to criminal history checks for approved supervisors to allow for a more expedited approval process. Citizens interested in being approved supervisors may be tentatively approved by the CST based upon a favorable CBI online criminal history check alone <u>or</u> verification of an approved support person through the Department of Corrections, provided that he/she <u>also</u> submits to an FBI online criminal history check. If subsequent results from the FBI indicate a problem, the approved supervisor status could then be removed pursuant to the requirements in the Standards and according to the discretion of the CST. This solution would allow offenders to have approved supervisors much sooner, but would add a cost (approximately $8.00). It is still acceptable for those citizens not wishing to pay the extra money to submit only the FBI online criminal history check and wait for the results as is stated in the current policy.

The hope is that this change in the current policy will maintain community and victim safety, while still supporting the needs of the offender for positive support via an approved supervisor.



CDOC/Nelson_00441

# Appendix P: Sexual Behavior History Packet

....................................................................................................................................

# Colorado Sex Offender Management Board Sexual Behavior History Packet

**Revised 2023**



305

CDOC/Nelson_00442

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

## A. Table of Contents:

Provider Instructions And Guidance.....................................................................3078

Introduction & Guidance...............................................................................31313

   To Clients And Providers:..........................................................................31313

   Guidance For Clients ...............................................................................3155

   Definitions............................................................................................3166

Section 1: Sexual History Behavior Inventory .....................................................3199

   Sex Education ........................................................................................3199

      Childhood Sexual Experiences ..............................................................320

      Masturbation Habits ..........................................................................32121

      Pornography History ..........................................................................32222

      Consensual Sexual Activity ..................................................................32423

   Risk, Needs, Responsivity Principles: Part 1 – The Introduction..............................3255

Section II: Sexual Offense History.....................................................................3277

   Introduction..........................................................................................3277

   Informed Consent ...................................................................................3288

   Index Crime ..........................................................................................33030

   Questionnaire........................................................................................33131

   Insights................................................................................................3488

   Risk, Needs, Responsivity Principles: Measuring Progress .....................................3499

   Talley Sheet..........................................................................................34951



CDOC/Nelson_00443

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

# PROVIDER INSTRUCTIONS AND GUIDANCE

**This portion of the packet can be removed when giving the packet to the client.**



CDOC/Nelson_00444

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

# Guidance for Providers:

**This section of the packet may be removed prior to starting the packet with the Client. This section is intended to provide support for the provider.  It is recommended that providers go over this section of the packet with the client when starting the sex history process.**

This portion of the packet will assist you in learning about your client's sexual development. It will also assist in identifying those protective factors that will be important in strengthening the client's skills to remain a safe member of the community. This is a **collaborative process** with the expectation that written work will be thoroughly discussed with the client in whatever treatment modality you find most appropriate. It is important to pay attention to the therapeutic relationship during this process and ensure that the sex history process does not harm the relationship between the therapist and client to the extent possible. Clients may benefit from some time to develop a therapeutic relationship before beginning this process.

It is recommended that the therapist use a timeline to assess the client's risk and needs as part of the process of deciding how to handle the sexual history disclosure packet process. Although it is a collaborative process, it should still be therapist guided.  The therapist should guard against the potential harmful impact of being exposed to terms beyond the client's sexual experiences and ability to understand.

If you determine the client's needs dictate that the information be gathered via a different method (e.g., a client unable to write may need a scribe) that is fine. It is important that the client's words be captured and then processed within the therapeutic alliance you have established with that client.

Previous versions of the sex history packet sought information regarding prior victims identifying information. The purpose of this packet is to explore prior behaviors in order to reduce risk for future sexually abusive and illegal behaviors. This packet does not require a client to disclose identifying information regarding past victims. The disclosure of prior victims may impact the clients progress in treatment and supervision.  It may also negatively impact named victim(s). Any disclosures may require an investigation and outreach to the named victim(s), causing further harm. Providers should use caution and seek guidance when soliciting information regarding prior victims not involved in the current offense.

## A. Personal Bias

It is important that providers understand their own personal biases prior to engaging in the sex history process with clients.  Providers should have a thorough understanding of the differences between sexual behaviors that are risk related to the client and those that may be against their own personal beliefs and preferences.  The focus of the disclosure packet should be on what is healthy versus what is unhealthy for the individual client. What is considered socially unconventional, may not be an unhealthy or risk-related behavior.  Providers should attend to their own personal biases and be mindful when using this information to inform treatment decisions, planning, risk assessments, and supervision recommendations.

## B. Cultural, Ethnic, and Religious Considerations

Providers should be aware of the cultural, ethnic, and religious preferences of the client prior to starting the sex history process.  It is recommended that background information regarding ethnic or cultural characteristics that may influence the process to be obtained and reviewed



CDOC/Nelson_00445

in advance. It is important for the team to be mindful of the manner in which they review the material with the client and the potential impact on the therapeutic alliance.

## C. Resistance and Denial

Providers should use caution in labeling a client as resistant based on their willingness or ability to disclose sexual behaviors or preferences.

## D. Commonly Misunderstood Terms

Below is a list of commonly misunderstood terms, that often cause confusion for clients and providers. A lack of understanding regarding these terms can cause barriers to the therapeutic alliance and a client's willingness to discuss or disclose sensitive information contained in their sexual history. In addition, a lack of clarification regarding these terms prior to polygraph testing may cause issues for the examiner. Examiners should be encouraged to identify and document any discrepancies in these terms or terms included in the definitions section.

## E. Romantic Attraction vs. Sexual Attraction

Romantic attraction is what makes people desire romantic contact or interaction with another person. This is often based more on emotional connection, bonds, and intimacy. Sexual attraction is what makes people desire sexual contact or have sexual interest in another person. There are some people who do not experience sexual attraction (i.e. sexual orientations on the asexual spectrum), however, they experience romantic attraction.

## F. Healthy vs. Unhealthy

Sexual health defined by the World Health Organization (2006): "A state of physical, emotional, mental and social well-being in relationship to sexuality; it is not merely the absence of disease, dysfunction or infirmity. Sexual health requires a positive and respectful approach to sexuality and sexual relationships, as well as the possibility of having pleasurable and safe sexual experiences, free of coercion, discrimination and violence. For sexual health to be attained and maintained, the sexual rights of all persons must be respected, protected and fulfilled."

It is important to note that what is considered "normal" sexual behavior in culture and society does not make a sexual behavior healthy. Healthy and normal are not synonymous. There are many unhealthy behaviors that have been normalized by culture and society which is why it is important to differentiate between what is healthy and what is normal.

Healthy sexuality has six principles to it: consent, non-exploitation, protection, honesty, shared values, pleasure and mutual pleasure. Healthy means that the sexual behavior is consensual, respectful, safe, is a choice, has controllable energy, boundaries, is about connection, requires communication, emotionally close, involves all the senses, reflects your values, and is private.

Some of the hallmarks of unhealthy sexual behavior is when sex involves using someone, feels compulsive, lacks healthy communication, has no ethical limits, feels shameful, is impulse gratification, is a performance for others or public commodity, emotionally distant, and requires a double life.



CDOC/Nelson_00446

## G. Risk-Related vs. Abusive

Abusive sex is defined as non-consensual sexual behavior where some of the hallmarks include but are not limited to: sex benefiting one person, is emotionally distant, unsafe, has no limits, is power over someone, compromises your values, is secretive and shameful, is void of communication, irresponsible, is harming someone, sex is hurtful, addictive, an obligation, has uncontrollable energy, and is "doing to" someone.

Risk-related sexual behaviors include any behaviors that are problematic for the specific individual. These are identified patterns of behavior that are a part of their offending cycle. For example, someone who committed a sexual offense with child sexual exploitation materials, often has a previous cycle and pattern of viewing legal pornography. Some may even identify themselves as struggling with a pornography addiction therefore pornography use would be considered risk-related and problematic. Risk-related behaviors pertain to the individual and their problematic patterns that played a role in unhealthy or abusive sexual behavior.

## H. Illegal vs. Unconventional

Conventional sex is defined as sexual behavior that is within the "range" of what a culture, subculture, or society considers as "normal." This type of behavior involves sex which does not include elements of bondage, discipline, dominance and submission, kink, fetishism, and sometimes anal sex. Hence, non-conventional sex is the use of non-conventional practices, concepts or fantasies. It is important to understand that someone who has a history of having unconventional sex does not mean that the sexual behavior is automatically problematic. This is where it is important for the therapist to take note if they have their own personal bias arising. Unconventional sex can be healthy when consensual and communication practices are included in the behavior.

Illegal sexual behavior includes behaviors that are non-consensual, abusive, and against the law.

## I. Force vs. Violence

Violence requires force; however, force does not require violence. The World Health Organization (WHO) defines violence as "intentional use of physical force or power, threatened or actual, against oneself, another person, or against a group or community, that either results in or has a high likelihood of resulting in injury, death, psychological harm, maldevelopment or deprivation." Force is when power is exerted against the other person's will or consent and can contain behaviors outside of violence such as manipulation, coercion, cooperation, compliance, bribery, trickery, relational pressure (guilt, shame, "you owe me," confusion, etc.), role-playing, games, exploitation, threats, intimidation, physical force, weapons, threats, etc. Anything that is able to make a big change in a person.

## J. Coercion vs Cooperation vs. Compliance:

These terms are often used interchangeably and it is important to understand the difference between the three. Please refer to the definition in the section regarding consent.



CDOC/Nelson_00447

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

## K. Pornography vs. Sexually Stimulating Material

Sexually stimulating material is anything that is arousing to the client or is meant to be arousing. It is not automatically problematic and is *not* sexually explicit. Sexual material may be implied or in the subtext, it is not directly expressed. Explicit material is where the sexual material is the primary subject, it is stated clearly leaving no room for confusion, ambiguity, or vagueness. Pornography is an example of sexually explicit material while underwear commercials may be considered to be sexually stimulating material.

## L. X Rated vs. MA Rating Materials

Anything that is X-rated material is considered any form of material (images, art, tv, magazine, film, etc.) where sexual acts are explicitly shown such as viewing penetration taking place or hyper-focusing on genetalia. When it comes to reading or listening to materials, it is considered X-rated if there are explicit details about genetalia or sexual acts. In other words, any material that depicts human genitalia or depicts or verbally describes nudity, sexual activity, sexual conduct, sexual excitement or sadomasochistic abuse that is considered only suitable for adults. It tends to be sexually driven or sex focused. MA rating materials include seeing the "act" or "assumed sexual act" or body parts such as breasts, buttocks, or genetalia. This includes reading or listening materials that imply or suggest sex and is intended for mature audiences. Sexual themes may play a role, but the content is not sex focused.



CDOC/Nelson_00448

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

# Introduction to the Sex History Packet :



CDOC/Nelson_00449

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

## Introduction & Guidance

This SOMB Sexual Behavior History Packet is divided into two sections.

**Section I of this packet is divided into multiple parts which contains guidance and recommendations for clients and providers.**

### To Clients and Providers:

The SOMB Sexual Behavior & History Packet is designed to provide a structure for the treatment provider to assist the client in discussing, organizing, and documenting relevant (i.e., specific to risk and treatment needs) information about the client's history of sexual behavior. An accurate and thoughtful approach to sexual behavior benefits the treatment process by focusing treatment on dynamic/criminogenic needs related to sex offense recidivism and aids in the identification of the client's individualized risk areas and problematic patterns.

The completion of the Sexual Behavior History Process requires a collaborative approach between the therapist and client. The Sexual Behavior History Packet is a working document in which the therapist should continue to work with the client in the understanding that additional information and/or disclosures may occur throughout the process.

The therapist will have open and continuous communication with the polygraph examiner in areas that should be addressed. It is the responsibility of the polygraph examiner to formulate additional questions in consultation with the CST.

It is incumbent upon the client to consistently bring written material into the treatment setting for discussion. Likewise, the therapist is responsible for collaborating with the client and for thoroughly discussing the client's work within a therapeutic setting using the treatment modality the therapist deems most appropriate for the individual client.

- **Definitions:** Terms used in treatment, supervision and the sex history process. Understanding these terms is essential to maintaining consistency and transparency with the Teams.

- **Sexual History Inventory:** The goal of this section is to assist clients in exploring how they learned about sexuality and how that has impacted their sexual development and possibly influenced their eventual sexually abusive/assaultive behaviors. It will include the following topics:

    - Sex Education
    - Childhood Sexual Experiences
    - Masturbation Habits
    - Pornography History
    - Use of Artificial Intelligence
    - Consensual Sexual History

- **Introduction to the Risk, Need, Responsivity Principle.** This section is used in conjunction with your sexual history inventory to identify protective factors, risks, and needs. This section should also be combined with a dynamic risk assessment on an ongoing basis when assessing risk and need. This can also be used to guide safety planning, trigger management and treatment planning.



CDOC/Nelson_00450

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

**Section II of this packet is also divided into multiple sections. This portion of the packet is designed to assist clients in taking inventory of their problematic sexual behaviors and sexually abusive/risk-related behaviors. It is an opportunity to learn about these behaviors so that the client can live a life offense-free.**

**It is important for clients and therapists to understand that treatment providers are Mandatory Reporters within the State of Colorado. Should a client provide enough identifying information, providers are required to report the information to law enforcement. If you have questions about what could be considered identifying information, please discuss this with your therapist.**

A. Standards Overview and Common Terms

B. Informed Consent:

C. Index Crime

D. Sexual Contact with Minors

E. Behaviors

    a. Voyeurism

    b. Electronic Voyeurism

    c. Exhibitionism or Exposing

    d. Exposing via Electronic Means

    e. Frottage

    f. Force, Violence, Intimidation, Weapons

    g. Coercion

    h. Helpless or Incapacitated

    i. Position of Trust

    j. Electronic Solicitation of a Minor

    k. Child Sexual Abuse or Exploitation Materials

    l. Distributing or Creating Child Sexual Abuse or Exploitation Materials

    m. Plan, Prepare, Assist, and/or Providing a Victim for Someone Else to Sexually Assault

    n. Paying Someone to Engage in a Sexual Act

F. Insights

G. Updated Risks and Needs

H. Responsivity

**I.** Tally Sheet



CDOC/Nelson_00451

## *Guidance for Clients*

The purpose of the sexual history process is to explore patterns of behaviors and assist clients in becoming aware of past behaviors that may have led to current offending behaviors. This process may lead to a pathway of self-discovery of sexuality, gender identity, and sexual preferences.

This will be difficult work. It may bring up difficult memories, and trigger reactions and difficult emotions related to any prior victimization. It is important, for your own well-being, that you speak about these feelings and memories with your therapist. Although difficult work, it is necessary and helpful as you work to create a lifestyle free of sexually abusive/assaultive behaviors. As you work through these sections, you may not be able to recall specific dates or ages.

In these situations, it is okay to estimate to the best of your ability. If you are unclear about the expectations or definitions in this packet, ask your therapist for assistance.

Although this will explore all of your past sexual behaviors, the purpose of this process is not intended to criminalize or shame you for anything identified within your sexual history.



CDOC/Nelson_00452

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

## Definitions

This section includes terms that are repeatedly used throughout this packet. Additionally, as terms are introduced they will be further explained and defined. It is the therapist's responsibility to discuss these definitions with each client as they begin working on this packet.

**Cultural Awareness**    Refers to the clinician's skill set. It requires self-awareness, with reflection on one's own belief systems and biases, acknowledging that these may, at times, hinder patient-centered care.[327]   Also referred to as *Cultural Competency.*

**Cultural Humility:**    Reminds the clinician that no one person can possibly understand all aspects of all cultures. To assume knowledge risks misconception and to claim understanding risks invalidation.[328]

**Cultural Sensitivity**    Refers to the clinician's approach to client interactions, encouraging a constant awareness that cultural differences exist, with a desire to understand them without passing judgment.[329]

**Gender**    A socially constructed system of classification that ascribes qualities of masculinity and femininity to people. Gender is on a spectrum and characteristics can change over time and are different between cultures.

**Heteronormative**    The assumption that heterosexuality is the standard for defining normal sexual behavior and that male–female differences and gender roles are the natural and immutable essentials in normal human relations. Heteronormativity is the belief that heterosexuality is the default, preferred, or normal mode of sexual orientation.

**Minor Child**    Any person under the age of 18.

**Protective Factors:**    Personal strengths and positive building blocks you have or can establish in your life. Research shows protective factors can reduce your risk of recidivism.

**Relative/Family Member:**    Include all persons related by blood, marriage (excluding spouse or someone in a spousal role) or adoption (e.g., mother, father, sister,

[327] From Matthew Lee Dominguez (2017) LGBTQIA people of color: Utilizing the cultural psychology model as a guide for the mental health assessment and treatment of patients with diverse identities, *Journal of Gay & Lesbian Mental Health*, 21:3, 203-220, DOI: 10.1080/19359705.2017.1320755

[328] From Matthew Lee Dominguez (2017) LGBTQIA people of color: Utilizing the cultural psychology model as a guide for the mental health assessment and treatment of patients with diverse identities, *Journal of Gay & Lesbian Mental Health*, 21:3, 203-220, DOI: 10.1080/19359705.2017.1320755

[329] From Matthew Lee Dominguez (2017) LGBTQIA people of color: Utilizing the cultural psychology model as a guide for the mental health assessment and treatment of patients with diverse identities, *Journal of Gay & Lesbian Mental Health*, 21:3, 203-220, DOI: 10.1080/19359705.2017.1320755



CDOC/Nelson_00453

brother, aunt, uncle, grandparents, grandchildren, cousins, nieces, nephews, step-children, in-laws, foster children).

**Safety Plan:**   A written document derived from the process of planning for community safety. The document identifies potential high-risk situations and addresses ways in which situations will be handled without the offender putting others at risk. The plan requires the approval of the therapist and supervising officer(s).

**Parental Role:**   Parental Role is an established and on-going position of authority with routine primary caretaking responsibilities for a child(ren) not limited by legal, biological or marital status.

**Physical Sexual Contact:**   Refers to rubbing or touching another person's sexual organs (i.e., breasts, buttocks, genitalia) whether over or under clothing, if for the purpose of sexual arousal, sexual gratification, sexual stimulation or sexual "curiosity." This includes having, allowing, or causing another person to rub or touch one's own sexual organs, whether over or under clothing, for purposes of sexual arousal, sexual gratification, sexual "curiosity," or sexual stimulation. This may not include parental contact with children's private areas in the form of diapering, wiping, bathing, dressing, or changing, unless done for the purpose of sexual arousal or stimulation.

Discussion Point: The therapist is responsible for thoroughly discussing this definition and its application to the sexual behavior disclosure process with each client. Arousal is a significant factor of this component. The type of contact described above may have occurred with no sexual arousal and it is therefore likely that such contact would not be considered sexual contact.

**Sexually Abusive/Assaultive**

**Behaviors:**   Forced, manipulated or coerced unwanted sexual contact that occurs without consent. This also includes non-contact sexual behaviors such as exhibitionism, voyeurism, public masturbation, child pornography, or other non-contact sexual behaviors.[330]

**Sexuality**   Refers to how a person feels about themselves. Sexuality refers to a person's sexual orientation or preference.

---

[330] Adapted from PSCOT Policy Manual – will complete reference if maintained



CDOC/Nelson_00454

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

**Sexual Orientation**    Refers to who a person is emotionally, mentally, and physically attracted to. For example: lesbian, pansexual, asexual, gray sexual, homosexual, heterosexual. This has nothing to do with their gender identity. Please note that sexuality and sexual orientation encompasses a wide spectrum, and clinicians are encouraged to increase their understanding of this subject matter as it is a rapidly expanding area.

**Sexual Preference**    Refers to preference sexual activities/behavior. This does not relate to gender identity or sexual orientation of the individual they are sexually attracted to, or their own.

**Stranger Victim:**    A victim is considered a stranger if the victim did not know the offender 24 hours before the offense. Victims contacted over the Internet are not normally considered strangers unless:

1. The offense takes place within 24 hours, or

2. A meeting was planned for a time less than 24 hours after initial communication. [331]

**Victim:**    Any person against whom sexually abusive behavior has been perpetrated or attempted.

---

[331] McGrath, R. J., Lasher, M. P., & Cumming, G. F. (2012). The sex offender treatment intervention and progress scale (SOTIPS): Psychometric properties and incremental predictive validity with static-99 R. *Sexual Abuse: A Journal of Research and Treatment, 24(5)*, 431-458.



CDOC/Nelson_00455

# Section 1: Sexual History Behavior Inventory

### *Sex Education*

Sexuality is an integral part of who we are, what we believe, what we feel, and how we respond to others. Please respond to the following statements. When you cannot recall specific information (i.e., age, date, etc.) it is acceptable to provide estimates or ranges. If you have questions, talk to your therapist prior to starting work on this section.

- Describe when, where, and how you learned about sexuality. This may have occurred at different times and from different sources. Please be as thorough in your answer as possible. Consider what was or was not discussed in your household, gender roles, exposure to sex from television/friends/family, pornography exposure, nudity, privacy, formal sex education in school/church, etc.

- How do you define sexuality?

- What were messages you have struggled with regarding sexuality (i.e. women who have sex with a lot of people are sluts, or men are entitled to have sex with whomever they want, etc.).

- Where/how did you typically meet your romantic and/or sexual partners?

- What kind of rules do you have when deciding to have sex?

- What are your beliefs about sex?

- Have your current or past partner(s) talked about sex?

- What have you learned about sexual behavior from culture?



CDOC/Nelson_00456

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

## Childhood Sexual Experiences

In this section, please describe your childhood sexual experiences. This may include exploration and curiosity-driven behaviors as well as experiences in which you felt you had no ability to stop. The point of this section is not to identify behaviors and experiences as abusive or non-abusive, but to simply identify those experiences and be prepared to discuss them with your therapist. In your narrative, please include the relationship, if any, to the other person as well as the ages of yourself and the other person. When you cannot recall specific information (i.e., age, date, etc.), it is acceptable to provide estimates or ranges. If you have questions, talk to your therapist prior to starting work on this section.



CDOC/Nelson_00457

## Masturbation Habits

**List history of masturbation including age of onset, frequency (including changes over time), types of fantasy, and places (i.e., bedroom, bathroom, or outside of your residence). Please specifically note masturbation where you could view others or could possibly be observed by others while masturbating, including public restrooms, workplace/school settings, vehicles, and others' homes. When you cannot recall specific information (i.e., age, date, etc.), it is acceptable to provide estimates or ranges. If you have questions, talk to your therapist prior to starting work on this section.**

Include use, theft, or purchase of underwear, undergarments, or personal property for masturbation or sexual arousal. Include taking or keeping undergarments from sexual partners, relatives, friends, or strangers for masturbation or sexual arousal. Also include all incidents in which you returned someone's underwear or undergarments after using them for masturbation or sexual arousal.

Lastly, include masturbation to pornographic and non-pornographic sexually stimulating material.



CDOC/Nelson_00458

*Colorado Sex Offender Management Board*
Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders

## Pornography History

Include all activities related to the use of pornography, including themes and interests. Include any sharing and/or requesting of nude or semi-nude images of yourself or others with another person (e.g., Sexting). If you cannot recall specific information (i.e., age, date, etc.), it is acceptable to provide estimates or ranges. If you have questions, talk to your therapist prior to starting work on this section.



CDOC/Nelson_00459

## Use of Artificial Intelligence (AI)/ Virtual Reality (VR)/ Augmented Reality (AR) for Sexual Experiences and Deep Fake Pornography

Include all activities related to the use of technology for interactive and immersive experiences and/or creating experiences and environments that combine the real world and computer generated content, using artificial intelligence to create sexual experiences or for the modification of images and videos for sexual gratification. Include if you have viewed, downloaded, masturbated to, or created deep fake pornography or AI generated sexual material. Describe if any AI generated material involved children or child characters.

Further Examples of using AI include: Chat Generative Pre-Trained Transformer [Chat GPT], virtual AI partners [girlfriends, boyfriends, spouses], sexual AI chatbots, the use of avatars, sexual-based videogames or internet games, etc.

Definitions:

- Deep fake pornography involves superimposing a person's face onto sexual images or videos to create realistic content that they have never participated in. The videos and images have been digitally created or altered with artificial intelligence or machine learning.

- Virtual reality is a computer-generated simulation of a three-dimensional image or environment that can be interacted with in a seemingly real or physical way by a person using special electronic equipment [i.e. Helmet, gloves with sensors, etc].

- Augmented reality is an interactive experience that enhances the real world with computer-generated content.



CDOC/Nelson_00460

## Consensual Sexual Activity

**It is important to understand Consent, Coercion and Compliance prior to completing this section of the packet.**

Discuss your consensual experiences including ages of you and your partner, how you met, what types of activities you did together, how you communicated, how the sexual contact began and progressed through the duration of the relationship. In your discussion, please include information regarding the use of dating sites, chat rooms and other forms of social media. When you cannot recall specific information (i.e., age, date, etc.), it is acceptable to provide estimates or ranges. If you have questions, talk to your therapist prior to starting work on this section.

- When thinking back about subsequent or additional consensual sexual experiences you have had, what thoughts and feelings do you experience?

- What about those relationships has been impactful or influential regarding your current approach and engagement in consensual sexual relationships? As you look back, do any themes repeat themselves?

If you believe you have not had consensual sexual activity, describe what you think a healthy sexual relationship looks like.



324

CDOC/Nelson_00461

# Risk, Needs, Responsivity Principles: Part 1 – The Introduction

The following section addresses risk domains from common risk assessment tools (e.g. VASOR-2 and SOTIPS) that are normed on white cis-gender males who have been convicted of a sexual offense. The specific domains in this section address sexual interests and attitudes.

Clients and providers should focus on the client's lifestyle, sexual behaviors, patterns and thought process at the time they committed the offense within this section. Any progress or changes since that time, will be addressed within RNR Part II (pg. 50)

Areas to be explored include

Sexual Attitudes and Beliefs[332]

1.  Viewing oneself as sexually entitled

2.  Viewing women with hostility

3.  Viewing others as objects for sexual pleasure

4.  Viewing sexual urges as uncontrollable

5.  Believing children can consent to sexual acts

6.  Believing sexual activity with children is not harmful

7.  Viewing oneself more emotionally congruent with children than adults

8.  Prior child abuse behavior

9.  Distorted cognitions about sexual offending/abuse

10. Intimacy deficits and problematic relationship(s)

11. Use of sex to regulate emotional state or fulfill the need for intimacy

12. Sexual gratification and instrumental goals such as revenge or humiliation

13. Puts needs of the co-offending partner above self and/or child(ren) and/or victim

14. Evidence of deviant sexual interest

15. Impulsivity

---

[332]McGrath, R. J., Lasher, M. P., & Cumming, G. F. (2012). The sex offender treatment intervention and progress scale (SOTIPS): Psychometric properties and incremental predictive validity with static-99 R. *Sexual Abuse: A Journal of Research and Treatment, 24(5)*, 431-458.



CDOC/Nelson_00462

Note: Many of the risk factors noted above are recognized in research as those specifically associated with individuals who identify as white, cis-gender, heterosexual males. This list is not exhaustive; however, it also includes risk factors that may relate to cis-gender females. There is not enough established research at this time to determine if these risk factors consistently apply to those who identify as transgender, non-binary, those who do not identify as heterosexual, or individuals of different cultures, ethnicities, or religions. While there are currently no normed risk assessments for these populations, these risk domains are consistent with existing research. [333]

---

[333] For additional information on risk assessment and female offenders see the Appendix M: Female Sex Offender Risk Assessment of the Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders.

SOMB

CDOC/Nelson_00463

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Section II: Sexual Offense History

## Introduction

To the Client:  This section is designed to assist you in gaining greater insight into your choice(s) to engage in sexually abusive/assaultive behavior. You will not be asked to provide names of the victims or specific locations where the behaviors occurred. You will be asked to be thoughtful and honest about your actions. It will be difficult work. Reach out to your therapist and peers for support. Be as truthful as you can be, although at times that may be painful. In doing so, you strengthen your resolve to not create another victim. When you cannot recall specific information (i.e., age, date, etc.), it is acceptable to provide estimates or ranges.

The sexual history polygraph examination process covers the following areas:

1.  Sexual contact with underage persons (persons younger than age 15 while the client is age 18 or older);

2.  Sexual contact with relatives whether by blood, marriage, or adoption, or where a relationship has the appearance of a family relationship (a dating or live-in relationship exists with the person(s) natural, step or adoptive parent);

3.  Use of violence to engage in sexual contact including physical restraint and threats of harm or violence toward a victim or victim's family members or pets, through use of a weapon, or through verbal/non-verbal means; and

4.  Sexual offenses (including touching or peeping) against persons who appeared to be asleep, were drugged, intoxicated or unconscious, or were mentally/physically helpless or incapacitated.

The team may add additional exams depending on the individual risk factors and reported sexual history of the client.  These may include, but not limited to:

1.  Use of Child Sexual Exploitation Materials

2.  Exposure/Voyeuristic Behaviors

3.  Other Risk-Related, Unhealthy or Abusive Sexual Behaviors

It is important to refer back to the Definitions of the following terms to ensure everyone has a clear understanding:

- Force

- Incapacitated

- Minor Child

- Sexual Contact



CDOC/Nelson_00464

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Informed Consent

As you engage in this process, it is important to work with your peers and treatment provider to gain an understanding of informed consent within the context of a sexual relationship. Informed consent means that a person has knowledge of what is happening *and* gives permission (verbal or non-verbal) for it to occur. Consent needs to be freely given, is reversible, is informed, is enthusiastic and specific. There are five components that make up consent:

Consent is unhindered participation based on:

1. **Equal Knowledge:** each person understands proposed behaviors, what they are consenting to and has all necessary information to make an informed decision.

2. **Equal Power:** each person has the freedom to agree or disagree without resistance, threat, or intimidation. Power dynamics include status, position, authority, strength, size, etc.

3. **Equal Capacity:** each person has an awareness of possible consequences and outcomes of the decision, is sober, conscious, and able-minded.

4. **Equal Experience:** each person has comparable previous experience.

5. **Equal Self-Image:** each person has an appropriate degree of self-worth, healthy self-image and positive self-esteem.

The following are NOT forming of consensual participation:

➢ **Cooperation:** participant is willing, but lacks the legal ability to consent and the sexual act is without regard for the person's beliefs or desires. The relationship is unequal.

➢ **Compliance:** participation without resistance in spite of personal beliefs or desires. The alternative to not participating is viewed as a worse alternative to going along with the proposed activity.

➢ **Coercion:** participation is the result of force.

Cooperation, compliance, and coercion may involve manipulation, trickery, relational pressure (guilt, shame, "you owe me," confusion, etc.), bribes, role-playing, games, exploitation, threats, intimidation, physical force, weapons, threats, violence, etc.

## Family Relationships Discussion

Additionally, sexual relationships within families are forbidden for a few reasons:

1. There are unfortunate biological consequences when closely matched DNA is combined for procreation.
2. Society imposes such rules because families are ideally a safe place for children and adults to thrive and develop without the complications of sexual relationships.



CDOC/Nelson_00465

3. Within the structure of a family there is often an inherent power differential (e.g., parent to child, older sibling to younger sibling, aunt/uncle to niece/nephew, etc.)

**Reflection:**

● Think back on your experiences and identify the non-verbal cues that you interpreted as "Yes." Please also identify the non-verbal cues that you believe meant "No."

● Discuss a situation when you and the other party equally understood the outcomes and consequences of the decision.



CDOC/Nelson_00466

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Index Crime

It is important that your treatment and supervision team understand the events and behaviors regarding your index offense. The index offense refers to the sexually abusive/assaultive behaviors that resulted in your conviction. While you may have pleaded or been found guilty at trial of a different crime, it is important to identify what actually happened.

Please take time to write about the following:

1. The nature of your relationship with the victim of the crime;
2. Length of time you knew that person;
3. Include gender and age of each victim(s);
4. Describe the sexual contact you engaged in;
5. Discuss the duration, frequency and location of the sexual assault;
6. Describe how you gained compliance from the victim(s);
7. Identify what elements of consent were non-existent;
8. Discuss how you convinced the victim(s) to keep the sexual abuse/assault a secret; and,
9. Explain how you got caught.



CDOC/Nelson_00467

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Questionnaire*

### Sexual Contact with Minor Children

1. Since turning 18 years old, how many children have you had sexual contact with that were younger than 15 years old? _____
   a. How old was the youngest victim?  _____
   b. How old was the oldest victim?  _____
   c. What are/were the gender(s) of the victim(s)?_____
   d. Were any of these children 12 years old or younger?[334]                    Yes   No

2. Prior to age 18, how many children have you had sexual contact with that were 4 or more years younger than yourself?  _____
   a. How old was the youngest victim?  _____
   b. How old was the oldest victim?  _____
   c. What are/were the gender(s) of the victim(s)?_____
   d. Were any of these children 12 years old or younger?[335]                    Yes   No

3. Since turning 25 years old, how many children have you had sexual contact with that were ages 15 or 16 years old?  _____
   a. How old was the youngest victim?  _____
   b. How old was the oldest victim?  _____
   c. What are/were the gender(s) of the victim(s)?_____
   d. Were any of these children 12 years old or younger?                    Yes   No

4. Of the victims accounted for in the above questions:
   a. Were any of the victims children who were strangers?[336]                    Yes   No
   b. Were any of the victims children who trusted you and for whom you had a caretaking or authoritative role over?                    Yes   No
   c. Were any of the children related to you?                    Yes   No

5. As of today, do you have an ongoing relationship with any of the people you had sexual contact with when they were (or are) children? If so, please discuss this further with your therapist.

---

[334] The age of 12 or younger is based on the distinction between pubescent and pre-pubescent development stages. There is disagreement in the current research regarding the onset of puberty, and the SOMB recognizes the limitations of defining the criteria based on a specific age.

[335] The age of 12 or younger is based on the distinction between pubescent and pre-pubescent development stages. There is disagreement in the current research regarding the onset of puberty, and the SOMB recognizes the limitations of defining the criteria based on a specific age.

[336] A victim is considered a stranger if the victim did not know the offender 24 hours prior to the sexually abusive/assaultive behavior.



CDOC/Nelson_00468

**Behavior:   Voyeurism**

**Definition:  Voyeurism refers to behaviors (including attempts) which involve looking into someone's home, bedroom or bathroom or any other place they assume is private, for the purposes of your sexual gratification.**
**Did you engage in this type of behavior?**                                      **Yes    No**

**If yes, please answer the following questions:**
1.  Were any of the victims under the age of 18?                              Yes    No
    If yes:
    a.  Were any victims 12 years old or younger?  Y / N
    b.  Were any victims 13 years or older?  Y / N
    c.  What are/were the gender(s) of the victim(s)?_____
2.  Were any of the victims 18 years old or older? Y / N
    a.  What are/were the gender(s) of the victim(s)?_____
3.  Were any of the victims strangers? Y / N
4.  Were any of the victims relatives? Y / N
5.  Were any of the victims intimate partners? Y / N
6.  How old were you when you started?  _____
7.  How old were you the last time you did this?  _____
8.  Why did you stop?
9.  During this time frame, how often did you engage in this behavior (e.g., 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
10. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in this behavior. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
11. Did you take photos or videos while engaged in this behavior?                Yes   No
    If yes:
    a.  What did you do with those images once they were in your possession?
    b.  Where are they now?
12. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00469

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Behavior:  Electronic Voyeurism**

**Definition:  Using electronic devices to engage in voyeurism. Voyeurism refers to behaviors (including attempts) which involve looking into someone's home, bedroom or bathroom or any other place they assume is private, for the purposes of your sexual gratification. In this section, please include the taking of photos or videos of people in various states of undress or sexual activity without their permission or knowledge. If you don't know if they were aware, assume they did not know and include them in your thoughts as you answer the following questions.**

**Did you engage in this type of behavior?**                                                       **Yes    No**
**If yes, please answer the following questions:**
1.  Were any of the victims under the age of 18?                                       **Yes    No**
    If yes:
    a.  Were any victims 12 years old or younger?  Y / N
    b.  Were any victims 13 years or older?  Y / N
    c.  What are/were the gender(s) of the victim(s)?_____
2.  Were any of the victims 18 years old or older? Y / N
    a.  What are/were the gender(s) of the victim(s)?_____
3.  Were any of the victims strangers? Y / N
4.  Were any of the victims relatives? Y / N
5.  Were any of the victims intimate partners? Y / N
6.  How old were you when you started?  _____
7.  How old were you the last time you did this?  _____
8.  Why did you stop?
9.  During this time frame, how often did you engage in this behavior (e.g. 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
10. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in this behavior. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
11. As best you can, identifying your thoughts and feelings during this time.
12. What did you do with those images once they were in your possession?  Where are they now?
13. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00470

**Behavior:   Exhibitionism or Exposing Behaviors**

**Definition:   Include all incidents in which you accidentally or intentionally exposed (including attempts) your bare private parts (including in a vehicle) to unsuspecting persons in public places or in private places. Include incidents when you wore loose or baggy clothing that allowed your sexual organs to become exposed to others. Also include mooning, streaking or flashing behavior, having sex in a public place and public urination <u>while in view of others.</u>**

**Did you engage in this type of behavior?                          Yes    No**
**If yes, please answer the following questions:**

1. Were any of the victims under the age of 18?                     Yes    No
    If yes:
       d.  Were any victims 12 years old or younger?  Y / N
       e.  Were any victims 13 years or older?  Y / N
       f.  What are/were the gender(s) of the victim(s)?_____
2. How many of the victims were 18 years old or older?  ____
       a.  What were the gender(s) of the victim(s)? _____
3. How many of the victims were strangers?  _____
4. How many of the victims were relatives?  _____
5. How old were you when you started?  _____
6. How old were you the last time you did this?  _____
7. Why did you stop?
8. During this time frame, how often did you engage in this behavior (e.g., 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
9. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in this behavior. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
10. Did you take photos or videos while engaged in this behavior?             Yes   No
    If yes:
       a.  What did you do with those images once they were in your possession?
       b.  Where are they now?
11. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



334

CDOC/Nelson_00471

**Behavior:   Exposing Behaviors via Electronic Means**

**Definition: Incidents in which images (photo or video) of bare sexual organs are exposed by electronic means during messaging, through social media, via email or web link.**

**Have you ever engaged in this type of behavior?                                    Yes    No**
**If yes, please answer the following questions:**

1. Were any of the victims under the age of 18?                                    Yes    No
   If yes:
   a.  How many were 12 years old or younger?  _____
   b.  How many were 13 years or older?  _____
   c.  What are/were the gender(s) of the victim(s)?_____
2. How many of the victims were 18-year-old or older?  _____
   a.  What are/were the gender(s) of the victim(s)?_____
3. How many of the victims were strangers?  _____
4. How old were you when you started?  _____
5. How old were you the last time you did this?  _____
6. Why did you stop?
7. Please write about engaging in this behavior. Describe how and in what context you exposed yourself via the internet. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and other common factors. Detail is important so you and your therapist can better understand the context(s) in which you engaged in these behaviors.
8. Did you take photos or videos while engaged in this behavior?  Yes   No
   If yes:
   a.  What did you do with those images once they were in your possession?
   b.  Where are they now?
9. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00472

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Behavior:  Frottage**

**Definition:  Opportunistic sexual rubbing, bumping or touching against strangers or unsuspecting persons inside or outside the home. This includes sexual touching (including attempts) of others' private parts during any play, sexual hugging, horseplay, bathing, diaper changing, lap sitting, wrestling or athletic activities of unsuspecting persons in private or public places (e.g., babysitting, school, work, stores, gym, crowds.) All such behaviors are to be considered if done for the purpose of sexual gratification.**

**Did you engage in this type of behavior?**                                                   **Yes    No**
**If yes, please answer the following questions:**

1.  Were any of the victims under the age of 18?                                    Yes    No
    If yes:
    a.  How many were 12 years old or younger?  _____
    b.  How many were 13 years or older?  _____
    c.  What are/were the gender(s) of the victim(s)? _____
2.  How many of the victims were 18 years old or older?  _____
    a.  What are/were the gender(s) of the victim(s)?_____
3.  How many of the victims were strangers?  _____
4.  How many of the victims were relatives?  _____
5.  How old were you when you started?  _____
6.  How old were you the last time you did this?  _____
7.  Why did you stop?
8.  Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in frottage. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
9.  Did you take photos or videos while engaged in frottage?                        Yes    No
    If yes:
    a.  What did you do with those images once they were in your possession?
    b.  Where are they now?
10. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00473

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Behavior:   Sexual Contact Involving Force, Including Violence, Intimidation and/or Weapons**

Definition:  Force includes sexual contact (including attempts) with any person whom you physically hit or struck, physically restrained using your body strength or any object, or use of weapons, including implied or improvised weapons, posing a threat, continues after stating "no" or "stop" in order to prevent the person from resisting or escaping. Force may also include threats of harm against a victim's family members, pets and includes threats of destruction of personal property.

Definition of Intimidate:  To frighten or instill fear in another, especially in order to make them do what one wants.

**Did you engage in this type of behavior?**                                          **Yes    No**
**If yes, please answer the following questions:**

1.  Were any of the victims under the age of 18?                                  Yes    No
    **If Yes:**
    a.  How many were 12 years old or younger?  _____
    b.  How many were 13 years or older?  _____
    c.  What are/were the gender(s) of the victim(s)?_____
2.  How many of the victims were 18-year-old or older?  _____
    a.  What are/were the gender(s) of the victim(s)?_____
3.  How many of the victims were strangers?  _____
4.  How many of the victims were relatives?  _____
5.  How many of the victims were intimate partners?  _____
6.  How old were you when you started?  _____
7.  How old were you the last time you did this?  _____
8.  Why did you stop?
9.  During this time frame, how often did you engage in this behavior (e.g., 3 times per week)? _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
10. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and when you would use violence, intimidation or weapons. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
11. Did you take photos or videos while engaged in this behavior?  Yes   No
    If yes:
    a.  What did you do with those images once they were in your possession?
    b.  Where are they now?
12. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00474

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Behavior:   Sexual Contact Involving Coercion**

**Definition:  Coercion** includes sexual contact (including attempts) with any person whose compliance you obtained through any non-violent form of manipulation despite the person's stated or unstated unwillingness to participate, including after the individual says "no" or "stop."  Common forms of coercion include bribery, manipulation, threats, gifts, trickery, money, drugs, alcohol and friendship.

**Did you engage in this type of behavior?**                                                   **Yes      No**
**If yes, please answer the following questions:**

1. Were any of the victims under the age of 18?                                  Yes    No
   **If Yes:**
   a. How many were 12 years old or younger?  ____
   b. How many were 13 years or older?  _____
   c. What are/were the gender(s) of the victim(s)?_____
2. How many of the victims were 18-year-old or older?  ____
   a. What are/were the gender(s) of the victim(s)?_____
3. How many of the victims were strangers?  _____
4. How many of the victims were relatives?  _____
5. How many of the victims were intimate partners? _____
6. How old were you when you started?  _____
7. How old were you the last time you did this?  _____
8. Why did you stop?
9. During this time frame, how often did you engage in this behavior (e.g., 3 times per week)? _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
10. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and how you would coerce your victims into compliance. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
11. Did you take photos or videos while engaged in this behavior?  Yes   No
    If yes:
    a. What did you do with those images once they were in your possession?
    b. Where are they now?
12. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00475

**Behavior:   Sexual Contact with Helpless or Incapacitated Victims**

**Definition of incapacitated: Temporarily or permanently impaired by drugs, alcohol, or mental and/or physical deficiency or disability. This person is unable to provide informed consent due to such impairment.**

**Definition of helpless:   Physically helpless means unconscious, asleep, or otherwise unable to indicate willingness to act. This person is unable to defend him/herself or unable to access assistance to prevent the assault/abuse.**

**Did you engage in this type of behavior?**                                                          **Yes    No**
**If yes, please answer the following questions:**

1.  Were any of the victims under the age of 18?                                    Yes    No
    **If Yes:**
    a.  How many were 12 years old or younger?  _____
    b.  How many were 13 years or older?  _____
    c.  What are/were the gender(s) of the victim(s)?_____
2.  How many of the victims were 18 years old or older?  _____
    a.  What was the gender of the victim(s)?_____
3.  How many of the victims were strangers?  _____
4.  How many of the victims were relatives?  _____
5.  How many of the victims were intimate partners? _____
6.  How old were you when you started?  _____
7.  How old were you the last time you did this?  _____
8.  Why did you stop?
9.  During this time frame, how often did you engage in this behavior (e.g. 3 times per week)? _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
10. Please write about engaging in this behavior, including if you purposely drugged or otherwise rendered someone incapable of stopping the sexual contact. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in this behavior. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
11. Did you take photos or videos while engaged in this behavior?  Yes   No
    If yes:
    a.  What did you do with those images once they were in your possession?
    b.  Where are they now?
12. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00476

**Behavior:  Sexual Contact While in a Position of Trust over the Victim.**

**Definition: Position of Trust means you have or have had authority over (e.g., babysitter, coach, younger relative, volunteer, tutor, mentor, institutional staff, etc.) another person.**

**Did you engage in this type of behavior?**                                   **Yes    No**

**If yes, please answer the following questions:**

1.  Were any of the victims under the age of 18?                        Yes    No
    **If Yes:**
    a.  How many were 12 years old or younger?  _____
    b.  How many were 13 years or older?  _____
    c.  What are/were the gender(s) of the victim(s)?_____
2.  How many of the victims were 18 years old or older?  _____
    a.  What are/were the gender(s) of the victim(s)?_____
3.  How many of the victims were strangers?  _____
4.  How many of the victims were relatives?  _____
5.  How old were you when you started?  _____
6.  How old were you the last time you did this?  _____
7.  Why did you stop?
8.  During this time frame, how often did you engage in this behavior (e.g., 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
9.  Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and how you would gain compliance from your victims. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
10. Did you take photos or videos while engaged in this behavior?            Yes    No
    If yes:
    a.  What did you do with those images once they were in your possession?
    b.  Where are they now?
11. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00477

**Behavior:   Electronic Solicitation of a Minor**

**Definition:  Includes all attempts to meet or actually having made arrangements to meet, a person under the age of 18 years old via electronic devices including computers, cell phones, text messages, e-mails, social media, video games, chat rooms, cyber-sex, live web-cams, electronic bulletin board systems, Internet Relay Chat, DCC chat channels, private bulletin boards or other user groups.**

**Did you engage in this type of behavior?                                        Yes    No
If yes, please answer the following questions:**

1. Were any of the victims under the age of 18?                          Yes    No
   If yes:
   a.  How many were 12 years old or younger?  ____
   b.  How many were 13 years or older?  _____
   c.  What are/were the gender(s) of the victim(s)?_____
2. How many of the victims were strangers?  _____
3. How many of the victims were relatives?  _____
4. How old were you when you started?  _____
5. How old were you the last time you did this?  _____
6. Why did you stop?
7. During this time frame, how often did you engage in this behavior (e.g., 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
8. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and why you chose them. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
9. Do you have screen shots or records of these electronic conversations?  Did you send or receive photos or videos?                                        Yes    No
   If yes:
   a)  What did you do with those images once they were in your possession?
   b)  Where are they now?
10. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00478

**Behavior:  Viewing of Child Sexual Abuse Images (aka child pornography or Child Sexual Exploitation Materials).**

**Definition:  Child Sexual Abuse Images are** any visual depiction of sexually explicit conduct involving a minor (persons less than 18 years old). Images or videos of child sexual abuse are also referred to as child pornography.[337]

**Illegal images may contain a nude pictures or videos of a child that is deemed sexually suggestive.**

**There may be times when it was difficult to identify the ages of the victims captured in the images. If such instances exist, please talk to your therapist prior to completing this section. It may be beneficial to complete this section regardless of a clear yes/no answer.**

**Did you engage in this type of behavior?                                                    Yes    No**

**If yes, please answer the following questions:**

      1.  How many were 12 years old or younger?  _____
         a.  What are/were the gender(s) of the victim(s)?_____
      2.  How many were 13 years or older?  _____
         a.  What are/were the gender(s) of the victim(s)?_____
3.  How old were you when you started?  _____
4.  How old were you the last time you did this?  _____
5.  Why did you stop?
6.  Did 51% or more of your viewing/possession of child sexual abuse images contain images of male children?
7.  Did 51% or more of your child nudity/other child materials contain images of male children? This includes but is not limited to depictions of children that do not meet the legal definition of child pornography/child sexual abuse images such as nude images of children, children in swimsuits, as well as children who may be fully clothed, etc.
8.  Did you view, download, or possess videos of child sexual abuse images?
9.  Did you listen to, view, download, or possess videos of child sexual abuse text stories?
10. Why did you stop?
11. During this time frame, how often did you engage in this behavior (e.g., 3 times per week)? _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
12. Please write about your experiences engaging in this behavior. Include specific themes and images for which you searched. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in this behavior.

---

[337] Definition retrieved from the following website: https://www.justice.gov/criminal-ceos/child-pornography.



CDOC/Nelson_00479

13. Where did you store images you found? What did you do with those images once they were in your possession? Where are they now?
14. As of today, do you have an ongoing relationship with any of the people you committed this behavior against? If so, please call your therapist now and schedule a time so you may discuss this further.



CDOC/Nelson_00480

**Behavior:   Create and Distribute Child Sexual Abuse Images/Child Exploitation Materials**

As you work on this section please exclude any sexting as a youth with a same age peer on a consensual basis. If you have questions, please consult your therapist.

**Did you create images of the sexual abuse of children?**                    Yes    No

**Did you distribute images of the sexual abuse of children?**                Yes    No

**If yes, please answer the following questions:**

1.  How many were 12 years old or younger?  _____
    a.  What are/were the gender(s) of the victim(s)?_____
2.  How many were 13 years or older?  _____
    a.  What are/were the gender(s) of the victim(s)?_____
3.  How old were you when you started?  _____
4.  How old were you the last time you did this?  _____
5.  Why did you stop?
6.  During this time frame, how often did you engage in this behavior (e.g., 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
7.  Please write about creating and/or distributing sexually abusive images of children. Include information about how you obtained victims and adult offenders for the creation of the images. Discuss why you chose the specific images and themes to produce and/or distribute. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in this behavior.
8.  Do you now possess sexually abusive images of children?  What did you do with those images once they were in your possession? (If previously discussed in #4, please state so. There is no need to repeat the information.)  Where are the images now?
9.  Are you currently benefiting, financially or otherwise, from any of the images you created and/or distributed?
10. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00481

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

**Behavior:   Plan, Prepare, Assist and/or Provide a Victim for Someone Else to Sexually Assault.**

**Definition:  Sex trafficking involves the coercion of an individual to engage in commercial sex against their will. It is important to note that, according to federal and state law, any person under the age of eighteen years of age induced into commercial sex is a victim of sex trafficking.** [338]

**Did you engage in this type of behavior?                                        Yes    No**
**If yes, please answer the following questions:**

    **1.** Were any of the victims under the age of 18?                              Yes    No
    If Yes:
      a.  How many were 12 years old or younger?  _____
      b.  How many were 13 years old or older?  _____
      c.  What are/were the gender(s) of the victim(s)?_____
2.  How many victims were 18 years old or older?  _____
    a.  What are/were the gender(s) of the victim(s)?_____
3.  How many victims were strangers?  _____
4.  How many victims were relatives?  _____
5.  How many of the victims were intimate partners? _____
6.  How old were you when you started?  _____
7.  How old were you the last time you did this?  _____
8.  Why did you stop?
9.  During this time frame, how often did you engage in this behavior (e.g., 3 times per week)? _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
10. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in this behavior. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
11. Did you take photos or videos while engaged in this behavior?                Yes    No
    If yes:
      a.  What did you do with those images once they were in your possession?
      b.  Where are they now?
12. Are you currently benefiting, financially or otherwise, from such behavior?     Yes   No
**13.** As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist now and schedule a time so you may discuss this further.

---

[338] Definition adapted from the following website: https://sites.google.com/a/state.co.us/cdps-prod/home/human-trafficking-council/resources/basics.



CDOC/Nelson_00482

**Behavior:   Pay (currency/electronic currency, goods or services) Someone to Engage in a Sexual Act.**

**Did you engage in this type of behavior?**                                                      **Yes    No**
**If yes, please answer the following questions:**

1. **Were any of the victims under the age of 18?**                                **Yes    No**
   **If Yes:**
      a.  How many were 12 years old or younger?  _____
      b.  How many were 13 years or older?  _____
      c.  What are/were the gender(s) of the victim(s)?_____
2. How many of the victims were 18 years old or older?  _____
      a.  What are/were the gender(s) of the victim(s)?_____
3. How many victims were strangers?  _____
4. How many victims were relatives?  _____
5. How old were you when you started?  _____
6. How old were you the last time you did this?  _____
7. Why did you stop?
8. During this time frame, how often did you engage in this behavior (e.g., 3 times per week)?  _____. If this answer varies during different periods of your life, please identify those time periods (either by age or month and year) and then list the frequency for those time frames.
9. Please write about engaging in this behavior. You do not have to identify specific individuals, but please describe them as a general group and be clear regarding things like general ages, genders and where you would engage in this behavior. Detail is important so that you and your therapist can better understand the context(s) in which you engaged in these behaviors.
10. Did you take photos or videos while engaged in this behavior?                        Yes   No
    If yes:
      a.  What did you do with those images once they were in your possession?
      b.  Where are they now?
11. As of today, do you have an ongoing relationship with any of the people you committed this behavior against?  If so, please call your therapist **now** and schedule a time so you may discuss this further.



CDOC/Nelson_00483

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

If there are other sexual behaviors not included above but that you have engaged in, please briefly identify them here and then contact your therapist for further discussion (e.g., bondage, submissive/dominance, sadomasochism, masochism, sadism, discipline [BDSM], kinks, role play, rough sex behaviors including choking, hitting, spanking, biting, paraphilias, bestiality).



347

CDOC/Nelson_00484

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Insights

**What insights have you gained from this written journey?**



CDOC/Nelson_00485

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Risk, Needs, Responsivity Principles: Measuring Progress

**The following section addresses risk domains from common risk assessment tools (e.g. VASOR-2 and SOTIPS) that are normed on males who have been convicted of a sexual offense. The specific domains in this section address sexual interests and attitudes. This section is used in conjunction with previously completed sections of this packet to identify protective factors, risks, and needs. This section should also be combined with a dynamic risk assessment on an ongoing basis when assessing risk and need and identifying treatment targets and treatment plan goals.**

*Now that you have completed the sexual history inventory, you should have increased insight into problematic patterns of abusive or unhealthy behaviors. This section should be used to identify relevant risk factors and risk management strategies.*

**Areas to be explored include:**

**Sexual Attitudes and Beliefs[339]**

16. Viewing oneself as sexually entitled

17. Viewing women with hostility

18. Viewing others as objects for sexual pleasure

19. Viewing sexual urges as uncontrollable

20. Believing children can consent to sexual acts

21. Believing sexual activity with children is not harmful

22. Viewing oneself more emotionally congruent with children than adults

23. Prior child abuse behavior

24. Distorted cognitions about sexual offending/abuse

25. Intimacy deficits and problematic relationship(s)

26. Use of sex to regulate emotional state or fulfill the need for intimacy

27. Sexual gratification and instrumental goals such as revenge or humiliation

28. Puts needs of the co-offending partner above self and/or child(ren) and/or victim

---

[339]McGrath, R. J., Lasher, M. P., & Cumming, G. F. (2012). The sex offender treatment intervention and progress scale (SOTIPS): Psychometric properties and incremental predictive validity with static-99 R. *Sexual Abuse: A Journal of Research and Treatment, 24(5)*, 431-458.



CDOC/Nelson_00486

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

29. Evidence of deviant sexual interest

30. Impulsivity

**Note:** Many of the risk factors noted above are recognized in research as those specifically associated with individuals who identify as white, cis-gender, heterosexual males. This list is not exhaustive; however, it also includes risk factors that may relate to cis-gender females. There is not enough established research at this time to determine if these risk factors consistently apply to those who identify as transgender, non-binary, those who do not identify as heterosexual, or individuals of different cultures, ethnicities, or religions.

This section is to be used collaboratively to continue building on identified protective factors and client strengths to prevent re-offense. This is also an opportunity to work on meaningful safety planning and to further individualize treatment planning. As you further discuss sexual risk management the following areas should be explored:

1. Management of emotional states

2. Substance use

3. Comments, thought and behaviors supportive of sexual offending

4. Sexual arousal to offense to inappropriate stimuli



CDOC/Nelson_00487

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Tally Sheet

Clients MUST complete this prior to scheduling the polygraph.  It also must be provided to the examiner at the time of the exam.  *This is essential to the successful completion of the sex history polygraph process.*

*Clients should do their best to be as accurate as possible when determining the number of victims.  When the exact number is unclear, please ensure you are notifying your therapist and polygraph examiner to determine an approximate range*

### SOMB Required Areas of Sexual Offense Disclosure Process

| Behavior | Yes (Check Box) | Number of Victims | How Many Victims Were Minors? |
|---|---|---|---|
| Sexual contact with underage persons (persons younger than age 15 while the offender is age 18 or older) | ❏ | | N/A |
| Sexual contact with relatives whether by blood, marriage, or adoption, or where a relationship has the appearance of a family relationship (a dating or live-in relationship exists with the person(s) natural, step or adoptive parent) | ❏ | | |
| Use of violence to engage in sexual contact including physical restraint and threats of harm or violence toward a victim or victim's family members or pets, through use of a weapon, or through verbal/non-verbal means | ❏ | | |
| Sexual offenses (including touching or peeping) against persons who appeared to be asleep, were drugged, intoxicated or unconscious, or were mentally/physically helpless or incapacitated. | ❏ | | |



351

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Other Areas of Potential Concern

| Behavior | Yes (Check Box) | Number of Victims | How Many Victims Were Minors? |
|---|---|---|---|
| Sexual Contact Since Turning 25 years old, with a Minor 15 or 16 years old | ❏ | | N/A |
| Sexual Contact Before Turning 18 years old with a Person 4 or More Years Younger | ❏ | | N/A |
| Sexual Contact Involving Coercion | ❏ | | |
| Voyeurism | ❏ | | |
| Electronic Voyeurism | ❏ | | |
| Exhibitionism or Exposing Behaviors | ❏ | | |
| Exposing Behaviors via the Internet | ❏ | | |
| Frottage | ❏ | | |
| Sexual Contact while in a Position of Trust | ❏ | | |
| Electronic Solicitation of a Minor | ❏ | | N/A |
| Viewing Images of Child Sexual Abuse (often referred to as child pornography) | ❏ | | N/A |
| Create and Distribute Images of the Sexual Abuse of Minors | ❏ | | N/A |
| Plan, Prepare, Assist and/or Provide a Victim for Someone Else to Sexually Assault | ❏ | | |
| Pay Someone to Engage in a Sexual Act | ❏ | | |

Top of the Document



352

CDOC/Nelson_00489

# Appendix Q: Parole Guidelines for Discretionary Release on Determinate-Sentenced Sex Offenders

These guidelines are designed to inform the Parole Board of information regarding progress in treatment, or criteria information for those not currently in treatment, for determinate-sentenced sexual offenders. Those offenders who have demonstrated treatment progress or meet certain criteria may be better suited for consideration of discretionary parole. These guidelines may be considered as a component in the decision-making process of the Parole Board among other components considered (e.g. lack of mandatory parole, Code of Penal Discipline/institutional behavior, risk assessment, victim input, etc.).

1. In treatment at the Department of Corrections
   A. Use the same treatment criteria as the indeterminate sentence offenders based on the standard format

      1. *Meets the criteria for successful progress in treatment in prison, or*
      2. *Does not meet the criteria for successful progress in treatment in prison*

2. Not in treatment at the Department of Corrections
   A. Not on wait list for treatment (Signified by a "D" designation)

      1. *Lack of recommendation for discretionary parole*

   B. On wait list for treatment (Signified by a "R" designation)

      1. Not designated Sexually Violent Predator (SVP), and
      2. No history of prior sex crime conviction or adjudication (1 sex crime conviction), and
      3. No history of parole or community corrections revocation during the current sentence to the Department of Corrections, and
      4. Does not have a "P" designation signifying a treatment placement refusal or failure.

      *No objection to recommendation for discretionary parole*

   C. On wait list for treatment

      1. Designated a SVP, or
      2. Have 2 or more sex crime convictions or adjudications, including factual basis, or
      3. History of parole or community corrections revocation during the current sentence to the Department of Corrections, or



CDOC/Nelson_00490

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

4. On the waitlist with a "P" designation signifying a treatment placement refusal or failure

   *Objection to recommendation for discretionary parole*

Top of the Document



354

CDOC/Nelson_00491

# Appendix R: Sexual Offenses Identified in Colorado Revised Statute

*The Colorado General Assembly has identified sexual offenses in §16-11.7-102(3). The listed offenses include:*

"Sex offense" means any felony or misdemeanor offense described in this subsection (3) as follows:

(a) (I) Sexual assault, in violation of section 18-3-402, C.R.S.; or
(II) Sexual assault in the first degree, in violation of section 18-3-402, C.R.S., as it existed prior to July 1, 2000;

(b) Sexual assault in the second degree, in violation of section 18-3-403, C.R.S., as it existed prior to July 1, 2000;

(c) (I) Unlawful sexual contact, in violation of section 18-3-404, C.R.S.; or
(II) Sexual assault in the third degree, in violation of section 18-3-404, C.R.S., as it existed prior to July 1, 2000;

(d) Sexual assault on a child, in violation of section 18-3-405, C.R.S.;

(e) Sexual assault on a child by one in a position of trust, in violation of section 18-3-405.3, C.R.S.;

(f) Sexual assault on a client by a psychotherapist, in violation of section 18-3-405.5, C.R.S.;

(g) Enticement of a child, in violation of section 18-3-305, C.R.S.;

(h) Incest, in violation of section 18-6-301, C.R.S.;

(i) Aggravated incest, in violation of section 18-6-302, C.R.S.;

(j) Human trafficking of a minor for sexual servitude, as described in section 18-3-504(2), C.R.S.;

(k) Sexual exploitation of children, in violation of section 18-6-403, C.R.S.;

(l) Procurement of a child for sexual exploitation, in violation of section 18-6-404, C.R.S.;

(m) Indecent exposure, in violation of section 18-7-302, C.R.S.;

(n) Soliciting for child prostitution, in violation of section 18-7-402, C.R.S.;

(o) Pandering of a child, in violation of section 18-7-403, C.R.S.;

(p) Procurement of a child, in violation of section 18-7-403.5, C.R.S.;

(q) Keeping a place of child prostitution, in violation of section 18-7-404, C.R.S.;

(r) Pimping of a child, in violation of section 18-7-405, C.R.S.;

(s) Inducement of child prostitution, in violation of section 18-7-405.5, C.R.S.;

(t) Patronizing a prostituted child, in violation of section 18-7-406, C.R.S.;

(u) Criminal attempt, conspiracy, or solicitation to commit any of the offenses specified in this subsection (3);

(v) Class 4 felony internet luring of a child, in violation of section 18-3-306(3), C.R.S.;



CDOC/Nelson_00492

(w) Internet sexual exploitation of a child in violation of section 18-3-405.4, C.R.S.;

(x) Public indecency, committed in violation of section 18-7-301(2)(b), C.R.S., if a second offense is committed within five years of the previous offense or a third or subsequent offense is committed; or

(y) Invasion of privacy for sexual gratification, as described in section 18-3-405.6, C.R.S.

(z) Unlawful electronic sexual communication, in violation of section 18-3-418; or

(aa) Unlawful sexual conduct by a peace officer, in violation of section 18-3-405.7.

[Top of the Document](#)



CDOC/Nelson_00493

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix S: Use Immunity

Standard 3.160(B)(3) outlines required Core Treatment Components for sex offense-specific treatment and includes "acceptance of responsibility for offending and abusive behavior." However, per Standard 3.162, Clients Who Have Filed an Appeal, there may be instances when the requirement is delayed because a client has filed a filed a direct or post-conviction appeal of the sex crime conviction that, if successful, may result in a new trial. In such cases, if the treatment provider wants to deviate from the Standards, the SOMB requires treatment providers to ask if Use Immunity has been granted by the Court. The purpose of this Appendix is to define and provide guidance regarding Use Immunity.

**What is Use Immunity?**

A person has a constitutional right not to be compelled to be a witness against themselves.[340] This means that a person cannot be forced to answer a question or provide information if the answer to that question or the information that would be provided would put the person at risk of criminal prosecution.[341] Refusing to answer a question or provide information on this basis is sometimes referred to as "asserting Fifth Amendment rights."

A defendant retains their Fifth Amendment rights after conviction, including while serving a probationary or other sentence.[342] This means that clients who have been convicted, but are challenging their conviction or sentence via post-conviction motion or appeal, may assert these rights because of the possibility they will face retrial and that any statements made or information provided may be used against them in that retrial. Importantly, a person cannot rely on an assertion of Fifth Amendment rights to completely refuse to participate in treatment before any question is posed.[343] Rather, to be valid, the right against self-incrimination must be asserted in response to a question or request for information where the answer or response would expose that person to criminal liability.[344]

In the context of treatment, one example of this would be a question posed regarding the crime of conviction. In this example, assume the client makes an admission of criminal sexual behavior related to the crime of conviction instead of exercising their right to remain silent. If the client is successful on appeal, and if a new trial is granted, the prosecution would be able to use that admission of guilt, obtained in treatment, as evidence against the client in the second trial. Therefore, in this circumstance, the client may choose to assert Fifth

---

[340] *People v. Blackwell*, 251 P.3d 468, 474 (Colo. App. 2010).

[341] *People v. Ruch*, 379 P.3d 309, 313 (Colo. 2016); ***People v. Roberson**, 377 P.3d 1039, 1042-43 (Colo. 2016).*

[342] *Roberson*, 377 P.3d at 1043.

[343] *Id.* at 316.

[344] *Id.*



CDOC/Nelson_00494

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Amendment rights and refuse to answer the question, and they cannot be unsuccessfully discharged from treatment (see 3.160(B)(3)(i)) nor face a substantial penalty for doing so.

However, Colorado law provides for the option of a grant of Use Immunity. [345] An order granting Use Immunity means that the prosecution cannot use any information directly or indirectly obtained from the immunized client against the client in any way, including in a second trial if the client's appeal or post-conviction motion is successful. The order granting Use Immunity permits a client who wishes to make admission in treatment, but does not want those admissions used against them in a subsequent proceeding, to fully engage in treatment without fear of that participation being used against them in a future proceeding. Therefore, a client who wishes to fully engage in treatment may request that the prosecution offer, and the judge grant, Use Immunity. Use Immunity can be granted by a judge only at the request of the prosecution. [346]

A Use Immunity Order is enforceable by the judge and binds all prosecutors, state and federal. [347] If questions arise as to whether an answer is protected by a Use Immunity Order, the court must resolve those issues. If Use Immunity has been granted, a client cannot successfully assert Fifth Amendment rights and refuse to answer questions that are covered by the Use Immunity order, [348] and a client can be held in contempt for refusing to answer or suffer other criminal liability. [349] Seeking a Use Immunity agreement can be an effective way to avoid delays in completing treatment while a client is appealing their conviction.

[Top of the Document](#)

---

[345] See § 13-90-118, C.R.S.

[346] *Harding v. People*, 708 P.2d 1354, 1358 (Colo. 1985); *People v. Eggert*, 923 P.2d 230, 233 (Colo. App. 1995).

[347] *People v. Mulberry*, 919 P.2d 835, 837 (Colo. App. 1995); Hood, Will, *Witness Immunity Under Colorado Law*, Colo. Law., December 1998, at 37-8.

[348] *People v. Manning*, 672 P.2d 499, 512-13 (Colo. 1983) ("[u]se-immunity is coextensive with the defendant's privilege against self-incrimination and, when granted, leaves an accused in substantially the same position as if she had not relinquished her constitutional rights at all").

[349] *People v. Mulberry*, 919 P.2d 835, 837 (Colo. App. 1995) ("...pronouncement before the trial court by an immunized witness that he or she will not testify as required by the court's order is a direct criminal contempt"); *People v. Lucero*, 584 P.2d 1208, 1211 (Colo. 1978) ("[t]he court's authority to punish for contempt of court a witness who disobeys an order to testify issued under section 13-90-118...cannot be seriously questioned"); *People v. Castango*, 674 P.2d 978, 979-80 (Colo. App. 1983) (prosecution of defendant who had been granted immunity but persisted in his refusal to testify was not barred by immunity statute or by principles of fairness).



CDOC/Nelson_00495

# Appendix T: Statutory Purview of the Standards and Guidelines for the Assessment, Treatment and Behavioral Monitoring of Adult Sex Offenders

The SOMB recognizes that that the *Standards and Guidelines* can be utilized as best practices, where there are concerns of abusive, harmful, or illegal sexual behavior, in the following situations:

1) Individuals convicted of a sex crime in federal court;

2) Individuals convicted of a sex crime in other states, including those who are being supervised in Colorado under Interstate Compact;

3) Individuals who have been investigated and charged with a sex crime but have not as yet entered a guilty plea, and have individually elected to undergo treatment which is not court ordered;

4) Individuals who were found not guilty by reason of insanity to stand trial of a sex offense; or

5) Individuals ordered to complete an evaluation or treatment under a dependency and neglect order

This is not an exhaustive list and there may be other situations where these *Standards and Guidelines* may serve as best practice.

Finally, under Standard 2.250, evaluators completing pre-plea sex offense-specific evaluations must meet all Standards criteria or note where the evaluation does not comply with Standards, even for clients who do not meet the definition of a sex offender.

Top of the Document



CDOC/Nelson_00496

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix U: Use of Tele-Therapy with Adult Sex Offenders

1) Prior to using teletherapy as a modality, the provider shall have training (formal training or informal training through supervision)  specific to this modality.

2) Providers using teletherapy shall ensure the platform utilized complies with all HIPAA and confidentiality requirements.

3) Providers using teletherapy shall have procedures in place to complete and transmit treatment assignments, safety plans, and other necessary documents.

4) Except in extenuating circumstances, if conducting teletherapy both the client and the provider must be residing in the state of Colorado.  If the client is residing in a state other than Colorado, the provider must follow any licensing requirements of the state the client is residing in as well as licensing requirements of Colorado.

5) The provider shall provide opportunities for both in-person and teletherapy sessions.

6) The provider shall have an established therapeutic relationship with the client, or clients for group therapy,  prior to considering the use of teletherapy.  If considering the use of teletherapy the provider shall:

    a. Check with the client(s) to determine if this is a modality they are comfortable with and want to pursue.

    b. Collaborate and consult with the CST/MDT regarding the clinician's recommendation/decision for teletherapy.

    c. Determine if there are any concerns that would impact the client's level of engagement or ability to attend teletherapy sessions (e.g. DD/ID concerns, specific responsivity needs, substance use concerns, concerns about inability to determine sexual arousal to specific topics, etc.).

    d. Determine that the client(s) has a safe and confidential space to participate in teletherapy.

    e. Determine if body language can appropriately be assessed via teletherapy.

7) When conducting teletherapy the provider shall have a dedicated workspace that is free from distractions and ensures confidentiality.



CDOC/Nelson_00497

    a. Providers shall not engage in non-session related tasks or activities while conducting teletherapy sessions (e.g. driving, recreation activities, tending to others, tending to non-session related work, etc.).

    b. Providers shall not have other individuals present during teletherapy sessions, with the exception of co-therapists, additional clients within group therapy, or approved MDT/CST members.

8) When conducting teletherapy the provider shall ensure they know the current location of the client(s) in the event an emergency occurs that would necessitate calling emergency personnel (e.g. suicidal ideation)

9) When initiating teletherapy the provider shall inform the client(s) of the parameters of teletherapy and have a signed agreement by the client(s) of their agreement to participate in teletherapy as well as the client's agreement to abide by the established parameters. Parameters shall, at a minimum, include:

    a. The reason teletherapy is being utilized (distance of client to services, medical conditions, lack of resources to support in person therapy, community risk, etc.)

    b. Agreement by the client(s) not to engage in non-therapy related activities during the session (e.g. driving, working, tending to others, recreational activities, use of substances, etc.).

    c. Agreement by the client(s) not to have anyone else in the session unless approved by the CST/MDT. This does not apply to other clients who are part of group therapy.

    d. Agreement by the client(s) to remain active and engaged during the session.

10) During the course of teletherapy the provider shall check in with the client(s) once per quarter to determine if teletherapy is meeting the client's needs, if adjustments are needed, and if the client(s) wishes to continue or discontinue teletherapy.

11) When conducting teletherapy the provider shall ensure the service matches the client's needs in relation to length and frequency in the same manner as would be provided with in-person sessions. The focus of teletherapy sessions shall follow the established goals and objectives for the client.

12) When conducting teletherapy the provider shall follow all SOMB standards and guidelines and ethical codes of conduct in the same manner as is expected during in-person therapy sessions.

13) When conducting teletherapy the provider shall provide regular updates to CST/MDT regarding participation, limitations, and how the rationale for teletherapy services may impact other activities of the client(s) (e.g. if teletherapy is being provided due to a community safety risk such as a pandemic, other community access/activities should be reviewed by the team).

14) When conducting teletherapy, in person sessions must be provided on the following schedule;



CDOC/Nelson_00498

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    a. Once per quarter for sessions provided on a monthly basis
    b. Once per quarter for sessions provided on a bi-weekly basis
    c. Once per month for sessions provided on a weekly basis

15) In rare cases the CST/MDT, in collaboration with the client(s), is authorized to modify any of the above criteria based on extenuating factors of the client that prevent the criteria from being met as written. If modifying the above criteria, the treatment provider shall document in the client's file the extenuating circumstances that warrant the modification, which criteria are being modified, and how client and community safety are addressed through the modification.  Such situations include, but are not limited to,
    a. Medical conditions of the client,
    b. Geographical/transportation barriers (distance, travel time, road conditions, transportation resources, etc.)  of the client relative to the service provider,
    c. Lack of reliable transportation that cannot be accommodated and would result in a barrier to treatment if criteria are not modified,
    d. Safety concerns that prevent the criteria from being followed and would result in a barrier to treatment if criteria are not modified

[Top of the Document](#)



CDOC/Nelson_00499

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix V: Resource List for Evaluators: Tools and Instruments for Sex Offense-Specific Evaluations

The Adult Standards and Guidelines indicate that Approved Evaluators shall administer assessment tools in accordance with the tool's user's manual. The following list is provided as a reference list for evaluators and does not include all possible assessments that may be used by Approved Evaluators. It is important for Approved Evaluators to note that assessment tools are often updated, and the most current version of the tool should be used. It is the responsibility of the Approved Evaluator to use the most appropriate and updated assessment tool within their area of competence.

All web links below are public domain, and do not necessarily have direct access to the specific assessment. Many of the assessment tools listed are proprietary and may require specialized training and approval for access and use. This information is intended to provide information on each assessment but is not intended to allow access to the assessment instruments and/or tools. The SOMB does not promote or endorse specific tools or instruments and does not have a financial stake in any of the tools listed. This list is informational only.

*Child Contact Screen:*

- Child Abuse Potential Inventory (CAPI)
  - https://www.parinc.com
- Parent-Child Inventory
  - https://www.wpspublish.com
- Parental Stress Index (PSI)
  - https://www.parinc.com
- Risk of Sexual Abuse of Children (ROSAC)
  - McGrath Psychological Services, P. C. :: ROSAC

*Cognitive, Intellectual Testing & Mental Status*

- Adaptive Behavior Assessment System™, Third Edition (ABAS™-3) (Adaptive functioning measure)
  - ABAS-3 Adaptive Behavior Assessment System 3rd Edition
- Bender Visual-Motor Gestalt Test
  - Bender Visual-Motor Gestalt Test | Second Edition
- BETA - Culture free test of intelligence-this link is to  Cattel's Culture Fair Intelligence Test
  - CATTELL'S CULTURE FAIR INTELLIGENCE TEST 'S CULTURE FAIR INTELLIGENCE TEST

- Bilingual Verbal Abilities Test (BVAT)
  - Bilingual Verbal Ability Tests (BVAT-NU) Normative Update
- Boston Naming Test



CDOC/Nelson_00500

- o [Boston Naming Test-Second Edition](#)
- CNS Vital Signs
  - o [CNS Vital Signs](#)
- Cognistat Cognitive Assessment
  - o [Purchase Cognistat | Cognistat Cognitive Assessment](#)
- Halstead-Reitan Neuropsychological Battery
  - o [Complete Halstead-Reitan Neuropsychological Test Battery for Adults and Older Children](#)
- Interference Procedure Luria tests
  - o [Luria Sequence (Luria's Test) - PsychDB](#)
- Kaplan-Baycrest Neurocognitive Battery
  - o [Kaplan Baycrest Neurocognitive Assessment](#)
- Kaufman Test of Educational Achievement (K-TEA)
- Kaufman Brief Intelligence Test (KBIT)
  - o [Kaufman Brief Intelligence Test | Second Edition](#)
- Leiter International Performance Scale
  - o [https://www.wpspublish.com/leiter-3-leiter-international-performance-scale-third-edition](https://www.wpspublish.com/leiter-3-leiter-international-performance-scale-third-edition)
- Mini-Mental State Exam
  - o [https://www.parinc.com/Products/Pkey/238](https://www.parinc.com/Products/Pkey/238)
- Montreal Cognitive Assessment (MoCA)
  - o [https://www.mocatest.org/](https://www.mocatest.org/)
- Ravens Standard Progressive Matrices (for non-English speakers/readers)
  - o [https://classicaliqtest.com/raven-test/](https://classicaliqtest.com/raven-test/)  -online version of test
- Repeatable Battery for the Assessment of Neuropsychological Status Update (RBANS)
  - o [RBANS Assessment of Neuropsychological Status Update](#)
- Shipley Institute of Living Scale Revised
  - o [Shipley Institute of Living Scale: Shipley-2 | PAR](#)
- Slosson Intelligence Test – Revised
  - o [Slosson Intelligence Test-Revised (SIT-4) | PAR](#)
- Saint Louis University Mental Status (SLUMS)
  - o [SLU Mental Status Exam](#)
- Stanford Binet
  - o [Stanford-Binet Intelligence Scales, 5th Edition (SB5) | PAR](#)
- Test of Memory and Learning (TOMAL)
  - o [Test of Memory and Learning, Second Edition](#)
- Test of Non-Verbal Intelligence (TONI)
  - o [Test of Nonverbal Intelligence | Fourth Edition](#)
- Trail Making Test
  - o [Trail Making Test](#) (pdf)
- Trauma History Screen:
  - o [https://www.ptsd.va.gov/professional/assessment/te-measures/ths.asp](https://www.ptsd.va.gov/professional/assessment/te-measures/ths.asp)
- Trauma Screening Questionnaire:
  - o [https://www.ptsd.va.gov/professional/assessment/screens/tsq.asp](https://www.ptsd.va.gov/professional/assessment/screens/tsq.asp)
- Trauma Assessment for Adults:
  - o [https://www.ptsd.va.gov/professional/assessment/te-measures/taa.asp](https://www.ptsd.va.gov/professional/assessment/te-measures/taa.asp)
- TBI Screening Tool
  - o [TBI Screening Tool | BrainLine](#)
- Vineland Adaptive Behavior Scales (Vineland™)



CDOC/Nelson_00501

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

- o [Vineland Adaptive Behavior Scales | Third Edition](#)
- Wechsler Adult Intelligence Scale (WAIS)
  - o [WAIS-IV Wechsler Adult Intelligence Scale 4th Edition](#)
- Wechsler Memory Scale
  - o [WMS-IV Wechsler Memory Scale 4th Edition](#)
- Wechsler Individual Achievement Test
  - o [Wechsler Individual Achievement Test | Fourth Edition (WIAT-4)](#)
- Wide Range Achievement Test
  - o [WRAT5 Wide Range Achievement Test, Fifth Edition](#)
- Wisconsin Card Sort Test
  - o [Wisconsin Card Sorting Test | WCST](#)
- Woodcock-Johnson Psychoeducational Battery, Revised
  - o [Woodcock-Johnson IV | WJ-IV | Psychoeducational Assessment | Nelson](#)

### *Protective Factors*

- Protective + Risk Observations For Eliminating Sexual Offense Recidivism - PROFESOR
  - o [Profesor](#)
- SAPROF/SAPROF-SO
  - o [SAPROF - Sexual Offending](#)

### *Psychological Assessments:*

- Beck Depression Inventory (BDI)
  - o [https://www.pearsonassessments.com](https://www.pearsonassessments.com)
- Brief Psychiatric Rating Scale
  - o [BPRS Brief Psychiatric Rating Scale](#)
- Brief Symptom Inventory (BSI)
  - o [https://www.pearsonassessments.com](https://www.pearsonassessments.com)
- Millon Clinical Multiaxial Inventory (MCMI)
  - o [https://www.pearsonassessments.com](https://www.pearsonassessments.com)
- Minnesota Multiphasic Personality Inventory (MMPI)
  - o [https://www.pearsonassessments.com](https://www.pearsonassessments.com)
- Personality Assessment Inventory (PAI)
  - o [https://www.parinc.com](https://www.parinc.com)
- Psychopathy Checklist/Psychopathy Checklist Screening Version
  - o [The Hare Psychopathy Checklist-Revised (PCL-R)](#)
  - o [https://www.pearsonassessments.com](https://www.pearsonassessments.com)
- Rorschach
  - o [https://www.parinc.com](https://www.parinc.com)
  - o [https://r-pas.org](https://r-pas.org)
- State-Trait Anger Inventory
  - o [https://www.parinc.com](https://www.parinc.com)
- Sentence Completion Series
  - o [https://www.parinc.com](https://www.parinc.com)



CDOC/Nelson_00502

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

- Symptom Checklist 90- Revised (SCL-90-R)
  - https://www.pearsonassessments.com
- Symptom Assessment-45
  - https://www.cognitivecentre.com
- Trauma Symptom Inventory (TSI)
  - https://www.parinc.com

*Sexual History, Interest & Arousal Testing*

- Adaptive Behavioral Assessment System
  - ABAS-3 Adaptive Behavior Assessment System 3rd Edition
- Bender Visual-Motor Gestalt Test
  - Bender Visual-Motor Gestalt Test | Second Edition
- Bender Visual-Motor Gestalt Test | Second Edition
- BETA - Culture free test of the intelligence-this link is to  Cattel's Culture Fair Intelligence Test
  - CATTELL'S CULTURE FAIR INTELLIGENCE TEST 'S CULTURE FAIR INTELLIGENCE TEST
- Bilingual Verbal Abilities Test (BVAT)
  - Bilingual Verbal Ability Tests (BVAT-NU) Normative Update
- Boston Naming Test
  - Boston Naming Test-Second Edition
- Clarke Sex History Questionnaire for Males-Revised
  - Comprehensive Report Clarke Sex History Questionnaire for Males-Revised
- CNS Vital Signs
  - CNS Vital Signs
- Cognistat Cognitive Assessment
  - Purchase Cognistat | Cognistat Cognitive Assessment
- Halstead-Reitan Neuropsychological Battery
  - Complete Halstead-Reitan Neuropsychological Test Battery for Adults and Older Children
- Kaplan-Baycrest Neurocognitive Battery
  - Kaplan Baycrest Neurocognitive Assessment
- Kaufman Test of Educational Achievement (K-TEA) (for ages 4 to 25– want to keep this?)
  - KTEA-3 Kaufman Test of Educational Achievement 3rd Ed
- Kaufman Brief Intelligence Test (KBIT)
  - KBIT-2 Kaufman Brief Intelligence Test 2nd Edition
- Leiter International Performance Scale
  - (Leiter-3) Leiter International Performance Scale, Third Edition
- Mini-Mental State Exam
  - MMSE-2 - Mini-Mental State Examination Second Edition
- Montreal Cognitive Assessment (MoCA)
  - MoCA
- Multidimensional Inventory of Development, Sex, and Aggression (MIDSA)
  - MIDSA Clinical Manual
- Multiphasic Sex Inventory
  - https://www.nicholsandmolinder.com/sex-offender-assessment-msi-ii.php\



CDOC/Nelson_00503

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

- Penile Plethysmography (PPG)
  - http://www.btimonarch.com/m21.html
- Personal Sentence Completion Inventory – Miccio-Fonseca
  - MEGA - Miccio-Fonseca
- Ravens Standard Progressive Matrices (for non-English speakers/readers)
  - Raven's Progressive Matrices test | Wechsler Adult Intelligence Scale
    - online version of test
- Repeatable Battery for the Assessment of Neuropsychological Status Update (RBANS)
  - RBANS Assessment of Neuropsychological Status Update
- Shipley Institute of Living Scale Revised
  - Shipley Institute of Living Scale: Shipley-2 | PAR
- Slosson Intelligence Test – Revised
  - Slosson Intelligence Test-Revised (SIT-4) | PAR
- Saint Louis University Mental Status (SLUMS)
  - SLU Mental Status Exam
- SONE Sexual History Background Form
- Stanford Binet
  - (SB-5) Stanford-Binet Intelligence Scales, Fifth Edition
- Test of Memory and Learning (TOMAL)
  - TOMAL-2 Test of Memory and Learning Second Edition
- Test of Non-Verbal Intelligence (TONI)
  - TONI-4 Test of Nonverbal Intelligence Fourth Edition
- Trail Making Test
  - Instructions for Trail Making test: Part A Sample A
- Vineland Adaptive Behavior Scales (Vineland™)
  - Vineland Adaptive Behavior Scales | Third Edition
- Wechsler Adult Intelligence Scale (WAIS)
  - Wechsler Adult Intelligence Scale | Fourth Edition
- Weschler Memory Scale
  - WMS-IV Wechsler Memory Scale 4th Edition
- Wide Range Achievement Test
  - WRAT5 Wide Range Achievement Test, Fifth Edition
- Wechsler Individual Achievement Test
  - Wechsler Individual Achievement Test | Fourth Edition (WIAT-4)
- Wisconsin Card Sort Test
  - Wisconsin Card Sorting Test | WCST
- Woodcock-Johnson Psychoeducational Battery, Revised
  - Woodcock-Johnson IV | WJ-IV | Psychoeducational Assessment | Nelson
- Wilson Sexual Fantasy Questionnaire
  - Wilson Sex Fantasy Questionnaire

- Viewing Time (VT)
  - Abel
    - Abel Screening
  - Look
    - LOOK Assessment
  - Affinity



CDOC/Nelson_00504

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

*Risk Assessments, Tools & Instruments*

- Acute 2007
  - ACUTE-2007 Tally Sheet – SAARNA
  - STABLE-2007/ACUTE-2007 – SAARNA
- Assessment of Risk and Manageability of Individuals with Developmental and Intellectual Limitations Who Offend - Sexually (ARMIDILO-S)
  - ARMIDILO-S
- Child Pornography Offender Risk Tool (CPORT)
  - CHILD PORNOGRAPHY OFFENDER RISK TOOL (CPORT) | Michael C Seto | 27 updates | 17 publications | Research Project
- Inventory of Offender Risk, Needs, and Strengths (IORNS)
  - Inventory of Offender Risk, Needs, and Strengths (IORNS) | PAR
- Level Of Supervision Inventory-Revised LSI-R
  - LSI-R
- MnSOST
  - Minnesota Sex Offender Screening Tool Revised (MnSOST-R)
- Profesor
  - Profesor
- Sex Offender Treatment Intervention and Progress Scale (SOTIPS): Please ensure you receive training and materials from the SOMB or Colorado Trainer due to changes in the manual
  - McGrath Psychological Services, P. C. :: SOTIPS
- Static 99R or 2002R
  - SAARNA
- Stable 2007
  - Stable-2007 Coding Manual (2014) – SAARNA
  - STABLE-2007/ACUTE-2007 – SAARNA
- SVR
  - Sexual Violence Risk-20, Version 2 (SVR-20 V2) | PAR
- Vermont Assessment of Sex Offender Risk (VASOR-2): Please ensure you receive training and materials from the SOMB or Colorado Trainer due to changes in the manual
  - McGrath Psychological Services, P. C. :: VASOR-2

- Violence Risk Scale: Sexual Offenders VRS:SO
  - VRS-SO | Psynergy Consulting
  - Violence Risk Scale: Sexual Offenders (VRS:SO)
- Violence Risk Assessment Guide (VRAG)
  - http://www.vrag-r.org/

*Other Risk Assessments, Tools & Instruments*

- Abel Substance Use Scale
  - Abel Screening Inc.
- Adverse Childhood Experiences Scale (ACES)
  - About the CDC-Kaiser ACE Study |Violence Prevention|Injury Center|CDC
- Clinical Analysis Questionnaire
  - Clinical Analysis Questionnaire | SpringerLink



CDOC/Nelson_00505

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

- Adult Substance Use Survey Revised
  - ASUS-R Adult Substance Use Survey - Revised (aodassess.com)
- Alcohol Use Questionnaire Drug and Alcohol History
  - Adult Alcohol Use Questions: List of Questionnaires (cdc.gov)
    Alcohol Dependence Scale (ADS)
  - Alcohol Dependence Scale (ADS) – Addiction Research Center – UW-Madison (wisc.edu)
    The Drug Abuse Screening Test (DAST)
  - Instrument: Drug Abuse Screening Test (DAST-10) | NIDA CTN Common Data Elements
- DVRNA
  - DVOMB Standards (2.23.2021).pdf (state.co.us)
- (See Section 4.06)
  - multi-health-systems-usd (mhs.com)
- Hare Psychopathy Checklist-Revised
  - (PDF) Hare Psychopathy Checklist (PCL) (researchgate.net)
- LSI-R
  - LSI-R
- Personal History Questionnaire
  - PHQ - JRA, INC. (jra-assessment.com)
- Sexual Sadism/SESAS
  - Items in the Severe Sexual Sadism Scale (SESAS; Nitschke, Osterheider,... | Download Scientific Diagram (researchgate.net)
  - Convergent Validity of Three Measures of Sexual Sadism: Value of a Dimensional Measure - PubMed (nih.gov)
- Simple Screening Instrument for Alcohol and Other Drugs (SSI-AOD)
  - Simple Screening Instruments for Outreach for Alcohol and Other Drug Abuse and Infectious Diseases - PubMed (nih.gov)
- Substance Abuse Subtle Screening Inventory (SASSI)
  - The SASSI Institute
- Substance Use History Matrix
- Client's Handbook: Matrix Intensive Outpatient Treatment for People With Stimulant Use Disorders

Top of the Document



CDOC/Nelson_00506

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

# Appendix W: Lifetime Supervision Criteria

**Establishment of the Lifetime Supervision Act**

In 1998, the Colorado General Assembly passed legislation directing the Sex Offender Management Board  (hereafter SOMB), in collaboration with the Department of Corrections, the Judicial Branch and the Parole Board to establish the criteria by and the manner in which a sex offender who is subject to lifetime supervision may demonstrate that he or she would not pose an undue threat to the community if released  on parole or to a lower level of supervision while on parole or probation or if discharged from parole or  probation and the methods of determining whether a sex offender has successfully progressed in  treatment (18-1.3-1009 C.R.S.).  Only those individuals who have committed an offense listed under 18-1.3-1003 (5) C.R.S, after November 1, 1998, are subject to a mandatory sentence under the Lifetime Supervision Act (LSA).

**Statutory Requirement and Creation of Criteria**

Previously, the SOMB, Department of Corrections, the Judicial Department and the Parole Board, collaborated to establish criteria which was incorporated as an Appendix to the Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders. The SOMB recognizes that treatment and management of individuals convicted for a sexual offense is a developing specialized field, subject to constantly emerging research-based changes. The Colorado Legislature has directed, in the SOMB's enabling statute, "The board shall revise the guidelines and standards for evaluation, identification, and treatment, as appropriate, based upon the results of the board's research and analysis." In order to ensure the SOMB remains consistent with current research and known best practices, the four impacted entities have agreed that the Probation Department and the Division of Parole will create, follow, and maintain criteria specific to the needs of offenders who fall under the Lifetime Supervision Act (LSA), as well as their agency in collaboration with the SOMB per the statute (18-1.3- 1009 C.R.S.).

The Department of Corrections, which includes the Division of Adult Parole and the Sex Offender Treatment and Monitoring Program (SOTMP), follow the Administrative Regulations for the Management of Offenders with an Identified Sex Offense and the Sex Offender Treatment and Monitoring Program. These Administrative Regulations also impact the way in which the Parole Board and Community Parole Officers address those individuals sentenced under the LSA who under the supervision of Department of Corrections'.

Probation Officers who provide supervision of individuals sentenced under the LSA and serving a probation sentence utilize the *Criteria for Reduction in Level of Supervision while on Probation and Discharge from Probation.*

Supervising parole and probation officers utilize the Criteria created by their respective agencies in consultation with the SOMB approved provider in making recommendations to the court and/or the



CDOC/Nelson_00507

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

Parole Board regarding release, reduction in levels of supervision, and discharge of sex offenders. These Criteria do not stand alone. Community Supervision Teams (CSTs) should work collaboratively in determining whether an offender meets the Criteria set forth by their respective agency. Treatment for sex offenders under lifetime supervision must be consistent with the existing SOMB Standards and Guidelines, and the policies and procedures of the individual supervising agencies.

Approved treatment providers and evaluators shall assess an offender's progress in treatment based the Standards and Guidelines for the Treatment, Evaluation, Assessment and Behavioral Monitoring of Adult Sex offenders, including 3.160 (B) regarding the Core Treatment Concepts, and 3.20 (A) regarding the criteria for successful completion of treatment.

**Application of Criteria**

Colorado law requires the use of the Lifetime Supervision Act criteria for purposes of making recommendations at several stages of a sentence.  Recommendations based on the Lifetime criteria must be provided to the Judge or Parole Board by the department of corrections, treatment providers, probation officers, and/or community parole officers, as applicable, at the following stages:

Whether a person serving a probationary sentence should have their sentence discharged (end their sentence successfully).

Whether a person serving a prison sentence should be granted parole.

Whether a person on parole should be granted a reduced level of supervision.

Whether a person on parole should have the sentence discharged (end their sentence successfully).

The Judge or Parole Board are not required to make decisions based upon the Lifetime Supervision criteria or recommendations. In other words, the criteria do not limit the decision-making authority of the Judge or Parole Board. Should the Judge or Parole Board make a ruling inconsistent with the recommendations provided, they must make findings on the record in support of their decision. § 16-11.7-103(4)(f), C.R.S.

Additionally, for people serving a prison sentence under the Lifetime Supervision Act who have not met the criteria to be released on parole but who are applying to be transferred to a community corrections facility, the Department of Corrections must consider the Lifetime Supervision criteria among other factors in deciding whether to permit the transfer. [C.R.S. Section 18-1.3-301(2)(f)]

**Revisions to Criteria**

Revisions or additions to the policies and administrative regulations which impact those that fall under the Lifetime Supervision Act shall be established in collaboration with the SOMB. The SOMB will review all revisions or changes to policies and regulations consistent with the legislative intent to establish "evidence-based standards for the evaluation, identification, treatment, management, and monitoring of adult sex offenders" (16.11.7-101(2) C.R.S).  All policies and administrative regulations will be made available through each agency and also be made public in electronic form on the SOMB Website.



CDOC/Nelson_00508

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

https://dcj.colorado.gov/boards-commissions/sex-offender-management-board

Department of Corrections:

> Administrative Regulation 250-48: Management of Offenders with an Identified Sex Offense:
>
> 0250_48_02012023.pdf - Google Drive
>
> Administrative Regulation 700-19: Sex Offender Treatment and Monitoring Program:
>
> 0700_19_07012022.pdf - Google Drive
>
> https://www.colorado.gov/pacific/cdoc/policies-1

Judicial Branch:

> *Criteria for Reduction in Level of Supervision while on Probation and Discharge from Probation:*
>
> https://www.courts.state.co.us/userfiles/file/Administration/Probation/LifetimeCriteriaReductioninSupervisionLS3_000.pdf
>
> *https://www.courts.state.co.us/Administration/Division.cfm?Division=prob*

Top of the Document



CDOC/Nelson_00509

*Colorado Sex Offender Management Board*
*Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

## Research and Citations:

The Lifetime Supervision Criteria are constructed utilizing the work and research performed in the creation and implementation of the *Vermont Assessment of Sex Offender Risk-2* (VASOR) and the *Sex Offender Treatment Intervention and Progress Scale* (SOTIPS). These two tools are research validated instruments that have undergone revisions when necessary to address newly identified issues or areas of new research. Should these instruments undergo radical research-based changes in the future it will be reflected accordingly in the Lifetime Criteria that use the instruments as their base.

McGrath, R. J., Hoke, S. E., & Lasher, M. P. (2013). *Vermont Assessment of Sex Offender Risk-2 Manual*. Retrieved from: http://robertmcgrath.us/files/8114/3151/8067/VASOR2_Manual_October_2013.pdf

McGrath, R.J., Hoke, S. E., & Lasher, M. P. (2013) *Sex Offender Treatment Intervention and Progress Scale Manual*. Retrieved from:

http://robertmcgrath.us/files/2614/3147/6781/SOTIPS_MANUAL_October_2013.pdf



CDOC/Nelson_00510